No. 3:12-cv-469

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

_____

ROBERT SPARKS,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the Criminal District Court No. 3 of Dallas County

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

**SETH KRETZER**                          **JONATHAN LANDERS**
SBN: 24043764                             SBN: 24070101

The Lyric Center                          2813 W. T.C. Jester
440 Louisiana Street; Suite 200           Houston, Texas 77018

Houston, TX 77056
(713) 775-3050 (office)                   (713) 301-3153 (Office)
(713) 224-2815 (fax)                      (713) 685-5020 (fax)
*email: seth@kretzerfirm.com*             *e-mail: jlanders.law@gmail.com*
Court-Appointed Attorneys for the Petitioner

1

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, ROBERT SPARKS, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice.  This application follows his conviction and death sentence in the Criminal District Court No. 3 of Dallas County, cause number F08-01020-VJ styled *State v. Robert Sparks.*

Sparks is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number F08-01020-VJ styled *State v. Robert Sparks.*  (See, Exhibit "A").

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record for Petitioner, ROBERT SPARKS, certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Robert Sparks | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center<br>440 Louisiana Street<br>Suite 200<br>Houston, TX 77002<br>(713) 775-3050 (direct)<br>(713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Jonathan Landers | Jonathan Landers<br>2813 W. T.C. Jester<br>Houston, Texas 77018<br>(713) 301-3153 – (phone)<br>(713) 685-5020 – (fax) | Appointed attorney for current federal habeas |
| Mr. Paul Johnson | Mr. Paul Johnson<br>311 North Market Street; #300<br>Dallas, TX 75202 | Trial Counsel |
| Mr. Lalon "Clipper" Peale | Lalon "Clipper" Peale<br>901 Main Street, Suite 6300<br>Dallas, TX 75202 | Trial Counsel |
| Mr. David Richards | David Richards<br>204 West Central Avenue<br>Ft. Worth, TX 76164<br>(817) 332-5567 (Phone) | state writ lawyer |

3

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Mr. John Tatum | 990 South Sherman Street<br>Richardson Texas 75081<br>(972) 705-9200 | State direct appellate lawyer |
| | | |
| | | |
| **Respondent** | | |
| The Hon. Mr. Greg Abbott | | Texas Attorney General |
| Mrs. Ellen Stewart-Klein | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548,<br>Capitol Station<br>Austin, TX 78711-2548<br>(512) 936-1600 (voice)<br>(512) 320-8132 (fax) | Asst. Attorney General |
| **Judges** | | |
| Honorable Robert Francis | Criminal District Court No. 3 of Dallas County<br>Frank Crowley Courts Bldg.<br>133 N. Riverfront, 6th Fl.<br>Dallas, Texas 75207 | Trial Judge (Retired) |
| Honorable Gracie Lewis | Criminal District Court No. 3 of Dallas County<br>Frank Crowley Courts Bldg.<br>133 N. Riverfront, 6th Fl.<br>Dallas, Texas 75207 | State Writ – District Court Judge |
| | | |

## DESIGNATION OF ABBREVIATIONS and
## EXPLANATION OF THE TRIAL RECORD

"RR" refers to reporter's record from the state trial court.  "CR" refers to clerk's record from state trial court.

4

## STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## CIRCUMSTANCES SURROUNDING THE FILING OF THIS PETITION

Sparks's direct appeal to the Court of Criminal Appeals (CCA) was decided on October 29, 2010.  *Sparks v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 629.

Sparks's state writ was filed on August 25, 2010.  The state writ was pending until December 14, 2011, when the CCA ruled.  *Ex parte Sparks*, 2011 Tex. Crim. App. Unpub. LEXIS 919.  Sparks's AEDPA deadline is therefore December 14, 2012.  28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

## AN AMENDED PETITION WILL BE FORTHCOMING

This initial petition should be considered a notice pleading that counsel has put together in good faith and in compliance with the relevant rules, using information that is true to the best of counsel's current knowledge and beliefs about the state court proceedings in this matter and the constitutional violations that occurred therein.  *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Court ("Habeas Rules") (outlining general requirements for a federal habeas petition's contents).

This District Court recognized the same, noting in its November 9 scheduling order that "Petitioner shall file an original petition for writ of habeas corpus on or before Friday, December 7, 2012, in accordance with the agreement of the parties to file a 'skeletal' petition."  (Doc. No. 8).

When filed, the amended petition will contain a complete and detailed analysis of the facts and law underlying each claim and will contain a detailed description of the

factual background of the case, none of which was possible due to the severe time limitations of the current Federal Habeas Corpus statutes.

## EXHAUSTION

Sparks states that most of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1]  Some claims, however, were not fully presented to the state court, were not ripe for review, or could only be raised in this forum.

Sparks expressly reserves his right to amend this petition.  In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition."  Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition.  *Id*. at 497-98.  Sparks believes additional claims may be identified following a further review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held.  At the appropriate time during these proceedings, Sparks will present any additional claims through amendments to the petition.

---

[1]The burden is on Respondents to demonstrate that Sparks failed to exhaust a particular claim.  *See, e.g.*, *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d 902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

## PROCEDURAL HISTORY

**A.    *Procedural History in State Court.***

In the superseding indictment filed on September 30, 2008, Sparks was charged in cause number F-00801020-VJ with intentionally and knowingly causing the deaths of Raekwon Agnew and Harold Sublet, Jr., by stabbing and cutting them with a knife, during the same criminal transaction. (C.R. Vol.1, p. 2;). Sparks was arrested and held without bond. The State of Texas had previously given notice of their intent to seek the death penalty. (C.R. Vol.1, p. 23). Trial began on December 2, 2008; on December 4th, the jury was charged, closing arguments were delivered, and the jury convicted. (R.R. Vol 36, p. 1; R.R. Vol 38, p.17-32). The punishment phase of trial began on December 8 and concluded on December 10. (R.R. Vol 39, p. 1-R.R. Vol. 42, p. 259). On December 11, Sparks was sentenced to death upon the jury's answers to the special issues. (R.R. Vol 42, p. 8; C.R. Vol. 2, p. 500).

Sparks's direct appeal to the Court of Criminal Appeals (CCA) was decided on October 29, 2010. *Sparks v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 629.

Sparks' state writ was filed on August 25, 2010. The state writ was pending until December 14, 2011, when the CCA ruled. *Ex parte Sparks*, 2011 Tex. Crim. App. Unpub. LEXIS 919.

**B.    *Procedural History in Federal Court***

On February 14, 2012, Sparks filed a motion for appointment of counsel. (Doc. No. 2). On March 27, this Court appointed Seth Kretzer as lead counsel. (Doc. No. 3). On May 8, this Court granted Kretzer's motion for appointment of Jonathan Landers as co-counsel. (Doc. No. 4).

## STATEMENT OF FACTS

[This statement of facts is meant to give the court an initial understanding of the proceedings in question, and will be finalized in the forthcoming amended writ.]

It is undisputed that Petitioner Sparks, on September 15, 2007, murdered his wife, Chare Agnew, and his step sons, Reaqwon Agnew and Harold Sublet, by stabbing them multiple times. He also sexually assaulted his step daughters Garysha and Lekenya. It also undisputed that Sparks was convinced his family was had been attempting to poison him, and that he suffered from a severe mental illness at the time of the murders.

### Sparks believed he was being poisoned by the victims and told everyone he could, even the local news

Immediately after the murders Sparks went to see the mother of his only child, Shunta Alexander. (R.R. Vol. 36, p.34-52). Mrs. Alexander explains that Sparks was crying, and not acting like himself. *Id.* He told his her that he had just killed Chare and the boys because they had been poisoning him. *Id.* Mrs. Alexander convinced Sparks to call the police and report what he had done, he did. (R.R. Vol.36, p.29) (State Ex. 1). During the call he explained that he had just killed his wife and step sons because they had been putting "shit" in his food. *Id.* After he left he Mrs. Alexander's house he drove to a cousins house and got a ride to the grey hound bus station, where he bought a ticket to Austin.

The next day, Sparks somehow directly called one of the detectives working the murder scene, Detective Perez. (R.R. Vol. 36, p. 132-34). He wanted to know if the police had found the recordings he had made prior to the murder, which he believed would be proof that his family was conspiring against him. *Id.* The detective had found the tapes, but the tapes did not show what Sparks expected, they were closer to gibberish. *Id.* at 39; State Ex. 117.

Three days after the murder the defendant was arrested after a twenty to thirty car chase in Dallas. *Id.* at 140-142. During the chase the defendant fired two shots in the air before

throwing his gun out of the window, and upon being apprehended requested the police to "just shoot me." *Id.*

The local news channels got wind of the chase and captured it on video. *Id.* at 150. Indeed, a Channel 8 reporter was lucky enough to asks Sparks a question while he was being escorted by police to a waiting police car. *Id.* 159; States Ex. 59. She asked Sparks why he did it, once again he said his wife tried to poison him and the kids were involved. *Id.* Detective Raley explained that the news media was heavily involved in both the investigation and manhunt of the case. *Id.* at 165. Indeed, Cliff Caldwell, a news reporter for the Channel 11 news in Dallas, was able to secure an early morning interview with Sparks the day after he was arrested. (R.R. Vol.37, p.13-15). A tape of the interview was introduced into evidence against Sparks, and was recorded before Sparks was appointed an attorney. *Id.*; State Ex. 63. Caldwell explained that whichever station arrived at the jail first was given the first interview. *Id.* Caldwell agreed that the defendant was not acting rationally during the interview. *Id.* at 17.

Sparks made a confession to police after he was apprehended. (States Ex. 60). He explained that a voice in his head told him to kill his wife. *Id.* He asked that his step-daughter's be given a polygraph to prove that he was being poisoned. *Id.* He explained that he killed his wife because she had been poisoning him recently.

After the murders and the sexual assault, Sparks even told his step daughters that the reason he did what he did is because their mom had been poisoning him. (R.R. Vol. 37, p.87-88). The young lady was not surprised to hear this, presumably because she had heard it before. *Id.* She confirmed that in the past Sparks had accused the family of trying to gas him out, by leaving the stove gas on when they left the house. *Id.* at 99. In the past Sparks had screwed the windows shut so the girls could not let people in to get him and had put tape recorders in the

house.  *Id.*at 100.  At one point in time, before the murders, one of the step daughters was watching a movie where a person was killed by poison.  *Id.* at 102.  She remarked that if she were to kill someone, she would do it that way.  *Id.*  This lead Sparks to jump and tell her mom, Chare, that he found out the truth about being poisoned.  *Id.*

Before his trial, Sparks insisted that he be tested for poison, and willingly gave samples to be tested.  (R.R. Vol.2-3).  There was apparently no lab which could test for the poison in Spark's body.

### Sparks: Low intelligence and mental illness

Even before he was captured, Sparks's family members had warned the authorities that they believed he had severe mental problems.  (R.R. Vol. 36, p.119-20).  His mom testified that Sparks had been a special education student when he attended school.  (R.R. Vol. 39, p. 100). She explained that after his father passed away, she could no longer control him.  *Id.* at 105-107. Eventually, at the age of 17, Sparks was sent to prison for 12 years, he served the entire sentence. When he got out, he had changed.  *Id.* at 105-113.  He had become paranoid.  Sounds from the attic or the roof became people trying to get in the house to get him.  *Id.*  He would crawl in the attic to investigate, and eventually nailed the attic door shut.  He would stay up drinking coffee and watching out of the windows.  *Id.*

Mrs. Alexander, the mother of his only child, explained that after he got out of prison he had changed.  (R.R. Vol. 39, p.157-161).  She thought he was crazy.  *Id.*  When she first saw him when he got out he was sitting on a couch rocking and talking to himself.  *Id.* He was friendly one minute and hated the world the next.  *Id.* He thought people were watching him.  *Id.*  She eventually told his family that he needed to see a psychiatrist.  *Id.*

Sparks, however, never saw a psychiatrist until after he was arrested.  The psychiatrist found what those around him thought they would.  The Doctors found that many of Sparks family members suffered from mental illness ranging from bi-polar disorder to dementia.  (R.R. Vol. 39, p.152-56).  Dr. Chefetz testified that Sparks was psychotic, suffered from delusions, including persecutory delusions, and had anti-social disorder.  (R.R. Vol. 40, p.190-94).  Further he was suffering from these issues at the time of the offense.  *Id.* at 135.  Dr. Compton testified that Sparks suffered specifically from schizoaffective disorder and functioned at the level of a fourth or fifth grader when he left school in the ninth grade.  (R.R. Vol. 41, p.10-11).

### Sparks's Trial Was Thoroughly Contaminated With Outside Influences

The State of Texas puts its prisoners convicted of the death penalty to death by lethal injection.  Those who support the death penalty for a certain person often remark that they should "got the needle."  One of the Bailiffs assigned to Sparks's case was Bobby Zoe Moorehead.  He apparently believed that Sparks should get the needle, and decided to express his belief by wearing a black tie with a white syringe on the day that the jury would begin their punishment deliberations.  On the day he wore this tie, the bailiff was seated directly behind the Sparks, within the juries view, operating a stun belt that was securely attached to Spark's person.  This same bailiff would have been well known to the jurors in this case because he had been responsible for shepherding the jurors to and from the court room during the guilt innocence phase of the trial.

Other strange happenings took place in Sparks's case.  Of course, as discussed above, there was a media frenzy surrounding the case.  On top of that, there were multiple outburst from the jury, one in which a victim's father attempted to attack Sparks in front of the jury.  (R.R. vol. 40, P. 41; R.R. Vol. 41, p. 68).  At one point, a large hack saw blade was found in the gallery,

prompting the court room to be cleared and metal detectors to be placed at the court room doors.
(R.R. Vol. 40, p.40).  And of course, throughout the trial Sparks was shackled and wearing a stun
belt.

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW IN TEXAS

The following is an overview of capital punishment law in Texas.  This summary is
provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death
penalty.  To warrant the death penalty, the defendant must have committed another serious crime
in addition to committing a murder.  For instance, kidnaping and then killing a person is a capital
offense.  So is killing two people, rather than one, which happened in the present case.

In recent years, once a person is indicted for capital murder and the State decides to
pursue the death penalty, the defendant is assigned two attorneys.  One of the lawyers is the lead
attorney; the other is the second chair attorney.  Both attorneys are charged with investigating the
case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty
verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes
three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions.  The
reason for this is because the state and federal law requires all issues raised on appeal to be first
presented to the trial judge.  Death penalty jurisprudence is thick with constitutional and
statutory issues.  All unsettled challenges to death penalty procedures must be raised.  Failure to
do so means that the issues are waived for direct appeal.  Moreover, because the Supreme Court
has insisted that effective assistance of counsel requires attorneys who are knowledgeable about

death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense.  The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts.  Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors.  Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700.  Many jurors exercise certain allowable rights not to serve; others cannot be found.  On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel.  Either side may ask for the jury to be shuffled at this point.  Jurors will be seated randomly in numerical order.  Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.  The judge may excuse some jurors but not others.  At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror.  After the juror leaves, each side is permitted to challenge for cause.  If granted, the juror is finally excused and deleted from the pool.  If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges.  For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied.  This is sometimes called the sequential method of selecting the jury.  The State goes first.  If the State strikes the juror, the juror is gone.  If the State declines to strike the juror, then the right passes to the defense.  If the defense strikes the juror, the juror is eliminated.  If the defense does not strike the juror, then the juror joins the twelve-member petit jury.  This process is repeated until twelve jurors and two alternates are seated.  Each side has ten peremptory challenges.  This form of jury selection was used in Sparks' trial.

Once the jury is selected and sworn, trial proceeds in the usual fashion.  If the defendant is found guilty of capital murder, the sentencing phase begins.  In response to the Supreme Court's insistence that the jury decision-making process be guided, Texas has constructed three questions, called special issues.  The questions have varied over the years.  In Spark's case, only two questions were asked: the future dangerousness question and the mitigation question.

The method of answering the special issues is complicated.  If the jurors unanimously answer both questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically.  If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes.  It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue.  If this occurs, then the defendant is sentenced automatically to life in prison.  There is no retrial.  Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case.  The result is always either a life sentence or a death sentence.  Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence.  Unanimity is required for a death sentence.  A life sentence is the result otherwise, the result of a single juror's decision.

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the

16

CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## ARGUMENT AND AUTHORITIES

### Overview of Claims for Relief

### Claim One

Sparks's right to an impartial jury guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution was violated at the punishment phase of the trial when a court official, a bailiff, in the presence of the jury, wore as part of his uniform, a necktie bearing the image of a hypodermic syringe seeping liquid showing his support for the death penalty.

### Claim Two

Sparks received ineffective assistance of counsel when trial counsel failed to object at the punishment phase of trial when a court official, a bailiff, in the presence of the jury, wore as part of his uniform, a necktie bearing the image of a hypodermic syringe seeping liquid.

### Claim Three

Sparks's right to an impartial jury guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated when the trial court refused to grant a mistrial in spite of repeated instances of misconduct by bystanders which took place within the view of the jury.

### Claim Four

Sparks's right to an impartial jury guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated based on the combined effects of the actions of the bailiff and the bystanders as well as the overall atmosphere surrounding his trial.

### Claim Five

Sparks's Eighth Amendment and Due Process rights were violated when the State's expert witness, A.P. Merillat, testified to materially inaccurate evidence at the punishment stage of Sparks' trial.

### Claim Six

The state trial court violated Sparks's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause to numerous jurors specifically named in the direct state appeal.

## Claim Seven

The Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by not requiring the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death.

## Claim Eight.

The Texas 12-10 Rule, and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by *Mills v. Maryland* and *McKoy v. North Carolina*.

## Claim Nine.

Petitioner was denied a fair trial, due process of law, and effective assistance of counsel in violation of the Sixth Amendment, eighth, and the Fourteenth Amendment to the United States Constitution based on trial counsel's performance.

## Claim Ten.

Petitioner was denied effective assistance of counsel during his direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

## Claim Eleven

Petitioner was denied effective assistance of counsel in pursuing state habeas remedies in violation of his rights to equal protection, due process, and access to the courts as provided by the United States Constitution.

## Claim Twelve

Executing the petitioner would violate the Eighth and Fourteenth Amendments to the United States constitution as construed by the Supreme Court in *Atkins v. Virginia.*

## Claim Thirteen

Sparks was denied both his substantive and procedural rights to Counsel and Due Process, and to Equal Protection under the Sixth and Fourteenth Amendments, during the media interviews with various Dallas news stations.

These violations also form a separate Ineffective Assistance of Counsel argument (see generally Claims 9,10, and 11).

<u>DETAILED ARGUMENTS</u>

<u>Claim 1:</u>

Sparks's right to an impartial jury guaranteed under the Sixth and Fourteenth Amendments to the U.S. Constitution was violated at the punishment phase of the trial when a court official, a bailiff, in the presence of the jury, wore as part of his uniform, a necktie bearing the image of a hypodermic syringe seeping liquid showing his support for the death penalty.

Raised as point of error number one in the state Writ of Habeas Corpus.

<u>BRIEF FACTUAL BACKGROUND OF THE CLAIM</u>

[This Factual Background will be elaborated upon in the Final Writ]

The State of Texas puts its prisoners convicted of the death penalty to death by lethal injection.  Those who support the death penalty for a certain person often remark that they should "get the needle."  One of the Bailiffs assigned to Sparks's case was Bobby Zoe Moorehead.  He apparently believed that Sparks should get the needle, and decided to express his belief by wearing a black tie with a white syringe on the day that the jury would begin their punishment deliberations.  On the day he wore this tie, the bailiff was seated directly behind the Sparks, within the juries view, operating a stun belt that was securely attached to Spark's person.  This same bailiff would have been well known to the jurors in this case because he had been responsible for shepherding the jurors to and from the court room during the guilt innocence phase of the trial.

<u>BRIEF LEGAL DISCUSSION</u>

[This Legal Discussion will be elaborated upon in the Final Writ]

The United States Constitution mandates that ". . . the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* . . ." U.S. Cons. Amend. VI.  The Supreme Court

19

has held that improper behavior on the part of a bailiff in a capital case constitutes an improper "outside influence" in violation of the Sixth Amendment which was made applicable to the States through the Fourteenth Amendment. *Parker v. Gladden*, 385 U.S. 363 (1966). Further, unauthorized conduct by a bailiff, such as the conduct of the bailiff in this case, 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 365. *See also Wellons v. Hall,* 558 U.S. 220 (2010) (Remanding petitioner's habeas corpus writ and suggesting a hearing is appropriate to decide the issue of juror partiality when evidence exist of improper behavior on the part of a bailiff.) The bailiff's improper conduct in Sparks's trial denied him of his right to an impartial jury, and prejudiced the jury against him.

## Claim 2:

Sparks received ineffective assistance of counsel when trial counsel failed to object at the punishment phase of trial when a court official, a bailiff, in the presence of the jury, wore as part of his uniform, a necktie bearing the image of a hypodermic syringe seeping liquid.

Raised as point of error number two in the state Writ of Habeas Corpus.

### SUMMARY OF THE ARGUMENT

The following claim is raised in the alternative to claim number one. The fundamental right to a fair trial guaranteed by the Fourteenth Amendment's due process clause and the Sixth Amendment guarantee a defendant the right to counsel, which in turn guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In *Strickland*, the Supreme Court held that in order to prevail on a claim of ineffective assistance of his defense counsel, "[f]irst, the defendant must show that counsel's performance was deficient . . . [s]econd, the defendant must show that the deficient performance prejudiced his defense." *Strickland v.Washington,* 466 U.S. at 687. Petitioner alleges that he was denied the effective

assistance of counsel at his capital trial when his trial counsel failed to immediately object to the constitutionally reprehensible actions of the bailiff discussed in in claim one.


**Claim 3:**

Sparks's right to an impartial jury guaranteed under the Sixth and Fourteenth Amendments to the U.S. Constitution was violated when the trial court refused to grant a mistrial in spite of repeated instances of misconduct by bystanders which took place within the view of the jury.

This claim was presented to the Texas Court of Criminal Appeals on direct appeal as point of error number 22.

### SUMMARY OF THE ARGUMENT

During Sparks's trial, the father of one of his victims repeatedly disrupted the proceedings, at one point attempting to attack Sparks during the state's punishment phase closing argument.  The following exchange recounts the actions of the victim's father, and the objection thereto by the defense:

MR. BEACH: . . . . I don't care how paranoid you are - -

(Audience interruption)

BAILIFF: Whoa up, brother.  Stop there.

BAILIFF: Get back.

BAILIFF: Stay there. Get him.

MR. JOHNSON: Ask for a recess, Your Honor.

THE COURT We'll take a break for a minute.

Neal, if you would get the jury a second.

(Recess)

(Open court, defendant present, jury not present.)

21

THE COURT: Let the record reflect we're outside the presence of the jury.

So the record's clear, during Mr. Beach's arguments somebody in the audience jumped up to move towards the break in the rail that brings you into the attorney-accessible-only area of the courtroom.

The bailiffs quickly and aptly took care of the situation.  Took a short break.

Mr. Johnson, go ahead.

MR. JOHNSON: Your Honor, at this time the defense is gonna move for a mistrial.

Like to at this time make a bystander's bill and would call a witness to testify in regards to the actions. This is the second time this individual has disrupted the court proceedings during portions of the descriptions of the evidence.

And if the court will allow, I'll make an offer of proof it's my understanding this is the same individual that during testimony in the guilt/innocence phase of the trial, jumped up, started yelling and had to be escorted out of the courtroom by the prosecution.

We objected at that time. The court - - -

MR. BEACH: This case?



MR. JOHNSON: Yes.  In fact, the court told members of the jury if there was any more outbursts in regards to testimony, they would be barred from the courtroom.

THE COURT: Mr. Beach.  Y'all come up.

(Discussion at the bench, off the record.)

MR. JOHNON: Judge, there's been discussion at sidebar in regards to the exact timing when this - - the exact events occurred.  There was an outburst in the testimony of

guilt/innocence phase, and due to that outburst, my recollection, the court was going to excuse the jury to admonish the jury - - or admonish  the audience any further outburst would result in any individuals being barred from further admittance into the courtroom, which time the jury was standing up at - - the prosecutor Heath Harris was required to get up and take Harold Sublet, Sr., and escort him out of the courtroom because he again approached the rail.

It's my recollection, Judge, and I believe it to be accurate, and would call Heath Harris to testify.

MR. BEACH: After arguments you can make your bill.

THE COURT: What's your motion?

MR. JOHNSON: Just let the record to reflect that now, in the conclusion or portion of Mr. Beach's argument in regards to the infliction of wounds on Harold Sublet, Sr. - - Jr., this same individual's now rushed the jury rail in front of the jury.

We believe this type of thing has prejudiced the defendant in the eyes of the jury.  This individual again has been escorted out of the courtroom by the prosecutor Heath Harris, as well as several members of the bailiffs staff.  We believe that the going forward at this point in time is in the jury's eyes we have been prejudiced and ask the court to grant a mistrial at this time.

THE COURT: All right.  Mr. Beach, any response?

MR. BEACH: Ask the court to deny the motion.  The jury doesn't know who this fella is, who he's related to. They can draw their own conclusion and has got nothing to do with their deliberations.

THE COURT: I'm gonna deny your motion for mistrial.....

(R.R. Vol. 41, p. 68)

It is possible the prior outburst was the one recorded by the court reporter, when a member of the audience yelled out "bring it on."  R.R. vol. 40, P. 41.  Or the "bring it on" comment might be yet another incident, in addition to the first outburst by the victim's father.

The right to a fair trial and an impartial jury guaranteed by the Sixth Amendment is violated when the jury is subjected to external influences.  *See, e.g., Parker v. Gladden*, 385 U.S. 363, 364-65 (1966) (stating that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel" (internal quotation marks omitted)); *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); *Remmer v. United States*, 347 U.S. 227, 229 (1954) (stating that "private communication, contact, or tampering" with the jury is presumptively prejudicial); *Mattox v. United States*, 146 U.S. 140, 149 (1892) ("It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment.").  The Sixth Amendment's guarantee of a trial by an impartial jury is enforceable against the states through the Due Process clause of the Fourteenth Amendment.  See, e.g., *Duncan v. Louisiana*, 391 U.S. 145, 179-80 (1968).

In *Oliver v. Quarterman*, 541 F.3d. 329 (5th Cir. 2008), the Fifth Circuit ruled that clearly establishes Supreme Court precedent prohibits external influences on a jury's deliberations.  The state trial court, by failing to grant a mistrial after numerous instances of spectator misconduct, violated Sparks's right to an impartial jury free from external influences.

The actions of the spectators at Sparks's trial prejudiced the jury against him, and were a sign that members of Sparks's community believed he should be given the death penalty.

**Claim 4:**

Sparks's right to an impartial jury guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution were violated based on the combined effects of the actions of the bailiff and the bystanders as well as the overall atmosphere surrounding his trial.

This is an amalgamation of the claims one and three above, both of which were presented to the state courts.

### SUMMARY OF THE ARGUMENT

Over a century ago the Supreme Court announced a principle which still underlies our nation's capital jurisprudence: "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. 140, 149 (1892). The combined effects of the bailiffs' improper actions, the multiple audience interruptions, breaks taken in the trial while bailiffs searched the court rooms for weapons such as hack saw blades, and the fact that the defendant was guarded by multiple bailiffs at all times while hooked up to shackles and a stun belt all acted as outside influences which prevent the defendant from being tried by jurors free from outside influences. The overall tone of the defendant's trial violated his rights under the Sixth, Eighth, and Fourteenth Amendments.

**Claim 5:**

Sparks's Eighth Amendment and Due Process rights were violated when the State's expert witness, A.P. Merillat, testified to materially inaccurate evidence at the punishment stage of Sparks's trial.

### SUMMARY OF THE ARGUMENT

"The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case. *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (internal quotation marks omitted). Based on this ideal the Supreme Court has held that a death sentenced based on evidence "that has been revealed to be materially inaccurate" must be reversed. *Id.* at 590.

Sparks's death sentence should be reversed because of materially inaccurate information testified to by the state's expert on prison classification, A.P. Marillat. Interestingly, Mr. Marillat, an investigator for the special prosecution unit Huntsville, was allowed to testify as an expert in prison classification despite the fact he had no formal training in this area, and did not work for the Texas Department of Criminal Justice. During his testimony Marillat testified to materially inaccurate information related to the initial classification level of Texas convicts sentenced to life without parole, the ability of inmates sentenced to life without parole to achieve a less restrictive classification status, restrictions placed on inmates sentenced to life without parole, and the opportunities for violence for inmates sentenced to life without parole.

The Court of Criminal Appeals has recently decided that Marillat's testimony violated the Eighth Amendment in two capital cases. Marillat's testimony was discussed in *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010) cert. denied, 131 S. Ct. 905, 178 L. Ed. 2d 760 (U.S. 2011). In that case "Merillat testified, without objection, that, after 10 years of G–3 status, a sentenced-to-life-without-parole capital murderer could achieve a lower (and less restrictive) G classification status than a G–3 status." *Id.* This information was incorrect. In the *Estrada* case, as in Sparks's case, the jury asked for clarification of Merillat's testimony during the punishment deliberations. *Id.* at 286-87; *See also* C.R. vol. 2, p. 489. In *Estreda,* the state agreed with the

defendant that "in the interest of justice, [the state] believes Appellant is entitled to a new trial on punishment due to the error raised in Appellant's second point of error." The Court of Criminal Appeals reversed the defendant's death sentence and ordered a new sentencing hearing because they believed "that the Supreme Court would find this to be constitutionally intolerable." *Id.* at 287 (*citing Johnson v. Mississippi,* 486 U.S. 578, 590, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) *(*death sentence based on "materially inaccurate" evidence violates Eighth Amendment*); Townsend v. Burke,* 334 U.S. 736, 740–41, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) *(*it violates due process to base conviction on "materially untrue" information "whether caused by carelessness or design")).

The Court of Criminal Appeals reversed another defendant's death sentence based upon Marillat's factually inaccurate testimony in *Velez v. State*, AP-76,051, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012), reh'g denied (Sept. 12, 2012). As in the both *Velez* and *Estrada,* Merillat's testimony in Spark's case was materially inaccurate, further, prejudice is established because the jury was clearly relying on Merillat's testimony to accurate. As a result, Sparks's constitutional rights were violated and this court should order a new sentencing hearing in his case.

## Claim 6:

The state trial court violated Sparks's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause to numerous jurors specifically named in the direct state appeal.

This claim was raised as claims one through nineteen in the state direct appeal.

### SUMMARY OF THE ARGUMENT

An accused has a right to a trial by an impartial jury. *United States Constitution*, Sixth Amendment. This right is denied when the trial judge erroneously overrules an accused's

challenge that a venire person could not be fair and impartial, and either the venire person sits on the jury because the accused has no remaining peremptory challenges to prevent it, or the accused is forced to use a peremptory challenge against the venire person, exhausts his remaining peremptory challenges, and is forced to accept an objectionable juror.  The standard of whether a venireperson should be struck for cause is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotations omitted).

In Witt, the Supreme Court upheld a trial court's exclusion for cause of venireperson Colby.  Id. at 430.  The trial court in that case excused potential juror Colby based on the following exchange between the state and the potential juror:

"[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

"[A. Colby:] I am afraid personally but not-

"[Q]: Speak up, please.

"[A]: I am afraid of being a little personal, but definitely not religious.

"[Q]: Now, would that interfere with you sitting as a juror in this case?

"[A]: I am afraid it would.

"[Q]: You are afraid it would?

"[A]: Yes, Sir.

"[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

"[Q]: You think it would.

"[A]: I think it would.

28

"[Q]: Your honor, I would move for cause at this point.

"THE COURT: All right. Step down." Tr. 266-267.

*Id.* at 415-416.  In upholding the challenge for cause to Colby the Court in *Witt* clearly decided,

based on the exchange above, that Colby's views on the death penalty would substantially impair

the performance of his duties as juror.  This is in spite of the fact that Colby never explicitly

stated that his views would interfere with his duties, but rather stated that he "was afraid" and he

thought they would.   In reaching their decision the Court further stated that the standard

identified above "does not require that a juror's bias be proved with 'unmistakable clarity.'  This

is because determinations of juror bias cannot be reduced to question and answer sessions which

obtain results in the matter of a catechism."  *Id.* at 425.

Based the *Witt* standard, Sparks's sixth and fourteenth amendment rights were thus

violated when the trial judge denied petitioner's challenge for cause to following venire:

a)  Lawrence Franklin Allen

b)  Anthony Lance Stephenson

c)  Kristine Marie Bell

d)  Kimberlyn Moriarity

e)  William B. Triola

f)  Heather Randall

g)  Myrna Noelia Conde

h)  Peter Finlay Cavazos

i)  Patrick E. Norton

j)  Harold Garland Wheeler

k)  Stacey Anne Chadwick

l)   Phillip Benjamin Magee

m)  Catherine Aileen Roberts

n)   Billy Esparza

o)   Michael Brent Davis

p)   John H. Reeves

q)   Ronald A. Jarvis

r)   Susan Cassel

**Claim 7:**

The Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by not requiring the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death.

This claim was raised in the state direct appeal as claims 21 and 47.

SUMMARY OF THE ARGUMENT

Retreating from earlier decisions, the Texas Court of Criminal Appeals has imported the idea of aggravating evidence into Texas Code of Criminal Procedure, Art. 37.071, Sec. 2(e), which deals with mitigating evidence in the punishment phase of capital trials.  This permits the State to introduce evidence of aggravating circumstances related to Art. 37.071, Sec. 2(e), which is not relevant to the other special issues.  The jury is to consider this evidence of aggravating circumstances in answering the mitigation issue.

This triggers the principle in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) that the State has the burden to prove beyond a reasonable doubt any factual decision that determines whether a defendant receives a greater sentence.  When the "future

dangerousness" issue is answered in the State's favor, the factual determination regarding the mitigation issue does determine the maximum penalty.

Further, the United States Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. *See e.g., Walton v. Arizona*, 110 S.Ct. 3047, 3055 (1990)(State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden...to prove the existence of aggravating factors"). The legal principle in Walton applies to the statutory "Penry" special issue today because, by judicial construction, this special issue has become a conduit for aggravating factors.

## Claim 8:

The Texas 12-10 Rule, and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by *Mills v. Maryland* and *McKoy v. North Carolina*.

This claim was raised on direct appeal as points of errors 8, 36-38, and 43.

### SUMMARY OF THE ARGUMENT

TEX. CODE CRIM. PROC. ART. 37.071 provides that in order for the trial court to impose a death sentence, all twelve jurors had to answer all of the "special issues" affirmatively; to impose a life sentence, at least ten jurors had to answer any of the special issues negatively. A failure of a capital sentencing jury to garner the requisite number of votes either way resulted in the imposition of a life sentence. However, Applicant's jurors were not informed that if they failed to reach a collective decision either way -- if one juror answered "no" to any special issue -- the court would impose a life sentence. Instead, they were instructed by the trial court that the jury must either unanimously agree to answer all of the "special issues" affirmatively (in which case a

death sentence would be imposed), or ten or more jurors were to agree to answer one or more of the "special issues" negatively (in which case a life sentence would be imposed).

The collective operation of these provisions of Article 37.071, upon which Texas capital sentencing jury charges are modeled, has come to be known as the "12-10 rule."[1]  This feature of 37.071 creates the potential for considerable confusion among reasonable jurors.  The United States Supreme Court has held that, in judging the constitutionality of a capital sentencing statute, a court must ask how a reasonable juror could view his or her role under the statutory scheme.  *See California v. Brown***,** 479 U.S. 538, 541 (1985); *Francis v. Franklin*, 471 U.S. 307, 315-16 (1985).  The Texas statute implicitly informs a juror that, absent similar votes from nine other jurors, his or her "no" vote to a special issue -- e.g. a vote against the imposition of the death penalty -- is meaningless because it cannot alone be sufficient to result in a life sentence.

Texas' 12-10 rule generates the danger that confused jurors otherwise disposed to hold out on voting for a death sentence will conform to a "majority rules" mentality.  Potential holdout jurors may reasonably believe that their votes in favor of a life sentence are worthless unless nine others join them; if a majority of other jurors are firmly voting "yes," holdouts may feel obliged to vote "yes" since there would appear to be no possibility of a life sentence and the jury has been instructed to return a verdict.  *See Mills v. Maryland*, 486 U.S. 367, 383 (1988) ("[C]ommon sense . . . suggest[s] that juries do not leave blanks and do not report themselves as deadlocked over mitigating circumstances after reasonable deliberation . . . unless they are expressly instructed to do so.").  Such a belief on the part of a juror is contrary to Texas law, which dictates that if a capital juror is unable to agree on an answer to any of the special issues, the court must sentence the defendant to life.

---

[1] See Robert J. Clary, *Voting for Death: Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 ST. MARY'S L. J. 353, 358-59 (1987).

In *Davis v. State*, 782 S.W.2d 211 (Tex. Crim. App. 1989), the Texas Court of Criminal Appeals acknowledged the possibility that "`a juror who conscientiously believes that the evidence called for a life sentence might nevertheless vote for the death penalty in order to avoid mistakenly assumed consequences of jury deadlock.'" *Id.* at 221, quoting *Barfield v. Harris*, 540 F.Supp. 451, 472 n. 17 (E.D.N.C. 1982), *affirmed*, 719 F.2d 58 (4th Cir. 1983), *cert. denied*, 467 U.S. 1210 (1984).  However, the *Barfield* opinion quoted in *Davis* also speculated that it was just as likely that a life prone juror would refuse to consider the evidence and the views of her fellow jurors in favor of a death sentence if she knew her steadfastness would result in a life sentence. *Id.*  The *Barfield* opinion, cited with approval by the Texas Court of Criminal appeals concluded that:

> Neither scenario results in a "reliable" or desirable process of deliberation, but the court cannot say that the first scenario is significantly more likely to occur as a result of not giving the instruction than is the second as of giving it.

*Id.*, *see also Sterling v. State*, 830 S.W.2d 114, 121-122 (Tex. Crim. App. 1992) (citing *Davis* with approval and noting Sterling failed "to point to any facts or circumstances which render the statute unconstitutional *as to him* (emphasis added)).

Support for the proposition that a juror in the minority may be subject to coercion, and that such coercion results in a constitutionally unreliable sentence, is found in the United States Supreme Court's cases criticizing the practice by trial courts of inquiring into the numerical division of deadlocked juries prior to requiring further jury deliberations.  *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 239-40 (1988); *Brasfield v. United States*, 272 U.S. 448, 450 (1926).  In such cases, this Court has held that "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear `in some degree, serious although not measurable, an improper influence upon the jury.'" *Lowenfield*, 484 U.S. at

33

239 (citing *Brasfield*, 272 U.S. at 450).    Put another way, Texas' "12-10 rule" is a built-in impermissible "dynamite charge," which the Supreme Court has recognized as a possible Eighth Amendment violation in the capital sentencing context.  *See Lowenfield*, 484 U.S. at 240-41.

In *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989), the United States Court of Appeals for the Seventh Circuit noted that the instructions to Kubat's jury stated the law as to whether a unanimous verdict was required to find a mitigating circumstance both correctly and incorrectly. However, they reasoned that the fact that the jury had heard a correct explanation of the law did not rescue the law's constitutionality:

> At worst, the jury may have retired for deliberations believing it had to reach a unanimous verdict on sentencing just as it had to do on the merits.  At best, it may have entered the jury room confused.  Indeed, even if only one juror had been confused, the reliability of the verdict is undermined.  For if that one juror thought that the death penalty should not be imposed, he or she might have submitted to the views of the other eleven because of the mistaken belief that unanimity was required.

*Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989).  As the reasoning of the Seventh Circuit reveals, there is little Constitutional difference between a jury being instructed that they must find a mitigating circumstance unanimously, and a jury being left in the dark about that issue.

The United States Supreme Court has held that the possibility that a jury may be confused about facts important to their capital-sentencing role has Constitutional implications. In *Simmons v. South Carolina*, 114 S. Ct. 2187 (1994) the Court, by a 7-2 majority, held that a criminal defendant must be given the opportunity to inform the jury that he would never be eligible for parole if given a life sentence.  *Id*. at 2196 (plurality opinion per Blackmun).  The plurality reasoned that "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested."  *Id*. at 2195.  The information about petitioner's

parole eligibility was of "obvious relevance . . . to the jury's formidable sentencing task." Id. at 2197. The parallel is obvious: the significance of an individual vote of "no" to either of the special issues was of "obvious relevance" to any jury, but they were denied information on this point. Justice Souter's concurring opinion in Simmons makes the reliability concerns raised by potential jury confusion even clearer: "Whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning. . . ." *Id.* at 2198 (Souter, J., concurring). The jurors in petitioner's case were told they could vote "no" to a special issue, but were never told what the result of that single vote would be, as a result, they may have misunderstood the meaning of their vote. Thus, the Texas capital-sentencing scheme "diminish[ed] the reliability of the sentencing determination." *Beck v. Alabama*, 447 U.S. 625, 638 (1980).

In this way, Article 37.071's "12-10 Rule" injected arbitrariness into the proceedings and created an unreliable sentencing determination -- a constitutional violation of the highest order in the capital sentencing context.[2] *See State v. Williams*, 392 So.2d 619, 631 (La. 1980) (on rehearing). In *Williams*, the court stated:

> In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. They were not told that, by their failure to decide unanimously, they would in fact decide that the court must impose a sentence of life imprisonment. . . . *Instead, the members of the sentencing body were left free to speculate as to what outcome would be in the event there was no unanimity.* Under these circumstances, individual jurors could rationally surmise that in the event of a disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required.

---

[2] See *Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988) (noting that capital sentencing proceedings made unreliable by coercion of jurors violate Eighth Amendment); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (opinion of Stewart, Stevens, & Powell, JJ.) (holding that mandatory death sentences deprive defendants of reliable, individualized sentences in violation of Eighth Amendment); *Cf. Gardner v. Florida*, 430 U.S. 349 (1977) (plurality opinion) (holding that capital-sentencing procedures which restrict defendant's ability to offer mitigating evidence lead to unreliable capital sentencing proceedings that violate due process clause of Fourteenth Amendment).

*Williams*, 392 So.2d at 631 (emphasis added).  Such a risk of speculation and confusion was held to be a constitutional violation by the Louisiana Supreme Court.

As Sparks's rights as guaranteed by U.S. Const. Amend. VII & XIV have been violated, the sentence of death should be vacated and the cause remanded to the trial court for further proceedings.

**Claim 9:**

Petitioner was denied a fair trial, due process of law, and effective assistance of counsel in violation of the Sixth Amendment, eighth, and the Fourteenth Amendment to the United States Constitution based on trial counsel's performance.

The fundamental right to a fair trial guaranteed by the Fourteenth Amendment's due process clause and the Sixth Amendment guarantee a defendant the right to counsel, which in turn guarantees the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In *Strickland*, the Supreme Court held that in order to prevail on a claim of ineffective assistance of his defense counsel, "[f]irst, the defendant must show that counsel's performance was deficient . . . [s]econd, the defendant must show that the deficient performance prejudiced his defense." *Strickland v.Washington,* 466 U.S. at 687. Petitioner alleges that he was denied the effective assistance of counsel at his capital trial for the following reasons.

a.      Trial Counsel failed to conduct an adequate pretrial investigation into the State's case and the potential defenses available to Petitioner, including, but not limited to, defenses involving Petitioner's psychological and neurological mental state before, during, and after the murders for which he was charged. There is a reasonable probability that these defenses, if

properly raised, would have been able to overcome the government's contention that Petitioner possessed the

requisite mental state to intentionally and with premeditation kill the victims and that would supported the defenses of lack of mental responsibility and lack of a specific intent to kill, based on the combined effects of brain damage and Petitioner's well documented psychiatric illness. Further, trial counsel specifically failed to investigate and present evidence of whether or not the defendant was insane, under the standard set forth by the Texas Code of Criminal Procedure, at the time he committed the offense in question;

b.      Trial Counsel failed to develop and present compelling mitigation evidence available to Petitioner, including, but not limited to, evidence of Petitioner's history of psychological, physical, emotional and sexual abuse and neglect, a disruptive and chaotic family history, a long history of mental health problems, including organic brain damage, and humanizing evidence of Petitioner's good character and positive personality traits. Had such evidence been presented, there is a reasonable probability that Petitioner would not have been sentenced to death;

c.      Trial Counsel failed to seek the appointment of proper experts and investigators, including a mitigation specialist, a trauma expert, an expert qualified to investigate the sanity of the defendant at time of the offense, and others, to evaluate Petitioner's psychological, educational, neurological and social history, as well as that of his family;

d.      Trial Counsel failed to develop and provide to its own mental health expert the available records and information regarding Petitioner's family and his psychological, educational, neurological and social history which were necessary to perform a thorough and accurate evaluation;

e.      Trial Counsel failed to adequately prepare for the sentencing phase of the trial and failed to ensure the presence of necessary witnesses for Petitioner mitigation presentation;

f.      Trial Counsel failed to adequately prepare the witnesses he did call to the stand during Petitioner's mitigation presentation;

h.      Trial Counsel failed to request the appropriate jury instructions at the guilt/innocence and penalty phases and failed to object to erroneous instructions given by the trial court;

i.      Trial Counsel failed to adequately investigate Petitioner's medical and mental health history and status. Counsel also failed to ensure that Petitioner was afforded a competent mental health evaluation, which would have conclusively revealed that Petitioner suffered from organic brain damage and trauma throughout his life and at the time of the crimes, which impaired Petitioner's

ability to form the requisite intent to convict on the murder charges and would have mitigated his culpability for the offenses or would have led to the opinion that the defendant was insane at the time he committed the offense;

j.      Trial Counsel failed to ensure that appropriate diagnostic testing was performed by its mental health experts;

k.      Trial Counsel failed to adequately file and litigate motions for expert assistance and further failed to protect the record on appeal by ensuring that the trial court ruled separately on each;

l.      Trial Counsel failed to properly develop and present evidence that the petitioner is mentally retarded so that his execution would be unconstitutional under *Atkins v. Virginia.*

m.      Trial Counsel failed to identify that the jury instruction given at the punishment phase violated the petitioners 8th and 14th Amendment rights by narrowly construing the evidence which could be considered in mitigation and not allowing all mitigation evidence presented to be considered.

n.      Trial Counsel was ineffective for failing to object to the state's improper jury argument.

o.      Trial Counsel was ineffective for failing to object or put on the record multiple instances of juror misconduct or outside influence which effected the partiality of the jury in this case.

p.      Counsel failed to develop the issues germane to Sparks's uncounseled media interviews.

q.      Petitioner Sparks is entitled to habeas relief.

## Claim 10:

Petitioner was denied effective assistance of counsel during his direct appeal in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

Sparks contends that appellate counsel owes him a duty of competent representation. This is particularly true in a capital case, because "there is a significant difference between the death penalty and the lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637 (1980).  The constitutional standard for judging the effectiveness of counsel under the sixth amendment is a two-prong test, requiring that the petitioner show: (I) counsel's performance was so "deficient," that is, that counsel did not provide" reasonably effective assistance," and (ii) that counsel's errors "prejudiced the defense by depriving the defendant of a fair trial whose result is reliable. An attorney is ineffective if he or she "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, at 688. (1984).   Appellate level right to effective

assistance of counsel is rooted in the Sixth Amendment right to effective assistance of counsel. *Evitts v. Lucey,* 105 S.Ct. 830 (1985). Petitioner claims his appellate counsel was ineffective in the following ways:

      a.     Counsel failed to raise as a point of error that the jury instruction given at the punishment phase violated the petitioners 8th and 14th Amendment rights by narrowly construing the evidence which could be considered in mitigation and not allowing all mitigation evidence presented to be considered.

      b.     Counsel failed to raise the claims addressed in points of error number three, four, and five which could have been raised on direct appeal.

      c.     Counsel failed to develop the issues germane to Sparks's uncounseled media interviews.

      d.     Sparks is entitled to habeas relief

**<u>Claim 11:</u>**

Petitioner was denied effective assistance of counsel in pursuing state habeas remedies in violation of his rights to equal protection, due process, and access to the courts as provided by the United States Constitution.

      The Supreme Court has recently held that "inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez v. Ryan*, 132 S.Ct. 1309, 1315 (2012). Petitioner asserts that *Martinez* stands for the proposition that where a claim can first be developed on collateral review, inadequate assistance of counsel on the initial collateral review establishes cause for a procedural default of that claim, or a petitioner's failure to fully develop the factual basis of the claim. While this claim will be fully developed in petitioner's amended

writ, petitioner now claims that he was denied equal protection, due process, and access to the courts by ineffective assistance of counsel at during his state writ proceedings.

Petitioner claims that his state habeas counsel was ineffective in the following ways:

a.  Counsel failed to raise claims 3-6 at the state habeas level.

b.  Counsel failed to properly develop the factual basis of claims 1-5.

c.  Counsel failed to raise or to develop a factual basis to show that it would be a violation of the *Atkins v. Virginia* to execute petitioner because of his mental limitations: and developing a factual basis the petitioner was incapable of forming the requisite intent to commit capital murder or was insane at the time of the murder.

d.      Counsel failed to develop the issues germane to Sparks's uncounseled media interviews.

e.      Sparks was prejudiced as a result of the state writ counsel's deficient performance.

## Claim 12:

**Executing Sparks would violate the Eighth and Fourteenth Amendments to the United States constitution as construed by the Supreme Court in *Atkins v. Virginia*.**

Petitioner incorporates the argument from claim 11.  The petitioner alleges that no one has ever properly investigated whether executing the petitioner would violate the eight and fourteenth amendments to the United States constitution.  For this reason petitioner now asserts just that, and would point out that the factual basis for this claim will be presented in his amended petition.

## Claim 13:

41

The Dallas County Sheriff's Office gives the media easy access to a capital defendant, often before or on the heels of the appointment of counsel.  The resulting video was introduced at trial.

### A.      Media Interviews Are A "Critical Stage"

The media interviews were a "critical stage" in the legal proceeding.  As explained in *Michigan v. Harvey*, 494 U.S. 344, 357-58 (1990):

> The accused's right to the assistance of counsel is not limited to participation in the trial itself.  A defendant is entitled to the aid of his lawyer from the time of arraignment "when consultation, thoroughgoing investigation and preparation [are] vitally important," *Powell v. Alabama*, 287 U.S. 45, 57 (1932).  Just as the Sixth Amendment's right to "the Assistance" of counsel necessarily encompasses a right to the effective assistance of counsel, so too the accused's right to have counsel "for his defense" in a "criminal prosecutio[n]" includes the right to rely on counsel after the government's role has shifted from investigation to accusation and  the "defendant finds himself faced with the prosecutorial forces of organized society."   *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (opinion of Stewart, J.)....

### B.      "One Working Day" Rule

The media's faster and superior access to Sparks (and other Dallas County defendants) occurs when the Texas Fair Defense Act, TEX. CODE CRIM. PROC. ART. 1.051(c), provides for appointment for eligible defendants "within one working day of the court's receipt of a request for appointed counsel." Also under TEX. CODE CRIM. PROC. ART. 26.04 (j)(1), the appointed attorney is required to contact the client "not later than the end of the first working day after the date on which he is appointed and interview the defendant as soon as practicable after the appointment." As a result, appointment is impermissibly premised on a "specified period after [an accused's] magistration," rather than on the need for counsel in a "critical stage" of the postattachment proceedings.  *See Rothgery v. Gillespie County*, 554 U.S. at 217 (Alito, J. concurring, Roberts, Scalia, JJ. join).

### C.      Constitutional Injury

Once Sparks's uncounseled, videotaped interview was played to the jury, he was deprived of any meaningful assistance of counsel at any stage of the trial (pre-trial, guilt/innocence and punishment). *See Rothgery*, 554 U.S. 191, 212 (2008) (Alito, J., concurring) ("Once attachment occurs, the accused at least is entitled to the presence of appointed counsel during any 'critical stage' of the post-attachment proceedings; what makes a stage critical is what shows the need for counsel's presence.").

The taped interviews resulted in a violation of Sparks's substantive and procedural rights to counsel, to equal protection, to a fair trial, and to his right to counsel, because the media interviews occurred at a critical stage in the post attachment proceedings, making it impossible for defense counsel to render any meaningful assistance whatsoever.

### D.    Prejudiced the Outcome of Trial

The media interviews of Sparks were events that "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented ...  in order to enjoy genuinely effective assistance of counsel." *Rothgery v. Gillespie County, TX*, 554 U.S. 191, 217 (2008).  The media interviews of Sparks were events that "so prejudice[d] the outcome of the defendant's prosecution that, as a practical matter, [Mr. Broadnax had to] be represented ...  in order to enjoy genuinely effective assistance of counsel."  Rothgery v. Gillespie County, TX, 554 U.S. 191, 217 (2008).

### E.    Systematic Municipal Policy

Upon information and belief, this media access appears to be a systemic problem in Dallas County, (and to Sparks in particular), and is the result of:

(1)    enactment of the Texas Fair Defense Act that provides that as applied to Dallas County, the "court .. shall appoint counsel ... no later than the end of the first working day after the date on which the court... receives the defendant's request for appointment of

counsel." TCCP 1.051 ( c).  This provision became effective January 2, 2002.  2001 Tex. Session Law Serv. Ch. 906 (S.B. 7) Vernon's); and/or

(2)   a custom and course of practice by the judges in the criminal courts of Dallas County that results in faster access by the media to a capital defendant, than counsel for capital defendants, see e.g., Dallas County Procedures for Appointment of Counsel in Death Penalty Cases as amended May 2007

(3)   law enforcement acting in tandem with the media to make the uncounseled interviews happen.  Among other things:

a.   the handling of the Media Relations Interview Requests Form, allows the media same-day-access to a capital defendant, while the appointment of counsel and access to the client is delayed because of the "1-working-day-from-receipt-of-request-by-the-court" rule.

b.   law enforcement participates in conveying the media letter requests to the defendants, which contain such statements of urgency as:

•   "...There are questions about the accuracy of the allegations that we would like to give you the chance to address." (State v. Franklin Davis, Media Request Interview Form),

and

•   "...we would like to hear your side of the story and share it with the public." (*State v. Broadnax*, Trial State Exhibit No. 16; Cause No. # F08-24667-Y, Criminal District Court #7). ("Urgency Statements").

c.   There are at least one, perhaps more, conversations between the jailers and the capital defendant from the time the jailers notify the defendant the media seeks to interview him, the jailer witnesses the so-called "consent," and the jailers escort the defendant to/from the media interview.

Upon information and belief, the Dallas County Sheriff's Department handling of the media requests are so routine, and ingrained that law enforcement acts in coordination with the media to make the media requests happen in a fashion that preempts Sixth Amendment access to counsel.

## CONCLUSION

As this petition demonstrates, Petitioner Sparks's rights under the federal constitution were violated, unremedied by the Texas courts.

## RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.    Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Sparks to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Sparks be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.    Issue a writ of habeas corpus to have Sparks brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.   In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have Holiday brought before it to the end that he may be relieved of his unconstitutional sentences;

6.   Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Applicant SPARKS asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Holiday from custody, or alternatively, to reverse Garcia' conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com

/s/ Jonathan Landers

_____
Jonathan Landers
2813 W T.C. Jester
Houston Texas 77018

46

(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT APPOINTED LAWYERS FOR PETITIONER
SPARKS

### CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of Habeas Corpus

was served on all counsel of record by filing on the ECF System on this 7th day of December,

2012.

_____
Seth Kretzer