No. 3:12-cv-469

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

_____

ROBERT SPARKS,

*Petitioner,*

v.

RICK THALER,

Director, Texas Department of Criminal Justice,
Institutional Division,

*Respondent.*

_____

Petition for Writ of Habeas Corpus
from a Capital Murder Conviction in the Criminal District Court No. 3 of Dallas County

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

**SETH KRETZER**          **JONATHAN LANDERS**
SBN: 24043764             SBN: 24070101

The Lyric Center          2813 W. T.C. Jester
440 Louisiana Street; Suite 200    Houston, Texas 77018

Houston, TX 77056
(713) 775-3050 (office)   (713) 301-3153 (Office)
(713) 224-2815 (fax)      (713) 685-5020 (fax)
*email: seth@kretzerfirm.com*   *e-mail: jlanders.law@gmail.com*

Court-Appointed Attorneys for Petitioner Robert Sparks

1

_____

## PETITION FOR WRIT OF HABEAS CORPUS
_____

TO THE HONORABLE U.S. DISTRICT COURT:

NOW COMES, **ROBERT SPARKS**, the Petitioner, and respectfully submits his Petition for Writ of Habeas Corpus, asking the Court to issue a writ ordering his release from the Institutional Division of the Texas Department of Criminal Justice. This application follows his conviction and death sentence in the Criminal District Court No. 3 of Dallas County, cause number F08-01020-VJ styled *State v. Robert Sparks.*

Sparks is illegally restrained of his liberty by the Director of the Texas Department of Criminal Justice – Institutional Division, by virtue of a sentence and judgment imposing the penalty of death rendered in cause number F08-01020-VJ styled *State v. Robert Sparks.* (See, Exhibit "A").

**CERTIFICATE OF INTERESTED PARTIES**

The undersigned counsel of record for Petitioner, ROBERT SPARKS, certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that this court may evaluate possible disqualifications or recusal.

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| *Petitioner* | | |
| Mr. Robert Sparks | Polunsky Unit | Petitioner |
| Mr. Seth Kretzer | The Lyric Center<br>440 Louisiana Street<br>Suite 200<br>Houston, TX 77002<br><br>(713) 775-3050 (direct)<br>(713) 224-2815 (fax) | Appointed attorney for current federal habeas |
| Mr. Jonathan Landers | Jonathan Landers<br><br>2813 W. T.C. Jester<br><br>Houston, Texas 77018<br><br>(713) 301-3153 – (phone)<br>(713) 685-5020 – (fax) | Appointed attorney for current federal habeas |
| Mr. Paul Johnson | Mr. Paul Johnson<br><br>311 North Market Street; #300<br><br>Dallas, TX 75202 | Trial Counsel |
| Mr. Lalon "Clipper" Peale | Lalon "Clipper" Peale<br><br>901 Main Street, Suite 6300<br>Dallas, TX 75202 | Trial Counsel |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| Mr. David Richards | David Richards<br>204 West Central Avenue<br>Ft. Worth, TX 76164<br>(817) 332-5567 (Phone) | state writ lawyer |
| Mr. John Tatum | 990 South Sherman Street<br>Richardson Texas 75081<br>(972) 705-9200 | State direct appellate lawyer |
|  |  |  |
|  |  |  |
| *Respondent* | | |
| The Hon. Mr. Greg Abbott |  | Texas Attorney General |
| Mrs. Ellen Stewart-Klein | Office of the Attorney General<br>Capital Litigation Division<br>P.O. Box 12548,<br>Capitol Station<br>Austin, TX 78711-2548<br>(512) 936-1600 (voice)<br>(512) 320-8132 (fax) | Asst. Attorney General |
| *Judges* | | |
| Honorable Robert Francis | Criminal District Court No. 3 of Dallas County<br>Frank Crowley Courts Bldg.<br>133 N. Riverfront, 6th Fl.<br>Dallas, Texas 75207 | Trial Judge (Retired) |
| Honorable Gracie Lewis | Criminal District Court No. 3 of Dallas County<br>Frank Crowley Courts Bldg.<br>133 N. Riverfront, 6th Fl.<br>Dallas, Texas 75207 | State Writ – District Court Judge |

| Interested Parties | | |
|---|---|---|
| *Individual* | *Address* | *Participation* |
| | | |

## DESIGNATION OF ABBREVIATIONS and EXPLANATION OF THE TRIAL RECORD

"RR" refers to reporter's record from the state trial court.  "CR" refers to clerk's record from state trial court.

### STATEMENT OF JURISDICTION

This petition is submitted pursuant to 28 U.S.C. § 2254 et. seq., and amendments five, six, eight, and fourteen, of the United States Constitution, and section nine, clause two of the United States Constitution (habeas corpus).

## SPARKS'S AEDPA DEADLINE WAS SATISFIED

Sparks's direct appeal to the Court of Criminal Appeals (CCA) was decided on October 29, 2010.  *Sparks v. State*, 2010 Tex. Crim. App. Unpub. LEXIS 629.

Sparks's state writ was filed on August 25, 2010.  The state writ was pending until December 14, 2011, when the CCA ruled.  *Ex parte Sparks*, 2011 Tex. Crim. App. Unpub. LEXIS 919.  Sparks's AEDPA deadline was therefore December 14, 2012.  28 U.S.C. 2244(d)(2); *see also Fields v. Johnson*, 159 F.3d 914, 916 (5th Cir. 1998).

In its initial November 9 scheduling order, this Court ordered that, "Petitioner shall file an original petition for writ of habeas corpus on or before Friday, December 7, 2012, in accordance with the agreement of the parties to file a 'skeletal' petition." (Doc. No. 8).

Sparks filed his placeholder writ on December 7, Doc. No. 9, seven days before his AEDPA deadline.

## EXHAUSTION

Sparks states that all but one of the federal constitutional claims alleged herein have been exhausted in proceedings before the Texas courts.[1]  The lone exception is a

---

[1] The burden is on Respondents to demonstrate that Sparks failed to exhaust a particular claim.  *See, e.g., Johnson v. Zerbst*, 304 U.S. 458, 464 (1938); *Esslinger v. Davis*, 44 F.3d 1515, 1528 (11th Cir. 1995); *Herbst v. Scott*, 42 F.3d

claim trained on the patently false testimony concerning prisoner classification by the state's expert, Mr. AP Merillat.   Merillat was a state employee.   Merillat was a state employee and a member of the prosecution team.   The State of Texas has never notified Sparks that Merillat testified falsely in his case and had never attempted to correct this false testimony.   This false testimony impinged directly on the future dangerousness issue, and was specifically relied upon by the jury.   For that reason, Sparks is filing contemporaneous with this writ an opposed Stay and Abey motion.

## Summary of Arguments

The sanctity of the jury room was repeatedly and thoroughly violated in the trial of Robert Sparks.   Throughout trial, Sparks wore a stun belt.   The operation of this machine is through a remote controlled box held in the lap of the bailiff tasked.   During Sparks's punishment phase, the assigned Bailiff, one Moorhead, wore a tie with a hypodermic syringe sewn on it by his wife.   When he testified at the habeas evidentiary hearing, Moorehead admitted that he wore this tie to signal his support for the death penalty, just as he had in other capital trials at which he had been assigned guard duties.

It would have been physically impossible for the jury not to have seen this tie from their position vis-à-vis Moorehead: defense counsel saw it, discussed it

---

902, 905 (5th Cir. 1995); *English v. United States*, 42 F.3d 473, 477 (9th Cir. 1994); *Brown v. Maass*, 11 F.3d 914, 914-15 (9th Cir. 1993); *Harmon v. Ryan*, 959 F.2d 1457, 1461 (9th Cir. 1992).

with the judge at the bench, and was then instructed by the judge to tell Moorehead to tuck his tie in his shirt.

Audience members made numerous outbursts during trial.   The most egregious example of which was when the father of the deceased rushed over the railing and had to be removed by court security.   Unfortunately, the District Court denied Sparks's contemporaneous motion for mistrial.

Sparks' trial was also plagued by the testimony of A.P. Merillat, an investigator employed by the State of Texas, and member of the prosecution team, who presented blatantly false testimony concerning level of custody to which Sparks' would be assigned within the Texas Prison System.  Merillat, who had no formal training in this area, and who had never worked for TDCJ, testified that Sparks would be classified to a G3 (medium) custody level if he was sentence to life in prison.  Merillat was adamant that no set of circumstances, or background information, could possibly change this initial classification.  He was testifying falsely about all of this.   The State of Texas has still not, to this day, brought this evidence to Sparks' attention or admitted the testimony was false.  Had Merillat not been identified for presenting false testimony in another Texas death penalty case (which was reversed based on his testimony), it is entirely possible that this false testimony would have remained undiscovered.

Merillat's false testimony violated Sparks right against Cruel and Unusual punishment, as well as his right to Due Process of Law.

Sparks also renews his challenge to the jury selected in his case, and to the repeated denials of his challenges for cause for jurors who were biased and could not properly consider all the evidence in a death penalty case. Finally, Sparks alleges that Texas death penalty scheme is unconstitutional.

## PROCEDURAL HISTORY

### A.    Procedural History in State Court

In the superseding indictment filed on September 30, 2008, Sparks was charged in cause number F-00801020-VJ with intentionally and knowingly causing the deaths of Raekwon Agnew and Harold Sublet, Jr., by stabbing and cutting them with a knife, during the same criminal transaction. (C.R. Vol.1, p. 2;). Sparks was arrested and held without bond. The State of Texas had previously given notice of their intent to seek the death penalty. (C.R. Vol.1, p. 23). Trial began on December 2, 2008; on December 4th, the jury was charged, closing arguments were delivered, and the jury convicted. (R.R. Vol 36, p. 1; R.R. Vol 38, p.17-32). The punishment phase of trial began on December 8 and concluded on December 10. (R.R. Vol 39, p. 1-R.R. Vol. 42, p. 259). On December 11, Sparks was sentenced

to death upon the jury's answers to the special issues. (R.R. Vol 42, p. 8; C.R. Vol. 2, p. 500).

Sparks's direct appeal to the Court of Criminal Appeals (CCA) was decided on October 29, 2010.  Sparks v. State, 2010 Tex. Crim. App. Unpub. LEXIS 629.

Sparks' state writ was filed on August 25, 2010.  The state writ was pending until December 14, 2011, when the CCA ruled.  *Ex parte Sparks*, 2011 Tex. Crim. App. Unpub. LEXIS 919.

## B.     Procedural History in Federal Court

On February 14, 2012, Sparks filed a motion for appointment of counsel. (Doc. No. 2). On March 27, this Court appointed Seth Kretzer as lead counsel. (Doc. No. 3).  On May 8, this Court granted Kretzer's motion for appointment of Jonathan Landers as co-counsel.  (Doc. No. 4).

Sparks filed his placeholder writ on December 7, Doc. No. 9, three days before his AEDPA deadline.

## STATEMENT OF FACTS

### Introduction

On September 15, 2007, murdered his wife, Chare Agnew, and his two stepsons, Reaqwon Agnew and Harold Sublet, by stabbing them multiple times. He also sexually assaulted his two step-daughters, Garysha and Lekenya. Delusional, Sparks was convinced his family had been attempting to poison him. Quite obviously, Sparks suffered from a severe mental illness at the time of the murders.

### The Crime and Its Apprehension

During the early morning hours of September 15, 2007, Robert Sparks stabbed and killed Chare Sparks, his wife of six months. 36 Ct. R. at 13. He then stabbed Chare's two young sons, also killing them. *Id.* After killing the boys, Sparks moved their bodies to the living room. 37 Ct. R. at 81. He then forced his wife's two daughters to look at their dead brothers, tied them up, and sexually assaulted them. 37 Ct. R. at 77 - 95; 46 Ct. R. at 96-119. He then forced the girls to watch him bathe, had them each kiss their dead mother, and locked them in a closet. 37 Ct. R. at 77- 95.

Sparks then drove to his mother's house, borrowed her car and drove to the home of an ex-girlfriend, Shunta Alexander. 36 Ct. R. at 34-51. He confessed the

killings to Alexander, called 911 to report the incident, gave his daughter Brianna

$100, and took a bus to Austin. *Id.* He returned to Dallas County two days later and

called a detective to request information before he turned himself in. 36 Ct. R. at

128-130.

On September 18, 2007, Sparks was spotted in a red van by a police officer.

36 Ct. R. at 137-152. A wild and televised police chase ended in Sparks' arrest. *Id.*

During the chase Sparks shot twice out of the moving vehicle's window, and

eventually threw his gun out the window. *Id.*

Sparks confessed to police detectives and a news reporter at the arrest scene,

explaining that he believed Chare and the boys were poisoning him, and claimed

he made a tape of them confessing to that crime. 36 Ct. R. at 12 - 15.

Sparks believed he was being poisoned by the victims and told everyone he

could, even the local news.

Immediately after the murders Sparks went to see the mother of his only

child, Shunta Alexander.  (36 Ct.R. at 34-52).  Mrs. Alexander explains that Sparks

was crying, and not acting like himself.  *Id.*  He told her that he had just killed

Chare and the boys because they had been poisoning him.  *Id.*  He also believed

that Chare and the kids had been letting people in and out of the house while he

was asleep.  *Id.* at 46. Mrs. Alexander convinced Sparks to call the police and

report what he had done, he did.  (36 Ct.R. at 29) (State Ex. 1).  During the call he explained that he had just killed his wife and step sons because they had been putting "shit" in his food.  *Id.*  Sparks was not making sense in the call.  *Id.* at 32. After he left he Mrs. Alexander's house he drove to a cousins house and got a ride to the grey hound bus station where he bought a ticket to Austin.

The next day, Sparks somehow directly called one of the detectives working the murder scene, Detective Perez.  (36 Ct.R. at 132-34).  He wanted to know if the police had found the recordings he had made prior to the murder, which he believed would show that his family was conspiring against him.  *Id.* The detective had found the tapes, but the tapes did not show what Sparks expected, they were closer to gibberish.  *Id.* at 39; State Ex. 117.

Three days after the murder the defendant was arrested after a twenty to thirty car chase.  *Id.* at 140-142.  During the chase the defendant fired two shots in the air before throwing his gun out of the window, and upon being apprehended requested the police to "just shoot me."  *Id.*

The local news channels got wind of the chase and captured it on video.  *Id.* at 150.  Indeed, a Channel 8 reporter was lucky enough to ask Sparks a question while he was being escorted by police to a waiting police car.  *Id.* 159; States Ex. 59.  She asked Sparks why he did it, once again he said his wife tried to poison him

and the kids were involved.  *Id.* Detective Raley explained that the news media was heavily involved in both the investigation and manhunt of the case.  *Id.* at 165. Indeed, Cliff Caldwell, a news reporter for the Channel 11 news in Dallas, was able to secure an early morning interview with Sparks the day after he was arrested.  (37 Ct.R. at 13-15).  A tape of the interview was introduced into evidence against Sparks, and was recorded before Sparks was appointed an attorney.  *Id.*; State Ex. 63.  Caldwell explained that whichever station arrived at the jail first was given the first interview.  *Id.*  Caldwell agreed that the defendant was not acting rationally during the interview.  *Id.* at 17.

Sparks made a confession to police after he was apprehended.  (States Ex. 60).  He explained that a voice in his head told him to kill his wife.  *Id.* He asked that his step-daughter's be given a polygraph to prove that he was being poisoned. *Id.*  He explained that he killed his wife because she had been poisoning him recently.

After the murders and the sexual assault, Sparks even told his step daughters the reason he did what he did was because their mom had been poisoning him.  (37 Ct.R. at 87-88).   The young lady was not surprised to hear this, presumably because she had heard it before.  *Id.*  She confirmed that in the past Sparks had accused the family of trying to gas him out, by leaving the gas stove on when they

14

left the house. *Id.* at 99.  In the past Sparks had screwed the windows shut so the girls could not let people in to get him and had put tape recorders in the house. *Id.* at 100.  At one point in time, before the murders, one of the step daughters and Sparks were watching a movie where a person was killed by poison. *Id.* at 102. She remarked that if she were to kill someone, she would do it that way. *Id.*  This led Sparks to jump and tell her mom, Chare, that he found out the truth about being poisoned. *Id.*

Before his trial, Sparks insisted that he be tested for poison, and willingly gave samples to be tested.  (37 Ct.R. at 2-3).  There was apparently no lab which could test for the poison in Sparks's body.  This was not the first time that Sparks had attempted to have himself tested to see if he was being poisoned.  Before the murders, he had visited the hospital because he wanted to have tests run to see if poison was discovered.  36 Ct. R. at 193.  This was verified by the police. *Id.*  Dr. Compton, a clinical and forensic psychologist, testified that she reviewed the Defendant's records from the Mesquite Community Hospital from December 24, 2006, which showed he went to the hospital claiming that he had a burning sensation coming from the top of his head with nausea and other ailments (41 Ct.R. at 19).  She said the Defendant did not tell the people at the hospital that he was poisoned because he wanted to see what they would find out. (41 Ct.R. at 19) She

said all the tests were negative.  (41 41 Ct.R. at 19) She said that the day before the murders, he faxed a request to the hospital requesting a copy of the records be immediately sent to him. (41 Ct.R. at 19) She said the reports also show that he complained of numbness in his face and hands. (Vol. 41 Ct.R. 19).

### Sparks: Low Intelligence Combined With Palpable Mental Illness

Even before he was captured, Sparks's family members had warned the authorities that they believed he had severe mental problems.  (36 Ct.R. at 119-20). His mom testified that Sparks had been a special education student when he attended school.  (39 Ct.R. at 100).   She explained that after his father passed away, she could no longer control him.  *Id.* at 105-107.  Eventually, at the age of 17, Sparks was sent to prison for 12 years, he served the entire sentence.  When he got out, he had changed.  *Id.* at 105-113.  He had become paranoid.  Sounds from the attic or the roof became people trying to get in the house to get him.  *Id.*  He would crawl in the attic to investigate, and eventually nailed the attic door shut. He would stay up drinking coffee and watching out of the windows.  *Id.*

Mrs. Alexander, the mother of his only child, explained that after he got out of prison he had changed.  (39 Ct.R. at 157-161).  She thought he was crazy.  *Id.* When she first saw him after his release he was sitting on a couch rocking and talking to himself.  *Id.* He was friendly one minute and hated the world the next.

16

*Id.* He thought people were watching him. *Id.* She eventually told his family that he needed to see a psychiatrist. *Id.*

Sparks, however, never saw a psychiatrist until after the murders. The psychiatrist found what those around him thought they would. The Doctors found that many of Sparks family members suffered from mental illness ranging from bi-polar disorder to dementia. (39 Ct.R. at 152-56). Dr. Chefetz testified that Sparks was psychotic, suffered from delusions, including persecutory delusions, and had anti-social disorder. (40 Ct.R. at 190-94). Further he was suffering from these issues at the time of the offense. *Id.* at 135.

Dr. Compton testified that Sparks suffered specifically from schizoaffective disorder and functioned at the level of a fourth or fifth grader when he left school in the ninth grade. (41 Ct.R. at 10-11). She said his school records showed that for a great period of time he failed everything and then went into special education. (41 Ct.R. at 9). She said in the ninth grade, the last grade the Defendant attended school, he was failing every subject with the exception of study hall. (Vol. Ct.R. at 10). She said the Test of Basic Skills showed that in vocabulary he was operating on a fifth-grade level, in reading the middle-fifth grade level, and language at a fourth-grade level, while he was in the ninth grade. (41 Ct.R. at 10).

She said she made two primary diagnoses on Mr. Sparks and found him to be a schizo-affective type with an antisocial personality disorder. (Vol. 41 Ct.R. at 11). She said she made this diagnosis after interviewing him, his family members, looking at documents and records. *Id.* She said Parkland Hospital had also diagnosed him with schizo-effective disorder.   *Id.* She said schizo-affective disorder meant a schizophrenic spectrum type of disorder which included delusions, hallucinations and/or a flat affect. *Id.* at 12.  The antisocial personality disorder is an ingrained way of behaving and thinking which includes antisocial acts and behaviors. *Id.*

The witness testified that in December 2007 the Defendant attempted suicide by trying to hang himself with a noose made out of socks. *Id.* at 14.  She said he was prescribed an antidepressant. *Id.* On February 11, 2008 his diagnosis was changed to schizo-affective disorder, which was the diagnosis she independently arrived at after her examination of the Defendant. *Id.*  She said the schizo-affective disorder symptoms of Robert Sparks were primarily ones of delusions.  *Id.* at 15. She said the delusions included being poisoned and there was a conspiracy to harm him in jail.  *Id.* She stated that he had auditory hallucinations and a flat affect in which he did not show very much emotion.  *Id.* at 15.  She said the Defendant was put on medications for depression and was given an antipsychotic medication. *Id.*

18

at 16.  She said that one of the Sparks's main delusions was that his wife was poisoning him.

The witness stated that the delusion Sparks had about being poisoned was a persistent delusion and over time he believed in the delusion more strongly. (41 Ct.R. at 21)  She said he asked for his blood workup from the hospital so he could verify that he was being poisoned. *Id*. She said he also had sexual delusions about being accused of being a child molester.  *Id*. at 22.  She said he also believed there were cameras installed in the bathroom. *Id*.

The witness testified that the Defendant also possesses a paranoid personality disorder which was evident when he thought he was being followed and people were conspiring against him. *Id*. at 23.  She said the schizo-affective disorder is a recognized severe mental illness which affects a person's everyday actions, thoughts, emotions and functioning. *Id*. at 23-24.  Sparks's history of antisocial acts at a young age, aggressive behavior, substance abuse and a lack of empathy for other people were the main features of his antisocial personality disorder. *Id*. at 24. Impulsivity was another feature of his personality. *Id*.

The doctor believed Sparks suffered from both of these disorders at the time of the offense. (RR: Vol. 41 p. 25) He had not been previously diagnosed with the mental illness because he was unaware he was mentally ill. *Id*. She said he was

also previously incarcerated for a large portion of time and that his paranoid and aggressive behavior is lumped in with people with antisocial personality disorder. *Id*. The doctor also believed the prison system does not have adequate mental health professionals. *Id*. at 26.

In short, Dr. Compton testified that she had no doubt that at the time of the murders, the Sparks was suffering from the effects of a severe mental illness. (RR: Vol. 41 p. 30).

### The Blatantly False Testimony of A. P. Merillat

The State of Texas, during its punishment presentation, presented the testimony of A.P. Merillat, who presented himself as a "criminal investigator with the special prosecution unit in Huntsville." 39 Ct. R. at 8-36, 68-95, at 8. Merillat was called as an expert witness to explain "the likelihood or opportunities to be violent inside the penitentiary." *Id.* at 8-9. Prior to Sparks' case, Merillat had testified falsely in at least two other capital cases, both have since been reversed on the basis of his false testimony and new punishment hearings have been granted. *See Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010) cert. denied, 131 S. Ct. 905, 178 L. Ed. 2d 760 (U.S. 2011); *Velez v. State*, AP-76,051, 2012 WL 2130890 (Tex. Crim. App. 2012), reh'g denied (Sept. 12, 2012). Merillat also testified falsely in Sparks' case, and the jury relied upon his testimony in

sentencing Sparks' to death.  It is not clear if the Prosecutors realized that Merillat was creating his testimony from whole cloth.

The state first gave notice of its intent to present the testimony of A.P. Merillat in a witness list filed one month before the start of the trial.  Cl. R. at 471-73.  The list included dozens of potential witnesses and didn't explain what Merillat would testify to, however Merillat was designated as an expert witness. *Id.*  The defense objected to Merillat's testimony during a vior dire examination prior to his testimony in front of the jury.  39 Ct. R. at 8-36.  Specifically, the defense objected that Merillat could not testify as an expert on prison classification as he had never been employed by the prison system, was not trained in the classification process, and never worked on the classification board.  *Id.* at 20.  The defense had apparently read portions of Merillat's prior testimonies and argued that his prior testimonies were "almost laughable" because they were not based on factual evidence.  *Id.* at 21-22.  The defense explained that Merillat could not possibly know where Sparks would end up in the prison system because the people at the classification department themselves could not know until Sparks arrived; if "Merillat has that information prior [to Spark's arrival], then he must be a seer." *Id.* at 24.  The trial court allowed Merillat to testify over objection.  *Id.*

During his testimony Merillat explained that there are multiple classification levels in Texas Prisons, and that a person convicted of capital murder and given life without parole would be assigned to a level G-3 upon entering prison. *Id.* 70. He was adamant that such a prisoner would enter at this level regardless of their history for violence or prior convictions. *Id.* at 86-87. Merillat explained that if Sparks were given a life sentence, he would be permitted to go to the mess hall with other inmates, go the library with other inmates, go to school and medical facilities, go to visitation, and that they could work outside the walls of the prison. *Id.* at 76. Thus, there would opportunities for "violent acts to occur in the prison system." *Id.* at 77. Amazingly, Merillat also testified that those people working for the TDCJ classification system have no formal training and simply learn on the job. *Id.* at 74-75. All of this testimony was false.

Frank Aubuchon, who worked over 26 years for TDCJ, in jobs with titles such as Classification Case Manager, Chief of Unit Classification, Courtroom Coordinator, Administrator for Unit Classification and Administrator for Classification Operations, explains that Merillat testified falsely in an affidavit prepared for this case. The affidavit is supported by documentation, and attached as Appendix 1. In part, Aubuchon explains as follows:

- 39 Ct. R. at 70: Q: "Tell the members of the jury, Mr. Merillat, anyone sentenced to 50 years or up, which obviously includes a

22

capital murder life without parole, what is their automatic classification coming into the prison system?"  A:  "They're automatically classified as what's called a G3."  This is inaccurate in several ways.  First, an offender on day one in the prison system does not yet have a determined custody level unless he is death sentenced, or if he is sentenced to life without parole, in which case he is classified as, at best, G3 or, ultimately, at the more restrictive G4 or G5 levels if required.   See Exhibit B - TDCJ Unit Classification Procedure 2.00 and Attachment A.    All non-death sentenced offenders are processed through the Reception and Diagnostic Process as described in the TDCJ Classification Plan.   See Exhibit C TDCJ 2003 Classification Plan pp. 35-55.   This process, for a non-death sentenced offender takes 30 days to complete.  See Exhibit D TDCJ Classification Plan page 17-18 at 18 II.A; Exhibit C Page 53 at I.A.   Only then can the appropriate custody level be determined.

- 39 Ct. R. at 73:  Q:  "You're telling the jury how a person's classified by the Institutional Division of the Texas Department of Criminal Justice and you don't work there.  Have you ever received any formal training whatsoever in classification process at TC – or Texas Criminal Department, Institutional Division? " A:  "Yes, sir.  I have been given the same training in the area of classification that classification employees receive.  Which they don't have schools for classification.  There's a manual.  You learn – so to speak, on the job.  You learn by doing the classification process.  I have the classification manual with me." This answer is also incorrect.   From 1992 until my retirement in 2007 I was involved in the process of training both Classification Case managers and Chief's of Unit Classification.  TDCJ did then and still does today have a formal training process for newly promoted classification staff in addition to annual training seminars for Classification Chiefs.  Since Mr. Merillat was NEVER an employee of TDCJ involved in the classification processes he would have never had the opportunity for any formal training.

- 39 Ct. R. at 74:  Q:  "Certainly anybody that works in the system has many opportunities and undergo rigorous training to be employed there and undertake the things you learn to do on your own; is that correct?"    A:  "That's not correct."  Again, Mr. Merillat is incorrect in his response.  All unit based classification staff is required to attend and successfully complete the TDCJ Pre-Service Training Academy, Annual In-Service Training, and

23

New Case Manager Training.   In addition there is annual training for Classification Chiefs.

• 39 Ct. R. at 85:  Q:  "You said that anybody convicted and given a sentence over 50 years in the penitentiary would automatically be a G-3 inmate; is that correct? " A:  "That's correct."  In fact that is not correct.  The TDCJ Classification Plan describes the classification characteristics of G3 custody.  An offender must fit those characteristics to be assigned to G3 custody. Those characteristics include having no pattern of recent in-prison assaultive behavior or other disciplinary convictions resulting in major penalties in the preceding six months and otherwise having "No requirement for a more restrictive custody."   Moreover, any inmate with a sufficiently bad disciplinary record or other negative characteristics, with a poor disciplinary record, could be assigned to more restrictive custody, at the G4 or G5 levels. See Exhibit E TDCJ Classification Plan at p. 73-86.   Had the witness reviewed the prison and jail disciplinary records of the defendant he would have seen that the defendant had an extensive history of  in-custody disruptive and violent acts.  This history would be taken into account when determining an initial custody level for Sparks upon his admission to TDCJ. See Exhibit B - TDCJ Unit Classification Procedure 2.00 and Attachment A.

• 39 Ct. R. at 86:  Q: " But as I just pointed out, sir,  whether or not you're classified, the minimum classification for a person is G-3 and can go all the way up to an automatic classification of ad seg right off the bat, couldn't it? That's yes or no sir.  Right or wrong?"  A:  "You're wrong".  In fact that is not correct.   The TDCJ Classification Plan describes the classification characteristics of G3 custody.  An offender must fit those characteristics to be assigned to G3 custody.  Those characteristics include having no pattern of recent in-prison assaultive behavior or other disciplinary convictions resulting in major penalties in the preceding six months and otherwise having "No requirement for a more restrictive custody."  Moreover, any inmate with a sufficiently bad disciplinary record or other negative characteristics, with a poor disciplinary record, could be assigned to more restrictive custody, at the G4 or G5 levels.   See Exhibit E TDCJ Classification Plan at p. 73-86.  Had the witness reviewed the prison and jail disciplinary records of the defendant he would have seen that the defendant had an extensive history of  in-custody disruptive and violent acts.  This history would be taken into account when determining an initial custody

level for Sparks upon his admission to TDCJ.    See Exhibit B - TDCJ Unit Classification Procedure 2.00 and Attachment A.

- 39 Ct. R. at 87   Q:   "So your testimony while ago what I called throwing a skunk over there, you're basically saying is we know what the minimum is, but we have no idea what it's actually gonna be for Robert Sparks.  That's what you're basically saying, isn't it?"   A:   "No, you're wrong."    As illustrated above in the responses in #6 and #7 the attorney is in fact correct and the witness is incorrect.  G3 custody is the least restrictive custody that Sparks would be eligible for but he could easily be assigned to a more restrictive custody based on his prior institutional history.  See Exhibit B - TDCJ Unit Classification Procedure 2.00 and Attachment A.

Aubochon's affidavit makes it clear, Merillat either had no idea what he was talking about, or possibly, was actively lying on the stand.

What makes this situation more disturbing is the fact that the jury almost certainly relied upon this testimony in sentencing sparks to death.  In their final two notes sent to the judge before returning with the punishment verdict, the jury specifically requested to view Merillat's testimony related to "what classification the defendant would have in prison if he was sentenced to life without parole."  Cl. R. at 489.  The judge provided the jury with Merillat's false testimony explaining that Sparks would be classified at the G-3 Level.  *Id.* at 490-94.  This note was sent to the judge at 7:59 pm, on December 10, 2008.  *Id.* at 495.  By 10:36 am the next morning Sparks would be sentenced to death.  Aubuchon explains the answer to the jury's questions was incorrect:

•       During deliberations, the jury had two questions pertaining to Mr. Merillat's testimony.  1:  "The jury has a conflict regarding the substance of Mr. Merillat's testimony pertaining to what restrictions are on a G3 prisoner? " 2: "If sentenced to a life sentence without parole, what would he be classified as?"  In response, the jury was provided with two excerpts of testimony given by Mr. Merillat.  As outlined in my point's #3-#8 above the testimony given by the witness was both misleading and incorrect.  Therefore the jury based their decision on incorrect information.  Cl. R. at 489-495.

Evidence presented at trial showed that Sparks had a prior violent felony conviction for Aggravated Robbery with a Deadly Weapon.  State's Exhibit 100 (TDCJ Records from the prior prison trip which include judgment).  The evidence shows that Sparks had a lengthy history of violence in jail.  *Id.*  According to the records Sparks had served the full term of his prior 12 year sentence and picked up violation in prison for things such as sodomy, failure to obey orders, and masturbation in public.  39 Ct. R. at 50.  The state also put on the testimony of Charles Maloney, a career criminal who spent time with Sparks in the pen.  39 Ct. R. 96-124. Maloney testified that Sparks was the leader of gang that forced people to prove themselves by fighting.  *Id.* at 99.  He explained that Sparks had beaten him up and was a good fighter.  *Id.* at 99-100.  After the initial beat down Sparks sexually assaulted Maloney on multiple occasions.  *Id.* at 101.   "It was either that way or get beat up."  *Id.*  As Aubuchon explains in his affidavit, "any inmate with a sufficiently bad disciplinary record or other negative characteristics, with a poor

disciplinary record, could be assigned to more restrictive custody, at G3 or G5 levels."  Appendix 1, affidavit point 6 (citing TDCJ classification plan at p. 73-86). G5 is of course the maximum custody level available.  The truth is it is entirely possible that Sparks would have immediately been assigned to G5 had he been given life in prison.

### Sparks's Trial Was Thoroughly Contaminated With Outside Influences

The State of Texas puts its prisoners convicted of the death penalty to death by lethal injection.  The colloquialism for such a death is "getting the needle."  One of the Bailiffs assigned to Sparks's case was Bobby Zoe Moorehead.  He apparently believed that Sparks should get the needle, and decided to express his belief by wearing a black tie with a white syringe on the day that the jury would begin their punishment deliberations.  See State Writ Hearing Cl. R. at 81 (State's exhibit C (news paper article)); 82 (Picture of Moorehead with the tie); 83 (close up of the tie).



On the day he wore this tie, the bailiff was seated directly behind the Sparks, within the juries view, operating a stun belt that was securely attached to Spark's person. State Writ Hearing Ct. R. at 20-25; 40-45. This same bailiff would have been well known to the jurors in this case because he had been responsible for shepherding the jurors to and from the court room during the guilt innocence phase of the trial. 36 Ct. R. at 13, 66, 96; 37 Ct. R. at 53; 149, 155.

This issue was brought up during the state writ of habeas corpus. In that proceeding, Perstephanie Sparks, Sparks' sister, swore in an affidavit that she was present on December 10, 2008, for the final day of testimony in her brother's trial. State Writ Hearing Cl. R.at 29. She explains as follows:

6. I was called to testify in Robert's trial and I testified in court on December 9, 2008. I was present at Robert's trial on December 10 2008 when the defense rested their case on the punishment phase of the trial. The bailiff that brought Robert into the court room and remained near him during the trial that day was wearing a dark uniform and he had a dark tie with a big white injection needle on it on. Everyone in court knew what it meant. This was on the day that the judge told the jury they could either give Robert a life sentence or the death penalty. I do not feel it is possible that the jury did not see what the bailiff was wearing. I was upset because I did not think it was the bailiff's decision to make about whether Robert received the sentence of death. I did not think the bailiff should not be able to influence the jury, but they had to see what he was wearing.

7. There was an article in the *The Dallas Morning News* about what the bailiff was wearing because the reporter, Ms. Ellis, saw it. She wrote a big story about the whole thing and I read it on-line.

*Id.* The news article Perstephanie refers to was included in the state writ file, and the opening passage of the article precisely explains the mood inside the court room on the final day of the punishment hearing:

On the surface, the courtroom scene typified old-time Texas justice.

The accused killed his family, so he needs killing, the prosecution argued. Among onlookers who filled the wooden benches for closing arguments, there was little doubt how this story would end: with an execution. One of the bailiffs offered his own not-so-subtle take, donning a black tie emblazoned with a white syringe.

*Id.* at 32.

Bobby Moorehead testified at the state writ hearing. At the hearing he produced the tie in question, which was introduced into evidence as Defendant's

Exhibit 1.   Writ Ct. R. at 15-16.   He had purchased the tie at a store, and "instructed his wife to get a needle emblazoned on it."  *Id.* at 17.  He wore black tie with all black shoes and a black shirt, with a black jacket, and with the jacket open. *Id.* at 18.  At one point he admitted to the state and defense that he wore the tie to show his support for the death penalty.  Id at 18.

The testimony at the hearing was that Moorehead wore his tie outside of his clothing for the first two hours of the day on December 10, until the defense counsel instructed him to tuck it into his shirt.  *Id.* at 18-20.  At that point, he did as he was instructed and tucked the tie into the shirt.  *Id.*  According to the defense counsel, Moorehead wore the tie outside his shirt until closing arguments were taking place, when an individual from the gallery attempted to rush the defendant. . at 83-84.  This meshes with the testimony of Perstephanie Sparks at the hearing. *Id.* at 101; See also 41 Ct. R. at 88-89 (showing that the individual from the audience rushed the forward in the court room well into the proceedings on December 10, 2008, when the jury was present.)

Moorehead was sitting behind the defendant during this time period, in a chair merely ten yards (less than 30 feet) from the jury booth.  Writ Ct. R. at 41-47.

There is no record of the defense discussing Moorehead's tie with the judge, but lead trial counsel did explain that he made an objection to the tie during a side

bar with the judge, off the record.  *Id.* at 56.  Trial counsel did not put his objection on the record because "[i]t wasn't something that [he] felt was necessary to make a judicial process out of because [he didn't] think it had an impact on the trial at all." *Id.* at 60.  He did not think it was problematic, and thought that Moorehead showing his support for the death penalty was "equivalent with a baby crying in the court room." *Id.* at 62-63.  He did not feel a bailiff was really a court official. *Id.* at 65.

In his state writ Sparks raised two grounds for relief: 1) that his constitutional rights had been violated by the bailiff's wearing of the neck tie, and 2) that in the alternative trial counsel was ineffective for failing to object on the record.  State Writ Hearing Cl. R. at 11.

The Dallas District Court Judge ruled that although Bailiff Morehead had worn the tie to show his support for the death penalty and in spite of the fact that Moorehead had worn the tie for a couple of hours in the jury's presence that Sparks "failed to present any evidence proving that any juror considered Mooreheads necktie during deliberations." *Id.* at 158.  The court also pointed out that the "applicant failed to present any evidence from any juror regarding this issue." *Id.* The court found that trial counsel "made a strategic decision not to object to Moorehead's necktie on the record." *Id.* at 159.

Other strange happenings took place in Sparks's case.  A media frenzy surrounded the trial.  Additionally, there were multiple outbursts from the audience, one in which a victim's father attempted to attack Sparks in front of the jury during the closing arguments on punishment.  (41 Ct. R. at 88-89); *see also* State's Exhibit B From the writ hearing, "Dallas DNA" DVD (showing one victim's father rushing at the defendant during guilt and innocence).  At one point, a large hack saw blade was found in the gallery, prompting the court room to be cleared and metal detectors to be placed at the court room doors.  40 C.Tr. 40).  And of course, throughout the trial Sparks was shackled and wearing a stun belt (operated at times by none other than Bailiff Moorehead of necktie fame).

The defense objected after the victim's father rushed Sparks in front of the jury by moving for a mistrial.  This was the second time that the boy's father had disrupted the trial, and the defense requested a mistrial. 41 Ct. R. at 89-92.  The mistrial was based on the belief that the defendant had been prejudiced in the eyes of the jury. *Id.*  The mistrial was denied.

## GENERAL DISCUSSION OF CAPITAL PUNISHMENT LAW IN TEXAS

The following is an overview of capital punishment law in Texas. This summary is provided simply as a general guide; not all capital murder trials follow this pattern.

The Texas Legislature has designated certain types of murders as eligible for the death penalty. To warrant the death penalty, the defendant must have committed another serious crime in addition to committing a murder. For instance, kidnaping and then killing a person is a capital offense. So is killing two people, rather than one, which happened in the present case.

In recent years, once a person is indicted for capital murder and the State decides to pursue the death penalty, the defendant is assigned two attorneys. One of the lawyers is the lead attorney; the other is the second chair attorney. Both attorneys are charged with investigating the case, filing motions, selecting the jury, and arguing as forcefully as possible for a not guilty verdict or a lesser conviction than capital murder, or if all else fails, for a life sentence.

The district attorney's office will equally prepare, usually assigning two, sometimes three, prosecutors to the case, along with one or two investigators and paralegals.

Lawyers for the defendant will usually file a large number of pretrial motions. The reason for this is because the state and federal law requires all issues raised on appeal to be first presented to the trial judge. Death penalty jurisprudence is thick with constitutional and statutory issues. All unsettled challenges to death penalty procedures must be raised. Failure to do so means that the issues are waived for direct appeal. Moreover, because the Supreme Court has insisted that effective assistance of counsel requires attorneys who are knowledgeable about death penalty litigation, the failure of trial lawyers to raise important issues at trial for later review on appeal can lead accusations that the trial lawyers were ineffective.

In a capital case, the trial judge will hold several pretrial hearings on motions by the State and defense. The judge will address motions to suppress, constitutional challenges, and hearings on the qualifications of experts. Any defense requests denied by the judge are preserved for appeal.

Texas adheres to individual voir dire of potential jurors. Generally, a large number of veniremen are summoned to the courthouse, around 600 or 700. Many jurors exercise certain allowable rights not to serve; others cannot be found. On appearance day, about 300 jurors or so will show.

The trial judge will perform the initial qualification of the jury panel.  Either side may ask for the jury to be shuffled at this point.  Jurors will be seated randomly in numerical order.  Beginning with juror number one, the first twelve jurors who are not struck or removed for cause will constitute the jury.

The judge will screen out those who cannot speak and write English, who have felony or moral turpitude convictions, and those who are entitled to legitimate legal exemptions from service.  In addition, the judge will hear explanations about physical disability, business conflicts, general biases, or other personal issues which might disqualify a juror.  The judge may excuse some jurors but not others.  At this stage, the attorneys for both sides have minimal input, other than a few questions for individual jurors called to the bench.  Frequently, the lawyers for both sides will agree to excuse a juror for some reason.  There is a certain Texas statutory provision which allows lawyers on both sides to agree to excuse a juror.

Qualifying the jury to this point is a difficult day-long affair.  Once the venire is qualified for general jury service, they are scheduled for individual voir dire examination.  Generally in groups of five to ten, they are instructed to return to court over the next three to four weeks, for individual questioning about their views on the death penalty.

When each juror arrives on his designated day, each side is generally allowed approximately forty-five minutes to question the juror. After the juror leaves, each side is permitted to challenge for cause. If granted, the juror is finally excused and deleted from the pool. If challenges for cause are denied, the juror remains in the pool and subject to a peremptory challenge or to become part of the twelve-member petit jury.

There are two methods in Texas for permitting peremptory challenges. For many years, judges required peremptory challenges to be exercised immediately after the juror is questioned individually and challenges for cause denied. This is sometimes called the sequential method of selecting the jury. The State goes first. If the State strikes the juror, the juror is gone. If the State declines to strike the juror, then the right passes to the defense. If the defense strikes the juror, the juror is eliminated. If the defense does not strike the juror, then the juror joins the twelve-member petit jury. This process is repeated until twelve jurors and two alternates are seated. Each side has ten peremptory challenges. This form of jury selection was used in Sparks' trial.

Once the jury is selected and sworn, trial proceeds in the usual fashion. If the defendant is found guilty of capital murder, the sentencing phase begins. In response to the Supreme Court's insistence that the jury decision-making process

be guided, Texas has constructed three questions, called special issues. The questions have varied over the years. In Spark's case, only two questions were asked: the future dangerousness question and the mitigation question.

The method of answering the special issues is complicated. If the jurors unanimously answer both questions in the State's favor, as they did here, then the judge sentences the defendant to death automatically. If the jurors answer *unanimously* any one of the questions in the defendant's favor, then the judge will sentence the defendant to life in prison.

Jurors are also told that in order to answer any special issue in the defendant's favor, at least ten of the jurors must agree.

The jurors are *not* told certain outcomes. It is possible that the jurors might fail to agree *unanimously* on the answer in the State's favor to any special issue. If this occurs, then the defendant is sentenced automatically to life in prison. There is no retrial. Unlike in any non-capital case, a hung jury does not result in a retrial in the sentencing phase of a capital case. The result is always either a life sentence or a death sentence. Jurors, however, are not told this.

As a corollary, jurors are also not told that a single juror can decide in favor of a life sentence. Unanimity is required for a death sentence. A life sentence is the result otherwise, the result of a single juror's decision.

37

Moreover, jurors are not told what occurs if fewer than twelve jurors agree on an answer to a special issue in the State's favor, but fewer than ten jurors agree on an answer in the defendant's favor.  Again, the answer is that the defendant receives an automatic life sentence.

Once the judge pronounces the death sentence and signs the judgment, appeal is automatic to the Texas Court of Criminal Appeals ("CCA").  At the same time that the trial judge appoints an appellate lawyer, the judge will also appoint an attorney to file the defendant's state article 11.071 application for state writ of habeas corpus.  The state writ must be filed shortly after the state direct appeal brief is filed, before the CCA decides the appeal.  If the direct appeal is affirmed, the defendant has the right to appeal to the United States Supreme Court.  Once the CCA denies the direct appeal and the state writ application, the inmate must proceed to federal district court.

## ARGUMENT AND AUTHORITIES

### Overview of Claims for Relief

### Claim One

Sparks's right to an impartial jury guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution was violated at the punishment phase of the trial when a court official, a bailiff, in the presence of the jury, wore as part of his uniform, a necktie bearing the image of a hypodermic syringe seeping liquid showing his support for the death penalty.  P. 41.

### Claim Two

This Claim has been omitted as it has no bearing on the outcome of this Federal Writ.

### Claim Three

Sparks's right to an impartial jury guaranteed under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated when the trial court refused to grant a mistrial in spite of repeated instances of misconduct by bystanders which took place within the view of the jury. P. 57.

### Claim Four

Sparks's right to an impartial jury guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution were violated based on the combined effects of the actions of the bailiff and the bystanders as well as the overall atmosphere surrounding his trial. P. 61.

### Claim Five

Sparks's Eighth Amendment and Due Process rights were violated when the State's expert witness, A.P. Merillat, testified to materially inaccurate evidence at the punishment stage of Sparks' trial.   P. 64

### Claim Six

The state trial court violated Sparks's Sixth and Fourteenth Amendment rights to an impartial jury and due process by denying his challenge for cause to numerous jurors specifically named in the direct state appeal. P. 97.

### Claim Seven

The Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by not requiring the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death. P. 124.

### Claim Eight.

The Texas 12-10 Rule, and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by *Mills v. Maryland* and *McKoy v. North Carolina.* P. 137

### Claims Nine through Eleven

Claims eight to eleven from the Initial Skeletal Petition raise contentions of ineffective assistance of counsel at the various stages of Spark's case and have been addressed in the foregoing sections.

<u>**DETAILED ARGUMENTS**</u>

**I.    CLAIM ONE: SIXTH AND FOURTH AMENDMENTS WERE VIOLATED BY THE BAILIFF WEARING A TIE WITH THE SYRINGE ON IT**

> Attorney: Well, why is it that you wanted to?  What was your motive in wearing the tie that day?
>
> Bailiff Moorehead: I wanted to wear it. Writ Ct. R. at18.

Sparks's right to an impartial jury guaranteed under the Sixth and Fourteenth Amendments to the U.S. Constitution was violated at the punishment phase of the trial when a court official, a bailiff, in the presence of the jury, wore as part of his uniform, a necktie bearing the image of a hypodermic syringe seeping liquid showing his support for the death penalty.



41



This claim was raised as point of error number one in the state Writ of Habeas Corpus.

## INTRODUCTION

The State of Texas puts its prisoners convicted of the death penalty to death by lethal injection.  Those who support the death penalty for a certain person often remark that they should "get the needle."  One of the Bailiffs assigned to Sparks's case was Bobby Zoe Moorehead.  Moorehead apparently believed that Sparks

should "get the needle", and decided to express his belief by wearing a black tie with a white syringe on the day that the jury would begin their punishment deliberations.  On the day he wore this tie, Moorehead was seated directly behind Sparks, within the plain  view of the jurors, operating a stun belt that was securely attached to Spark's person.  Moorehead was well known to the jurors in this case because he had been responsible for shepherding the jurors to and from the court room during the guilt innocence phase of the trial.

### A.    Core Legal Inquiry Concerning External Influences: Did The   Intrusion Affect the Jury's Deliberation and Thereby Its Verdict?

For over a century, the Supreme Court has held that "Private communications, possibly prejudicial, between jurors and third persons…are absolutely forbidden and invalidate the verdict at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892).  In *United States v. Olano*, the defendant claimed prejudice when the trial court permitted alternate jurors to sit in on deliberations, but instructed them not to participate. The Court summarized what it termed its "intrusion jurisprudence" and concluded:

> There may be cases where an intrusion should be presumed prejudicial, but a   presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and      thereby its verdict?

507 U.S. 725, 739 (1993).

In *Stockton v. Virginia*, the Fourth Circuit found a restaurant owner's comment to jurors during a capital sentencing phase that "they ought to fry the son-of-a-bitch" harmful and requiring retrial. 852 F.2d 740 (4th Cir.1988) ("The fact that there was here no threat or inducement, no invasion of the sanctity of jury room deliberations, does not still the sense that something went awry.").

## B.   Second Line of Legal Inquiry Trains on the Interactions Between the Bailiff and His Jurors

The hallmark Supreme Court case on the subject of bailiffs as witnesses is *Turner v. Louisiana*, 379 U.S. 466 (1965).   Two deputy sheriffs oversaw the sequestered jury.   As part of their duties, the deputies "ate with them, conversed with them, and did errands for them," although there was no evidence that the deputies spoke with the jurors about the case itself. *Id.* at 468. These same deputies also served as the prosecution's principal witnesses. *Id.* The Court held that the deputies' external contact with the jurors "subvert[ed] the[] basic guarantees of trial by jury." *Id.* at 473.   *See also Yelton v. State*, 50 Ala. App. 168 (Ala. Crim. App. 1973) (reversing conviction for first-degree murder and remanding for new trial because of an improper communication by a sheriff who was the custodian of the jury during a mealtime with some of the jurors.).

44

The law is even more severe when the bailiffs do not testify at a trial, but engage in *ex parte* communications with the jurors.   In *Parker v. Gladden*, the Supreme Court reversed when a bailiff stated to sequestered jurors on one occasion that the defendant was a "wicked fellow" who was guilty.   385 U.S. at 363-64 (1966).   The trial court had found the comments prejudicial and that they had affected the defendant's rights. The state appellate court had reversed the trial court, finding that the defendant's constitutional rights had not been violated. The Supreme Court reversed the appellate court, finding a violation of the Sixth Amendment right to trial by an impartial jury and the defendant's right to confront the witnesses against him.

In so ruling, the Court found controlling:

the fact that the official character of the bailiff -- as an officer of the court as      well as the State -- beyond question carries great weight with a jury which   he had been shepherding for eight days and nights.

Aside from this, we believe that the unauthorized conduct of the bailiff         'involves such a probability that prejudice will result that it is deemed inherently lacking in due process.'

379 U.S. 466 (citation omitted).

*See also Miles v. State*, 602 P.2d 227 (Okl.Cr.1979) (holding that reversible error existed where the bailiff dissuaded the jury from making a recommendation for leniency which the jury wanted to make); *Logan City v. Carlsen*, 799 P.2d 224

(Utah Ct. App. 1990) (district court erred in denying mistrial after bailiff had conversation with jurors in which bailiff explained courts' sentencing powers).

### C. Bailiff Moorehead's Conduct Bridges The Gap Between *Turner* and *Parker*

The conduct of Bailiff Moorehead was sufficiently egregious as to touch on both *Turner*-error and *Parker*-error. Like *Parker*, Moorehead's tie clearly communicated to the jury his belief that Sparks was a "wicked fellow" who deserved the death penalty. Like *Turner*, Moorehead may not have spoken with the jurors about the case itself, but his blatant external non-verbal communication with the jurors "subverted the basic guarantees of trial by jury."

### D. Prejudice is Presumed

The Supreme Court has long held that some state procedures are so inherently prejudicial that no alternative rationale could possibly be established:

> It is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.

*Estes v. Texas*, 381 U.S. 532, 542-543 (1965).

### E. Findings of Fact and Conclusions of Law

Judge Lewis's Findings of Fact and Conclusions of Law declared:

6.      The necktie was custom-made by the bailiff's wife at his direction and **was intended by the bailiff to show his support for the death penalty.**

(emphasis added).

7.      Moorehead has worn the necktie during other Capital Murder cases in which he has served and has never been reprimanded by his supervisors.

8.      The Court finds that Moorehead was not the bailiff in charge of the jury on the day he wore the said necktie, but was seated directly behind the Defendant operating the remotely activated custody control device.

9.      The Court finds that, following an unrecorded sidebar with the trial court, defense counsel Paul Johnson advised Moorehead that the Court wanted Moorehead to tuck his necktie into his shirt.

10.     The Court finds that Moorehead tucked his necktie and the hypodermic syringe embroidered on the necktie **was concealed from view.**

        (emphasis added)

**F.      Unreasonable Determination of the Facts**

        **1.      Unreasonableness is A Function of the Physical Impossibility Surrounding Moorehead's Situation Viz-A-Viz the Jury's Seating in the Courtroom**

Section 2254(d)(2) provides that a petitioner is entitled to relief if the state court's determinations of fact are unreasonable. Such unreasonableness is manifest in this case because the conclusion cannot possibly follow from the premises listed in FFCL Paragraphs 6-10. "Only when testimony is so unbelievable on its face that it defies physical law should the court intervene and declare it incredible as a

47

matter of law." *United States v. Lindell*, 881 F.2d 1313, 28 Fed. R. Evid. Serv. 1164 (5th Cir. 1989).  Simply put, it was physically impossible for the jury NOT to have seen the needle on Moorehead's tie.



### 2.   Unreasonableness is Demonstrated By The Internal Inconsistencies in the Findings of Fact and Conclusions of Law

While Sparks certainly agrees that Moorehead's tie "was intended by the bailiff to show his support for the death penalty" (¶6) and that trial judge advise "Moorehead to tuck his necktie into his shirt", (¶9), he respectfully submits that it is physically impossible for the jury not to have seen this tie since Moorehead "was

seated directly behind the Defendant operating the remotely activated custody control device." (¶8).

### 3.     The Tie Was Both Objectively and Subjectively Communicative in Nature

Moorehead's tie "was intended by the bailiff to show his support for the death penalty." (¶6). The fact that "Moorehead has worn the necktie during other Capital Murder cases in which he has served and has never been reprimanded by his supervisors", *id.* at ¶7, can only establish that Moorehead's desire to "show his support for the death penalty" is deliberately targeted to jurors in death penalty cases (rather than in some other more global or general sense). Moreover, Moorehead did not wear the tie during the guilt/innocence phase, but rather waited until thethe day the jury would start deliberating on punishment.

> Q:     Well, why is it that you wanted to? What was your motive in wearing the tie that day?
> A:     I wanted to wear it.

Writ Ct. R. at18.

> Q:     You support the death penalty?
> A:     Certainly, I do.

> Q:     And as a bailiff, you understood that the jury had a decision to make with regard to the special issues in the case as to whether or not the defendant would live or die.
> A:     Yes, I did. I was aware of that.

*Id.* at 20.

Q:    How many cases have you worn that tie in?

A:    I don't know how many cases, Counselor.

*Id.* at 36.

Moreover, Moorehead had interacted with the jurors in Sparks's trial at earlier points when he was occupied with responsibilities other than working the stun belt:

Q:    Would you be surprised if the record reflects that you did help out with the jury at some points during trial?

A:    I would not be surprised; I just don't remember that.

*Id.* at 28 (questioning by State on cross-examination).

###    4.    The Jurors Must Have Seen The Tie Because Several Other People in the Courtroom Saw The Tie

The fact that 1) Defense Counsel Paul Johnson saw the tie and 2) the trial judge saw the tie necessarily yields the conclusion that 3) the jurors saw the tie because the judge and the defense counsel were necessarily looking in different directions (i.e., at each other).  If two people looking in opposite directions see an object, it is impossible for a third person (looking at the other two) not to see it, also.

The district court concluded that "the necktie was concealed from view." FFCL; ¶10).  Implicit in this finding is an unstated conclusion that the members of

the jury never saw the tie, or that the tie was tucked away from view while the jury was present.  This is not what the evidence presented to the state court established.

The testimony at the hearing was that Moorehead wore his tie outside of his clothing for the first two hours of the day on December 10, until the defense counsel instructed him to tuck it into his shirt at the presiding judge's direction. Writ Ct. R. at18-20.  At that point, Moorehead did as he was instructed and tucked the tie into the shirt.  *Id.*  According to the defense counsel, Moorehead wore the tie outside his shirt until closing arguments were taking place, when an individual from the gallery attempted to rush the defendant.  *Id.* at 83-84.  This meshes with the testimony of Perstephanie Sparks at the hearing.  *Id.* at 101; *See also* 41 Ct. R. at 88-89 (showing that the individual from the audience rushed the forward in the court room well into the proceedings on December 10, 2008, when the jury was present.)  A review of the trial record for the final day of the trial shows that closing arguments came only after the defense presented their final witness, Dr. Kristi Compton, meaning that the tie was visible throughout Compton's testimony. 41 Ct. R. at 1-78.  The jury was of course present for the Dr. Compton's testimony. *Id.*

> **5.    The Jurors Must Have Seen The Tie Because Moorehead Stood With His Coat Unbuttoned When They Alighted To and From the Courtroom**

Q:     Do you usually wear your jacket open or unbuttoned?
**A:     I usually wear it open.**

*Id.* at 30 (emphasis added) (questioning by State on cross-examination).

Q:     You would have been standing, is that correct?
A:     Yes, I would have.
*Id.* at 21.

A:     If [Sparks] was standing, I was standing.
*Id.* at 29 (questioning by State on cross-examination).

### 6.     Since the Jurors Saw Sparks, They Necessarily Also Saw Moorehead's Tie

A:     I probably would have been seated in that chair, the first chair just inside the holdover door there, next to the brown desk.
*Id.* at 22.

Q:     You sit in a chair that's immediately in front of the rail, correct?
A:     Yes, ma'am, that's correct.

*Id.* at 26 (cross-examination testimony by the State).

### 7.     Moorehead's Position Was Clearly Visible From the Front of the Courtroom

Q:     And for purposes of the record, that chair is located, at least right now, in your line of visibility, is it not?
A:     Well, it is right now, yes.

*Id.* at 22.

### 8.     Nothing in Moorehead's Hands or Lap Impeded The Jury's View of the Tie

Moorehead was clear that the device he was holding to control the stun belt was so small as not to impede the view of his tie:

> A:     The device is very small.  It's only about 3 inches by maybe 1 inch.

*Id.* at 30.

### G.     Unreasonable Application of Clearly Established Federal Law Concerning the External Influence of Bailiff Moorehead's Tie On the Jurors

Under 28 USC §2254(d)(1), a district errs when it denies habeas relief based on an "unreasonable application of, clearly established Federal law."  Judge Lewis's conclusion in FFCL ¶14, "The Court finds that applicant has failed to present any evidence proving that any juror considered Moorehead's necktie during deliberations" is so diametrically opposed to the Supreme Court's doctrine on external influences that no reasonable jurist could find it correct.

### 1.     Sparks Does Not Have to Show Prejudice

As an initial matter, Sparks does not have to show prejudice concerning this external influence because it involves a "procedure employed by the State" rather than some private individual impermissibly communicating with the jury.

> [A] procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process.

*Estes v. Texas*, 381 U.S. 532, 542-543 (1965).

Bailiff Moorehead was a longtime employee of Dallas County, a political subdivision of the State of Texas.  Moorehead himself testified, and Judge Lewis stated in the FFCL, that "Moorehead has worn the necktie during other Capital Murder cases in which he has served and has never been reprimanded by his supervisors."   FFCL; ¶7.   The ineluctable conclusion is that the bearing of hypodermic syringes on Moorhead's attire was a form of municipal policy or custom.

The Fifth Circuit has long held that "the mere existence of contact between the sheriff and the jurors resulting from the performance of ***perfunctory duties*** required by law and the orderly conduct of court is not sufficient in and of itself to invalidate the conviction."   *Bowles v. Texas*, 366 F.2d 734, 738 (5th Cir. 1966) (emphasis added).  Moorehead's regular custom of wearing a syringe on his tie is the antitheses of a perfunctory duty.

> ### 2. Even if Sparks Had to Show Prejudice, No Court Has Ever Held that the Jurors Must Have Actually "Considered" The External Influence In Their Deliberations
>
> In *Turner*, the Supreme Court explained of a required prejudice showing, This court is inclined to look upon the practice with ***disapproval***, however, because in such cases ***there may be prejudice of a kind exceedingly difficult to establish***.

*Turner*, at 470 (emphasis added).

And even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association…

*Id.* at 473.

### H.    Unreasonable Application of Clearly Established Federal Law Concerning the Situation of Moorehead Behind Sparks But in the Plain View of the Jury

In *Holbrook v. Flynn*, the Supreme Court addressed whether seating "four uniformed state troopers" in the row of spectators' seats immediately behind the defendant at trial denied the defendant his right to a fair trial. 475 U.S. 560, 562 (1986). The Court held that the presence of the troopers was not so inherently prejudicial that it denied the defendant a fair trial. *Id.*, at 571. In reaching that holding, the Court stated that "the question must be ... whether 'an unacceptable risk is presented of impermissible factors coming into play.' " *Id.*, at 570.

In other words, "*Flynn* focused on a practice's risk - the risk, not the reality, of prejudice - to the defendant." Scot Kitner, *The Need and Means to Restrict Spectators From Wearing Buttons at Criminal Trials*, 27 REV. LITIG. 733, 766 (Summer 2008).

Sparks respectfully submits that Moorehead's situation behind Sparks but in the plain view of the jury is the precise situation forewarned in *Flynn*. The shockingly "unacceptable risk" of a bailiff wearing a syringe right behind the jury

55

is wholly distinct from whether or not the jury actually relief on this influence in reaching its decision.

## II.   CLAIM TWO HAS BEEN OMITTED

In his initial skeletal petition, Sparks raised as Claim Two an IAC claim

derivative of the Moorehead/necktie issue.  This was raised in the state writ, but

has no bearing on the outcome of Issue One.  Sparks is not re-raising this issue in

the instant federal writ.  However, for purposes of keeping the numbering uniform

and consistent, Sparks will continue to call this Claim Two.

## III.   CLAIM THREE: SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS WERE VIOLATED   WHEN THE TRIAL COURT REFUSED TO GRANT A MISTRIAL IN SPITE OF REPEATED INSTANCES OF AUDIENCE DISRUPTIONS

### Spectator Outburst at the Punishment Phase
### Raised as Point Twenty-Two in the Direct Appeal

Sparks's Sixth and Fourteenth Amendment rights to a fair trial were
violated     when the trial court overruled his contemporaneous
motion for mistrial after  one of the victims' father, Harold Sublet,
Sr., caused a disturbance in the courtroom by rushing towards the jury
rail causing numerous bailiffs to         jump up to constrain him.

### Introduction

One of the victim's father, Harold Sublet, Sr., attended trial wearing a t-shirt

with a picture of his late son imprinted.  A review of State Writ Exhibit 2 from

approximately minutes 20:00-28:00 shows that Sublet stood in the doorway to the

courtroom during the first trial outburst by a hysterical woman.  However, during

closing argument at punishment phase, Sublet charged the jury rail.  The following

recordation of the commotion is presented in the Record:

> Bailiff: Whoa up, brother. Stop there.
> Bailiff: Get back.
> Bailiff: Stay there. Get him.

(R.R. vol. 40, P. 41; 41 Ct. R. at 88-89); see also State's Exhibit B From the writ
hearing, "Dallas DNA" DVD, (showing one victim's father rushing at the
defendant during guilt and innocence.)"

Sparks recognizes that in *Carey v. Musladin*, the Supreme Court denied

habeas relief when members of the deceased's family sat in the front row of the

spectators' gallery wearing buttons displaying the deceased's image.  549 U.S. 70

(2006).  Sublet's t-shirt fits comfortably within *Musladin*'s holding.

However, the Texas Court of Criminal Appeal's conclusion that "the

conduct at issue was Sublet's non-verbal, emotional response to the prosecutor's

closing argument" is both factually incorrect and (as a result) yields a legal

incorrect result.  The reason is this: the issue is not Sublet's "emotional response"

but rather the external influence he imparted to the jurors in a purely physical; this

is wholly different from the purely visual functioning of the buttons in *Musladin*.

> **A.    Unreasonable Determination of Fact: Court of Criminal
> Appeals Description of Sublet's "Emotional Response"
> Elides Past the External Influence Imparted Through His
> Physical Conduct**

Section 2254(d)(2) provides that a petitioner is entitled to relief if the state court's determinations of fact are unreasonable.  Such unreasonableness is manifest in the CCA's factual determination that the conduct at issue was Sublet's "non-verbal, emotional response to the prosecutor's closing argument."  Left unmentioned is that this response took the form of a physical charge into the attorney's-only area.

Because of this factual misunderstanding, the CCA applied the wrong legal standards.

### B.    Unreasonable Application of Clearly Established Federal Law Concerning the External Influence of Non-State Actors

The Constitution guarantees a criminal defendant a trial free from an unduly hostile atmosphere. *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986) and *Carey v. Musladin*, 549 U.S. 70 (2006).

### 1.    Government-Sponsored Practices

In *Flynn*, four uniformed police officers sat in the spectator section immediately behind the defense table at trial.  Throughout trial, uniformed policemen remained present as security.  The *Flynn* Court confronted two questions about the constitutional effect of their trial participation.  First, the Supreme Court confronted the question of "whether the conspicuous, or at least

noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 568–89. While recognizing that "the sight of a security force within the courtroom might under certain conditions create the impression in the minds of the jury that the defendant is dangerous or untrustworthy," the *Flynn* Court refused to find that the presence of security guards in the courtroom was inherently prejudicial. 475 U.S. at 569 (quotation omitted).

In *Carey v. Musladin*, 549 U.S. 70 (2006), members of a murder victim's family attended the defendant's trial wearing buttons with photographs of the victim. The defendant claimed that the buttons violated his Sixth and Fourteenth Amendment rights and invoked *Flynn*'s "inherent prejudice" review. The federal circuit court in Musladin had granted habeas relief, finding that the spectators' courtroom conduct created an unacceptable risk of prejudice. *See Musladin v. Lamarque*, 403 F.3d 1072 (9th Cir.2005). The Supreme Court reversed, distinguishing *Flynn* as a case of "government-sponsored practice." *Id.* at 75.

### 2.    Practices by Non-State Actors During Trial - Press, Mobs, Victims, Spectators

The First Amendment rights of spectators to attend a trial do not allow free-reign to disrupt the proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S.

555, 580-81 (1980) (holding that the public has a right to attend trials, but that right is restricted by defendant's right to a fair trial).

The Supreme Court has found some spectator activities so prejudicial that they deny the defendant a fair trial. *Sheppard v. Maxwell*, 384 U.S. 333, 362-63 (1966) (reversing Sheppard's conviction because the trial judge failed to protect the defendant from to control disruptive influences in the courtroom, depriving Sheppard of a fair trial consistent with due process under the Fourteenth Amendment.).

## IV.   SIXTH AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE COMBINED EFFECTS OF THE OVERALL ATMOSPHERE AS IDENTIFIED IN THE IMMEDIATELY FOREGOING CLAIMS

### The Combined Effect of the Manifold External Influences Rendered Sparks's Trial A "Sham" Suffering "Mob Domination"

In *Carey v. Musladin*, the Supreme Court took cognizance of the combined effect of otherwise disparate external effects on a trial. "This Court has considered cases in which the proceedings were a sham or were mob dominated." 127 S. Ct. 649, 654 n.2 (2006).

One such mob case was *Frank v. Mangum*, 237 U.S. 309 (1915). A Georgia grand jury indicted Frank for murder, and he was found guilty after a four-week trial. *Id.* at 311-15. Frank's attorney filed a motion for a new trial because of

disorder in and about the courtroom, including "manifestations of public sentiment hostile" enough to influence the jury.   Examples of hostile sentiment included laughter during witness examination, applause after an exchange in favor of the prosecutor, and loud cheering outside the courtroom after the jury announced its verdict and while the judge polled the jury of its verdict. Moreover, Frank was not present during the verdict for fear of violence against him. The Supreme Court, while denying relief to Frank on procedural grounds, recognized that if a mob dominates a trial and actually interferes with the course of justice, such a trial violates due process. *Id.* at 335.

In *Moore v. Dempsey*, 261 U.S. 86 (1923), five African-American men faced murder charges after a white man died during a disturbance near a black church in Arkansas. *Id.* at 88-91.   The governor appointed seven people to a committee to investigate the murder.   After the authorities arrested the five men, a mob marched to the jail to lynch the defendants, but the committee promised the mob that the men would be found guilty.   Trial was "thronged with an adverse crowd that threatened the most dangerous consequences to anyone interfering" with finding the defendants guilty.

The defendants appealed to the Supreme Court, arguing that the state court proceedings were sham proceedings in violation of due process because of mob

pressure. *Id.* at 87.  The Court recognized the that "whole proceeding [was] a mask - that counsel, jury and judge were swept to the fatal end by an irresistible wave of public passion, and that the State Courts failed to correct the wrong." *Id.* at 91. Members of the jury, the Court noted, were under intense pressure to find the defendants guilty.  *Id.* at 92.  The Court remanded the case for trial of the habeas claim in the federal district court. *Id.*

Sparks's trial is highly similar to *Frank* and *Moore*.  There was an "adverse crowd" demonstrated by numerous outbursts from the audience manifesting hostile public sentiment.  This mob mentality affected the outcome of Sparks's trial.

**V.    SPARKS'S EIGHTH AMENDMENT AND DUE PROCESS RIGHTS WERE VIOLATED WHEN THE STATE'S EXPERT WITNESS, A.P. MERILLAT, TESTIFIED TO MATERIALLY INACCURATE EVIDENCE AT THE PUNISHMENT STAGE**

### A.    Factual Background: The Court of Criminal Appeals Has Repeatedly Reversed On the Grounds of Merillat's False Testimony

The State of Texas, during its punishment presentation, presented the testimony of A.P. Merillat, who presented himself as a "criminal investigator with the special prosecution unit in Huntsville."  39 Ct. R. at 8-36, 68-95, at 8.  Merillat was called as an expert witness to explain "the likelihood or opportunities to be violent inside the penitentiary."  39 Ct. R. 8-9.  Merillat explained that sparks would enter the Texas Prison System (TDCJ) at a G-3 classification level if he was sentenced to life in prison, and that no set of circumstances could change this.  *Id.* 70-80.  He also explained that persons entering at this level would be permitted to go to the mess hall with other inmates, go the library with other inmates, go to school and medical facilities, go to visitation, and that they could work outside the walls of the prison.  *Id.* at 76.  Merillat's testimony concerning the initial custody level for those sentenced to life in prison was false.  However, the jury, who did not have the benefit of the information presented below, relied upon Merillat's testimony when sentencing Sparks to death.  Cl. R. at 489, 90-94.

Prior to Sparks' case, Merillat had testified falsely in at least two other capital cases, both have since been reversed on the basis of his false testimony and new punishment hearings have been granted.   See *Estrada v. State*, 313 S.W.3d 274, 286 (Tex. Crim. App. 2010) cert. denied, 131 S. Ct. 905, 178 L. Ed. 2d 760 (U.S. 2011); *Velez v. State,* AP-76,051, 2012 WL 2130890 (Tex. Crim. App. 2012), reh'g denied (Sept. 12, 2012).

**B.     In Truth, TDCJ Reviews Each New Prisoner and Determines the Correct Initial Custody Level Based Upon the Inmate's Specific Characteristics**

For the purposes of his Federal Writ, Sparks' has obtained the services of Frank Aubuchon, who worked over 26 years for TDCJ, in jobs with titles such as Classification Case Manager, Chief of Unit Classification, Courtroom Coordinator, Administrator for Unit Classification and Administrator for Classification Operations.   *See* Exhibit 1, (Affidavit of Aubuchon and supporting documents.) Sparks requests that this Court to review the information submitted by Aubuchon, which explains the specific false statements made by Merillat at trial.   *See* Exhibit 1.

Aubuchon explains that a person sentenced to life without parole will, at best, be classified to the G3 level, **or, to the more restrictive G4 or G5 levels if required.**   *See Id.* point 3 (*citing* internal Exhibit B - TDCJ Unit Classification

65

Procedure 2.00 and Attachment A.)  He explains that all non-death offenders are processed through a diagnostic process as required by TDCJ regulations.  *Id.* (*citing* internal Exhibit C TDCJ 2003 Classification Plan pp. 35-55.) Aubuchon points out that before an offender will be assigned to a G3 classification the "offender must fit those characteristics to be assigned to G3 custody.  Those characteristics include having no pattern of recent in-prison assaultive behavior or other disciplinary convictions resulting in major penalties in the preceding six months and otherwise having 'No requirement for a more restrictive custody.'"  *Id.* at point 6 (*citing* internal Exhibit E TDCJ Classification Plan at p. 73-86.)  Those offender's with sufficiently bad disciplinary records could be assigned to G4 or G5 custody level right off the back.  *Id.*  In short, Sparks history for violence both in and out of jail would "be taken into account when determining an initial custody level for Sparks upon his admission to TDCJ."  *Id.* at 6 (*citing internal* Exhibit B - TDCJ Unit Classification Procedure 2.00 and Attachment A.)

Of course, G4 and G5 custody both offer prison officials with the opportunity to keep inmates in more secure lock ups with more restrictions on their movement and actions.  *See* Exhibit one, internal exhibit b (Unit Classification Procedure, 2.00) and attachment a thereto.   Finally, Aubuchon explains that all TDCJ classification employees receive formal training on the classification

procedures, and yearly training seminars are held to keep the staff up to date.  *See* Exhibit 1, points 5-6.

### C.      Merillat's False Testimony

First, it should be pointed out that Merillat never worked for TDCJ, and therefor never had any of the formal training offered to TDCJ employees related to the classification process.  39 Ct. R. at 20; Exhibit one at points 5-6.  This might explain why he incorrectly testified that he had the same training as a TDCJ employee: none.  39 Ct. R. at 73, 74.  Merillat also was adamant that those sentenced to life without parole would be "automatically classified as what's called a G3."  *Id.* at 70.  He then explained all of the activities permitted of a G3 prisoner and explained these prisoners would have opportunities for violent acts in the future.  *Id.* at 76-77.  On cross examination Merillat continued his false testimony once again claiming that all prisoners sentenced to over 50 years would start at a G3 classification.  *Id.* at 85.  Merillat told the defense counsel he was "wrong" about his assertion that a person could be sentenced to a more restrictive classification than G3 "right of the bat."  He likewise disagreed that G3 was minimum classification a person receiving a life sentence could receive, insisting instead that they would be classified as G3 no matter what characteristics or background.  *Id.* at 87.

### D.    The Jury Specifically Relied on Merillat's Testimony When Making Its Life/Death Determination

During closing argument the State of Texas pointed out that Spark's had "89 mind-numbing instances" of misconduct in his first TDCJ stay.  41 Ct. R. at 85-86. The State also highlighted Merillat's testimony that there was "plenty of opportunity, plenty of opportunities to commit acts of violence" in prison.  *Id.* The State exclaimed "[b]oy, did he fire up [defense attorney] Mr. Johnson." *Id.*  It is quite possible that Johnson was fired up because he was unable to show that Merillat was presenting false testimony.

Indeed, because the defense did not rebut Merillat's testimony, all they could do to was vaguely argue that Merillat was not reliable, without being able to identify the specific TDCJ documents which would have shown Merillat had no idea what he was talking about, or worse, was actively lying on the stand.  *Id.* at 96-7.

After failing to reach a verdict after deliberating the majority of the day on December 10, 2008, the jury specifically asked the court for Merillat's testimony.

The first note was sent at 7:23 p.m., and is reproduced below:

68

① the jury has a conflict regarding the
substance of Mr. Marliot's testimony
pertaining to what restrictions are on a 63
prisoner.

② ~~xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx~~
~~xxxx~~ If sentenced to a life sentence without
parole, what would he be classified as?

Heather Randall
12/10/08

FILED

000455

69

The second note was sent at 7:59 p.m., and is reproduced below:



Cl. R. at 489-99.  In response, the trial judge provided the jury with Merillat's false testimony explaining that Sparks would be classified at the G-3 Level.  *Id.* at 490-94.  By 10:36 am the next morning Sparks would be sentenced to death.

At no time during the pendency of this case has the State of Texas taken any steps to correct Merillat's false testimony.[1]

**ISSUE RESTATED: The Eight Amendment to the United States Constitution would be violated by allowing a death sentence based on materially false classification evidence.**

---

[1] The prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also* TEX. CODE CRIM. PROC. art. 2.01 (stating duty of prosecutor in nearly identical terms).

"The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special 'need for reliability in the determination that death is the appropriate punishment' in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) (*citing Gardner v. Florida*, 430 U.S. 349, 363-364 (1977) (WHITE, J., concurring in judgment)(*quoting Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991-92, 49 L.Ed.2d 944 (1976)). In *Johnson v. Mississippi* the Supreme Court reversed a sentence of death where the "jury was allowed to consider evidence that has been revealed to be materially inaccurate." *Id.* at 590.

In *Johnson* the Supreme Court looked at two factors, first, it decided that the jury was allowed to consider materially inaccurate evidence, second it decided that the evidence was prejudicial. *Id.* at 586. The Supreme Court pointed out that even had the prosecutor not relied upon the false evidence in closing arguments "there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life sentence and a death sentence.'" *Id.* (*citing Gardner v. Florida*, 430 U.S., at 359 (plurality opinion)).

Both factors, false testimony and prejudice, are present in Sparks' case. Just as in the *Johnson* case, the jury in Sparks' case was presented with materially false evidence. Also, as in the *Johnson* case, the State highlighted this evidence during

closing argument.  Taking things a step further than *Johnson,* we know that the jury actually considered the false evidence in this case because they asked for it shortly before returning a death sentence.  It cannot be doubted that both error and cause are present in Sparks' case.

The Supreme Court has repeatedly explained that "under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985) (*citing California v. Ramos*, 463 U.S., at 998-999, 103 S.Ct., at 3452.)  For this reason the Court of Criminal Appeals was correct when it, in reversing a capital defendant's death sentence on the grounds of Merillat's false testimony, said that they "believe that the Supreme Court would find this to be constitutionally intolerable." *Estrada v. State*, 313 S.W.3d 274, 287 (Tex. Crim. App. 2010) (*citing Johnson v. Mississippi*, 486 U.S. 578, 590, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) (death sentence based on "materially inaccurate" evidence violates Eighth Amendment); *Townsend v. Burke*, 334 U.S. 736, 740–41, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (it violates due process to base conviction on "materially untrue" information "whether caused by carelessness or design").

**E.     The State Violated Sparks' Due Process rights by Presenting Materially False and Misleading Information to the Jury**

Sparks' Due Process rights were violated by the state's use of Merillat's false testimony for three related reasons: (1) a "conviction obtained through the use of false evidence must . . . fall under the Fourteenth Amendment;"[2] (2) suppression of "evidence favorable to the accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution;"[3] and (3) the Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain."[4]

**1.     Convictions based on false evidence violate due process**

Constitutional due process prohibits the state from securing a conviction or death sentence through the use of false or highly misleading evidence. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"). "The same result [is obtained] when the State,

---

2 *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959) (*citing Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791; *Pyle v. State of Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; *Curran v. State of Delaware*, 3 Cir., 259 F.2d 707. *See State of New York ex rel. Whitman v. Wilson*, 318 U.S. 688, 63 S.Ct. 840, 87 L.Ed. 1083, and *White v. Ragen*, 324 U.S. 760, 65 S.Ct. 978, 89 L.Ed. 1348. *Compare Jones v. Commonwealth of Kentucky*, 6 Cir., 97 F.2d 335, 338, with *In re Sawyer's Petition*, 7 Cir., 229 F.2d 805, 809. Cf. Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1.

3*Brady v. Maryland*, 373 U.S. 83, 87; 83 S.Ct. 1193, 1197 (1963)
4 *Simmons v. S. Carolina*, 512 U.S. 154, 161 (U.S.S.C. 1994) (*citing Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977)).

although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* at 79. Importantly, it is not necessary that the prosecution actually knew that the testimony in this case was false, it is enough that the prosecution should have known as much. *See e.g., United States v. Agurs*, 427 U.S. 97, 103(1976) (explain that error occurs with the use of false evidence where the "evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.")[5] Convictions based on false evidence must be reversed if the false evidence "may have had an effect on the outcome of the trial." *Napue*, 360 U.S. at 272 (1959).

As discussed *supra,* Merillat's testimony was false. Further, in this case, the State of Texas has never made any attempts to correct this false testimony.[6]

The State constructively knew or should have known Merillat's claims were false for three reasons. First, the prosecutors themselves knew or should have known. The TDCJ policy is not merely a technical or obscure fact of concern only

---

5 The State of Texas recognizes the knows or should have known standard. *See Ex parte Adams*, 768 S.W.2d 281, 289 (Tex.Crim.App. 1989) (*Napue* applies "where the prosecution knew or should have known that perjured testimony was utilized to secure a conviction") (internal quotation omitted) *citing United States v. Agurs*, 427 U.S. 97, 103 (1976) (reaffirming "knew or should have known" standard); *Giglio v. United States*, 405 U.S. 150, 154 (1972) ("whether the nondisclosure [is] a result of negligence or design, it is the responsibility of the prosecutor.")); *Duggan v. State*, 778 S.W.2d 465, 468 (Tex.Crim.App. 1989) ("It does not matter whether the prosecutor actually knows that the evidence is false; it is enough that he or she should have recognized the misleading nature of the evidence.").

6 Petitioner points out that in *Estrada,* a previous cases where Merillat falsely testified, the prosecution followed their duty and conceded error on appeal: "In this case, the State has fulfilled this duty to correct the "false" testimony of Merillat that it presented at appellant's trial and which may have contributed to appellant's death sentence." *Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010). Sparks urges the state to do so in his case as well.

to corrections experts. Instead, this information is of critical importance to the prosecutor's job in ascertaining: 1) which defendants pose a threat of future danger warranting the State's pursuit of a death sentence; 2) the appropriateness of plea dispositions in capital cases; and 3) how to prove future dangerousness, when a death sentence is sought.[7]   Representing the State of Texas, which relies on TDCJ to incarcerate its convicts, the prosecution sought a death sentence based on its position that Mr. Estrada posed a threat of future danger if not executed. Demonstrating that it did know the importance of classification to this special issue the state called Merillat who essentially testified only that the initial G3 mandatory classification, which was false, would allow Sparks to be violent in prison.  If the prosecution did not know about TDCJ Unit Classification Procedure 2.0 it had a duty to inquire of other state personnel including those at the TDCJ before calling

---

7 The American Bar Association ("ABA") Standards on the Prosecution Function also support the common-sense notion that the prosecutors knew or should have known the correct and current classification policy, given its crucial importance to the future dangerousness inquiry. See ABA Prosecution Function, Standard 3-6.2 Information Relevant to Sentencing (available at http://www.abanet.org/crimjust/standards/pfunc_blk.html#1.2) (last visited Oct. 29, 2008).:

    (a)    The prosecutor should assist the court in basing its sentence on complete and accurate information for use in the presentence report. The prosecutor should disclose to the court any information in the prosecutor's files relevant to the sentence. If incompleteness or inaccurateness in the presentence report comes to the prosecutor's attention, the prosecutor should take steps to present the complete and correct information to the court and to defense counsel.

    (b)    The prosecutor should disclose to the defense and to the court at or prior to the sentencing proceeding all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

*Id.* (emphasis added). Although this standard refers only to inaccurate information in presentence reports, the broader principle – that prosecutors must supply the sentencer with reliable information – applies equally here. The ABA standards are a useful guideline for determining what the prosecutor knew or should have known. Indeed, the Supreme Court cited ABA standards pertaining to discovery in support of its holding in *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Officer Merillat to the stand and after the jury sent its second note.[8]  Asking the jury to sentence Sparks to death based on TDCJ classification evidence, the prosecution, at a minimum, should have known the current TDCJ policy. Although whether its ignorance was in good or bad faith is legally irrelevant,[9] if the State did not know, it was willfully or recklessly ignorant of a fact of life and death consequence.

Second, Merillat himself, knew or should have known, that his testimony was false and highly misleading. Courts impute the knowledge of the "prosecution team" to the prosecutor.[10]  Merillat works for the State of Texas as a "criminal investigator with the special prosecution unit in Huntsville."  39 Ct. R. at 8-36, 68-95, 8.  Merillat was called as an expert witness to explain "the likelihood or opportunities to be violent inside the penitentiary."  *Id.* at 8-9.  His expertise on Texas prisons is also self-professed.  *Id.* at 68-59.  As an expert, he had an obligation to know the current TDCJ policy.  Given the stakes, there is absolutely

---

8 The prosecutor's primary "duty [was] not to convict, but to see that justice is done." TEX. CRIM. PROC. art. 2.01. Clearly, justice required that the State acquire accurate sentencing information from TDCJ, especially once the jury crystallized the importance of this issue. See also *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding in context of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), that prosecutors have a "duty to learn of any favorable evidence known to the others acting on the government's behalf in the case").

9 Because Brady was aimed at ensuring that an accused receives a fair trial rather than punishing the prosecutor for failing to disclose favorable evidence, the prosecution's obligation to disclose is not measured by the moral culpability, or the willfulness, of the prosecutor. Agurs, 427 U.S. at 110 & n. 17, 96 S.Ct. at 2400 & n. 17. U.S. ex rel. Smith v. Fairman, 769 F.2d 386 at 392 (7th Cir.1985). In Brady cases the good or bad faith of the State is irrelevant for due process purposes.

10 United States v. Antone, 603 F.2d 566, 569 (5th Cir. 1979) (cited often by Texas Courts and imputing knowledge of state police officers to federal prosecutor) ("In considering use of perjured testimony this Court has declined to draw a distinction between different agencies under the same government, focusing instead upon the "prosecution team" which includes both investigative and prosecutorial personnel.").

no excuse for him not to know an extremely pertinent, published, and disseminated TDCJ classification policy that was the subject of his testimony, of course, if he did know of the policy he perjured himself in Sparks' case.  Finally, it should be pointed out that the Court of Criminal Appeals agrees that "[b]oth Merillat and the state knew or should have known of that regulation and therefore knew or should have known that Merillat's testimony about the G classification of inmates who were sentenced to life without parole was false."  *Velez v. State*, AP-76,051, 2012 WL 2130890 (Tex. Crim. App. June 13, 2012), reh'g denied (Sept. 12, 2012), cert. denied, 133 S. Ct. 2020 (U.S. 2013) (concerning similar false testimony from Merillat).

Third, the TDCJ is properly considered part of the prosecutorial team for *Napue* purposes under these circumstances.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60-61 (1987) (finding Brady obligation applied to state youth agency in case prosecuted by Pittsburgh District Attorney's Office).

It cannot be doubted that Merillat's false testimony "may have had an effect on the outcome of the trial" and was therefore prejudicial.  *See Napue*, 360 U.S. at 272 (1959) (using this standard of harm).  Merillat's testimony falsely told the jury that Sparks would initially be classified as a G3 prisoner when arriving to prison, **in spite of his past record or any other factors.**  This was patently false.  He

77

testified that as a G3 prisoner Sparks would be permitted to go to the mess hall with other inmates, go the library with other inmates, go to school and medical facilities, go to visitation, and that they could work outside the walls of the prison. 39 Ct. R. at 76. Of course, as explained by Frank Aubuchon, who is actually familiar with the TDCJ rules and regulations, in reality the classification committee would review Sparks past for violence and could, based on their review, classify Sparks to a more restrictive classification. *See* Exhibit 1. Finally, the fact that the jury specifically requested Merillat's testimony before sentencing Sparks to death shows that jury considered his testimony in reaching their decision. It is clear this false testimony was material and affected Sparks' case.

## 2. *Brady* Violation Predicated on the Withholding of Impeachment Evidence

In *Brady v. Maryland*, the Supreme Court held that suppression by the State of "evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87; 83 S.Ct. 1193, 1197 (1963). In later cases, the Supreme Court extended *Brady* and held that the prosecutor's duty to disclose such evidence applies even if there has been no request by the defendant, *United States v. Agurs*, 427 U.S. 97 (1976), and that this

duty includes both impeachment and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667 (1985).

The Supreme Court has also decided the State is deemed to possess evidence that is in the possession of any part of the prosecutorial team. *Kyles v. Whitley*, 514 U.S. at 437.    Evidence withheld by the state is material, and a new trial is required, if there is a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different.  *See e.g. Giglio v. U.S.*, 405 U.S. 150, 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.) Thus, a due process violation occurs if: 1) the State fails to disclose evidence, regardless of the prosecution's good or bad faith; 2) the withheld evidence is favorable to the accused; 3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. See *Brady v. Maryland, supra.*

It cannot be doubted that Merillat is part of the prosecution team for this case.  Prosecutors have a duty to learn of Brady evidence known to others acting on the State's behalf in criminal cases. *See Kyles v. Whitley*, 514 U.S. 419 (1995) (the State's failure to disclose two eye witness statements known only to the police violated Brady).  In Sparks' case, the prosecution therefore had a duty to discover

what Merillat knew, either that he was fabricating his testimony or that he had no idea what he talking about.  "Moreover, whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (*citing* Restatement (Second) of Agency s 272; American Bar Association, Project on Standards for Criminal Justice, Discovery and Procedure Before Trial s 2.1(d)).

The state has never disclosed, either during Sparks' trial or at any time after the trial, that Merillat's testimony was false.  Clearly this evidence was favorable to the accused, and as discussed above, there is a reasonable probability, that had Merillat been outed as a charlatan, that Sparks' would have received life in prison. While it is true that Sparks committed a horrible murder, it is also true that there was ample evidence that he suffers from severe mental illness.  Everything in this case points to that fact, his delusions about being poisoned, his beliefs people were out to get him, the way he acted after the crime, the fact that he thought the audio tapes he made would set him free, when they were closer to gibberish.  It is entirely possible that had the jury known Sparks could be classified as a G5 inmate, immediately upon his arrival to prison, that they would have found in his favor when making their sentencing determination.

### 3. Violation of *Simmons v. South Carolina* By Presenting False Evidence Which Sparks Was Not Afforded the Opportunity to Deny

The Supreme Court has explained "that The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" *Simmons v. S. Carolina*, 512 U.S. 154, 161 (1994) (*citing Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977)). In that case the capital defendant repeatedly requested the judge to include a jury instructing notifying the jury that if he was sentenced to life in prison, he would not be eligible for parole. *Id.* at 160. The judge refused to grant the motion. *Id.* Shortly into their determination of whether or not the defendant should receive death, the jury specifically asked if the defendant would be eligible for parole if sentenced to life. *Id.* They were instructed not to consider the defendant's parole eligibility, and the defendant was sentenced to death. *Id.* Had he been sentenced to life in prison he would not have been eligible for parole. *Id.*

Based on this set of facts the Supreme Court ruled "it is clear that the State denied petitioner due process." They moved on to decided prejudice. They began by explaining that "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors

81

constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not." *Id.* at 163. In much the same way, in assessing future dangerousness, a person's prison classification is indisputably relevant. A person who will be allowed to mingle freely with other inmates and work outside the walls is more likely to have opportunities to for violence than someone who will be classified to a more restrictive classification. By presenting false testimony related to the classification procedure, and failing to correct the false testimony, the State of Texas violated Sparks rights to due process by sentencing a man to death based on evidence which he had no opportunity to deny or explain.[11]

### F. Trial Counsel Failed to Provide Constitutionally-Required Effective Assistance of Counsel When He Failed to Correct the Record by Introducing Evidence Rebutting Merillat's Testimony

The withheld evidence in this case was not facially apparent from Merillat's testimony. Quite simply, in our justice system we expect state officials to testify truthfully and it is rather rare to find one who will testify falsely, as Merillat was willing to do. It seems unfair to put the onus for correcting false testimony on the defense team. However, Sparks recognizes that some Courts have held a prosecutor's duty to disclose evidence is limited to information that the defendant

---

11 The state court explained in another Merillat case that the "[a]ppellant had no duty to object because he could not reasonably be expected to have known that the testimony was false at the time that it was made. *Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010).

or defense counsel could not have obtained exercising reasonable or due diligence. *See, e.g., Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006).   Also, if the evidence was equally accessible to the defendant, it is not subject to Brady. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).   In the event his court believes Merillat's false testimony would have been discovered through the use of due diligence, then Sparks' trial counsel was ineffective.

There are two venerable elements to an ineffective assistance of counsel claim.   "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (2003).   Under Strickland, in order to show prejudice a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.   As noted in *United States v. Bagley*, the prejudice test for Strickland is identical to the materiality test for *Brady* claims.   473 U.S. 667, 682 (1985).   Prejudice has therefor been shown by proving that Merillat's testimony reasonably effected the outcome of the trial.

Defense counsel was ineffective for allowing Officer Merillat to mislead the jury with his demonstrably incorrect claim that inmates sentenced to life without parole will enter prison at the G3 classification level regardless of the specific offender characteristics.  Further, defense counsel had a constitutional obligation to investigate future dangerousness. *See, e.g., Rompilla v. Beard*, 545 U.S. 374, 381-83 (2005) (finding ineffectiveness based on failure to investigate and discover mitigating evidence).  In spite of the fact that the defense had apparently reviewed some of Merillat's past testimony (39 Ct. R. at 19), the defense failed to request Merillat's personnel file, training history, and case files prior to trial.  *Id.*  Only at the trial did the defense tell the judge "I need to see every bit of information."  *Id.*

Defense counsel also failed to secure an expert who could have set the record straight, and testify as the proper TDCJ rules regarding classification.  Had an expert, like Frank Aubuchon, been called to testify, Merillat could have been outed as the charlatan that he is.  See Exhibit 1, Affidavit of Frank Aubuchon (explaining that Aubuchon would personally have been available to consult with the defense and testify before the jury.)  The TDCJ policy in effect at the time of Sparks' trial makes it clear, there is a review process undertaken before a TDCJ inmate is assigned a custody level.  See Exhibit 1, internal exhibit B.  A basic open records request of TDCJ would have led to the written policy itself.  Undoubtedly,

other avenues to this information also exist. Counsel's failure to locate any of several avenues to the truth, and to guide the jury there, was inexcusable and completely ineffective.

As the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) and their Texas counterparts demonstrate, this information constitutes precisely the type which competent counsel is required to investigate and find in a capital case.[12]  It is well recognized that counsel cannot make a reasonable strategic decision without first conducting an adequate investigation. *See, e.g.*, *Wiggins*, 539 U.S. at 534 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'" (quoting *Strickland*, 466 U.S., at 690-691)). Here, by failing to take the rudimentary investigative steps that would have led to the pertinent TDCJ written policy,

---

12 See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines for Capital Counsel"), 31 Hofstra L. Rev. 913, 1055 (2003). Guideline 10.11(A) ("As set out in Guideline 10.7(A), counsel at every stage of the case have a continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation."); 10.11 Commentary, pp. 1059-1070 ("Counsel is entitled to impress upon the sentencer through evidence, argument, and/or instruction that the client will either never be eligible for parole, will be required to serve a lengthy minimum mandatory sentence before being considered for parole, or will be serving so many lengthy, consecutive sentences that he has no realistic hope of release. In at least some jurisdictions, counsel may be allowed to present evidence concerning the conditions under which such a sentence would be served." (noted omitted)) (emphasis added); 10.11 (F)(3) ("In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following: Witnesses who can testify about the applicable alternative to a death sentence and/or the conditions under which the alternative sentence would be served") (emphasis added); 10.7 (A) ("Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty."). See also State Bar of Texas Guidelines and Standards for Texas Capital Counsel Guideline 11.7 (F)(3) (same as ABA Guidelines for Capital Counsel 10.11 (F)(3) (published in 69 TEXAS BAR JOURNAL 966, 974 (2006) (available at www.texasbar.com) (last checked Oct. 29, 2008)).

counsel failed to conduct an adequate penalty-phase investigation and his representation fell below a basic level of competence.

By failing to properly conduct an investigation into the punishment phase of his case, Sparks' attorneys rendered ineffective assistances of counsel. As discussed above, this failure provided effective counsel prejudiced Sparks' case because it allowed the jury to consider Merillat's false testimony. The fact that the jury requested to review this testimony shortly before returning their verdict shows a reasonable probability that, but for counsel's ineffective assistance, Sparks' case would have ended with a life sentence, not a death sentence.

### G.    Contemporaneously Filed Motion to Stay and Abey

Simultaneously with the filing of this Amended Writ, Sparks' is filing a motion related to his requested Stay and Abeyance. Sparks' will only briefly introduce the issue here and respectfully direct this Court to his motion for a full explanation of his argument.

Federal precedent has firmly established that federal district courts should not entertain unexhausted claims raised in writs of habeas corpus. *See Rose v. Lundy*, 455 U.S. 509 (1982). This idea is based on the "interests of comity and federalism [which] dictate that state courts must have the first opportunity to decide a petitioner's claims." *Rhines v. Webber*, 544 U.S. 269, 273 (2005).

However, this doctrine was established in the era before AEDPA was enacted when there was no statute of limitations related to the filing of federal habeas petitions. *Id.* at 274. With the enactment of AEDPA came the strict one year statue of limitations on the filling of federal petitions. 28 U.S.C. § 2244(d).

In *Rhines*, the Supreme Court recognized the difficulty faced by petitioners when trying to balance the effect of the exhaustion requirement on one hand with the short statute of limitations on the other. After discussing the goals of AEDPA and the role of habeas corpus in general, the Court decided that it is proper for district courts to stay and abet federal writs so that unexhausted claims can be presented to the state courts in limited circumstances. *Rhines*, 544 U.S. at 277. The Court decided that it was proper to stay and abey a petitioners claims when: (1) "the district court determines there [is] good cause for the petitioner's failure to exhaust his claims first in state court" and (2) the unexhausted claims are potentially meritorious, and 3) there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines v. Weber*, 544 U.S. 269, 278 (2005). *Id.*

Until the recent past, Texas' capital petitioners had a hard time establishing that they had potentially meritorious claims as required by *Rhines* because the Court of Criminal Appeals refused to hear any writ applications while there was a

parallel federal writ pending. *See Ex Parte Soffar*, 143 S.W. 3d 804, 804 (Tex. Crim. App. 2004). However, in *Ex Parte Soffar* the Court of Criminal Appeals determined it would consider properly presented subsequent writs if the federal district court had granted a stay of the federal proceedings. *Id.*

In his motion to Stay and Abey Sparks specifically explains why such an action is proper in his case.

### H.    The Supreme Court's Recent Opinion in *Trevino v. Thaler* Applies Straightforwardly to the Case *Sub Judice*

Recently, in *Trevino v. Thaler,* the Supreme Court held that the holding of *Martinez* applies to Texas:

> "[A] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."

*Trevino v. Thaler*, 133 S. Ct. 1911 (U.S. 2013) (*citing Martinez v. Ryan*, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)).

Sparks submits that his State Habeas Counsel was ineffective for failing to present this claim in his state writ of habeas corpus. Sparks would first point out that Marillat's use of false testimony was exposed in the *Estrada* case which was decided close to two months before his state writ was filed. In the event this Court concludes that state habeas counsel should therefore have discovered the false

testimony in time to present this claim to the state court but failed to do so, then habeas counsel was ineffective.

Sparks' recognizes that some Courts have held a prosecutor's duty to disclose evidence is limited to information that the defendant or defense counsel could not have obtained by exercising reasonable or due diligence. *See, e.g., Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006).   Also, if the evidence was equally accessible to the defendant, it is not subject to Brady. *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

There are two elements to an ineffective assistance of counsel claim.  "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (2003).   Prejudice is shown by showing, *supra,* that the Merillat claim is potentially meritorious.

In the event this court finds that state habeas counsel could have discovered this claim in time to include it in the state writ by exercising due diligence (in spite of the fact the State has never brought this issue to Sparks' attention), it seems axiomatic that counsel was constitutionally deficient. The State Bar of Texas has

identified the "Duties of Habeas Corpus Counsel" in the State Bar of Texas' Guidelines and Standards for Texas Capital Counsel.[13]   The Texas State Bar, in identifying the duties of capital habeas counsel, identified one duty as follows:

> Habeas corpus counsel cannot rely on the previously compiled record, but must conduct a thorough and independent investigation. Specifically, habeas counsel cannot rely on the work of, or representations made by, prior counsel to limit the scope of the post-conviction investigation. Counsel must not assume that the trial record presents either a complete or accurate picture of the facts and issues in the case.

*Id.* at 30.   Further, the State Bar has also stated that state habeas "counsel has a duty to conduct a searching inquiry to assess whether any constitutional violations may have taken place."  *Id.*  If this evidence of Merillat's false testimony was of the type which should have been readily apparent to state habeas counsel, then it is clear he failed his client by not raising this issue below, and was therefore ineffective in representing his client.

Thus, under the principles established in *Trevino,* this claim, at least as it applies to the ineffectiveness of trial counsel, is not barred from this court's review.   However, the principles established in *Trevino* and *Martinez* are also applicable to this claim as whole, including the Due Process arguments.  *Trevino* pointed out that generally, "if a convicted state criminal defendant can show a

---

13 http://www.texasbar.com/Content/NavigationMenu/ForLawyers/Committees/TexasCapitalGuidelines.pdf).

federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino v. Thaler*, 133 S. Ct. 1911 at 6 (U.S. 2013). Of course there are many traps for the unwary defendant, one being the general requirement that claims first be presented to the state courts, this is referred to as procedural default. *Id.* However, the Supreme Court has pointed out that "the doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Id.* (internal quotations omitted).

The Supreme Court has identified three factors which support their belief that Ineffective State Habeas Counsel excuses procedural default for the failure to raise an ineffective trial counsel claim. "First, the right to the effective assistance of counsel at trial is a bedrock principle in our justice system.... Indeed, the right to counsel is the foundation for our adversary system." *Id.* at 7 (quotations removed). Second, taking into account that ineffective counsel on direct appeal is cause, it only makes sense that ineffective assistance of habeas counsel should be cause for claims which cannot be raised on direct appeal. *Id.* Such claims include those which rely on evidence outside the trial record. *Id.* Third, where a state channels

review of certain claims into collateral proceedings, the lawyers failure to raise those claims at the state habeas level could deprive a person of any review at all. *Id.* at 7-8.

Sparks' "Marillat claim" satisfies all of these factors. First, the idea that a death penalty cannot rest on false testimony is well established. *Johnson*, 486 U.S. 578 (1988). Further the Supreme Court has repeatedly held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair. *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214; *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9; *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217; Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690; *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104; *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 273, 38 L.Ed.2d 216.

Secondly, the review of a claim based on perjured testimony generally requires in investigation, outside of the appellate record, in order to show that the perjured testimony existed. After all, had the state followed their duty and corrected the false testimony at trial then there would be no claim at all. Finally, in Texas, as the Court held in *Trevino*, "[i]t would have been difficult, perhaps impossible, within [the] time frame [for direct appeal] to investigate" the Merillat Claim thoroughly. *Trevino,* at 10.

Sparks therefor argues that his state habeas attorney was ineffective for failing to raise this claim as a whole, not just for his failure to raise the ineffectiveness of the trial counsel, and that the nature of this claim when viewed through the *Trevino* framework establishes cause for his failure to raise this claim bellow. Sparks has requested this court to grant a stay and abey in this case, however, based on this analysis, it would also be proper for this court review this claim *de novo,* without using the extra judicial resources necessary to take this case back down the state courts, and without allowing the state to benefit from their Due Process claim by forcing Sparks to file a successive writ which has a more restrictive standard of review. *See*, *e.g.*, *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's Brady claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to "any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Instead, the claim is reviewed de novo."); Tex. C. Crim. P. 11.71 § 5.

## I.     A Valid *Brady* Claim Shows Cause for Failure to Exhaust

In *Banks v. Dretke,* the Supreme Court explained that a petitioner who affirmatively shows a valid *Brady* claim will also establish "cause and prejudice"

to excuse a procedural default.  540 U.S. 668, 686 (2004).  The Court explained the

reasoning behind this rule:

> *Brady*, we reiterate, held that "the suppression by the prosecution of
> evidence favorable to an accused upon request violates due process
> where the evidence is material either to guilt or to punishment,
> irrespective of the good faith or bad faith of the prosecution." 373
> U.S., at 87, 83 S.Ct. 1194. We set out in *Strickler v. Greene*, 527 U.S.
> 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the three
> components or essential elements of a Brady prosecutorial misconduct
> claim: "The evidence at issue must be favorable to the accused, either
> because it is exculpatory, or because it is impeaching; that evidence
> must have been suppressed by the State, either willfully or
> inadvertently; and prejudice must have ensued." 527 U.S., at 281-282,
> 119 S.Ct. 1936. "[C]ause and prejudice" in this case "parallel two of
> the three components of the alleged Brady violation itself." *Id.*, at 282,
> 119 S.Ct. 1936. Corresponding to the second Brady component
> (evidence suppressed by the State), a petitioner shows "cause" when
> the reason for his failure to develop facts in state-court proceedings
> was the State's suppression of the relevant evidence; coincident with
> the third Brady component (prejudice), prejudice within the compass
> of the "cause and prejudice" requirement exists when the suppressed
> evidence is "material" for Brady purposes. 527 U.S., at 282, 119 S.Ct.
> 1936. . . . Thus, if [Sparks] succeeds in demonstrating "cause and
> prejudice," he will at the same time succeed in establishing the
> elements of his Farr Brady death penalty due process claim.

In that case the Supreme Court explained that it is the prosecution team

which matters for this analysis, not simply the trial prosecutors.  *Id.* at 693 (*citing*

*Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)

(prosecutors are responsible for "any favorable evidence known to the others

acting on the government's behalf in the case, including the police.")  Further, the

Court in *Banks* suggested that a State's failure to admit a *Brady* violation could be seen as waiver of an procedural default argument.   *Id.* at 705 ("We note in this regard that, while AEDPA forbids a finding that exhaustion has been waived unless the State expressly waives the requirement, 28 U.S.C. § 2254(b)(3), under pre-AEDPA law, exhaustion and procedural default defenses could be waived based on the State's litigation conduct.")

As *Sparks* has established a valid *Brady* violation, he has also shown cause and prejudice for failing to exhaust this claim in the state courts below.

### J.  This Court Should Hold an Evidentiary Hearing before Deciding if Sparks is Entitled to Relief on his "Merillat Claim"

AEDPA discusses when a District Court should allow an applicant to develop facts which were not developed at the state level:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on--(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 USCA § 2254(e)(2).  However, the Supreme Court has held that "[u]nder the opening clause of § 2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  In short, "[i]f there has been no lack of diligence at the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254(e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." *Id.* at 437.  Most importantly: "a person is not at fault when his **diligent efforts to perform an act are thwarted**, for example, by the conduct of another or by happenstance." *Id.* at 432 (**emphasis added**).  The Court suggested that a person is entitled to a hearing when, for example, "the prosecution concealed facts." *Id.* at 435.

In this case, Sparks is not at fault, and did not fail to present this claim below, because the state has never complied with their duty to correct the false testimony given in this case.  As Sparks is not at fault, and did not fail to pursue the claim diligently, the "cause and prejudice" standard applies to whether or not this Court should hold a hearing on this issue. This is the same standard applied to procedurally defaulted claims. *Id.* at 433.  As discussed above, the showing of a valid *Brady* claim shows cause and prejudice for the failure to exhaust this claim at

the state level, it also excuses the failure to develop the factual record below. This

Court should order a hearing to properly develop the factual basis for this claim.

**VI.** **VIOLATION OF THE SIXTH AND EIGHTH AMENDMENTS IN THE DENIAL OF STRIKES FOR CAUSE TO NUMEROUS JURORS SPECIFICALLY NAMED IN THE DIRECT STATE APPEAL**

## Introduction

This claim was raised as claims one through nineteen in the state direct

appeal. While state direct appeal concerned the trial court's denial of challenges

for cause related to eighteen venirepersons, Sparks, taking into consideration the

requirements of 28 U.S.C. § 2254(d), now asserts that the trial court erred in failing

to grant the defense's challenges for cause on the following jurors: Kristine Marie

Bell, Myrna Noelia Conde, Patrick E. Norton, Harold Garland, Wheeler, Stacey

Anne Chadwick, Billy Esparza, and finally Susan Cassel. Sparks argues that the

Court of Criminal Appeals' decision as related to these jurors resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established

Federal law and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court

proceeding.

## Clearly Established Federal Law

The United States Supreme Court gave us the proper standard for deciding when a capital juror should be excused on account of their bias: "[t]hat standard is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (internal quotations omitted). However, the Court did not stop there, it also pointed out that "this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'" *Id.* The capital defendant does not have to prove a juror's bias with unmistakable clarity is simple: "[t]his is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Id.* Stated another way: "many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings." *Id.* 424-25. Because of this "the trial court has a serious duty to determine the question of actual bias, and a broad discretion in its rulings on challenges therefor.... In exercising its discretion, **the trial court must be zealous to protect the rights of an accused**." *Id.* at 429-30 (emphasis added and internal quotations omitted).

In *Witt,* the Supreme Court upheld a trial court's exclusion for cause of venireperson Colby.  *Id.* at 430.  The trial court in that case excused potential juror Colby based on the following exchange between the state and the potential juror:

> "[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?
> "[A. Colby:] I am afraid personally but not-
>
> "[Q]: Speak up, please.
>
> "[A]: I am afraid of being a little personal, but definitely not religious.
>
> "[Q]: Now, would that interfere with you sitting as a juror in this case?
>
> "[A]: I am afraid it would.
>
> "[Q]: You are afraid it would?
>
> "[A]: Yes, Sir.
>
> "[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?
>
> "[A]: I think so.
>
> "[Q]: You think it would.
>
> "[A]: I think it would.
>
> "[Q]: Your honor, I would move for cause at this point.
>
> "THE COURT: All right. Step down." Tr. 266-267.

*Id.* at 415-416.  In upholding the challenge for cause to Colby the Court in *Witt* clearly decided, based on the exchange above, that Colby's views on the death

penalty would substantially impair the performance of his duties as juror.  This is in spite of the fact that Colby never explicitly stated that his views would interfere with his duties, but rather stated that he "was afraid" and he thought they would.

Also important is the Supreme Court rule that "[a]ny juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial." *Morgan v. Illinois*, 504 U.S. 716, 740 (1992).  This is related to the holding in *Ross v. Oklahoma,* where the Supreme Court held that a juror who would automatically impose the death penalty in the event of conviction should have been removed for cause. 487 U.S. 81, 83-84 (1988).

In Sparks' case the Court of Criminal Appeals repeatedly excused the trial judge's failure to grant defense challenges to potential jurors on the grounds that the death prone jurors would eventually agree to the follow the law, even where the overall theme of their voir dire showed bias.  However, the fact that a potential juror, who initially expresses hesitation in being fair, ultimately asserts they can follow the law does not mean that juror is fit to serve on a capital jury. The Sixth Circuit illustrated this point in *White v. Mitchell*, 431 F.3d 517 (6th Cir. 2005).

*White* also involves a federal writ of habeas corpus reviewing a death sentence.  Petitioner White contended that the juror in question, Sheppard, "had

already formed an opinion with regard to (1) his guilt and (2) the appropriate

penalty and that, for this reason, she should have been removed by the trial judge."

*Id.* at 537.

> The Ohio Supreme Court found that, although the 'challenged juror
> expressed repeated concerns over whether she could be fair to the
> appellant[,] ... she ultimately acknowledged that she was a fair person and
> was willing to listen to all the evidence before making a final decision on
> appellant's guilt.' White, 693 N.E.2d at 777. The district court likewise
> found that although juror Sheppard 'initially expressed hesitation' regarding
> her ability to be a fair and impartial juror, she ultimately 'asserted that she
> could follow the dictates of the law,' and thus, the Ohio Supreme Court
> ruling on this issue was not unreasonable under AEDPA.

*Id.* at 537.  The Sixth Circuit disagreed.

The juror in question "initially expressed strong doubts as to whether she

could serve on the jury, stating, '[t]o be honest, when I walked in here, I had my

opinion formed. And my opinion is still very strong. And I really feel that I know

the newspapers and the TV told so much, but I really feel that there's enough

evidence right there.'"  *Id.* at 538.  However, the juror also repeatedly explained

she could listen to the evidence before making her decision, and believed if she

were in the defendant's position, she would want a juror like her on the panel.  *Id.*

at 538-39.  She repeatedly went back and forth, expressing her pro-death stance

while also saying she could be fair and listen to the evidence presented.  *Id.* at 538-

541.  The Sixth Circuit explained they were "struck by the vacillating nature of her

responses; she contradicts herself from question to question, sometimes openly equivocating during a single answer." *Id.* at 541.

In reversing the district court and ordering a writ of habeas corpus to issue the Sixth Circuit was "guided by the Supreme Court's holding in *Patton*, 467 U.S. at 1036, 104 S.Ct. 2885. In that case, the Supreme Court stated that the appropriate question on review of a juror bias issue is 'did a juror swear that [s]he could set aside any opinion [s]he might hold and decide the case on the evidence, **and should the juror's protestation of impartiality have been believed.**" *Id.* at 542 (*citing Patton v. Yount,* 467 U.S. 1025, 1036 (1984)). Indeed, it was "[t]he second portion of that inquiry-whether the statements of the impartiality should have been believed-" that highlighted "the grave problem" with the juror's testimony in *White*. *Id.* at 543. In short, the vacillating nature of the juror's statements made them "simply unbelievable." *Id.* It was because the lower courts failed to review whether the jurors affirmation of fairness was believable that the Sixth Circuit found that "the trial judge's failure to excuse Sheppard and the Ohio Supreme Court's finding that the trial court did not abuse its discretion in failing to strike Sheppard were contrary to or an unreasonable application of Supreme Court precedent." *Id.*

### The Factual Basis for the Claim and the State Court Decision

The direct appeal decision explains that Sparks properly preserved this issue for appeal by objecting to each juror, using a preemptory strike, and requesting additional strikes. *Sparks v. State*, AP-76,099, 2010 WL 4132769 (Tex. Crim. App. Oct. 20, 2010). "However, because the trial court granted him two additional peremptory strikes, appellant must show that the trial court committed error in denying his challenges for cause to three potential jurors to demonstrate that he was harmed." *Id.*

### Venireperson Kristine Bell

The Defense objected to Venireperson Bell on the grounds that she would automatically find a person to be a future danger in the even they were convicted of capital murder and that she was extremely death prone. 12 Ct. R. at 147-149. Bell explained that if she were the Governor of Texas she would expand the death penalty. *Id. at* 128. The following also shows she should have been excluded for cause:

> Q.(By Defense Counsel): I'm asking how you feel. We're not asking you how things ought to be; we're asking you how you think they should be.
> A. How I thinking they should be? Possibly, yeah, the - - possibly a child. Definitely physical, you know, like I said, quality of life. I mean, impairment. If I were writing the laws or whatever, elderly, possibly. It's hard. Because I think no matter what, you're still a person, as hard as that is. Doesn't - - even though he- - I hate saying that. Whether you're six or 60, you're still a person.
> Q. What's the death penalty accomplish?

A. Accomplish? I think it justifies an action that's done, and if it's proven I think it's warranted.

Q. So if it's - - what's proven, that the person committed the act?

A. Yes.

Q. Okay.

. . . . .

Q. Whole bunch of folks tell us - - no right or wrong answers.

Whole bunch of folks tell us, "If I just found this person guilty of a horrible multiple murder, in my mind I'm always gonna believe that Special Issue Number 1 should be yes."

A. Uh-huh.

Q. How do you fell about that?

A. I think probably yes.  Not always, but probably.  Not always.

Q. Where do you envision the possibility of not always?

A. Not always because I'm not him.  I don't know him.  I don't know what he's gonna do.  There a chance he may continue on, but I don't' know that.

Q. How could you ever answer that question, then?

A. What do you mean, saying yes?  It's probable. It's probable given evidence, given background, given all those things.  In the end, I don't know what he's gonna do.

Q. So you wouldn't consider that Special Issue Number 1 automatically should be answered yes?

A. I think in this case, yes, it doesn't. It has to be answered yes, because of the fact that he's gonna be either sent to prison or the death penalty.  In that situation with Special Issue No. 1, it would be yes.

Q. Explain that, why you think it would be yes, then.

A. From the way that I understand it, the way he described it to me, then I am not considering society like this society. I'm considering prison, that society there.

Q. So you think that a person guilty of a multiple murder, you think - - would the answer to that question, being the fact he's in prison, would always be yes?

 A. Yes.

. . .

Q. You feel that if you found someone guilty of multiple murders, that - - in the same transaction, like our indictment in this case, that you feel he would always be probably a continuing threat to society?

A. In the prison society?

Q. Yes, ma'am.

A. Yes.

. . .

Q. - -you said you're understanding that way, but you're talking about, since you don't know him, you think - - you're kind of like interchanging probability and possibility.

A. No, I'm saying that, well, 99 percent.  You know, there's 1 percent that maybe not.  Mostly, yeah.

Q. Okay.

12 Ct. R. at 130-143.

This potential juror explained that she would automatically find a person was a future danger, so long as the person was convicted of capital murder (at least 99% of the time.)  It is clear that her views prevented her performing her duty as a juror in a death penalty case, and in this particular instance, her bias was unmistakably clear.  Although Sparks' presented this issue to the state court in his Direct Appeal, the state court did not review the claim as related to this particular juror.  *See Id.* at n. 32.  However, because this claim was raised below, there was no procedural bar to raising the claim, and because the Court of Criminal Appeals did not reach the merits of this particular claim, this court is not subject to the deferential standards that apply under AEDPA.  *Cone v. Bell*, 556 U.S. 449, 472, 129 S. Ct. 1769, 1784, 173 L. Ed. 2d 701 (2009).  Instead, the claim is reviewed de novo.  *Id.* (*citing Rompilla v. Beard*, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (de novo review where state courts did not reach prejudice prong under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d

674 (1984)); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (same)).

### Venireperson Myrna Conde

The defense objected to Conde on the grounds that she would automatically rule in favor of death on special issue number one if she found a person guilty of capital murder, and on the grounds that she could not properly considering mitigation evidence.   17 Ct. R. at 67-86.   As the Court of Criminal Appeals recognized, Conde was showed definite signs of being biased:

> "If it was presented that the defendant did commit the crime[,] that the severity of it was horrendous, the circumstances were premeditation, I believe that the State of Texas does impose the death penalty, I would be in favor of that." She then indicated that she did not mean to say that in such a case the State "imposes" the death penalty, but rather the State of Texas "allows" the death penalty. Defense counsel asked Conde several times whether, after finding the defendant guilty, she would presume that the defendant would be a future danger, and each time Conde affirmed that she would answer the future dangerousness question affirmatively.

*Sparks*, 2010 WL 4132769, at 6.   In part, the Court of Criminal Appeals was referring to the following exchange:

> Q.(By the defense) : ….What you're saying is the fact that you found him guilty of a heinous capital murder, you're going to lean towards or presume that he will be a future danger and presume Special Issue Number 1 should be answered yes.  Is that correct?
> A. That's correct.

17 Ct. R. at 62.  The juror repeatedly stated that she would find the defendant to be

a future danger .   She also emphatically stated that there was nothing she would

find that would be mitigating.  This juror was positively mitigation impaired:

> Q. (By Mr. Peale): ....The law doesn't define, which they're always good at
> doing, not giving you much guidance. Telling you to make up your own
> mind.  That's what this situation is.  We can give you - - we can kind of ask
> you what you think about things and give you some things other jurors
> indicated to us, but to you, is there anything you think would be
> mitigation or important to you?
> A. No.
> Q. There's nothing you would give any sufficient consideration to determine
> whether it was mitigating or not?
> A. Correct.

*Id.*at 64-65.  The trial court then attempted to rehabilitate the Venireperson before

denying the defense strike for cause:

> THE COURT: So you can't go in and automatically - - the law won't allow
> you to automatically say, "Well, you know, he committed this heinous
> criminal act so therefore he's gonna be a threat to society."  Following the
> law, you have to presume - - just like the presumption of innocence, you've
> got to presume that the correct verdict is life.  And make the state prove to
> you beyond a reasonable doubt, if they can, that he would be a continuing
> threat to society. Sometimes we call that question the future-dangerousness
> issue.
> Would he be a danger to other folks in the future?  Even in the penitentiary
> system, which is where he would be.
> VENIREPERSON CONDE: Okay.
> THE COURT: Let me ask you, can you do that?
> VENIREPERSON CONDE: Yes, sir.
>
> THE COURT: Okay.  The reason I'm confused is because when Mr. Peale
> asked you a question if you find the defendant guilty of capital murder,
> would you in looking at Special Issue No. 2, because of the heinous act,
> would you always find he would be a continuing threat to society, you
> answered yes.

VENIREPERSON CONDE: Uh-huh.

THE COURT: That's not following the law.   In fact, that's in direct contradiction.   You have two contradicting answers.

VENIREPERSON CONDE: Huh?

THE COURT: One you gave to Mr. Birmingham, one you gave to Mr. Peale.

Do you understand? Have I explained to you that you have to follow the law and you have to assume or give the defendant the presumption of a life sentence?

VENIREPERSON CONDE: Okay.

*Id.* at 74.

Based on this exchange the Court of Criminal Appeals Ruled in a way which contradicts clearly established Supreme Court Presedent:

> The record shows that Conde vacillated depending on who was asking the questions. When the law was explained to her, she affirmed that she would follow the law. In this situation, we afford particular deference to the trial court's determination.23 Point of error six is overruled.

*Sparks*, 2010 WL 4132769 at 7.   The error committed by the Court of Criminal Appeals is the same error committed by the state court in *White* discussed above, the court failed to discuss the second prong identified in *Patton,* whether the protestation of impartiality was believable.   *Patton*, 467 U.S. at 1036.   The Court of Criminal Appeals failed to even address this issue, instead, taking Conde's assertion as gospel in spite of her clear bias.   The Court of Criminal Appeals decision was therefore contrary to clearly established federal law.

### Venireperson Norton

The defense objected to Venireperson Norton on the grounds that he would always answer the special issues in such a way that a death penalty would result. 18 Ct. R. at 102.   Norton's voir dire examination included the following:

Q. (By the defense): And then I think your first comments when you first got up there and the prosecutor talked to you, you basically said if somebody kills somebody and they're responsible for it, they should get the death penalty?
A. Yes.
Q. Do you remember saying that?
A. Yes.
Q. Would you agree you have pretty strong feelings on the death penalty?
A. Yes.
Q. That's similar to your response- -
A. Yes.
Q.  - - in your questionnaire.
So I want to put you in a hypothetical situation.  Hypothetically, you're on a jury with 11 other individuals.  You and those 11 other individuals have determined that the individual is guilty of capital murder, a heinous crime. Knowingly and intentionally taking the life of two people.  Meant to do it, intended to do it.  Wasn't a mistake, wasn't an accident.  Individual wasn't insane at the time.
At that point right there, if you found him guilty, what are your thoughts on the death penalty?
A. Is that it would a just penalty.
. . . . .
Q.....That's all we're trying to get at.  If that's your true and honest feeling that you feel if I have been placed in a situation like that and if I found the person guilty of capital murder, my thoughts are they ought to get the death penalty and that's where I am, nothing wrong with that.
Tell me your thoughts in that situation.
A. I would say I feel that if the evidence showed that he was guilty of capital murder, I wouldn't have a problem with answering the questions if the evidence showed it to be that they deserve the death penalty.  It wouldn't - - I wouldn't have any issue with that.
18 Ct. R. at 90-92.

The juror continued to insist he could follow the law explaining he would consider the mitigation special issue.  *Id.* at 95-98.  However, the juror could not explain any situation he thought was mitigation and added "I think people should be accountable for what they do."  *Id.* at 96-97. He did not think genetics, circumstances of birth, upbringing and environment should be used as an excuse. *Id.* at 97-101.  Mental defects were not something the venireperson would find sufficiently mitigating.  *Id* at 101. He was further questioned:

> Q. (By Mr. Peale): Because this question here kind of gives the feeling, as the other answers gave me the feeling, that you know what, there's nothing this guy's gonna really consider, that his mind's made up.  Not a problem with that.  As I said, doesn't mean that you're not a fair person, doesn't mean you're not qualified. Means maybe this isn't the case that we would want you on.
> A. Yeah.
> Q. So tell me your thoughts and feelings on, now, correlating that question with Special Issue Number 2.  What are your thoughts and feelings?
> A. I guess I still would feel at this point, not determining guilt or innocence but punishment, I feel I could take in consideration anything that would, I guess, be leading up to why he's doing this crime.  I mean, I don't know.
> In being fair, I feel I could, but I don't know.

*Id.* at 99.

In short, this was a severely death leaning juror who should have been excluded when objected to by the defense.  The Court of Criminal Appeals even recognized many of the issues:

> When defense counsel questioned Norton about his written responses to the jury questionnaire, he stated that his own feelings were that if someone takes a life, his own life ought to be taken.

. . .

> He acknowledged that he had written on his questionnaire that background was "not an excuse" in assessing punishment, but he affirmed that, after he was made aware of the context for that question, he could "probably" take into consideration anything that would "be leading up to why [the defendant was] doing this crime." When counsel asked Norton whether he would consider poverty and education to be mitigating, Norton responded that they were not mitigating. Counsel also asked Norton whether he would consider a mental defect to be mitigating. Norton first stated that he was not sure, and then later he indicated that a mental defect would not be sufficiently mitigating.

*Sparks*, 2010 WL 4132769 at 7.  However, like most jurors, when asked if he could he keep an open mind and follow the law Norton answered yes.  *Id.*  Based on these answers the Court of Criminal Appeals ruled as follows: "Concerning future dangerousness, the record shows that Norton stated that he could set aside his personal views and follow the law. Concerning mitigation, Norton's statements that particular types of evidence were not mitigating to him did not render him challengeable for cause.  Point of error eight is overruled."  *Id.*

The Court of Criminal Appeals fell into the same trap as the lower courts in *White,* the court simply took a person's statement that they could follow the law at face value, without deciding if the persons statements should be believed. As the *White* court pointed out: "[w]ith a transcript reflecting statements as internally inconsistent and vacillating as these, including numerous statements of strong doubt regarding impartiality and merely a few tentative or cursory statements that

111

she would be fair, Sheppard was simply unbelievable as an impartial juror." *White v. Mitchell*, 431 F.3d 517, 542 (6th Cir. 2005).   The Court of Criminal Appeals misapplied clearly established federal law in reaching their decision, and further, the court's implicit decision that Norton was not biased by his pro-death views was an unreasonable determination of facts.

### Venireperson Wheeler

The defense objected to Venireperson Wheeler on the grounds that he "equivocated on his responses in regards to the special issues, in particular as to regards Special Issue Number 1."   21 Ct. R. at 67-68.   The defense argued that Wheeler's voir dire showed he would automatically vote for death in the event of a guilty finding.   *Id.*   The trial court overruled the objection and the defense was forced to use a preemptory challenge.   *Id.* at 69.

Wheeler believed and supported in the death penalty.   *Id.* at 12.   He always had believed in the death penalty because that is the way he lived his life and was the way he was brought up.   *Id.* 13.   His wife and children also believed in the death penalty.   *Id.* at 13.   He explained that there was a possibility he would always answer the future danger issue in such a way that would result in the death penalty:

> Q. (By the defense): Prosecution comes down and talks to you about it.   And he says, "You found him guilty. We're gonna ask you to go back.   Wipe the board clean, go back and consider that issue."

See, now that you had a chance to think about it and take all the time you
need to think about it some more.  Before you get to that question you have
just found him guilty under that type indictment that you have before you,
multiple murders, no excuse.
A. Okay.
Q. Horrendous crime.  Mr. Wheeler, could you honestly tell me that you're
gonna go back and make them prove something, or when you go back and
examine totality of the evidence before you, after anything you might or
might not hear in the punishment phase, would you honestly be able to go
back there and find that answer to be no, that he's not gonna be probably a
future danger, or would you always answer that question yes, based on the
finding you make in the guilty phase.
A. Based on the findings.
Q. You fell you would always answer that question yes?
A. Possible.

21 Ct. R. at 52.  When asked again if he would always vote yes Wheeler could

only answer "I couldn't say always."  *Id* at 55.  He also could not think of any

mitigating circumstances, except for self-defense.  *Id.* at 59-60.  Further, Wheeler

had written in his juror questionnaire that he didn't "think mitigation would be

appropriate in a murder case."  *Id.* at 68.

The Court of Criminal Appeals once again upheld the trial court's ruling

because "Wheeler indicated that he would keep an open mind and follow the law"

when asked if he could do so by the state.  *Sparks*, 2010 WL 4132769 at 8.  This

was in spite of the Court's recognition that "[d]uring the defense's examination,

Wheeler was somewhat less sure of his ability to set the defendant's guilt aside

when considering the future dangerousness issue."  *Id.*  In ruling this way the Court

113

of Criminal Appeals dispensed with United States Supreme Court's mandate that there is "no ritualistic adherence to a requirement that a prospective juror make it 'unmistakably clear ... that [she] would automatically vote against the imposition of capital punishment ....'" *Wainwright v. Witt*, 469 U.S. 412, 419, 105 S. Ct. 844, 849, 83 L. Ed. 2d 841 (1985).  The Court of Criminal Appeals erred in upholding the trial court's decision to deny the defenses strike for cause on Venireperson Wheeler.

## Venireperson Chadwick

The defense objected to Venireperson Chadwick on the grounds that she did not understand or appreciate the mitigation scheme in Texas, and that she was a death prone juror.  *Id.* at 125-26.  The defense challenge to Chadwick was denied, and the defense was forced to use a peremptory strike on her.  *Id.* 125-26.  In short, the defense believed that Chadwick's views would substantially impair her performance as a juror.  *See*, *e.g., Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (The proper standard for deciding whether a juror may be excluded for cause is whether the "juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.")

Chadwick's answer showed both that she did not understand her duty as a juror, and that she was possibly a death prone juror.  When asked if she could participate in the death sentence process she answered:

> A. I believe so, because ultimately he -- if he's found guilty, he -- he did the actions knowing – maybe not knowing that the death penalty could possibly be on the other side of his punishment if the person was caught, if he was caught.
> **But you took a life.**
> Q. now, you say "I think so."  If we were getting on the airplane and you were strapping in and the pilot came over and said, "I think I can fly this plane. I think can, were gonna reach our destination, how would you feel about that?
> A.  Not too good.
> Q.  Okay. Again, I'm not trying to pin you down.
> A. But that's the decision that was ultimately made taking the lives of the people. He brought - - the sentence was brought upon himself.  It's just up to myself, if I was chosen, to agree to that. **To agree that, yes, he's found guilty, then that's part of it; you have to do it.**
> If the issues, you know, if we can answer those however they would have to be answered. But that's - - **I believe in the death penalty.** Yeah, it would be difficult if it was a family member, yeah, I would want to change, probably, That's my family.  But going at this for not knowing the person, going at it as an innocent person, not knowing anybody, going in looking that way, not having a personal tie to anyone, I could.

26 Ct. R. at 83-84.  While the answer is somewhat nonsensical, it also raises serious doubts as to Chadwick's bias toward the death penalty.  It seems to show that she would give an automatic death sentence after convicting a person of capital murder.  This belief is bolstered by her answer to the state's question about whether the death penalty is ever warranted:

115

A. Well, I think, you know - - now, again, not the accidental death, but I do think if someone thought about - - it someone went to - - if they needed 20 bucks, went to a convenience store and robbed them, stabbed the person, killed them, that was not necessary.  You got the money; no need to kill somebody.  Murder's murder, as long as it's not an accidental, you know, where it was not intentional ; it was a circumstance that accidentally happened.  But murder's murder.  **You took someone's life, and although you may not want your life to be given for that life, eye for an eye.**

*Id.* at 93-94 (**emphasis added**).  Chadwick also expressed doubts about whether

she could consider the mitigation special issue:

Q. (by the state) Some people, maybe age may be a mitigating factor.  Some people, drug abuse may be a significant mitigating factor.  Some people say, "No, if it's " - - like you said in your questionnaire. You know, you don't appear to believe that drug use - -
A. Not an excuse.
Q. Right. But again, you have to keep an open mind and at least listen to the evidence to determine whether or not it was in this circumstance.
`       You understand what I'm saying?
A. I do, but I still don't think that would be an excuse.  I think I wouldn't feel that way.  I don't think I could say that.
Q. But could you keep an open mind and answer both these questions?
A. I can the first.  **The second one, I don't know.  If you find - - if you found the person to be a danger already.  Well -** -

*Id.* at 100-101 (**emphasis added**).  At the end of a rather confusing question and

answer session with the defense, Mrs. Chadwick explained "I don't think I

answered that well." *Id.* at 125.  The defense objected to her in part because after

"an hour and a half of explaining to her by the state and defense" she "doesn't

seem to fully understand or appreciate the mitigation scheme." *Id.* at 125.  Also

the defense believed she was death prone. *Id.* at 125-26.  The court overruled the

defense challenge for cause and the defense was forced to use a peremptory strike on her. *Id.*

Once again the Court of Criminal Appeals treated the juror's conclusory claims that they could be fair as the only important factor in deciding juror bias:

> The record reflects that at the beginning of voir dire, Chadwick indicated that she generally favored the death penalty. She stated that she did not have any problem with assessing the death penalty because, in her view, someone who made the decision to take the lives of others "brought [the death sentence] upon himself ." However, after the prosecutor explained the penalty phase and the special issues to her, Chadwick indicated that she could presume that the appropriate sentence would be life without parole until the State proved the defendant's future dangerousness to her.

2010 WL 4132769 at 8.  Also, concerning mitigation:

> She acknowledged that after finding a defendant guilty and also answering the future dangerousness issue affirmatively, she would have to see "something massive" to cause her to find sufficient mitigation in order to change the death sentence to life. She agreed, however, to listen to the evidence and keep an open mind. Her answers during the defense's examination were consistent with these responses.

*Id.*

Clearly, a person who would require something massive in mitigation and who thinks that causing the death of person is cause for a death sentence is biased within the meaning of *Witt*.  Conclusory statements that a person will follow the law do not change this analysis, unless those statements are believable.  They were not in this case.

## Venireperson Esparza

The defense objected to Esparza's presence on the jury on the grounds that he was mitigation impaired, and because he did not seem to comprehend the Texas death penalty scheme.  29 Ct. R. at 156-57.  The Judge denied their motion to remove the jury, and the defense exercised a peremptory challenge on the juror. *Id.*  Possibly the most troubling feature of Esparza's testimony was the fact he equated the word probably, with possibly:

> Q: (by the state) Right, we're saying, "Hey, look, based on the evidence, is there a probability that the defendant would commit criminal acts of violence?" So we're asking you to predict the future. Would you agree?
> A: Yes.
> Q: But when we talk about probability, you think probability is greater than possibility?
> A: Probably equal.
> Q  Basically, we have to prove there is a probability that he would commit future criminal acts of violence.
> A: Yes
> Q: Which would be greater than just a possibility, but less than an absolute certainty.  Can you see that?
> A. Say that again.

28 Ct. R. at 125-26.  Eventually Esparza said he understood the difference between probability and possibility.   However, when this was brought up again by the defense he once again showed he did not grasp the difference.  First he denied ever saying that possibility and probability were the same thing.  *Id.* at 155.  He could not explain the difference between the two words.  *Id.*  This is troubling because

the First Texas Special Issue in Spark's case was: Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Robert Sparks, would commit criminal acts of violence that would constitute a continuing threat to society?  Cl. R. at 499.  The question calls for a probability, something more than a possibility, and a juror who equates these two words necessarily reduces the burden on the state in proving special issue number one beyond a reasonable doubt.

There were other troubling signs in Esparza's testimony that show he was death biased.  When asked what he considered criminal acts of violence, his response "stealing a candy bar to committing another capital crime."  *Id.* at 127. He did not believe that alcohol, drugs or poverty were even possibly mitigating circumstances.  *Id.* at 132. He believed strongly in the death penalty and believed that Texas did not use the death penalty frequently enough.  *Id.* at 143.  One a scale of one to ten, ten being in support of the death penalty, he was a ten.  *Id.* at 142. He did not seem to know what mitigation evidence would be important to him.  *Id.* at 153.

The Court of Criminal Appeals upheld the trial court's decision not to strike Esparza for cause.  The court gave the following reasoning:

> Esparza's views that poverty and education were not mitigating did not render him challengeable for cause. Although he expressed some

119

> initial confusion concerning the distinction between "probability" and "possibility," he understood and accepted the distinction once it had been explained to him. Therefore, the trial court did not abuse its discretion in denying the challenge for cause.

*Sparks*, 2010 WL 4132769 at 11.  This factual analysis was unreasonable in light of the facts presented to the court.  It is clear that Esparza never grasped the difference between a probability and a possibility, which lowered the State's burden on special issue number one.  Also, the state court failed to recognize that Esparza did not seem to believe anything was sufficiently mitigating to call for a life in prison.  Esparza showed, rather clearly, that he was a biased juror, and the Court of Criminal Appeals erred in deciding otherwise.

### Venireperson Davis

The defense objected to Davis on the grounds that he was mitigation impaired, and because once he found a person guilty of a capital murder and future dangerousness, he would not consider mitigation.  *Id.* at 54.  That is exactly what Davis said he would do:

> Q.  (By Mr. Peale):  ....You and the other 11 jurors determine that presumption of life has been overcome and that the prosecutor proved to you that person's gonna be a future danger.  You found him guilty of this horrendous crime.
>
> Tell me your thought at that point.

A. My thoughts would be, you know, probably the death penalty.
Q. What's that? Sorry?

A. Probably the death penalty.
Q. You understand that - - and a lot of people feel this way and there's no problem with it. It's hard to imagine if you find someone guilty of capital murder and you found they're a future danger - - what else is there?
A. Right
Q. I think you're telling me , at that point your mind's made up.
A. Yeah
. . .
Q. So am I correct in saying you believe that once you found him a future dangerousness, that the death penalty is what he should get?
A. Yes.
Q. And there isn't anything you would ever consider to be mitigating to unring that bell, so to speak?
A. Uh, yeah.

29 Ct. R. at 54. Once again, when asked by the judge if he could follow the law the venireperson answered that he could. *Id.* 52-53. The judge denied the defense challenge by expressing the opinion that Davis was fair and that his admission to the contrary only came about because the defense "tactfully and skillfully inserted [their] words for his." *Id.* at 54-55.

The Court of Criminal Appeals made the same error once again: "[t]he record shows that Davis gave inconsistent answers with regard to whether he would consider mitigating evidence, but he affirmed on several occasions that he would follow the law and consider mitigating evidence. His assertion that Davis would always find the defendant to be a future danger is not supported by the

121

record." *Id.* at 11.   The court's ruling that the "Davis would always find the defendant to be a future danger is not supported by the record" is an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.   Also, the court once again failed to consider both *Patton* factors, meaning the Court incorrectly applied clearly established Supreme Court precedent.

### Sparks was harmed by the trial court's repeated failure to grant challenges for cause

By the time Venireperson Susan Cassel was reached during voir dire, the defense was out of strikes, many of which had been used on the objectionable jurors listed above.   After Cassel was interviewed by the both the state and the defense the defense objected that Cassel was "not the kind of juror that the law envision[ed] sitting on this type of case."   33 Ct. R. at 129-130.   The defense was concerned that the Cassel did not understand the nature her role as a juror, and opined that there was no way, "under any stretch of the imagination we could accept [her] as the 12th juror on the panel."   *Id.* at 129.   They challenged her for cause, this challenge was denied.   *Id.*   The defense asked for an additional peremptory strike, so that they could excuse her from serving, this was also denied. *Id.* at 30.   The court had previously granted two additional strikes and would not grant another.   *Id.* The bailiff, Bobby Moorehead, went and got Mrs. Cassel and

brought her before the court, where she was informed she was the 12th juror.  *Id.* at

30-31.

Some of Cassel's voir dire was nonsensical.  For example when asked if

society includes prison society she answered as follows:

> A:  A little bit. I guess who I am.  I don't know anything about the penal
> system.  I'm sorry I don't.  I would say again, believe in your system.  I
> would say I, personally, would believe if you were sent to a life
> imprisonment that – I mean, when you say a threat to like, a medical staff
> and the guards and whatnot, I just assume when you're sent to something
> like that – I guess I don't think of them as a threat, but I can understand them
> being a little bit of this, that I guess you can be still a threat to society inside.
> Q: Do you think it would help to hear from witnesses who would talk about
> what prison life is like? You think that would help you in making that
> decision?
> A: I guess. I try not to – I think I read on here don't listen to TV shows.
> That's all I can go by.  That's silly.

*Id.* at 65-86.  This would become a theme of Cassel's voir dire, rambling answers

which show a lack of understanding of Texas Death Penalty Scheme.  At points

during the voir dire, even on paper, it is clear that Cassel was overwhelmed:

> A: Oh gosh. Go over that again. Sorry.
> Q: (by the state) That's okay.
>      We talked about presumption of life.
> A: Right
> Q. Relax, your doing good,
> A: Okay.
> Q: You seem to be more nervous as I am talking to you.
> A: This is heavy. This is heavy.

*Id.* at 88-89.  When asked if she could consider all of the mitigation evidence

presented, she could only answer "I think so."  *Id.* at 90.

After a painstaking explanation of the law by the state, the defense asked a

simple question:

> Q: Okay: And the law tells you – you remember Mr. Birmingham said just
> like you have to presume he's innocent in the first part, you have to presume
> what in the second part?
> A:  That he's guilty.

*Id.* at 107.  The juror believed she could follow the law, but she also was unable to

understand what the law was.  The Supreme Court has made it clear that a juror is

excludable if they show an "inability to follow the law or abide by their oaths."

*Adams v. Texas,* 448 U.S. 38, 48, 100 S. Ct. 2521, 2528, 65 L. Ed. 2d 581 (1980).

In cases where such a person serves on the jury a death sentence cannot be carried

out.  *Id.*  In this case, Mrs. Cassel's inability to reach a basic understanding of

Texas' death penalty scheme shows that she was unable to the follow the law.

How can one follow a law they do not understand?  Sparks was therefore harmed

by having this juror sit on his jury.

## VII.  Texas's Death Penalty Scheme Violates the Sixth, Eighth, and Fourteenth Amendments By Not Requiring The State to Prove Aggravating Factors Relevant to the Mitigation Special Issue Beyond A Reasonable Doubt Before the Jury May Sentence

**EXHAUASTION:** This argument was presented as **21 and 47**  in  the  State
direct appeal.

Texas Code of Criminal Procedure article 37.071 violates the Due Process

Clause of the Fourteenth Amendment because it fails to place the burden of proof

on the mitigation special issue to the State to establish a "No" answer, and thereby implicitly assigned the burden of proof to Sparks.

A bit of the history that produced this special issue and its surrounding legislation may be helpful here. The original Texas special issue capital sentencing system was constructed in response to the Supreme Court decision in *Furman v. Georgia*, 408 U.S. 238 (1972). The lack of a vehicle to permit consideration of a good many types of mitigating circumstances was quickly noticed, but it took some 17 years for the Supreme Court to mandate the use of a vehicle that would permit sentencing jurors to fully consider and give effect to mitigating circumstances. See *Penry I*.

The Texas legislative response to *Penry I* was a grudging one. Here is a list and description of what this writer calls the "crippling amendments" that were enacted with the legislation providing for the special issue set forth above. First, in a departure from the long accepted practice that prevailed in Texas as of the date of the *Penry* amendments, the Texas legislature relieved the prosecutors from the burden of proving the lack of sufficient mitigating circumstances beyond a reasonable doubt. *See e.g., Steadham v. State*, 119 Tex.Crim. 475, 43 S.W.2d 944 (1931)[15].

_____

[15] Prior to the 1972 amendments in response to *Furman*, Texas prosecutors had an onerous burden of proof of "malice aforethought" defined as follows: "Malice aforethought" is the voluntary and intentional doing of an

125

Second, in the face of *Skipper v. South Carolina*, *supra*, the Texas legislature enacted a mandatory supplemental instruction limiting Texas capital sentencing jurors, in deciding the mitigation inquiry, to the consideration of evidence that they believe to reduce "moral blameworthiness." Intended or not, this instruction directs many jurors away from consideration of mitigating facts other than the circumstances of the offense, especially background facts like abuse as a child or mental illness less severe than insanity, where the nexus to the crime is not present or less pronounced.

Third, the Texas legislature provided that jurors must be told that a life verdict requires 10 votes, and not told the practical result of a failure to reach a unanimous verdict, when the law actually only requires that 1) a life verdict results if there is one vote dissenting from a death verdict, and 2) no mistrial or new trial will result from a failure to reach a unanimous verdict.

The result of these crippling amendments is to deny full consideration of mitigating evidence, especially the kind Sparks presented to his sentencing jury. A reasonable, law abiding Texas capital sentencing juror after hearing the horrific crime facts, and the evidence of extraneous misconduct, including a lengthy

---

unlawful act by one of sound memory and discretion, with the purpose, means, and ability to accomplish the reasonable and probable consequence of the act; and includes all of those states of mind under which the killing of a person takes place without any cause which will, in law, justify, excuse, or extenuate the homicide. It is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken." *Steadham, supra.*

misconduct record from a previous prison sentence, might well decide to place the burden of proving facts in mitigation of sentence upon Sparks. Absent a proper jury instruction, such a juror could very well require proof *beyond all doubt* that Sparks was indeed suffering from severe mental illness at the time he committed the murders in this case.   A Texas capital sentencing juror that placed such an impossibly high burden of proof and persuasion on Sparks in the mitigation inquiry would not be violating his oath as a juror to render a true verdict based on the law and the evidence. Such a Texas capital sentencing juror would not be in violation of any law given him by the trial court because the charge does not purport to set any burden of proof or persuasion on any fact for any party. This feature of the charge, even considered alone, demonstrates an egregious violation of the principles of *Furman v. Georgia.*

While the *Furman* Court "did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments," *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), it did recognize that "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Id.* Because of its uniqueness, the death penalty can not be imposed under sentencing procedures that "create a substantial risk that it [will] ... be inflicted in an arbitrary and capricious manner." *Id.* Because the Court found that the capital

sentencing procedures then being utilized did create such a risk, the *Furman* Court invalidated those procedures as incompatible with contemporary standards of decency.

There is another feature of the failure to assign a burden of proof or persuasion in the mitigation inquiry that leads directly to the arbitrary and capricious infliction of death as a penalty that *Furman* forbids. The state will often offer evidence of its own that tends to rebut the defense mitigation case.

In this case, as discussed at length, *see supra*, the state offered the expert opinion of Merillat who explained that Sparks, who is clearly mentally ill, will essentially have many opportunities to commit violence in prison. The state also admitted testimony that Sparks, while he was awaiting trial, took opportunities to be violent in jail, and that these episodes of violence were linked to Sparks' illness. 39 Ct. R. at 140-45. A reasonable law abiding Texas capital sentencing juror, exposed to the horrific crime facts and the extraneous misconduct, might well decide that Sparks was indeed suffering from mental illness at the time of the murder, but also believe that his mental illness, which should be treated as a mitigation factor, would make him a future danger in prison.

Again, such a Texas capital sentencing juror would not violate his or her oath to render a true verdict according to the evidence and the law because the

128

court's charge, the only law the jurors are to follow, leaves the evidentiary threshold for consideration of facts adverse to the defendant completely up to the sentencing juror. The Texas mitigation inquiry simply does not provide the guided discretion required in *Furman* that saved the Texas system from facial attack in *Jurek* or the vehicle for reasoned moral response that the Supreme Court required in *Penry I*. Whether a sentencing juror will conclude that a mitigating circumstance exists or whether life or death is "warranted" depends heavily on how the court channels his or her thought processes.

Sparks argues that the constitutional principles, derived from *Furman*, and more recently acknowledged by the Supreme Court in *Kansas v. Marsh*, 548 U. S. 163 (2006) are offended by the Texas CCA's refusal to grant relief from the constitutional frailties of the Texas capital sentencing system, and the mitigation inquiry in particular.

The *Marsh* opinion, authored by Justice Thomas, acknowledged that the high court had long required due process in the capital sentencing process, citing to the concurrence by Justice Thomas in *Graham v. Collins*, 506 U.S. 461 (1993), which, in turn cited *Gardner v. Florida* 430 U.S. 349 (1977)[due process required that the capital defendant be afforded an opportunity to rebut and explain the evidence adduced to support the state's death aggravators] and *Walton v. Arizona*,

497 U.S. 639, 672 (Scalia, J., concurring in part and concurring in judgment). Other Supreme Court cases have upheld the notion that the right to present mitigating evidence and to rebut aggravating evidence can only be vindicated with a rational process, one that will permit a reasoned moral response to the body of evidence before the jury.[16]

As Justice Thomas noted in his concurrence in *Graham*, supra., the major emphasis of our Eighth Amendment jurisprudence has been on "reasoned" sentencing. The Supreme Court  has continually sought to verify that States' capital procedures provide a "rational basis" for predictably determining which defendants shall be sentenced to death[1].  States may satisfy *Furman*'s demands--providing objective standards to ensure that the sentencer's discretion is "guided and channeled by . . . examination of specific factors." [2] "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of the factual conclusions

---

[16]  See *Simmons v. South Carolina*, 512 U.S. 154 (1994) [right to inform the sentencing jury that the capital defendant will never parole.]

[1] *Furman*, supra, at 294 (Brennan, J., concurring). See also *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *California v. Brown*, supra, at 541; *Barclay v. Florida*, 463 U.S. 939, 960 (1983) (Stevens, J., concurring in judgment) ("A constant theme of our cases . . . has been emphasis on procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner"); *McCleskey v. Kemp*, 481 U. S., at 323 (Brennan, J., dissenting) ("[C]oncern for arbitrariness focuses on the rationality of the system as a whole, and . . . a system that features a significant probability that sentencing decisions are influenced by impermissible considerations cannot be regarded as rational").

[2] *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

130

for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)). With respect to guilt phase elements, the beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship,* 397 at 364 (internal quotation marks and citation omitted). The same principle applies to aggravating factors in death penalty cases. See *Ring v. Arizona*, supra., *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004). The principles of *Ring,* derived from *Furman,* require that the same rule must apply to the prosecution's facts offered to rebut the defense mitigation case, such as the state's forensic psychologist testimony here.

In *Ring*, 122 S. Ct at 2439, the United States Supreme Court wrote: "The dispositive question, we said, 'is one not of form, but of effect.' If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact — no matter how the State labels it — must be found by a jury beyond a reasonable doubt."

Since Article 37.071 does not assign a burden of proof on the mitigation special issue it violates *Ring, supra*. Sparks contends that *Ring* requires the State to prove beyond a reasonable doubt that the answer to the mitigation special issue

should be "NO."   Article 37.071 does not require the State to prove beyond a reasonable doubt a "NO" answer to the mitigation special issue. In truth, the statute requires the defendant to prove that the mitigating evidence is sufficient to warrant a life sentence. This is a violation of *Ring,* supra.

Applying these principles to Sparks' case, the Court can readily see that Sparks explained his misconduct as the product of severe mental illness, whereas the prosecutors argued to the contrary, that he was essentially nothing more than an evil person who deserved death. To decide these issues without the application of a burden of proof to any party at all is a clear violation of our traditional notions of due process that all members of the *Marsh* court acknowledge are applicable in capital sentencing.

Though Sparks does claim that the constitution requires the state to prove its basic, underlying facts used to rebut the defense mitigation case beyond a reasonable doubt, he does not go so far as to demand that the overall burden of proof and persuasion on the ultimate mitigation inquiry be placed on the prosecution in this case. What Sparks asks the Court to require the prosecution to prove beyond a reasonable doubt is just the truth of the adverse facts that the jury might consider when reviewing his mitigation case. As to the ultimate mitigation issue, Sparks merely asks for our usual adversarial process, the traditional means of assuring reliability and due process of law in the resolution of important disputes. In the present state of capital sentencing law, this could mean that the burden of proof might be assigned to either party by one of the three recognized burdens of persuasion, a preponderance, clear and convincing and beyond a reasonable doubt. See *Walton v. Arizona, 497 U.S. 639 (1990)*[19] and *Ring v. Arizona*, and cases cited therein.  But it cannot mean that the court does not assign any burden of proof or persuasion to any party on any issue bearing on mitigation of punishment in a capital case. The failure to afford even the most rudimentary

---

[19]In *Martin v. Ohio,* 480 U.S. 228 (1987), the high court  upheld the Ohio practice of imposing on a capital defendant the burden of proving by a preponderance of the evidence that she was acting in self defense when she allegedly committed the murder. In *Leland v. Oregon*, 343 U.S. 790 (1952), the Supreme Court upheld, in a capital case, a requirement that the defense of insanity be proved beyond a reasonable doubt by the defendant, see also *Rivera v. Delaware*, 429 U.S. 877 (1976), and in *Patterson v. New York*, 432 U.S. 197 (1977), the Supreme Court rejected the argument that a State violated due process by imposing a preponderance of the evidence standard on a defendant to prove the affirmative defense of extreme emotional disturbance.

features of our traditional adversarial process at capital sentencing is objectively unreasonable in light of the principles of *Furman* and progeny requiring the proper guidance of the discretion of the sentencing jury.

The sentencing jury in this case selected Sparks for the death penalty without the benefit of any burden of proof or persuasion on any party at all. No reviewing court can possibly divine whether or how the sentencing jury gave full consideration and effect to Sparks's mitigation case. The *Richardson v. Marsh* presumption that jurors follow their instructions simply has no application here, because the sentencing jurors had inadequate instructions guiding the great discretion given them in deciding their response to the  mitigation inquiry. Without proper guidance, the jury's decision may have been entirely irrational and arbitrary. This not only offends the Due Process Clause, it violates the principle of heightened reliability in capital proceedings right up to the point of execution. *See,* e. g. *Ford v. Wainright*, 477 U.S. 399 (1986)

The sentencing process that produced Sparks's death sentence is constitutionally flawed for failure to provide for and enforce the rule of guided discretion in another way. *Gregg* and its companion cases reviewing the several state's responses to the *Furman* mandate stressed the fact that all of the approved statues required meaningful appellate review. 428 U.S. at 153. The purpose of appellate review is to provide "a means to promote the evenhanded, rational, and

consistent imposition of death sentences . . ." *Jurek v. Texas,* 428 U.S. at 276. In *Parker v. Dugger*, 498 U.S. 308 (1991), the Court re-emphasized "the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.". . . It is a "crucial protection." *Id.* While the Court has held that comparative proportionality review is not required by the Eighth Amendment, *see Pulley v. Harris*, 465 U.S. 37 (1984), some form of meaningful appellate review is still required. *See also Sochor v. Florida*, 504 U.S. 527 (1992). In this respect, Sparks says that the Texas system that produced his death sentence is facially flawed in that the CCA simply does not review this aspect of the process. It was objectively unreasonable for the CCA to uphold Sparks's death sentenced over his *Furman* based claim of error presented in the Texas trial court and the CCA.

To our knowledge, the previous attacks on the application of the crippling amendments to the fairly straightforward terms of the special issue itself have taken the form of a global demand for the assignment of the burden of proof and persuasion to the state in the mitigation inquiry. *See Rowell v. Dretke*, 398 F.3d 370, 376-77 (5th Cir. 2005); *Granados v. Quarterman*, 455 F.3d 529, 537 (5th Cir.), cert denied, 127 S. Ct. 732 (2006); *Ortiz v. Quarterman*, No. 06-70020, 2007 WL 2936244, at *10 (5th Cir. Oct. 10, 2007); *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007).

Sparks's argument is different, and it rests on a much firmer foundation. The demand here is also a more modest one, to simply require Texas to honor the Due Process Clause and the heightened reliability requirement of the Eighth Amendment by requiring the trial courts to tell the parties and the jurors who has the burden of proof at mitigation and how high is the standard of proof of the facts at issue. Put another way, Sparks's complaint is that he and the sentencing jurors did not know the rules of the mitigation game before play started, or, indeed, at any later time. There is no justification for jettisoning our usual adversarial process right at the point where life or death is to be finally decided. To do so is objectively unreasonable.

The Texas CCA overruled Sparks's *Furman* argument in two paragraphs without citing any federal authority. *Sparks v. State*, 2010 Tex. Crim. App. Unpub. 2010 WL 4132769, at 29.  The failure to require proper guidance to the discretion to the sentencing jury was objectively unreasonable in light of *Furman* and its progeny.

## VIII. TEXAS'S 12-10 RULE, AND THE LAW PROHIBITING JURORS FROM BEING INFORMED THAT THEIR INDIVIDUAL VOTE THAT LIFE IS THE PROPER SENTENCE WILL LEAD TO A LIFE SENTENCE, VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS AS CONSTRUED BY *MILLS V. MARYLAND* AND *MCKOY V. NORTH CAROLINA*

> **EXHAUSTION: This claim was raised on direct appeal as points of errors 36-38, and 43**.

Sparks argues that the Texas' capital sentencing scheme, by affirmatively misleading jurors about their individual ability to give effect to their personal belief regarding mitigation, violates the Eighth and Fourteenth Amendments. This claim is based on *Mills v. Maryland*, where the Court ruled that the petitioner's sentence could not stand where it was possible that some "jurors were prevented from considering factors which may call for a less severe penalty [than death.]" 486 U.S. 367, 376 (1988). As the Fifth Circuit has repeatedly recognized, "[s]ubsequent to *Mills*, the Supreme Court has explained that 'Mills requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death.'" *See, e.g., Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (citing *McKoy v. North Carolina*, 494 U.S. 433, 442–43, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990)); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994).

The constitutional defect with Texas' current jury instructions is that they, by statute and as applied in Sparks' case, mislead jurors about their individual ability to give effect to mitigating circumstances.  Although Texas' sentencing statute gives individual jurors the power to prevent the death penalty if they believe mitigating circumstances call for a sentence of life, that same statute also misleads jurors into believing their individual belief is immaterial unless they are able to persuade nine of their fellow jurors that their view of the evidence is correct. *See* TEX. CODE CRIM. PRO. ART. 37.071 (Art. 37.071). Sparks does not argue that it is necessary to instruct jurors about the consequences of a single holdout juror although that would give meaning to Art.37.071 Sec. 2 (g) (if the jury is unable to answer either of the special issues the court shall sentence the defendant to life in prison).  Rather, Sparks argues that the Texas' sentencing scheme misleads jurors about their individual ability to "give effect to mitigating evidence when deciding the ultimate question whether to vote for a death sentence." *McKoy*, 494 U.S. at 442-43.

The State will likely reply that this claim has been consistently rejected by the Fifth Circuit on two grounds: both on the merits and because the argument is *Teague* barred.  However, the Fifth Circuit in rejecting this claim has repeatedly relied upon cases decided before Texas Code of Criminal Procedure 37.071 was drastically changed in September of 1991, even when in denying this claim for

post-1991 cases.  In so doing the Fifth Circuit has not addressed the fact that the

Texas Sentencing Scheme has changed, or how this change affects the analysis

of this claim.

Before 1991, Texas' death penalty sentencing scheme consisted of asking

Jurors a series of three questions:

(1) whether the conduct of the defendant that caused the death of the
deceased was committed deliberately and with the reasonable expectation
that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit
criminal acts of violence that would constitute a continuing threat to
society; and

(3) if raised by the evidence, whether the conduct of the defendant
in killing the deceased was unreasonable in response to the provocation, if
any, by the deceased.

Art. 37.071(b) (Supp.1975-1976).

These questions remained until the law was drastically changed in September

of 1991.

If the jurors unanimously agreed that each of these questions had been

proven beyond a reasonable doubt, then they answered them 'yes,' and a

sentence of death would result. *Id.* If the jury answered any of these questions

'no,' then life imprisonment would result. *Id.* Much like today, a yes answer had

to be unanimous and a no answer had to be supported by ten of the jurors. *Id.*

Although the pre-1991 sentencing statute failed to specifically allow consideration of mitigation evidence, the Supreme Court upheld the statute because the Texas Court of Criminal Appeals "indicated that it will interpret this second question so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Jurek v. Texas*, 428 U.S. 262, 272 (1976). Thus, juries in Texas were allowed to consider mitigation evidence, although they were never told so. Of course the infirmities of the pre-1991 sentencing scheme were brought to light when the Supreme Court held that Johnny Paul Penry had been sentenced to death in violation of the Eighth Amendment because his jury had not been adequately instructed with respect to mitigating evidence. *See Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*); *Penry v. Johnson*, 532 U.S. 782 (2001). As a result, the Texas death penalty sentencing scheme was changed to expressly allow juries to consider mitigation evidence.

In 1991 the Texas legislature amended Code of Criminal Procedure art. 37.071 to include a true "mitigation special issue." See 1991 Tex. Sess. Law Service Ch. 838 (S.B. 880). Related to Sparks' case, the two special issues in question became the following:

1) "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

2) "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and

140

the personal moral culpability of the defendant, there is a sufficient
mitigating circumstance or circumstances to warrant that a
sentence of life imprisonment rather than a death sentenced be imposed.

*Id.*; See TEX. CODE CRIM. PRO. art. 37.071 (Vernon Supp. 1993-present).

The jury could not answer special issue no. 2 "no" unless they agreed
unanimously, and they could not answer special issue no. 2 "yes" unless ten or
more of them agreed that mitigation called for a life sentence. *Id.* Jurors are not
told that a single juror's belief that life is appropriate will result in a life
sentence. *Id.*

The Fifth Circuit repeatedly held that Mills did not apply to the pre-
1991 sentencing scheme because "*Mills* involve[d] statutory schemes different
from the Texas sentencing statute and different legal standards." *See, e.g., Webb
v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993). This was true, as the pre-1991
sentencing scheme did not actually involve a mitigation special issue. However,
the post-1991 sentencing scheme does include a mitigation special issue and is
therefore much closer to the sentencing scheme discussed in *Mills*. The problem
is that the Fifth Circuit, in its decisions related to the post-1991 sentencing
scheme, has relied on decision based on Pre-1991 sentencing schemes. Sparks
has not discovered cases which address whether or not the change in the
sentencing scheme affects the analysis of this issue.

For example, the state will likely cite *Druery v. Thaler*, for the propositions that *Teague* bars review of this claim and that *Mills* does not apply to Texas' sentencing scheme.  647 F.3d 535, 543 (5th Cir. 2011) cert. denied, 132 S. Ct. 1550 (U.S. 2012).  *Druery* cites *Miller v. Johnson* for the idea that "*Mills* is not applicable to the capital sentencing scheme in Texas." *Id.* (citing *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir.2000)).  *Miller* however is not applicable to the issue currently before this court for many reasons. First, "the jury at [Miller's] trial was instructed what to do if they did not reach agreement as set forth in the charge. The jury instructions provided that if there was any special issue on which the vote of the jurors was not unanimously 'yes' or not at least ten in favor of an answer of 'no,' there should be no answer for that special issue and the presiding juror should not sign his or her name to any answer form for that special issue." *Miller*, at 288. Had this happened in Sparks case, this claim would not have been presented. Further, *Miller* concerned the pre-1991 jury capital sentencing scheme which was not used in Sparks' case. *Id.* However, it is important that the *Miller* Court did recognized that "*Mills* requires that each  juror be permitted to consider and  give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *Id.* Sparks argues that the post-1991 sentencing scheme does not allow each juror to consider and give effect to mitigating evidence.

Concerning the pre-1991 sentencing scheme, the Fifth Circuit ruled that "*Mills* may inform the analysis of his claim, but [it does] not dictate the constitutional rule urged by [the petitioner]." *Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993). The basis of this ruling was that "*Mills* involve[d] statutory schemes different from the Texas sentencing statute and different legal standards." *Id.* At the time that this line of argument was adopted by the Fifth Circuit, Texas did not use the mitigation special issue. By adopting a mitigation special, Texas law was brought much closer in line with the sentencing scheme found in *Mills*. Further, the Supreme Court has found that differences in underlying sentencing schemes do not necessarily provide a basis for denying relief under *Teague*. *Stringer v. Black*, 503 U.S. 222, 229 (1992) ("We acknowledge there are differences in the use of aggravating factors under the Mississippi capital sentencing system and their use in the Georgia system in *Godfrey*. In our view, however, those differences could not have been considered a basis for denying relief in light of precedent existing at the time petitioner's sentence became final.").

In conclusion, because the Fifth Circuit has not addressed whether the 1991 change to Texas' sentencing scheme alters the analysis of this issue this Court should not be bound by prior precedent and should address this issue on the merits.

143

### IX. Claims Eight to Eleven From the Initial Skeletal Petition Raise Contentions of IAC Which Have Been Addressed in the Foregoing Sections

In Sparks's initial skeletal writ, Claims Nine, Ten, and Eleven raised various contentions on ineffective assistance of counsel. The substance of these predecessor claims have all been raised in this amended petition.

### CONCLUSION

As this petition demonstrates, Petitioner Sparks's rights under the federal constitution were violated, unremedied by the Texas courts.

### RELIEF REQUESTED

Prayer for Relief

WHEREFORE, Petitioner respectfully prays this Court:

1.   Order that Petitioner be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit Sparks to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent

necessary to fully develop and identify the facts supporting his petition, and any defenses thereto raised by the Respondents' Answer;

2.    Order that upon completion of discovery, Petitioner be granted leave to amend his petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery and that Sparks be granted to leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include additional materials related to the petition;

3.    Grant an evidentiary hearing pursuant to Rule 8 of the Rules Governing § 2254 Cases at which proof may be offered concerning the allegations of this petition;

4.    Issue a writ of habeas corpus to have Sparks brought before it to the end that he may be discharged from his unconstitutional confinement and restraint;

5.    In the alternative to the relief requested in Paragraph 4, if this Court should deny the relief as requested in Paragraph 4, issue a writ of habeas corpus to have

Sparks brought before it to the end that he may be relieved of his unconstitutional sentences;

6.  Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

WHEREFORE, PREMISES CONSIDERED, the Applicant SPARKS asks this Court to hold hearings, make its findings of fact and conclusions of law, and find that he was denied rights.  He requests the Court to vacate his conviction and issue a writ to the Respondent, or the warden of the Polunsky Unit, ordering release of Sparks from custody, or alternatively, to reverse Sparks' conviction and order a new trial, or alternatively, to vacate his sentence of death and order a new trial on sentencing.

Respectfully submitted,

LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

seth@kretzerfirm.com

/s/ Jonathan Landers

_____

Jonathan Landers
2813 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com

COURT APPOINTED LAWYERS FOR PETITIONER
SPARKS

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Petition for Writ of Habeas Corpus

was served on all counsel of record by filing on the ECF System on this June 10, 2013.


_____

Seth Kretzer


## VERIFICATION

As a representative for the petitioner, I verify that the foregoing is true and correct to the

best of my knowledge.

Respectfully submitted,


LAW OFFICE OF SETH KRETZER
The Lyric Center
440 Louisiana Street
Suite 200
Houston, TX 77002
(713) 775-3050 (work)
(713) 224-2815 (FAX)

147

seth@kretzerfirm.com


/s/ Jonathan Landers

_____

Jonathan Landers
2813 W T.C. Jester
Houston Texas 77018
(713) 301-3153 (work)
(713) 685-5020 (FAX)

jonathan.landers@gmail.com