IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ROBERT SPARKS | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 3:12-CV-469-N |
| | § | (Death Penalty Case) |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Robert Sparks petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional due to trial errors, prosecutorial misconduct and ineffective assistance of counsel. Because Sparks has not shown that he is entitled to relief, the Court denies the requested relief.

## I. PROCEDURAL BACKGROUND

Sparks was convicted and sentenced to death for the capital murder of his wife and two stepsons in the same criminal transaction. *State v. Sparks,* No. F-0801020-J (Crim. Dist. Ct. No. 3, Dallas County, Tex. Dec. 11, 2008). The Texas Court of Criminal Appeals ("CCA") unanimously affirmed the conviction and death sentence. *Sparks v. State,* No. AP-76,099, 2010 WL 4132769, at *1 (Tex. Crim. App. Oct. 20, 2010), *cert. denied,* 563 U.S. 962 (2011). During the pendency of his direct appeal, Sparks filed his first postconviction application for a writ of habeas corpus in the state trial court in writ number W08-01020-J(A) on August 25, 2010. (State Habeas Clerk's Record, "SHCR," at 5-27). The CCA adopted

the trial court's findings of fact and conclusions of law to deny relief. *Ex parte Sparks,* No. WR-76,786-01 (Tex. Crim. App. Dec. 14, 2011).

Sparks filed his original petition for a writ of habeas corpus in this Court on June 10, 2013, which was accompanied by a motion to stay these proceedings to exhaust his claim concerning the allegedly false prisoner classification testimony of A.P. Merillat and a related claim of ineffective assistance of trial counsel. (Pet. doc. 19; Mot., doc. 18.) Respondent agreed to the motion to stay. (Resp., doc. 27.) The Court found that this agreement complied with *Rhines v. Weber,* 544 U.S. 269 (2005), and stayed these proceedings to allow Sparks to exhaust these claims. (Order, doc. 33.) Following abeyance, Sparks filed a subsequent state habeas application which was dismissed by the CCA as an abuse of the writ, and Sparks returned to this Court. *Ex parte Sparks,* No. WR-76,786-02, 2014 WL 2002211, at *1 (Tex. Crim. App. May 14, 2014) (per curiam).

Following exhaustion, these proceedings were reopened on June 19, 2014. (Order, doc. 37.) Sparks filed his amended petition on August 27, 2014 (Am. Pet., doc. 38), Respondent filed her answer on September 26 (Ans., doc. 44), and Sparks filed his reply on November 17 (Reply, doc. 52).

## II. FACTUAL BACKGROUND

The state court described the facts of the offense as follows:

Appellant was charged with intentionally and knowingly causing the deaths of Raekwon Agnew and Harold Sublet, Jr., by stabbing and cutting them with a knife, during the same criminal transaction. The record shows that on September 15, 2007, appellant murdered his wife, Chare Agnew, and his 9-

and 10-year-old stepsons, Harold and Raekwon, and he raped his 12- and 14-year-old stepdaughters, Garysha Brown and LaKenya Agnew. Some time after midnight, when everyone else in the house was asleep, appellant put his hand over Chare's mouth and stabbed her eighteen times as she lay in her bed. He then went into the boys' bedroom. As Raekwon lay sleeping, appellant woke Harold and took him to the kitchen, where he stabbed him at least 45 times. He then woke Raekwon, took him to the kitchen, and killed him in the same manner. Appellant dragged the boys' bodies to the living room and covered them with a comforter. He then went into the girls' bedroom and woke LaKenya. He pulled her out of bed at gunpoint, tied her up with bedsheets, and told her he had killed her mother and brothers. He showed her their bodies and told her it was her fault they were dead. Next, he woke Garysha and tied her up with electrical cords, and he tied a washcloth around her mouth. He then told LaKenya that in order to save her and her sister's life, one of the girls would have to have sex with him. LaKenya said that she would do it. Appellant took her to the living room and raped her on the living room couch.

When he had finished raping LaKenya, appellant took Garysha to the living room and raped her on the couch, next to her sister. Then, he made the girls stay in the bathroom with him while he took a shower. He apologized to the girls for the rapes and murders. He told them that their mother had been trying to poison him and that her death was their fault. Next, he forced both girls to go with him into the garage, where he tried, unsuccessfully, to change the license plate on his car. He took the girls back to the living room, where he lifted the comforter and showed the girls their brothers' bodies. He remarked that Raekwon was stronger than he had expected him to be. Appellant made the girls walk into their mother's bedroom and kiss her face, and then he put them into the bedroom closet. He started a CD player and told them that help would come when the music ended. He then locked the closet door and moved a dresser in front of it. Finally, appellant left the house.

Appellant drove to his mother's house to borrow her car. He then drove to the home of his former girlfriend, Shunta Alexander, and their teenaged daughter, Brianna. He told Shunta what he had done. He gave her some money for Brianna and remarked that if there was a reward for catching him, Brianna should have it. Shunta begged him to call the police. Appellant called the police on his cell phone and briefly reported that he had killed his wife and two boys and he had left two girls locked in a bedroom closet. He provided the address and stated that he knew the police would trace the call if he stayed

on the phone too long. He then hung up, broke his cell phone, and left Shunta's home. Later that morning, appellant's cousin drove him to the Greyhound bus station, where he bought a bus ticket under an assumed name and traveled to Austin.

Appellant returned to Dallas a few days later. He called a police detective and asked him if the police had found an audiocassette tape he had left in the house, which he believed contained a recording of Chare or one of the children admitting that they had been conspiring against him. He thought that this tape would help his case. After his arrest, appellant made a statement to police in which he requested testing for the presence of poison in his body, and he said that LaKenya and Garysha should be polygraphed about whether Chare had been poisoning him. He provided buccal, blood, hair, and fingernail samples to be tested for evidence of poisoning, but the lab that received the samples was not able to conduct the requested tests, and investigators were unable to locate a lab with that capability.

*Sparks v. State,* No. AP-76,099, 2010 WL 4132769, at *1-2 (Tex. Crim. App. Oct. 20, 2010).

These findings are entitled to deference. *See* 28 U.S.C. § 2254(e)(1).

## III. CLAIMS

Sparks presents eight claims for relief in the following enumerated categories:

1.     Sparks was denied his right to an impartial jury at the punishment phase of the trial when a bailiff wore a necktie bearing the image of a hypodermic syringe that showed his support for the death penalty. (Am. Pet. at 42);

2.     (Abandoned.)[1] (Am. Pet. at 57.)

3.     Sparks was denied his right to an impartial jury when the trial court refused to grant a mistrial in spite of repeated instances of misconduct by bystanders which took place within the view of the jury. (Am. Pet. at 57);

---

[1] This omitted claim is mentioned to preserve numbering.

4.     Sparks was denied his right to an impartial jury based on the combined effects of the actions of the bailiff and the bystanders as well as the overall atmosphere surrounding his trial.  (Am. Pet. at 61);

5.     Sparks was denied his Eighth Amendment and Due Process rights when the State's expert witness, A.P. Merillat, testified to materially inaccurate evidence at the punishment stage of Sparks' trial. (Am. Pet. at 63);

6.     Sparks was denied his right to an impartial jury and due process when the trial court denied his challenges for cause to numerous jurors specifically named in the direct state appeal.  (Am. Pet. at 109);

7.     The Texas death penalty scheme violates the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by not requiring the state to prove aggravating factors relevant to the mitigation special issue beyond a reasonable doubt before the jury may sentence the defendant to death.  (Am. Pet. at 137);

8.     The Texas 12-10 Rule, and the law prohibiting jurors from being informed that their individual vote that life is the proper sentence will lead to a life sentence, violates the Eighth and Fourteenth Amendment as construed by *Mills v. Maryland*[2] and *McKoy v. North Carolina*.[3] (Am. Pet. at 150); and

9-11.   Ineffective assistance of counsel addressed in the foregoing sections. (Am. Pet. at 157).

Sparks also requests an evidentiary hearing, specifically on his fifth claim (Am. Pet. at 107-09, 158).  Respondent asserts that the fifth claim is defaulted and procedurally barred and in the alternative that it lacks merit.  (Ans. at 26-46.)  Respondent also asserts that the remaining claims lack merit and were properly denied by the state court.

---

[2] 486 U.S. 367 (1988).

[3] 494 U.S. 433 (1990).

## IV. STANDARD OF REVIEW

Federal habeas review of these claims is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This statute sets forth the preliminary requirements that must be satisfied before reaching the merits of a claim made in a federal habeas proceeding.

### A. Exhaustion

Under this statute, a federal court may not grant habeas relief on any claim that the state prisoner has not first exhausted in the state courts. *See* 28 U.S.C. § 2254(b)(1)(A); *Harrington v. Richter*, 562 U.S. 86, 103 (2011). However, the federal court may deny relief on the merits notwithstanding any failure to exhaust. *See* 28 U.S.C. § 2254(b)(2); *Miller v. Dretke*, 431 F.3d 241, 245 (5th Cir. 2005).

### B. State-Court Procedural Determinations

If the state court denies a claim on state procedural grounds, a federal court will not reach the merits of the claim if it determines that the state-law grounds are independent of the federal claim and adequate to bar federal review. *See Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). If the state procedural determination is based on state grounds that were inadequate to bar federal habeas review, or if the habeas petitioner shows that an exception to the bar applies, the federal court must normally resolve the claim without the deference that 28 U.S.C. § 2254(d) otherwise requires. *See Miller v. Johnson*, 200 F.3d 274, 281 n.4 (5th Cir. 2000); *but see Busby v.*

*Dretke,* 359 F.3d 708, 721 n.14 (5th Cir. 2004) (affording deference to merits finding when state court "invoked a procedural bar as an alternative basis to deny relief"); *Rolan v. Coleman,* 680 F.3d 311, 319 (3rd Cir. 2012) (holding that "AEDPA deference [under section 2254(d)] applies when a state court decides a claim on procedural grounds and, alternatively, on the merits").

## C. State-Court Merits Determinations

If the state court denies a claim on the merits, a federal court may not grant relief unless it first determines that the claim was unreasonably decided by the state court, as defined in section 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim——
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In the context of section 2254(d) analysis, "adjudicated on the merits" is a term of art referring to a state court's disposition of a case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997). This provision does not authorize habeas relief, but restricts this Court's power to grant relief to state prisoners by barring claims in federal court that were not first unreasonably denied by the state courts.

The AEDPA limits rather than expands the availability of habeas relief.  *See Fry v. Pliler*, 551 U.S. 112, 119 (2007); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  *Richter*, 562 U.S. at 98.  "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court rulings be given the benefit of the doubt.'"  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citations omitted) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)).

Under the "contrary to" clause, a federal court is not prohibited from granting federal habeas relief if the state court either arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts.  *See Williams*, 529 U.S. at 412-13; *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000).  Under the "unreasonable application" clause, a federal court may also reach the merits of a claim on federal habeas review if "if the state court identifies the correct governing legal rule ... but unreasonably applies it to the facts of the particular state prisoner's case."  *White v. Woodall,* 134 S. Ct. 1697, 1705 (2014) (quoting *Williams*, 529 U.S. at 407-408).  " '[C]learly established Federal law' for purposes of § 2254(d)(1) includes only 'the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions.' "  *Woodall,* 134 S. Ct. at 1702 (quoting *Howes v. Fields,* 132 S. Ct. 1181, 1187 (2012)).  The standard for determining

whether a state court's application was unreasonable is an objective one and applies to federal habeas corpus petitions that, like the instant case, were filed after April 24, 1996. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

Federal habeas relief is not available on a claim adjudicated on the merits by the state court unless the record before that state court first satisfies section 2254(d). "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Pinholster*, 563 U.S. at 185. The evidence required under section 2254(d)(2) must show that the state-court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

## V. ANALYSIS

### A. External Influence - Necktie

In his first claim, Sparks contends that the jury was improperly influenced in the punishment phase of his trial by a necktie worn by one of the bailiffs that displayed a syringe. (Am. Pet. at 42-57; Reply at 1-9.) Respondent argues that this claim was reasonably denied by the state court. (Ans. at 11-15.)

#### 1. <u>Standard</u>

A juror is exposed to an external influence when he receives information not admitted into evidence. *See Tanner v. United States,* 483 U.S. 107, 117 (1987). "Under clearly

established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, or (2) is an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering . . . with a juror.'" *Robinson v. Polk,* 438 F.3d 350, 363 (4th Cir. 2006). Once the inmate proves that a "private communication, contact, or tampering" is received by a juror, the burden shifts to the government to prove that the contact with the juror was not harmful. *See Remmer v. United States,* 347 U.S. 227, 229 (1954); *but see Smith v. Phillips,* 455 U.S. 209, 215 (1982) (holding "that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias"). The ultimate question is whether the improper external intrusion affected the jury's deliberations and thereby its verdict. *See United States v. Olano,* 507 U.S. 725, 739 (1993).

## 2. State Court Action

No objection was presented on the record at trial or on direct appeal. During the postconviction habeas review, the state court conducted an evidentiary hearing on this claim. Based on the evidence presented, the state court determined that Sparks had not shown that any juror actually saw the image on the bailiff's tie. (State Habeas Clerk's Record, "SHCR," at 157-58.)

At the state evidentiary hearing, Sparks called the bailiff, Bobby Zoe Moorehead, who testified that he was not in charge of the jury at that time but was seated behind the defendant

and his attorneys, was wearing a lanyard in front of the tie that would have covered the image, which was also potentially obscured by the bailiff's coat and the stun-belt box he was holding. (SHRR at 12-40.) Moorehead also testified that he complied with an instruction relayed by defense counsel to tuck his tie into his shirt. (SHRR at 19.)

Sparks also called his investigator, Bobby Walton, who testified regarding measurements from the bailiff's chair to the jury and that he was able to see the tie and image on the tie at those distances. (SHRR at 40-46.) On cross examination, Walton testified that he did not view the tie on the black background of the bailiff's clothing, did not view it with a lanyard or stun belt box in front, and did not view it while attorneys were sitting at the desk or the defendant with security. (SHRR at 48-50.) He also testified that he did not know the position of the computer and monitor on the desk at the time of trial, but that it could also have affected the jury's view of the tie. (SHRR at 49.)

The State called Sparks' lead trial counsel Paul Johnson, who testified that when he saw the bailiff's tie with the syringe on it, he said something to the bailiff, asked to talk with the judge, obtained an instruction for the bailiff to conceal the image and told the bailiff, who complied. (SHRR at 55-56.) Johnson testified that he made his objection off the record, rather than on the record, because he didn't see a need for a record of it at that time. "I didn't have any reason to believe anybody else had seen it or noticed it or that it was having an impact or influence on the trial." (SHRR at 56-57.)

The State also called Lalon Peale, another one of Sparks' trial counsel, who said that

Mr. Johnson was the first to notice the tie and she did not know if anyone in the gallery or jury would have noticed. (SHRR at 71.) She said that there was a lot going on at the same time, but that Mr. Johnson brought it to the court's attention and the bailiff was told to conceal the tie. (SHRR at 71-72.) She thought that there was an objection on the record, but that the appellate counsel didn't find it. (SHRR at 71-72.) She said that the bailiff complied and concealed the tie. (SHRR at 73.)

The State also called Sparks' mother, Viola Sparks, who had provided an affidavit in support of petitioner's state habeas application. She testified that she saw the bailiff wearing the tie and could see the image of the needle before he tucked it in. (SHRR at 93.) She said the bailiff wearing the tie operated the box that controlled the stun gun and sat behind her son, the defendant. (SHRR at 93-94.) She said from the spot where she testified during the trial, she could see the bailiff wearing the tie if he was standing, but that during her testimony she was focused on the district attorney's questions and could not see the tie over her son and the attorneys. (SHRR at 94.) She also testified that her affidavit that the attorney wrote stated that you couldn't miss what the bailiff was wearing, but she does not know for sure whether the jury would have been able to see the image on the tie from where they were in the courtroom. (SHRR at 90, 95-96.) She also testified that she has problems with memory and gets confused. (SHRR at 96.)

The State also called Sparks' sister, Perstefanie Sparks, who had also provided an affidavit in support of petitioner's state habeas application. (SHRR at 98-100.) She testified

that she noticed the bailiff wearing the tie with the image of the needle on it when a victim's father approached the rail during jury argument, and the bailiffs made people in the audience where she was sitting leave the courtroom. (SHRR at 104-106.) She told Petitioner's trial counsel about it, but could not remember which day it was. (SHRR at 101.) She also remembered that the bailiff later tucked the tie into his shirt. (SHRR at 106-107.) She provided an affidavit that she did not feel it was possible that the jury did not see what the bailiff was wearing, but acknowledged that the jury would have seen the bailiff from a different vantage point than her during the trial. (SHRR at 101-102.) She did not remember whether there was a projector between the jury and the bailiff, and did not remember the bailiff holding a box. (SHRR at 102-103.) She also admitted prior offenses for forgery of a check and securing a document by deception. (SHRR at 103-104.)

The State also called Andy Beach, the lead trial prosecutor in the trial. (SHRR at 109.) Mr. Beach testified that he remembered seeing the bailiff wearing the tie with the image of a syringe on it during the last day of trial when the bailiff was handling the box that operated the stun belt. (SHRR at 109-10.) Mr. Beach testified that defense attorney Paul Johnson stood up, asked to approach the bench, and went sidebar with the judge to deal with the tie. (SHRR at 110.) The trial court judge took care of it and had the bailiff either tuck in the tie or button his coat to conceal the image of the syringe. (SHRR at 110.) Mr. Beach remembered that this took place early in the day and "well before argument." (SHRR at 110-11.) Mr. Beach also remembered the ruckus in the courtroom during his closing argument,

but did not remember what the bailiff was wearing during that part of his jury argument. (SHRR at 111.)

The State also produced an affidavit from the jury foreperson that she did not see the tie. (SHCR at 76-77.) "I personally never saw the tie. To my knowledge nothing about the tie or Bailiff Moorehead entered into the jury's deliberations." (SHCR at 77.) Based on this, other documents in the record, and the evidence at the hearing, the state court found that Sparks had not shown that any juror saw the tie, and concluded that no constitutional violation resulted from the bailiff's tie. (SHCR at 157-58.)

### 3. Analysis

To show the state court's determination to be an unreasonable determination of fact based on the evidence presented to the state court, Sparks argues that it was physically impossible for the jury to have not seen the image on the bailiff's tie and that other people saw it. (Am. Pet. at 48-50, 51-54.) However, none of the court officials–including the attorneys for either side–testified that they thought that the jury could see the image on the tie, the testimony indicated that there were obstacles between the jury and the tie that may have obstructed its view before the bailiff concealed it, and the only evidence from the jury was that it was not seen or considered by them. Even if this could rise to the level of the jury tampering in *Remmer,* 347 U.S. at 229, the first element of this claim–that the jury actually received the external influence by viewing the image on the tie–was not proven. Therefore, the burden of proof could not have shifted to the State to prove that the alleged viewing was

not harmful. The state court's determination has not been shown to be incorrect under section 2254(e)(1), much less unreasonable under section 2254(d).

Accordingly, Sparks' first claim for relief is DENIED for lack of merit.

## B. External Influence - Spectators

In his third claim, Sparks contends that the jury was improperly influenced in the punishment phase of his trial by the "repeated instances of audience disruptions" at the trial.[4] (Am. Pet. at 57-61.) Respondent argues that the portion of this claim presented to the state court–which included only one incident of audience disruption–was reasonably denied, and that the portion not presented to the state court is unexhausted and procedurally barred. (Ans. at 15-24.)

### 1. <u>Exhaustion and Procedural Bar</u>

#### a. Law

Generally, a federal court cannot grant habeas relief on an unexhausted claim. *See* 28 U.S.C.A. § 2254(b). To properly exhaust a claim, a habeas petitioner must fairly present its factual and legal basis to the highest available state court for review in a procedurally correct manner that allows the state court to consider the merits of the claim. *See Carty v. Thaler,* 583 F.3d 244, 254 (5th Cir. 2009); *Deters v. Collins,* 985 F.2d 789, 795 (5th Cir. 1993); *Satterwhite v. Lynaugh,* 886 F.2d 90, 92-93 (5th Cir. 1989); *see also Nickleson v. Stephens,* 803 F.3d 748, 753 (5th Cir. 2015) ("The exhaustion doctrine demands more than allusions

---

[4] Sparks has abandoned his second claim. (Am. Pet. at 57.)

in state court to facts or legal issues that might be comprehended within a later federal habeas petition. The exhaustion doctrine is based on comity between state and federal courts, respect for the integrity of state court procedures, and 'a desire to protect the state courts' role in the enforcement of federal law.'") (quoting *Castille v. Peoples,* 489 U.S. 346, 349 (1989) (in turn quoting *Rose v. Lundy,* 455 U.S. 509, 518 (1982))). In Texas, a death-sentenced prisoner must present his claims to the CCA on direct appeal or in an application for state post-conviction relief. *See Bautista v. McCotter,* 793 F.2d 109, 110 (5th Cir. 1986) (noting procedure in noncapital cases); *Fuller v. State,* 253 S.W.3d 220, 224 (Tex. Crim. App. 2008) (noting that direct appeal to CCA is automatic under TEX. CODE CRIM. PROC. art. 37.071, § 2(h)); *Beazley v. Johnson,* 242 F.3d 248, 269 (5th Cir. 2001) (noting death-sentenced petitioner's failure to raise claim on direct appeal to CCA resulted in failure to exhaust claim).

### b. State Court Action

In his twenty-second point of error on direct appeal, Sparks claimed that "[t]he trial court erred in denying Appellant's motion for a mistrial after a spectator caused a disturbance in the courtroom which had an improper influence on the jury." (App. Br. at 79.) In support of this claim, Sparks asserted his Sixth Amendment right to be tried by impartial jurors whose verdict is based solely on the evidence at trial and cited that portion of the record of the proceedings during the closing argument when the disturbance occurred and the motion

for mistrial made by Sparks' trial counsel. (App. Br. at 79-80 (citing 41 RR at 68).)[5]  In this

record, the defense counsel at trial asserted that this was the second time that this individual

had caused a disruption and described a prior incident during the guilt phase of the trial.  The

prosecutor also expressed his view of the prior events and the defense moved for a mistrial.

The trial court denied the motion and Sparks appealed.

The CCA denied this point of error, in part, because Sparks' counsel failed to preserve

the error by first requesting the lesser remedy of an instruction to the jury to disregard the

influence as required by Texas law.  After discussing the incident, the prior incident, and

comparing these facts to precedent, the CCA concluded:

> Although the harm, if any, could have been cured by an instruction to
> disregard, appellant did not request this "lesser remedy."  Further, appellant
> has not carried his burden of showing a reasonable probability that the outburst
> interfered with the jury's verdict or posed a reasonable probability of injury to
> himself.  Appellant offers only conclusory assertions that this disturbance
> violated his constitutional right to an impartial jury and was "designed" to
> deny him a fair trial.  Point of error twenty-two is overruled.

*Sparks v. State,* No. AP-76,099, 2010 WL 4132769, at *20 (Tex. Crim. App. Oct. 20, 2010)

(footnote omitted) (citing *Ocon v. State,* 284 S.W.3d 880, 885 (Tex. Crim. App. 2009)).

### c. Analysis

In his third claim, Sparks complains that the same individual who charged the rail

during the prosecutor's punishment argument had previously stood in the doorway during an

outburst by "a hysterical woman." (Am. Pet. at 58.)  Although the woman was not mentioned

---

[5] At the end of his allegation before the state court, Sparks' mistakenly cited volume 35 of the Reporter's Record at page 68, but that volume only has 31 pages.

in Sparks' complaint before the state court or in the CCA's discussion, the prior incident was raised and discussed in the context of the same motion for a mistrial. The CCA considered the nature of the disruption before the jury and the prior disruption, compared these facts with other precedents, and concluded that, even if Sparks had properly preserved this error in accordance with Texas law, Sparks had not shown a reasonable probability that the outburst interfered with the jury's verdict or posed a reasonable probability of injury to himself.

In support of his argument that this claim was exhausted, Sparks cites *Vela v. Estelle,* 708 F.2d 954, 960 (5th Cir. 1983), holding that an ineffective-assistance-of-counsel claim was exhausted because, although certain facts asserted before the federal court were not specifically raised in the state court pleading, the same legal theories were presented and the state court had an obligation under that pre-*Strickland* standard to review those additional facts in making its determination.

Outside of referencing "Sparks's claims regarding other instances of bystander misconduct," Respondent's argument does not identify any substantially different incidents raised in Spark's third claim that were not raised and considered in his claim before the state court. (Ans. at 16.) Therefore, while the *Vela* case is distinguishable, Sparks appears to have fairly presented the substance of his third claim to the state court.

The state court's conclusion that the error had not been properly preserved by first requesting a lesser remedy in accordance with state law has not been asserted as an

independent and adequate ground to bar federal habeas review, and this Court declines to raise that procedural bar *sua sponte*. Further, even if this claim were not exhausted, it is clear that this Court may deny the claim on its merits regardless of exhaustion. "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

## 2. Merits

### a. Law

Sparks relies upon *Holbrook v. Flynn,* 475 U.S. 560 (1986), in which the Supreme Court held that a prisoner was not denied his constitutional right to a fair trial when, at his trial with five codefendants, customary courtroom security force was supplemented by four uniformed state troopers sitting in first row of spectator section. Sparks also relies upon *Carey v. Musladin,* 549 U.S. 70, 75-77 (2006), in which the Supreme Court reversed a grant of relief by the Ninth Circuit Court of Appeals and held that state appellate court determination that habeas petitioner was not inherently prejudiced when spectators wore buttons depicting murder victim was not contrary to or unreasonable application of clearly established law.

In *Musladin*, the Supreme Court distinguished between the "government-sponsored practices" governed by the standard set out in *Flynn* and in *Estelle v. Williams,* 425 U.S. 501 (1976), and "spectator conduct" that does not yet have an established governing standard.

In contrast to state-sponsored courtroom practices, the effect on a defendant's fair-trial rights of the spectator conduct to which Musladin objects is an open question in our jurisprudence. This Court has never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial. And although the Court articulated the test for inherent prejudice that applies to state conduct in *Williams* and *Flynn*, we have never applied that test to spectators' conduct. Indeed, part of the legal test of *Williams* and *Flynn*–asking whether the practices furthered an essential state interest–suggests that those cases apply only to state-sponsored practices.

*Musladin,* 549 U.S. at 76 (footnote omitted). The Supreme Court then concluded that the state court could not have unreasonably applied clearly established federal law as determined by the Supreme Court because the Supreme Court had not established a standard for spectator's conduct. "No holding of this Court required the California Court of Appeal to apply the test of *Williams* and *Flynn* to the spectators' conduct here. Therefore, the state court's decision was not contrary to or an unreasonable application of clearly established federal law." *Id.* at 77.

### b. Analysis

Sparks relies upon *Musladin*, in which the Supreme Court held that it never applied the standard set forth in *Williams* and *Flynn* to the conduct of bystanders rather than government actors. The very case he relies upon reveals the lack of clearly established federal law to support relief under section 2254(d). Sparks has not shown that the state court decision was an unreasonable adjudication of his claim under section 2254(d). Therefore, the third claim is DENIED for lack of merit.

## C. External Influence - Cumulative

In his fourth claim, Sparks complains that the cumulative effect of bystander outbursts and the image on the bailiff's necktie created an overall atmosphere of "mob domination" that deprived him of his rights to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments.  (Am. Pet. at 61-63.)  Respondent again argues that this claim is unexhausted and procedurally barred, and in the alternative, lacks merit.  (Ans. at 24-26.)

### 1. <u>Exhaustion and Procedural Bar</u>

#### a. Law

As set out above, a habeas petitioner must fairly present the factual and legal basis of his claims to the highest available state court to satisfy the exhaustion requirement.  *See Carty,* 583 F.3d at 254; *Deters,* 985 F.2d at 795; *Satterwhite,* 886 F.2d at 92-93.  This includes claims of cumulative error.  It is not enough that the habeas petitioner "effectively raised in the state courts each of the underlying errors on which his claim of fundamental unfairness depends."  *See Nickleson v. Stephens,* 803 F.3d 748, 753 (5th Cir. 2015).  He must "fairly present to the state courts" that the cumulative effect of the errors denied him due process and a fundamentally fair trial.[6]  *Id.*  Further, "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find

---

[6] In *Nickleson,* the Court of Appeals noted that one court had misinterpreted its opinion in *Derden v. McNeel,* 978 F.2d 1453, 1454 (5th Cir. 1992), to imply that it dispensed with the exhaustion doctrine when considering a claim of cumulative error. *See* 803 F.3d at 753 n.5 (citing *Collins v. Sec'y of Pa. Dep't of Corrs.,* 742 F.3d 528, 541-42 (3d Cir 2014.)).

material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese,* 541 U.S. 27, 32 (2004).

"The purposes of the exhaustion requirement 'would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it.'" *Carty,* 583 F.3d at 254 (quoting *Edwards v. Carpenter,* 529 U.S. 446, 453 (2000)). This can also result in a procedural bar from federal review.

> "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." If the "independent and adequate state ground" doctrine were not applied, a federal district court or court of appeals would be able to review claims that [the Supreme] Court would have been unable to consider on direct review.

*Lambrix v. Singletary,* 520 U.S. 518, 523 (1997) (quoting *Coleman,* 501 U.S. at 730-731, 732; internal citations omitted).

A petition containing both exhausted and unexhausted claims must normally be dismissed or stayed so that the petitioner may return to state court to exhaust state remedies. *See Rhines v. Weber,* 544 U.S. 269, 277-78 (2005); *Rose v. Lundy,* 455 U.S. 509, 519-20 (1982). Such action would be futile, and the federal court should find claims to be procedurally barred, if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman,* 501 U.S. at 735 n.1; *see also Neville v. Dretke,* 423 F.3d 474, 480 (5th Cir. 2005) (holding unexhausted claims ineligible for stay when state court would find them

procedurally barred).  But a habeas petitioner may avoid the imposition of this bar by demonstrating a recognized exception.

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman,* 501 U.S. at 750.

The federal court should find claims to be procedurally barred, if "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman,* 501 U.S. at 735 n.1; *see also, Neville,* 423 F.3d at 480.  The United States Court of Appeals for the Fifth Circuit has repeatedly "held that 'the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar.'" *Canales v. Stephens,* 765 F.3d 551, 566 (5th Cir. 2014) (quoting *Hughes v. Quarterman,* 530 F.3d 336, 342 (5th Cir. 2008)).

### b. Analysis

Respondent argues that Sparks did not present the combined claim to the state court, but presented his complaint regarding the bailiff's tie in the state postconviction proceedings and his complaint about the bystander disruption in the state direct appeal.  In neither of these proceedings did Sparks combine these claims to complain about an environment of "mob domination" in violation of his rights under the Sixth and Fourteenth Amendments.

23

Sparks responds that he properly exhausted each of his complaints regarding the necktie and regarding bystander disruption and that the remainder of his complaint was evident from the state court record. (Reply at 15-16.) Therefore, Sparks argues, his claims are exhausted and not procedurally barred.

Even if Sparks exhausted individual parts of his cumulative claim, he has not exhausted the cumulative claim itself. However, Sparks has not even exhausted each of his individual claims. He argues that portions of his claim were apparent from the record, but a claim is not "fairly presented" if the state court "must read beyond a petition or a brief ... in order to find material" that alerts it to the presence of a federal claim." *See Baldwin,* 541 U.S. at 32; *Wooten v. Kirkland,* 540 F.3d 1019, 1025 (9th Cir. 2008)). Therefore, the cumulative error claim presented to this court was not presented to the state court and it relies upon parts that were also not actually exhausted before the state court. Since his cumulative error claim would now be considered procedurally barred in state court under the state abuse-of-the-writ doctrine, it is procedurally barred in this Court as well. *See Coleman,* 501 U.S. at 735 n.1; *Neville,* 423 F.3d at 480; *Canales,* 765 F.3d at 566.

Spark's fourth claim is DISMISSED as procedurally barred.

## 2. Alternative Merits Analysis

The CCA denied Sparks' complaint regarding the Bailiff's necktie on the basis that Sparks had not shown it was seen by the jury. Before this Court, Sparks has not shown that finding to be incorrect or unreasonable. Therefore it could not have, either independently or

in combination with other factors, have created any adverse impact on the jury's consideration of his case.

This leaves the allegations of Spark's third claim now presented under the theory that the repeated conduct of a bystander created a "mob dominated" atmosphere that deprived him of his right to a fair trial under the Sixth Amendment. Petitioner also likens this case to *Sheppard v. Maxwell,* 384 U.S. 333 (1966), which only addressed prejudicially extreme media coverage, both before trial and during trial that created a carnival atmosphere.

> While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. In light of this background, we believe that the arrangements made by the judge with the news media caused Sheppard to be deprived of that 'judicial serenity and calm to which (he) was entitled.' *Estes v. State of Texas, supra,* 381 U.S., at 536, 85 S.Ct., at 1629. The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard. At a temporary table within a few feet of the jury box and counsel table sat some 20 reporters staring at Sheppard and taking notes. The erection of a press table for reporters inside the bar is unprecedented.

*Id.,* 384 U.S. at 354-55. Nothing like this is presented in this case.

For the same reasons this Court rejected the merits of Sparks' third claim, this claim also lacks merit. Therefore, if it were not dismissed as unexhausted and procedurally barred, it would be DENIED for lack of merit.

### D. False Testimony - Merillat

In his fifth claim, Sparks complains that his Eighth Amendment and Due Process rights were violated when a state's expert was allowed to testify to materially inaccurate and

false information.  (Am. Pet. at 63-109; Reply at 16-45.)  Respondent asserts that this claim is procedurally barred by the state court's determination that it was barred in a successive habeas petition.  (Ans. at 26-30.)  In the alternative, Respondent asserts that the claim lacks merit.  (Ans. at 26, 31-34.)

Sparks argues that the delay in filing this claim was due to prosecutorial misconduct. (Am. Pet. at 92-98; Reply at 16-17.)  Sparks also asserts that he has established cause and prejudice to excuse the procedural default in that the prosecution team violated *Brady* in failing to disclose the false nature of the testimony.[7]  (Am. Pet. at 92-98.)  Further, Sparks argues that the state procedural ground are not independent of federal law.  (Ans. at 103-106.)  Respondent argues that Merillat's testimony was not false and he was not a member of the prosecution team.  (Ans. at 31-38)

### 1. <u>Factual Background</u>

During the punishment stage, the prosecution called A.P. Merillat,  a "criminal investigator with the special prosecution unit in Huntsville" to explain "the likelihood or opportunities to be violent inside the penitentiary."  (Am. Pet. at 64 (citing 39 RR at 8-36, 68-95, at 8).)  On direct examination, Merillat testified that Sparks would enter the state prison system, the Institutional Division of the Texas Department of Criminal Justice (TDCJ), at a G-3 classification level if he was sentenced to life in prison, and that no set of

---

[7] Sparks also argues that his alternate claim of ineffective assistance of trial counsel comes within the exception to procedural bar created in *Martinez v. Ryan,* 566 U.S. 1 (2012), and applied to Texas cases in *Trevino v. Thaler,* 569 U.S. 413 (2013).  (Am. Pet. at 98-103.)  This is addressed in the discussion of his "ninth" claim.

circumstances could change this.  (Am. Pet. at 64-65 (citing 39 RR at 70-80).)  Merillat also

explained that persons entering at this level would be permitted to go to the mess hall with

other inmates, go the library with other inmates, go to school and medical facilities, go to

visitation, and that they could work outside the walls of the prison.  (Am. Pet. at 65 (citing

38 RR at 76).)  On cross examination by defense counsel, Merillat agreed that an offender

receiving a life sentence for capital murder could be classified at the more restrictive G-4 or

G-5 levels.

> Q.    But as I just pointed out, sir, whether or not you're classified, the
> minimum classification for a person is G-3 and can go all the way up
> to an automatic classification of ad seg right off the bat, couldn't it?
> That's yes or no, sir.  Right or wrong?
>
> A.    You're wrong.
>
> Q.    I'm wrong?
>
> A.    Yes.
>
> Q.    Couldn't be placed in ad seg?
>
> A.    Very limited circumstances.  But the broad way you say it is not correct.
>
> Q.    He could be, couldn't he?
>
> A.    He could be.
>
> Q.    Could be G-4, couldn't he?
>
> A.    He could be.
>
> Q.    Could be G-5.
>
> A.    Could be.

(39 RR at 86-87.)

In support of his claim, Sparks presents the testimony of his expert, Frank Aubuchon, that a person sentenced to life without parole will, at best, be classified to the G-3 level, or, to the more restrictive G-4 or G-5 levels, if required. (Am. Pet. at 66 (citing Pet. Ex. #1).)

## 2. State Court Action

This claim was not raised in the direct appeal or initial state habeas proceeding. Instead, this Court granted an agreed stay of these proceedings to allow this claim to be presented to the state court in a subsequent state habeas application. (Order, doc. 33.) During the abeyance, the state court denied the subsequent state application filed to present this claim "as an abuse of the writ without considering the merits of the claim." *Ex parte Sparks,* No. WR-76,786-02, 2014 WL 2002211, at *1 (Tex. Crim. App. May 14, 2014).

## 3. Procedural Bar

### a. Law

This Court will not reach the merits of a claim that the state court denied on independent and adequate state procedural grounds, unless the habeas petitioner shows that an exception to the procedural bar applies. *See Sawyer*, 505 U.S. at 338; *Coleman*, 501 U.S. at 729. The United States Court of Appeals for the Fifth Circuit has repeatedly "held that 'the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar.'" *Canales v. Stephens,* 765 F.3d 551, 566 (5th Cir. 2014) (quoting *Hughes v.*

*Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008)).

### b. Analysis

Because the state court denied the claim as procedurally barred by the Texas abuse-of-the-writ rule, Respondent argues that it is barred from review in this Court as well. (Ans. at 27-30.) Sparks responds that it comes within an exception to procedural bar.[8] (Am. Pet. at 92-103.) Specifically, Sparks asserts as cause and prejudice the prosecutorial misconduct of withholding exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83 (1963), "by concealing the fact that Merillat, a state agent, was testifying falsely at Sparks (sic) punishment phase, and how sparks (sic) was prejudiced by Merillat's false testimony." (Am. Pet. at 92-93.) However, as set out in the alternate merits analysis below, Sparks has not shown that the testimony in question was materially false in light of Merillat's correcting testimony on cross-examination.

To the extent that Sparks asserts that the State withheld evidence because "Merillat had to have known he was testifying falsely," Sparks does not consider the correcting testimony provided on cross examination. Therefore, any prior misstatement of the TDCJ classification plan was not material under *Brady* in light of the correcting testimony.

To the extent Sparks complains of the suppression of TDCJ classification regulations, the withholding of administrative regulations is not generally considered a violation of *Brady* if the regulations were equally available to either side. *See e.g., United States v. Farkas, 867*

---

[8] Sparks also called upon the State to waive the procedural bar, but there is no indication that they have done so. (Am. Pet. at 90-91.) Instead, the procedural bar is clearly asserted in defense of this claim.

*F.2d 609* (4th Cir. 1989) (holding that federal administrative regulations are not *Brady* material.). Sparks has not shown that the TDCJ Unit Classification Procedure was not equally available to both sides. Therefore, he has not shown any suppression, even if the testimony had been shown to be false and material.

To the extent that Sparks attempts to prove that the evidence was false based on the testimony of his own expert, this has generally not been considered sufficient to show a due process violation. A mere disagreement between experts is not normally sufficient to show that the opinion testimony of one of them is false or misleading. *See Boyle v. Johnson,* 93 F.3d 180, 186 (5th Cir. 1996) (holding that "the fact that other experts disagreed" was insufficient to show the state's expert testimony to be false or misleading); *Clark v. Johnson,* 202 F.3d 760, 767 (5th Cir. 2000) (holding disagreement between experts was insufficient to overcome state habeas court's factual determination that the prosecution expert's testimony was not false or misleading); *Harris v. Vasquez,* 949 F.2d 1497, 1524 (9th Cir. 1990) (holding that conflicting psychiatric opinions did not show that the state's expert testimony was false, noting that "psychiatrists disagree widely and frequently" (quoting *Ake v. Oklahoma,* 470 U.S. 68, 81 (1985)).); *Campbell v. Gregory,* 867 F.2d 1146, 1148 (8th Cir. 1989) (presenting differing testimony from new expert in motion for new trial did not establish falsity of prior expert's opinion offered at trial). But even if it could be sufficient, for the reasons set out in the alternate merits analysis, Sparks' expert testimony would not establish a due process violation.

Sparks' contention that the state court's disposition on procedural grounds is intertwined with federal law is effectively rebutted by the state court order which dismissed Sparks' subsequent application "as an abuse of the writ without considering the merits of the claim." *Ex parte Sparks,* 2014 WL 2002211, at *1. This language is sufficient to show the disposition on "adequate and independent state law" grounds. *Gutierrez v. Stephens,* 590 F. App'x 371, 384 (5th Cir. 2014); *see also Thompson v. Davis,* No. CV H-13-1900, 2017 WL 1092309, at *14 (S.D. Tex. Mar. 23, 2017) (holding such a dismissal adequate to bar federal review). Sparks argues that the state law is not independent, asserting that the "Art. 11.071 §(5) review necessarily includes a federal component." (Am. Pet. at 104.) He cited *Ruiz v. Quarterman,* 504 F.3d 523, 527 (5th Cir. 2007), in support of this position, but *Ruiz* is distinguishable.

In *Ruiz,* the state court order did not contain the express language that the claim was dismissed as an abuse of the writ without considering the merits of the claim. Instead, the "studied ambiguity" of the language gave rise to the uncertainty relied upon in *Ruiz.* 504 F.3d at 527. The Court of Appeals also considered the intricacies of the CCA's voting requirements and the language in both the concurring and dissenting opinions which "strongly suggest that the CCA debated and reached the federal merits question, not the independent state law ground." *Id.* at 528. This is clearly distinct from the express language of the order dismissing Sparks' subsequent state writ. Sparks has not shown this express finding to be incorrect.

The Court finds that Sparks has not shown cause and prejudice to excuse the procedural default on independent and adequate state grounds.  Therefore, this claim is DISMISSED as procedurally barred.

### 4. <u>Alternate Merits Analysis</u>

#### *a. Law*

Sparks relies upon *Napue v. Illinois,* 360 U.S. 264, 269 (1959), in support of his argument that a conviction obtained through perjury, known to be such by representatives of the State, violates due process, even when the State, although not soliciting the perjury, allows it to go uncorrected when it appears.  (Am. Pet. at 76-77; Reply at 16.)  To prove a due process violation under *Napue*, a petitioner must establish that (1) the testimony was false, (2) the government knew the testimony was false, and (3) the testimony was material.  *See Summers v. Dretke,* 431 F.3d 861, 872 (5th Cir. 2005); *United States v. Mason,* 293 F.3d 826, 828 (5th Cir. 2002).  Sparks also relies upon *Johnson v. Mississippi,* 486 U.S. 578, 590 (1988), in support of his assertion that his death sentence was procured in violation of the Eighth Amendment because it was based on "materially inaccurate" evidence.  (Am. Pet. at 74-75.)   The United States Court of Appeals for the Fifth Circuit has held that, notwithstanding the difference between a claim of false testimony and the use of an invalid aggravator, to sustain a claim under *Johnson,* a habeas petitioner must establish that the testimony was "false and material."  *See Hernandez v. Johnson,* 213 F.3d 243, 252 (5th Cir.

2000) (citing *Fuller v. Johnson,* 114 F.3d 491, 497 (5th Cir.1997)).[9] This would correspond

with two of the three elements of a due process claim under *Napue*.

### b. Analysis

Sparks argues that the principle set forth in *Johnson* was applied by the State court to

reverse death sentences in *Estrada v. State,* 313 S.W.3d 274 (Tex. Crim. App. 2010) and

*Velez v. State,* No. AP-76,051, 2012 WL 2130890, at *31 (Tex. Crim. App. June 13, 2012)

because it found the death sentences to be based on similar inaccurate testimony by Merillat.

In *Estrada,* the defendant presented expert testimony that the least restrictive classification

he could receive if given a life sentence was G-3. In rebuttal, the state presented testimony

from Merillat that, "after 10 years of G-3 status, a sentenced-to-life-without-parole capital

murderer could achieve a lower (and less restrictive) G classification status than a G–3

status." 313 S.W.3d at 286. On appeal, the State confessed error, joining with Estrada in

asking the CCA to take judicial notice of a TDCJ regulation which, both parties agree,

unambiguously shows that, prior to Estrada's trial, "offenders convicted of Capital Murder

and sentenced to 'life without parole' will not be classified to a custody less restrictive than

G–3 throughout their incarceration' (it appears that before September 1, 2005, a

sentenced-to-life-with-the-possibility-of-parole capital murderer could have obtained a lower

and less restrictive G–3 status after ten years)." *Id.* at 287. The CCA accepted the

---

[9] Sparks also argues an opinion of the CCA in support of this claim. (Am. Pet. at 59 (citing *Estrada v. State,* 313 S.W.3d 274, 287 (Tex. Crim. App. 2010)); Reply at 8-9.) Under section 2254(d), however, only a state court decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" can make the required showing. This would not include state court decisions, but "only 'the holdings, as opposed to the dicta, of [United States Supreme Court] decisions.'" *Woodall,* 134 S. Ct. at 1702.

confession of error, vacated the sentence, and remanded for a new punishment hearing. *See id.* at 317.

In *Velez,* the State also called Merillat, who testified that a capital murderer sentenced to life without parole could achieve a lower, less restrictive G classification status than G-3 based on good behavior. 2012 WL 2130890, at *31. On direct appeal, the CCA found that this testimony contained the same error as in *Estrada,* that, if sentenced to life, the defendant could obtain a classification less restrictive than a G-3 status. The CCA sustained the point of error, vacated the death sentence, and remanded for a new punishment hearing. *See* 2012 WL 2130890, at *35.

Respondent argues that Sparks' case is distinguishable from *Estrada* and *Velez*, and that Merillat's testimony in Sparks' trial was not false. (Ans. at 31-34.) Respondent asserts that to obtain relief, Sparks must establish a due process violation resulting from the use of perjured testimony, and must show that the prosecution knowingly presented materially false evidence to the jury. (Ans. at 31-32 (citing *Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990); *United States v. Martinez-Mercado,* 888 F.2d 1484, 1492 (5th Cir. 1989)).)

As noted above, Merillat's allegedly false testimony was corrected during defense counsel's cross examination. Any misstatement was not materially false for purposes of *Napue* or *Brady*. Accordingly, Sparks has not shown that the testimony was false or materially inaccurate. Therefore, if this claim were not dismissed as procedurally barred it would be DENIED for lack of merit.

*E. Juror Challenges*

In his sixth claim, Sparks complains that the state court improperly overruled his challenges for cause to numerous jurors named in his direct appeal.  (Am. Pet. at 109-37.) Respondent argues that the state court adjudication was not contrary to or an unreasonable application of clearly established federal law.  (Ans. at 46-58.)  Respondent also asserts that Sparks has not demonstrated harm in that he was able to strike all but one of the jurors about which he complains and, moreover, that he was granted two additional strikes.  Respondent argues that, at a minimum, Sparks must show that the juror who actually sat rendered his trial fundamentally unfair and that two additional jurors he peremptorily struck were equally egregious.  (Ans. at 58.)  Because Sparks fails to demonstrate a violation of clearly established constitutional law, Respondent argues that these claims for relief must be denied. (Ans. at 58.)

**1. State Court Action**

At trial, Sparks challenged seventeen jurors for cause that were made part of his appellate points of error to the CCA, including the eight jurors listed in his amended petition. When these challenges for cause were overruled, Sparks exercised a peremptory challenge to each of them except for the last one, Susan Cassel.  By that time, Sparks had run out of his original and the two additional peremptory strikes that he had been granted.  This prevented all but Cassel from serving on the jury.  The CCA held that, because the trial court had granted 2 additional peremptory strikes, Sparks had to "show that the trial court committed

error in denying his challenges for cause to three potential jurors to demonstrate that he was harmed." *Sparks,* 2010 WL 4132769, at *2.

After thoroughly reviewing fifteen of the challenged jurors, and determining that each of the challenges lacked merit, the CCA declined to review the challenges to the last two, Kristine Marie Bell and Kimberlyn Moriarity, as moot due to the lack of three remaining challenges. *Sparks,* 2010 WL 4132769, at *17 n.32.

## 2. **Law**

"It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury." *Ross v. Oklahoma,* 487 U.S. 81, 85 (1988). However, the forced use of a peremptory challenge does not rise to the level of a constitutional violation. *See id.* at 88. "Any claim that the jury was not impartial, therefore, must focus not on [the excused venireperson], but on the jurors who ultimately sat." *Id.* at 86.

The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424 (1985). Further, "[d]ue process implies a tribunal both impartial and mentally competent to afford a hearing." *Jordan v. Com. of Massachusetts,* 225 U.S. 167, 176 (1912). In federal prosecutions, "[t]o enforce this right, the jury's verdict must be set aside if the defendant presents 'clear

evidence of a juror's incompetence to understand the issues and to deliberate at the time of his service." *United States v. Hall,* 989 F.2d 711, 714 (4th Cir. 1993) (quoting *United States v. Dioguardi,* 492 F.2d 70, 78 (2d Cir.1974), and *United States v. Vargas,* 606 F.2d 341 (1st Cir.1979)). "A federal court must assume the state court's determination of the facts is correct unless the petitioner 'rebut[s] the presumption of correctness by clear and convincing evidence.'" *Prystash v. Davis,* 854 F.3d 830, 835 (5th Cir. 2017), *cert. denied,* 138 S. Ct. 649 (2018) (quoting 28 U.S.C. § 2254(e)(1)).

### 3. <u>Analysis</u>

The only challenge that Sparks presents regarding a juror who actually sat on his jury complains of Susan Cassel. At trial, Sparks did not challenge this juror because of her views on capital punishment or any perceived bias. He only complained that she did not have the mental capacity to sit on this jury.

> After Cassel was interviewed by the both the state and the defense the defense objected that Cassel was "not the kind of juror that the law envision[ed] sitting on this type of case." 33 Ct. R. at 129-130. The defense was concerned that the Cassel did not understand the nature her role as a juror, and opined that there was no way, "under any stretch of the imagination we could accept [her] as the 12th juror on the panel." *Id.* at 129.

(Am. Pet. at 135.) The trial court disagreed and found the juror to be qualified.

> THE COURT:      I'm not sure, Mr. Johnson, whether you and I just observed the same juror an hour and a half. Be that as it may, your motion that she be stricken for cause is denied.
>
> MR. JOHNSON:    Judge, at this time, we have to ask the court to grant us an additional peremptory strike so we could excuse her from serving.

| | |
|---|---|
| THE COURT: | Having given you two previous strikes, I deny your request for additional peremptory strikes. |
| MR. JOHNSON: | So the record's clear, the court's -- if we have to accept -- we can't accept her. If the court's gonna force this juror upon us without giving us an additional strike, that is the conclusion of the voir dire; is that correct? |
| THE COURT: | She will -- ya'll not having any strikes left, no additional being given, ***her clearly being qualified***, she will be our 12th juror and we will begin to pick the alternates. |

(33 RR at 129-30) (emphasis added).

On appeal to the CCA, Sparks presented his seventeenth point of error which complained that Cassel was

> challengeable for cause under Article 35.16(a)(5), which provides that a challenge for cause may be made by either the state or the defense for the reason that
>
> > the juror has such defect in the organs of feeling or hearing, or such bodily or mental defect or disease as to render the juror unfit for jury service, or that the juror is legally blind and the court in its discretion is not satisfied that the juror is fit for jury service in that particular case[.]
>
> A "mental defect" may be present when the prospective juror's responses show an inability to understand the jury's role in capital proceedings.

*Sparks v. State,* 2010 WL 4132769, at *15 (footnote omitted). The CCA explained

> During voir dire, Cassel said that she understood and would follow the law concerning the State's burden of proof at the guilt phase. She also stated that after finding a defendant guilty, she could presume that a life sentence was the proper punishment. She affirmed that she could presume that the defendant would not be a future danger, unless and until the State proved

38

future dangerousness during the punishment phase. Cassel also said that she would be open to considering mitigating circumstances.

Near the conclusion of voir dire, defense counsel asked Cassel if she had any questions for him. Cassel asked for clarification about the timing of the different parts of the trial. Counsel explained that the guilt phase would come first, and then, if the jury found the defendant guilty, the punishment phase would follow. During punishment, the jury would hear evidence concerning both future dangerousness and mitigation, all at the same time. The jury would then retire to deliberate on the future dangerousness question and then, if the jury found that the defendant was a future danger, the jury would deliberate on the mitigation question. Cassel thanked defense counsel for this information.

*Id.,* 2010 WL 4132769, at *16. The CCA concluded,

This record does not demonstrate that Cassel had any bodily or mental defect that rendered her unfit for jury service. The record shows only that, when defense counsel asked Cassel if she had any questions, she asked him for clarification about the timing of the different parts of the trial. Counsel answered her question, and she thanked him. The trial court did not abuse its discretion in denying appellant's challenge for cause. Point of error seventeen is overruled.

*Id.*

Sparks cites certain portions of Cassel's testimony as "nonsensical" and showing that she was "overwhelmed" and did not understand Texas death penalty law. (Am. Pet. at 135-37.) However, Sparks takes these passages out of context and does not accurately quote from the record. Sparks alleges that "when asked if society includes prison society she answered as follows . . . ." (Am. Pet. at 135.) But the record reflects that Cassel had already answered the question about society and heard the attorney's comments about how this part of future dangerousness may seem "counterintuitive." She was then asked, "You have any questions

39

about that? You're hesitating." (33 RR at 85.) Cassel's open-ended response makes far more sense in light of the open-ended question she was given.

Sparks also complains about Cassel's response to his question about the presumption of innocence in the first part of the trial and her response that in the second part she guessed she was supposed to presume guilt instead. (Am. Pet. at 136.) Sparks has not shown that her answer was unreasonable or any proof of mental incompetence. *See Stullivan v. State,* 47 Tex. Crim. 615, 619, 85 S.W. 810, 812 (1905) (holding that the presumption of innocence does not apply in the punishment stage after a determination of guilt); *United States v. Thaxton,* 483 F.2d 1071, 1072 (5th Cir. 1973) (presumption of innocense disappears with a verdict of guilty). And the attorney did not disagree with her answer. Further, Sparks neglected to mention that the attorney had just given her a scenario where the jury unanimously found the defendant guilty and emphasized that the best the defendant could get was life without the possibility of parole. (33 RR at 107.) He was looking for a presumption that the answer to Special Issue No. 1 was "no." (33 RR at 107-108.) In his questioning, the attorney's emphasis was that, at the punishment stage, Sparks was never going to get out of prison regardless of how the jury answered those special issues.

The state court has determined that Cassel was qualified and fit for jury service. Sparks has not shown that these findings were incorrect or any unreasonable adjudication of his claim. Since none of the other prospective jurors in issue served on this jury, there is no need to analyze whether Sparks' challenges for cause of those prospective jurors were

properly overruled before they were otherwise excused. *See Ross,* 487 U.S. at 86. Sparks'
sixth claim is DENIED for lack of merit.

### F. Jury Instructions

In his seventh claim, Sparks complains that the Texas death penalty procedures violate
the Sixth, Eighth, and Fourteenth Amendments by not requiring the prosecution to disprove
the mitigation special issue beyond a reasonable doubt. (Am. Pet. at 137-49.) Respondent
argues that this claim is foreclosed by binding precedent in accordance with the state court
adjudication. (Ans. at 58-63.) Respondent is correct.

In *Rowell v. Dretke,* 398 F.3d 370, 375-76 (5th Cir. 2005), the habeas petitioner
complained that Texas law was unconstitutional for failing to assign a burden of proof to the
mitigation special issue and not providing a standard for appellate review. The Court of
Appeals held that this special issue procedure was constitutional and that to create such a
new rule of constitutional law would be barred from federal habeas review under *Teague v.
Lane,* 489 U.S. 288, 310 (1989). *Id.,* 398 F.3d at 376-77.

Sparks acknowledges this Circuit precedent, but argues that his argument is different,
and it rests on a much firmer foundation. (Am. Pet. at 148-49.) He argues that his complaint
is a more modest one in that it does not argue that the prosecution should have the burden of
proof beyond a reasonable doubt, but that the law must merely assign a burden of proof to
let everyone know "the rules of the mitigation game before play started." (Am. Pet. at 149.)
Sparks both asserts different complaints in his own ground for relief and misapprehends

circuit precedent.  His complaint bears no meaningful distinction from that in *Rowell,* even assuming the lesser standard.

This claim does not show an entitlement to relief, but is foreclosed by binding circuit precedent.  Accordingly, Sparks seventh claim for relief is DENIED for lack of merit.

## G. Informing Jurors of Effect of Failure to Reach Verdict

In his eighth claim, Sparks complains that the Texas death penalty procedures violate the Sixth, Eighth, and Fourteenth Amendments by not informing the jurors that the failure to come to a verdict will result in a life sentence.  (Am. Pet. at 150-56.)  Sparks argues that this affirmatively misleads jurors "about their individual ability to give effect to their personal belief regarding mitigation."  (Am. Pet. at 150.)  Sparks bases his argument on Supreme Court precedent "that the petitioner's sentence could not stand where it was possible that some 'jurors were prevented from considering factors which may call for a less severe penalty [than death.]'"  (Am. Pet. at 150 (citing *Mills v. Maryland,* 486 U.S. 367, 376 (1988)).  Respondent argues that this claim is foreclosed by binding precedent in accordance with the state court adjudication, and is barred by the the nonretroactivity principle of *Teague*.  (Ans. at 63-67) (citing *Jones v. United States,* 527 U.S. 373, 381 (1999), *Blue v. Thaler,* 665 F.3d 647, 669-70 (5th Cir. Tex. 2011), *Alexander v. Johnson,* 211 F.3d 895, 897 (5th Cir. 2000), and *Webb v. Collins,* 2 F.3d 93, 95-96 (5th Cir. 1993)).

Citing *Mills v. Maryland,* 486 U.S. 367, 376 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 442-43 (1990), Sparks argues that the jury instructions were unconstitutional

in that they misled jurors about their individual ability to give effect to mitigating circumstances.

> Although Texas' sentencing statute gives individual jurors the power to prevent the death penalty if they believe mitigating circumstances call for a sentence of life, that same statute also misleads jurors into believing their individual belief is immaterial unless they are able to persuade nine of their fellow jurors that their view of the evidence is correct.

(Am. Pet. at 151.) This complaint has been repeatedly rejected in this Circuit.

In *Allen v. Stephens,* 805 F.3d 617, 631-32 (5th Cir. 2015), the petitioner argued that

his "sentencing process was confusing and violated *Mills v. Maryland,* 486 U.S. 367, 108

S.Ct. 1860, 100 L.Ed.2d 384 (1988), because it gave the jurors the misimpression that they

did not have an individual ability to prevent a death sentence based upon their personal view

of the mitigating evidence." The Court of Appeals rejected that argument, holding that the

Supreme Court has declined to give *Mills* such a "broad construction." *Id.* at 632 (citing

*Smith v. Spisak,* 558 U.S. 139, 148-49 (2010)).

> *Mills* error occurs only where jurors are led to believe that they are "precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence **of a particular such circumstance**." *Id.* (quoting *Mills,* 486 U.S. at 384, 108 S.Ct. 1860) (emphasis added).
>
> Allen points to no instruction in his case that would have led jurors to believe that they were required to agree on the existence of any particular mitigating circumstance. Indeed, the instructions in Allen's case specifically provided that jurors "need not agree on what particular evidence supports an affirmative finding on" the mitigation special issue.

*Id.*

Similarly, Sparks has not identified any instruction that the jurors were required to

43

agree on any particular mitigating circumstance, and the instructions concerning the mitigation special issue at his trial provided that "[t]he jury however need not agree on what particular evidence supports a 'Yes' answer on this Special Issue." (Vol. 2, Clerk's Record, "CR", at 497.) This Circuit has repeatedly rejected arguments against the 12-10 rule like the one that Sparks raises here, holding that the 12-10 rule does not violate *Mills*. *See, e.g., Allen,* 805 F.3d at 632; *Reed v. Stephens,* 739 F.3d 753, 779 (5th Cir.2014); *Druery v. Thaler,* 647 F.3d 535, 542-43 (5th Cir.2011); *Miller v. Johnson,* 200 F.3d 274, 288-89 (5th Cir.2000); *Jacobs v. Scott,* 31 F.3d 1319, 1328–29 (5th Cir.1994).

Sparks attempts to avoid this long line of precedent by arguing that prior circuit precedent did not address the change in article 37.071 of the Texas Code of Criminal Procedure. (Am. Pet. at 151-56.) The United State Court of Appeals for the Fifth Circuit has expressly rejected this argument as well.

> Allen attempts to distinguish our prior cases on the ground that he was sentenced after Texas's 1991 revisions to the mitigation special issue. The district court rejected this argument because several of our cases in fact examined the post-1991 mitigation special issue. *Reed,* 739 F.3d at 761 (petitioner charged in 1997); *Parr v. Thaler,* 481 Fed. Appx. 872 (5th Cir. 2012) (petitioner convicted in 2004); *see also Druery v. State,* 225 S.W.3d 491, 495 (Tex. Crim. App. 2007) (petitioner convicted in 2003). Allen argues that these newer cases relied on precedent that analyzed the pre-1991 mitigation special issue. However, that the later cases relied on older precedent does not allow the panel to disregard their holdings and flout the circuit's rule of orderliness—"only an intervening change in the law . . . permits a subsequent panel to decline to follow a prior Fifth Circuit precedent." *United States v. Alcantar,* 733 F.3d 143, 145 (5th Cir.2013). Allen cites no such change in the law. Therefore, the district court correctly held that Allen's *Mills* argument is foreclosed by binding circuit precedent. *E.g., Druery,* 647 F.3d at 542-43.

*Allen,* 805 F.3d at 632-33. For these same reasons, Sparks' *Mills* argument is also foreclosed by binding circuit precedent.

Sparks' eighth claim is DENIED for lack of merit and as barred by *Teague.*

## H. Effective Assistance of Counsel

In his final claim, labeled alternatively "Claims Eight to Eleven" and "Claims Nine, Ten, and Eleven," Sparks asserts in two sentences that he was deprived of the effective assistance of counsel as set out in earlier portions of the amended petition. (Am. Pet. at 157.) Respondent argues that these claims are inadequately briefed and lack merit. (Ans. at 67-70.)

### 1. Claim

Sparks references claims from his original skeletal petition which constituted a list of conclusions without supporting facts. (Pet., doc. 9, at 36-41.) Even so, Sparks confirms that "[t]he substance of these predecessor claims have all been raised in this amended petition." (Am. Pet. at 157.) This Court has only found one claim of ineffective assistance of counsel that was actually presented in the amended petition.

In addition to complaining in his fifth claim about prosecutorial misconduct, Sparks also complained in the alternative that his trial counsel failed to provide effective assistance of counsel by failing to correct the record by introducing evidence rebutting Merillat's testimony. (Am. Pet. at 86-89.) Specifically, Sparks argues that Defense counsel was ineffective for allowing Officer Merillat to mislead the jury with his demonstrably incorrect claim that inmates sentenced to life without parole will enter prison at the G3 classification

level regardless of the specific offender characteristics. (Am. Pet. at 87.) In connection with this, Sparks argues that defense inadequately investigated punishment-phase evidence by failing to request Merillat's personnel file, training history, and case files prior to trial. (Am. Pet. at 87.) Sparks also argues that defense counsel failed to secure an expert who could have set the record straight, and testify to the proper TDCJ rules regarding classification. (Am. Pet. at 88.)

Sparks asserts that he was prejudiced in that the jury was allowed to consider Merillat's false testimony which resulted in a death sentence rather than a life sentence. (Am. Pet. at 89.) This claim was not presented to the state court in the original state habeas proceeding, and was included in the alternative in his subsequent state habeas application that was dismissed as an abuse of the writ. (Subsequent State Appl at 25, 38-41, doc. 60 at 84, 97-100.) Sparks argues that this claim comes within the exception to procedural bar set out in *Trevino* and *Brady*. (Am. Pet. at 92-103.)

## 2. <u>Analysis</u>

### a. Procedural Bar

As set out above, "the Texas abuse of the writ doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar." *Canales,* 765 F.3d at 566. Therefore, this Court will not reach the merits of a claim that the state court denied on such procedural grounds, unless the habeas

petitioner shows that an exception to the procedural bar applies. *See Sawyer*, 505 U.S. at 338; *Coleman*, 501 U.S. at 729.

Sparks argues that good cause exists for this court to consider the merits of his prosecutorial misconduct claim because the prosecution "violated *Brady* by concealing the fact that Merillat, a state agent, was testifying falsely at Sparks punishment phase, and how sparks was prejudiced by Merillat's false testimony." (Am. Pet. at 92-93 (referencing allegations in Am. Pet. at 76-85).) Sparks argues that Merillat was a member of the prosecution team and "had to have known he was testifying falsely," thus giving rise to the State's duty to disclose. (Am. Pet. at 94.) However, as set out above, Sparks has not shown the testimony to be materially false in light of Merillat's correcting testimony on cross examination that an inmate could be placed in ad seg, G-4 or G-5 under certain circumstances. (39 RR at 86-87.) Therefore, this does not show cause and prejudice under *Brady*.

Sparks also asserts that this claim comes within the exception to procedural bar created in *Martinez v. Ryan,* 566 U.S. 1 (2012), and applied to Texas cases in *Trevino v. Thaler,* 569 U.S. 413 (2013). (Am. Pet. at 98-103.) To bring a claim within this exception, Sparks must show that a substantial claim of ineffective assistance of trial counsel was not presented to the state court because of the ineffective assistance of state habeas counsel. *See Martinez,* 566 U.S. at 14; *Trevino,* 569 U.S. at 429. However, as further discussed in the alternate merits analysis below, Sparks has not shown any merit to his claim that trial counsel

was ineffective for failing to correct a false statement in light of the record showing that it was trial counsel's own cross-examination that corrected the allegedly false statement. Further, state habeas counsel could not have been ineffective in failing to raise a meritless claim. *See Garza v. Stephens,* 738 F.3d 669, 676 (5th Cir. 2013) (agreeing with the district court that "habeas counsel was not ineffective in failing to raise [a] claim at the first state proceeding" because "there was no merit to [the petitioner's] claim"); *Beatty v. Stephens,* 759 F.3d 455, 466 (5th Cir. 2014).

Sparks has not established cause and prejudice to excuse the procedural default. Accordingly, this claim is DISMISSED along with the rest of Sparks' fifth claim as procedurally barred.

### b. Alternate Merits Analysis

To determine whether a habeas petitioner has shown ineffective assistance of counsel, this Court applies the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The first prong of *Strickland* requires the defendant to show that counsel's performance was deficient. *Id.* at 687. The second prong of this test requires the defendant to show prejudice resulting from counsel's deficient performance. *Id.* at 694. The court need not address both prongs of the *Strickland* standard if the complainant has made an insufficient showing on one. *Id.* at 697.

In demonstrating that counsel's representation was deficient, a petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-

88; *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). "It is well settled that effective assistance is not equivalent to errorless counsel or counsel judged ineffectively by hindsight." *Tijerina v. Estelle*, 692 F.2d 3, 7 (5th Cir. 1982). A court reviewing an ineffectiveness claim must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence or that, under the circumstances, the challenged action might be considered sound trial strategy. *Gray v. Lynn*, 6 F.3d 265, 268 (5th Cir. 1993); *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). There are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Richter,* 562 U.S. 106. In *Richter,* the Supreme Court noted the "wide latitude counsel must have in making tactical decisions" and the need to avoid judicial second-guessing. *Id.* (quoting *Strickland,* 466 U.S. at 689). "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Id.* at 110.

To satisfy the second prong of the *Strickland* test, the petitioner must show that counsel's errors were so egregious "as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The test to establish whether there was prejudice is whether "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

A reasonable probability under this test is "a probability sufficient to undermine confidence in the outcome." *Id.*

For the same reason that he has not shown cause and prejudice to excuse the procedural default, Sparks fails to show that his claim has any merit. Sparks has not shown Merillat's testimony to be materially false in light of his correcting testimony that dispelled the alleged falsity. Therefore, trial counsel could not have been ineffective in failing to correct a falsity that his own cross examination, in fact, corrected. *See, e.g. Beavers v. Lockhart,* 755 F.2d 657, 663 (8th Cir. 1985) (holding attorney not ineffective in deficiency that was corrected by the state eliminating prejudice); *Jones v. Attorney Gen. of California,* 280 F. App'x 646, 647 (9th Cir. 2008) ("Because Jones's second attorney corrected the misrepresentation, and it is clear from the record that the trial court was aware of the correct information, Jones cannot show prejudice and is not entitled to habeas relief."). Accordingly, if this claim were not dismissed as procedurally barred, it would be DENIED for lack of merit.

## VI. REQUEST FOR EVIDENTIARY HEARING

Sparks requests an evidentiary hearing on his complaints regarding the false testimony of A. P. Merillat and related ineffective assistance of trial counsel, which are presented in his fifth and ninth through eleventh grounds for relief. (Am. Pet. at 63-109, 157; Reply at 16-45.) This Court has discretion to grant an evidentiary hearing if one is not barred under section 2254(e)(2). *See Schriro v. Landrigan,* 550 U.S. 465, 468 (2007). In exercising that

discretion, the Court considers whether a hearing could enable petitioner to prove the petition's factual allegations which, if true, would entitle him to relief. *Id.* at 474. The Court also must consider the deferential standards which limit the Court's ability to grant habeas relief. *Id.*

Sparks argues that a hearing is required because the state courts "have not fully and fairly addressed the factual issue" regarding Merillat's false testimony and this Court should now find cause and prejudice to excuse the procedural default. (Am. Pet. at 107-108.) Sparks argues that an evidentiary hearing is required whether or not the Court finds that the prosecution team knew whether the testimony was false.

> Simply put, if the cause for the default is Merillat's false testimony, then (unless the state concedes that it presented false testimony) a hearing will be necessary. On the other hand, if this Court concludes that nobody on the State's side should be charged with knowing whether Merillat's testimony was false, then the question becomes whether the defense adequately investigated this issue pretrial and whether state habeas counsel adequately investigated in state hearings.

(Am. Pet. at 109.) In light of the record before this Court that Merillat corrected the alleged falsity on cross examination, Sparks has not shown any falsity upon which either claim may be granted. Therefore, in light of the record and this Court's own review of the merits of these claims, the request for an evidentiary hearing is denied.

## VII. CONCLUSION

The Court denies Sparks's amended petition for a writ of habeas corpus.

In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Sparks a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right. *See Miller-El v. Cockrell,* 537 U.S. 322, 338 (2003); *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2). If Sparks files a notice of appeal, he may proceed in forma pauperis on appeal.

SIGNED March 27, 2018.

David C. Godbey
United States District Judge