**UNITED STATES DISTRICT COURT**
**FOR THE NOTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

**Robert Sparks,**
      **Petitioner,**

    *v.*

**Lorie Davis,**
      **Director, TDCJ.**

**3:12-CV-469-N**

**Appendix Table of Contents**

Appendix A - Order Setting Execution Date (signed) -2

Appendix B - Prior Neurological Assessment - IQ of 75 - 5

Appendix C - Relevant Pages from the DSM-5 - 26

Appendix D - Sparks' School Records from Trial - 34

Appendix E - Additional School Records - 47

Appendix F - vita for Dr. Anderson - 50

# Appendix A - Order Setting Execution Date (signed)

## CAUSE NO. F08-01020-VJ

| THE STATE OF TEXAS | § | IN THE CRIMINAL |
| | § | |
| VS. | § | DISTRICT COURT NO. 3 |
| | § | |
| ROBERT SPARKS | § | DALLAS COUNTY, TEXAS |

### ORDER SETTING EXECUTION DATE

The Court has reviewed the State's Motion to Set an Execution Date and finds that the motion should be granted; and whereas

The Defendant, Robert Sparks, was previously sentenced to death by the Court in the presence of his attorneys; and

There being no stays of execution in effect in this case, it is the duty of this Court to set an execution date in the above numbered and styled cause, and the Court now enters the following **ORDER:**

**IT IS HEREBY ORDERED** that the Defendant, Robert Sparks, who has been adjudged to be guilty of capital murder as charged in the indictment and whose punishment has been assessed by the verdict of the jury and judgment of the Court at Death, shall be kept in custody by the Director of the Texas Department of Criminal Justice, Institutional Division, until the **25th day of September, 2019,** upon which day, at the Texas Department of Criminal Justice, Institutional Division, at some time after the hour of six o'clock p.m., in a room arranged for the purpose of execution, the said Director, acting by and through the executioner designated by said Director, as provided by law, is hereby commanded, ordered and directed to carry out this

ORDER SETTING EXECUTION DATE
*Sparks/ose/duplicate original*

3

sentence of death by intravenous injection of a substance or substances in a lethal quantity sufficient to cause the death of the said Robert Sparks until the said Robert Sparks is dead. Such procedure shall be determined and supervised by the said Director of the Texas Department of Criminal Justice, Institutional Division.

Within 10 days of the signing of this Order, the Clerk of this Court shall issue and deliver to the Sheriff of Dallas County, Texas, a Warrant of Execution in accordance with this Order, directed to the Director of the Texas Department of Criminal Justice, Institutional Division, at Huntsville, Texas, commanding him, the said Director, to put into execution the Judgment of Death against the said Robert Sparks.

The Sheriff of Dallas County, Texas is hereby ordered, upon receipt of said Warrant of Execution, to deliver said Warrant to the Director of the Department of Criminal Justice, Institutional Division, Huntsville, Texas.

The Clerk of this Court is ordered to forward a copy of this Order to Defendant's counsel, Seth Kretzer, seth@kretzerfirm.com, and Jonathan Landers, jlanders.law@gmail.com, to counsel for the State, Jaclyn O'Connor Lambert, Jaclyn.OConnor@dallascounty.org, and to the Director of the Office of Capital and Forensic Writs, Benjamin Wolff, Benjamin.Wolff@ocfw.texas.gov.

SIGNED this __25TH__ day of June, 2019.


_____Gracie Lewis_____
**JUDGE GRACIE LEWIS**
**CRIMINAL DISTRICT COURT NO. 3**
**DALLAS COUNTY, TEXAS**

ORDER SETTING EXECUTION DATE
*Sparks/ose/duplicate original*

4

# Appendix B - Prior Neurological Assessment - IQ of 75

DEFENDANT'S
EXHIBIT
7

# Michael D. Chafetz, Ph.D., ABPP

3520 General DeGaulle Dr., #4098
New Orleans, LA 70114
504-362-8046; Fax: 362-2215

*Board Certified in Clinical Neuropsychology*
*Licensed in Clinical Psychology and Neuropsychology (LA)*
*Licensed in Louisiana & Texas*

\* \* \*

## Neuropsychological Evaluation
(This report is private and confidential and may not be
further released without specific permission)

| | |
|---|---|
| **Examinee Name:** | Robert Sparks |
| **Cause No:** | F-0756931 |
| **Attorneys of Record:** | Paul Johnson, Esq.; Lalon Peale, Esq. |
| **Dates of Examination:** | 9/25/08; 9/26/08 |
| **Date of Report:** | 10/3/08 |
| **Age:** | 34 |
| **Date of Birth** | 2/13/74 |
| **Examiner:** | Michael D. Chafetz, Ph.D., ABPP |
| **Tests and Procedures:** | **"A" Random Letter Test (Auditory Vigilance)** |
| | **Beck Depression Inventory-II** |
| | **Beery Visuomotor Integration Test** |
| | **Clock Drawing Test** |
| | **Controlled Oral Word Association Test (COWA)** |
| | **Finger Tapping Test** |
| | **Language Testing from Woodcock-Johnson-III** |
| | **Luria Fist-Side-Palm Test** |
| | **Mental/Cognitive Status Examination** |
| | **Minnesota Multiphasic Personality Inventory - 2 (MMPI-2)** |
| | Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) |
| | **Ruff Figural Fluency Test** |
| | **Simple Alternating Figure, Copy** |
| | **Stroop Color and Word Test** |
| | **Symptom Validity Testing (Indicators, Tests, and Analyses)** |
| | **Trail Making Test - Forms A & B** |
| | **Wechsler Adult Intelligence Scale - III (WAIS-III)** |
| | **Wechsler Memory Scale - III** |
| | **Wechsler Test of Adult Reading (WTAR)** |
| | **Wisconsin Card Sorting Test - 64** |
| | **Woodcock-Johnson Tests of Achievement - III** |
| | **Woodcock-Johnson Tests of Cognitive Abilities - III** |
| | **Clinical Interview** |
| | **Review of Records** |

**Referral Question/Relevant History:** Robert Sparks is charged by indictment with the offense of murder. He is entitled to effective assistance of counsel, and his attorneys want him examined by Neuropsychological Evaluation.

The evaluation was designed to address:
- Whether the defendant possesses any neuropsychological deficits?
- What is the extent and nature of the deficits?
- How might the specific deficits affect his daily functioning, decision-making ability, and life choices?
- Does the defendant have a genetic pre-disposition to a psychotic mental illness?
- Does the defendant have a mental illness, psychotic or otherwise?
- Is his mental illness considered severe or serious mental illness?
- What are his primary symptoms?
- Could his symptoms significantly impact his emotional expression, cognition, functioning, and volitional control?

Mr. Sparks reported that in his early thirties he started developing feelings that people were trying to poison him. A neuropsychological evaluation was requested to determine the nature and extent of his problems, and to answer the specific questions posed above.

Mr. Sparks cooperated with this evaluation as requested by his attorneys. He was warned of the additional limits of confidentiality; in particular, he was told that his attorneys would see the evaluation results, and that his attorneys would control the release of information contained in this evaluation. He was further told that this would be an objective evaluation, and that throughout the evaluation the examiner would be looking for signs that he was claiming symptoms or disabling problems that were exaggerated or not real. He was warned to do his best on everything, as any findings to the contrary might have a negative impact on his case. He was further asked to understand that he was not the patient of the examiner, and that the examiner may not offer him treatment or advice.

**Records Reviewed:**
Dallas County Jail records showed a Mental Health Followup note dated 2-28-08 indicating his current medications as Geodon (40 mg/day), which is typically used for agitation and schizophrenic illness, along with Paxil (20 mg/day) for depression and anxiety, and Trazodone (100 mg/day) for depression and insomnia. He had previously been given Haldol (5 mg) for "aggressive behavior," but Haldol is well-known as an antipsychotic medication. His history included significant closed head injury with loss of consciousness with subsequent behavior problems from a MVA in 1991. His diagnostic assessment included schizoaffective disorder (depressed), cannabis dependence, and a history of closed head injury. There was a notation that he was suicidal, very depressed, and had prepared a noose to kill himself. Suicide precautions were started. In a sick call request dated 7-27-08, he indicated having a problem moving from segregation to the population, as he would then have a "cellie," and he would not trust anyone to "sleep around." He also noted that when a "mental doctor" put him in a cell with people, he believed he was being set up. Earlier, on 12-12-07, he wrote that the feelings were getting

stronger and more regular and he thought about killing himself everyday. At the time, he would not communicate with the nurse; he had made a makeshift noose and was placed on suicide watch. Previously, on 10-5-07, he refused psych screening. On 12-4-07, he verbalized that he feels he is being watched. On 11-28-07, he noted that he felt that the walls were closing in on him, and he felt that he was being watched. He indicated that the feeling of the walls closing in and making it hard to breath made him feel like "ending the misery."

## News Reports:

The Online News Report entitled Triple Murder Suspect Talks only to CBS 11 indicated that Robert Sparks talked to the reporter from a Dallas jail, explaining why he allegedly killed his wife and her two sons. He reportedly told police as he was escorted to jail that his wife, Chare Agnew had tried to kill him, and he blamed her for enlisting her 9 and 10-year-old sons to help. According to the article, he faces at least three counts of capital murder punishable by the death penalty. There are also reportedly two counts of aggravated sexual assault for the alleged attacks on his wife's 12 and 14 year old daughters. According to the arrest warrant affidavit released to the new station, Sparks had called 911 to say he had committed the crime. Sparks reportedly blamed his wife for trying to kill him, saying, "she tried to poison me." He had reportedly said that she had put her children in on the attempt to poison him.

## Interview with Mother: Viola Sparks (10-6-08)

Ms. Sparks (DOB: 9-2-46) consented to a phone interview. She said that she had 5 children, and that Robert was her third child. She said that the birth was natural. She could not get in touch with anyone to bring her to the hospital, and so Robert was born at home. Her mother-in-law accidentally wrapped the cord around his neck, but she was not sure if there was oxygen loss. When they got to the hospital he was okay. She said that as a child he was "always climbing" and "not being still." When he was 5 years old, he was often up at night. He was nervous and would wake up crying, wanting water and milk. She said that he was in Special Education in school and had behavior problems. He was always acting up and disrupting class. She did not know what was wrong.

She said that she went to see Robert today (day of interview). He accused her of "trying to help the girl poison him." She said that the first time she heard him talk that way, it bothered her, but she tried not to let him know it. She indicated that in 2005, after he got out of prison, he thought somebody was in the attic, and so he nailed the attic door shut. He could not be persuaded that it was either a tree brushing against the house, or possibly rats in the attic.

When asked about other family members, Ms. Sparks said that every time her brother looks at TV, "he thinks he did that before." She said that he thinks he has been an FBI agent, an undercover narcotics agent, a Secret Service agent, etc. She said that this behavior started in his late 20's. She also said that her sister Sarah was treated for schizophrenia and has been on Seroquel and Zoloft. With respect to her uncle on her mother's side, she said, "He just lost his mind." He was sent to a mental hospital in Austin, TX. His second child also has schizophrenia. Her youngest brother (Robert's uncle), Elvin Smith, was "doing well," and "all of a sudden he quit going to work." He stopped caring for how he looked, and he left home and his wife never saw him again.

When asked about his relationships, she said that he has had girlfriends, and he had a daughter when he was 17 years old. The mother thought that his relationship with his wife was going well until he started thinking they were trying to kill him. He thought that they had left the gas on to kill him one time. The mother tried to put it in perspective, saying that it was likely to be an accident when the kids were in a rush. The mother tried to assure Robert that he was overreacting.

The mother said that Robert's father promised him at age 14 that he (the father) would always be there for him. The mother objected to this promise, telling the father that he could not possibly know if he could honor the promise. Indeed, the father died when Robert was about 15 years old, and Robert was so traumatized he did not go to the funeral. The mother said that things all went downhill after that, and he was truant from school. The mother would drop him off at school, and as soon as she left he would leave the school. She said that in high school he got into trouble. He was arrested once for burglary. One time he walked down the street with his father's rifle. He wanted to die after his father's death.

### Interview with Sister: Perstefanie Sparks (10-11-08)

His sister, Perstefanie Sparks (DOB: 7-14-75) consented to a phone interview. She is one year younger, and they grew up together. She said they got along pretty well when they were children. She said that he would sometimes do things other children wouldn't do, such as hurting a dog when he was young. She said they both got along pretty well with their parents, but he was always in trouble at school. He was in a Resource class (before their father died) for behavior problems. She said that the school statement was: "Could not function in a regular setting." She said he was in trouble in Gaston Middle School when he was 12-13 years old. She said that he didn't want to do what the teacher said, and that he was often fighting.

She said that their father died (leukemia) when he was 14 years old, and he "totally changed." She said he started acting out, stealing and selling drugs. She said their father had been strict with the children, and the father did not tolerate disrespect. One day, a few months after the father died, Robert was mad about something. He had had a fight and was talking about the father with the sister. He threw a brick through the window and then started crying. He shut down, saying, "Daddy, you promised to never leave me."

Perstefanie was asked when Robert began to believe that people were trying to kill him. She said it started a year or so after he came home from prison. She started hearing that he thought people were following him. One time the sister let him use her car to go to a friend's house. He returned the car with a window broken. He knew the door didn't lock but she couldn't understand why he broke the window. He told her one day that he was walking, and a car was following him and he had to run and jump in the bushes. He told another sister that a car was following them. Once, in their mother's house, he nailed an attic door shut because he thought people were walking up there. One day, when Perstefanie came over to the house, he came around the corner with a gun and surprised her, saying, "Girl you better say something; I didn't know you had a key to momma's house. The first time he came home from prison, he went to his sister's house for a few

nights. He was looking out the window in the daytime and talking in a mumble that she could not understand. She would ask him what was wrong and he could not tell her.

She acknowledged that he was emotionally withdrawn at this time. She said her husband took him riding when he first got out of prison. He was looking around, as if for the first time. He did not want to get out of the car. If they offered to take him out to dinner, he wanted to stay home. He would let his wife fill out applications because he "didn't want to be around a whole bunch of people." Perstefanie said that she talked to their mother about committing him and getting him some kind of help. Their mother said that he just needed time to adjust to being home.

Perstefanie said that she and Robert were close before he was incarcerated. When he came home, "he wasn't the same." She felt the family should have done more for him when he was locked up. She said that she only saw the (paranoid) "stuff" since he came home. She did not see this when he was a teen coming up. In her mind it all started when he got home from prison. Before that he would go out and not wonder if people were following him. She said she never heard him talk about voices or say there was a transmitter in his head broadcasting his thoughts.

**Interview with Robert Sparks:**
Mr. Sparks indicated that in his early 30's he started feeling that people were trying to poison him. He said he felt that way on December 24, 2006; he went to the hospital feeling someone was trying to poison him. He did not tell the doctors that; he simply told them that he had numbness in his hands, burning in his head, tingling in his feet, and a pain in his stomach. The doctors ran tests, which were all reportedly negative. The doctors reportedly said he was healthy.

He said that he had been feeling that he was being poisoned "way before that," but he "could not prove it." He told his sister and mother about his feelings, and they did not believe him. They told him he was eating too fast.

He said he has been hesitant to eat while in jail. He said that this is because inmates will walk in and look into his cell. He is afraid someone might poison him in jail. He said he mostly eats in the commissary because he "likes stuff closed." He said he "don't eat nothing that is open."

He said that in 2005 he started getting sick. He had hypertension. He said that he let his wife talk him out of going to the hospital. He started feeling she was poisoning him. He said that he stopped eating her food and started eating out. He kept asking himself why she would want to poison him, but he could not find out why. He said, "She had the kids helping her." He said, "They knew what not to eat and what to eat. If they eat it, I'll eat it."

Mr. Sparks said that he had never been asked these questions before in this way. In particular, he mentioned that he has not been asked about his feelings. The examiner asked his feelings about these issues. He said, "I'm confused. Why me?" He asked why he has been put in this position. He asked why they tried to do him harm when he never did them any harm. He said, "Hell, I even thought my mom was helping them." He said, "Every time I told her what I feel, she'd tell me I am eating too fast or putting me off." When asked about when this all started, he said, "in my

30's." He did not think these things as a teenager. He said that he was incarcerated in his 20's and did not have the same thinking about food. He said he would openly eat food during that period of time. He said that he started thinking this way because he was getting sick for no reason. When he stopped eating his wife's food, he stopped having these bad feelings. He asked his wife one day why he was having those feelings and she was not. He said that she replied that she just was not having those feelings. He said that one day when she complained about her stomach hurting, he thought that she was bull shitting him: "just saying it to make it look like I am not the only one." He said that he started eating out, not eating in the house for a few months. He said that he came back for two reasons: he had no money (not selling drugs anymore, according to him), and he was still trying to seem normal. He said that after a while, it seemed like he was starting to get burning feelings again and feeling like he was being poisoned. He said that when he and his wife started making more money he started eating out again.

He said that he thought his mother knew about poisoning him and was complicit in this. He never thought his sister, Perstefanie, was in on it. He said that she told him he needed to talk to somebody. He assumed she meant a psychiatrist. He said that she was trying to get him a telephone number, but then the tragedy happened shortly thereafter.

He said that he is on Geodon and Trazodone, but these have no effect on his feelings of being poisoned. He said that he no longer feels as uptight as he used to and his heart is not racing as much. He said that before the medications, he had episodes of his heart racing in which he was feeling cooped up, like he was going to explode. During these episodes it was hard to breathe and he had sweaty hands. The medication calmed him down. He said that he had these episodes sometimes three times a day, and "that is what made me want to end it." He said, "that he still thinks about that night, thinks about it everyday."

## Background (Given by Examinee)
### Education/Work
He said that he went to Gaston Junior High School and Robert T. Hill Junior High School, stopping after the 8th grade. He was in Special Education as a slow learner and with behavior problems. He said that he had a C average while in school. He said that he stopped because he was kicked out and he never went back. He had started high school, but he was in trouble with fighting and disruptive behaviors. He said there were no weapons and no drugs. He said that math was a big problem at school. He also had trouble with spelling and reading. He said that he worked for Starlight Staffing as a temp. He was sent to a warehouse where he worked as a machine operator and pulling plastic for about two weeks. He said that he quit because he was doing 2-3 different jobs instead of one. He said he never worked again. He indicated that he was sent to prison at age 17 and he got out at age 29 for an aggravated robbery. He said that once he was released he was out for four years. He tried to get a job but could not get hired because of his record. He said that he started selling drugs and he stopped because it was too stressful. He said that his wife was pulling the weight in the family as a security guard. He said that he was then arrested again at age 33 and has been in this jail for about a year.

### Medical/Developmental

He indicated that his birth was full term and natural. The cord being wrapped around his neck reportedly complicated the birth. He said that he was born at home. He indicated that his developmental milestones proceeded within normal time limits. He said that he has had no major illnesses. He was hospitalized overnight when he was involved in an automobile accident at age 17. He said that he sustained a head injury during this accident and woke up in the hospital. He said that he was the driver, and he did not remember whether he had a seatbelt on. He said the police were chasing him, and his passenger pulled on the wheel. He went from the hospital directly to jail, and he was chained to the bed. He remembered the chase and the accident. He said that he turned on the street doing 60 when his passenger jerked the wheel. Thus, there was no retrograde loss of information. He said that his memory was spotty after he woke up (post-traumatic amnesia). He was in the hospital for six days. He does not remember everyone who came in. He said that he broke his pelvic bone, but there were no marks on his head. He has no known allergies to medications. He said he is currently on Benadryl, Trazodone, Paxil, and Geodon. He was given his prescriptions here in the jail. He said that prior to coming into jail he would drink alcohol "barely - every now and then." He said that he used marijuana daily but no other drugs. He has not used it here in the jail. He said that he smoked one pack of cigarettes every two days before going to jail.

### Adaptive Functioning

His adaptive functioning was characterized by reduced expressive but adequate receptive communication, and good self care for toileting, bathing, dressing, and eating. He said that before he arrived in jail, he could drive (but had no license). He did no cooking. He said that he reads the sports while in jail. He watches TV, mostly boxing and movies. He used to do yard work. He said that he has no friends because he does not trust anyone.

### Symptom/Problems

He indicated that he was mostly sad, and he identified symptoms of depression that included difficulty getting to sleep, reduced interest in activities, having guilt, reduced energy, reduced concentration, and poor appetite. However, he said the he has gained weight by eating at the commissary, because he is afraid of being poisoned. He said he has suicidal ideation, and he made preparations to hang himself but someone came up to his door. He feels that there are "cameras in the cells." He indicated problems of anxiety that included restlessness, fatigue, poor concentration, irritability, and difficulty getting to sleep. He denied symptoms of ADHD as a child. He identified with some oppositional symptoms as a child that included defiance, blaming others, being touchy and hypersensitive, and being resentful and angry. He also identified with conduct problems that included getting into fights, being cruel to animals, stealing, having indiscriminate sex, setting fires, harming property, and burglarizing homes. He said that he has hurt cats. When asked whether he had ever seen or heard things that other people don't usually see or hear, he said that the only thing he heard was on that night (in question), when he heard a voice that sounded like him. The voice said "to kill them because they were trying to kill me." When asked what the voice actually said, he replied, "If don't kill them, they'll kill me." He said that he has never heard voices before, and he has never heard voices since. When asked who was going to kill you he said, "all of them." When asked if the voice was specific, he said, "It just said

kill them because they were trying to kill me." He said if they weren't trying to poison him, he would not be sitting here talking to me. When asked if he had taken drugs, he said that he had smoked weed but that there were no other drugs in his system.

### Family Issues
He said that his parents stayed married until his father died. He has two sisters and two brothers from his mother. He is the third child. His father had four other children. He said that he was married one year before his wife died. He has a 17-year-old daughter who stays with her mother.

## Mental Status/Cognitive Examination:
Robert Sparks was a 34-year-old right-handed African American man who looked his stated age. He wore jail stripes, and he was adequately groomed, sporting a mustache and goatee. He had a burn mark on his right hand and tattoos on his upper arms. He was alert and well oriented to person, place, and date, but not well oriented to time. Cooperation was adequate except at times in the beginning, but rapport was obtained. Affect was blunted but stable, and mood was dysphoric. He appeared tense or worried at times. He showed little or no impulsivity during the examination. Spontaneity was limited. Social interactions were adequate. He had limited insight. There was no evidence of slowing of movements, and no hyperkinesia or fidgeting was seen. He had no gait problems that this examiner witnessed. Speech content was reduced, with slightly reduced fluency and moderately reduced animation, but normal articulation and word finding. Everyday memory was normal to gross probing. Conversational proficiency was limited. He was prompt and careful in responding, and he generally persisted with difficult tasks. He evinced delusions that he was being poisoned. He also indicated that he looked at the wall and said, "The cord just moved." Judgment for solutions to common life problems was concrete. Testing conditions were adequate, and the results were thought to be representative within limitations noted below.

## Symptom Validity:
It is the current standard in any neuropsychological examination to provide an evaluation of symptom validity, which can account for a large proportion of the cognitive test findings. It is especially important to do so when any form of compensation or avoidance of punishment may be riding on the results. To this end, neuropsychologists have developed an examination of symptom validity that includes the evaluation of inconsistencies in the records and self reports, internal indicators within the examination, and formal tests of symptom validity, which have been standardized and well normed.

The examinee passed simple probes of effort that occurred during the mental status examination without any difficulty. He also made no errors on a simple test of auditory vigilance. His reliable digit span of 7 was above the reduced cutoff normally used for lower functioning individuals, which gives no evidence of problems with symptom validity. On the raw auditory recognition delayed score from the Wechsler Memory Scale, he obtained a score of 44, which was above the cutoff that identifies symptom validity problems. This indicated no problems with symptom validity. On a symptom validity rating scale for low functioning individuals, he obtained a score

Sparks, R.                                        9-25-08; 9-26-08                                     p. 9

of zero, which again gave no evidence of problems with symptom validity. This scale contains many embedded items within the examination that have been individually and collectively validated as measuring symptom validity. On the Test of Memory Malingering he made scores of 42, 50, and 47, which gave no evidence of problems with symptom validity. On the Portland Digit Recognition Test, he obtained an easy items score of 25, a hard item score of 23, and a total score of 48. All three of these scores are passing, and do not indicate problems with symptom validity per se. On a modification of the Rey 15 item test that includes a recognition trial to enhance sensitivity, his total score of 18 was below the cutoff that indicates problems with symptom validity. While this score is consistent with negative response bias, it is the only finding out of a number of embedded indicators and established tests, which does not by itself invoke a diagnosis of malingering. In particular, there was some confusion on this test as he apparently thought that the letter O was a circle, which subtracted a point from his score. There are also no inconsistencies in his claims, particularly as he is not claiming amnesia or memory problems per se. Thus, he does not fit the Slick et al (1999) established criteria for Probable Malingered Neurocognitive Dysfunction. The cognitive findings were therefore taken to be the product of good effort, even when they might be low in some areas.

On the MMPI-II, he obtained a VRIN score of 54T and a TRIN score of 57T (false), which indicated adequate attention to the items and consistency in responding. In the face of his good attention and consistency, he obtained an F scale of 120T, FB of 120T, and FP of 84T. These scores show a pattern of endorsement of rarely endorsed items that even psychotic individuals do not typically choose. Thus, there appears to be symptom endorsement particularly of psychosis that is not generally reflected in psychotic individuals. This will be discussed at greater length in the appropriate section.

**Estimated Premorbid Levels of Functioning:**
The Wechsler Test of Adult Reading (WTAR) was designed to provide an assessment tool for estimating premorbid intellectual functioning of adults. This test presents words with irregular pronunciation rules, which maximizes the assessment of the examinee's previous learning of the word. The scores on this test are generally resistant to brain damage. On the WTAR, Mr. Sparks obtained a full-scale IQ estimated score of 88 (20th %ile), which is in the low average to average range. This score was somewhat above his obtained full scale IQ score of 75 (5th %ile), with about 10% of test takers obtaining a difference this large in this direction. This score was consistent with his low average to average word identification score of 92 (30th %ile). It is generally recognized that individuals have particular strengths and weaknesses, creating fluctuations around a central expected position. If this score is taken to be the estimate of his general cognitive abilities, we would expect to see a normal distribution of scores, with some above and some below this central estimated position. The 5th %ile relative to this expectation would be a score that is 25 standard score points below, which corresponds to a standard score of 63 (<1st %ile). The expected level for a general normative population is 100, with a 5th %ile level of 75. Moreover, the WTAR has normative values that predict expected values from particular tests such as the Wechsler Memory Scale - III and the Wechsler Adult Intelligence Scale - III. The differences on these tests will also be acknowledged.

Sparks, R.                              9-25-08; 9-26-08                              p. 10

**Summary of Findings (See Score Report Graph and Table at end for Details)**

1.  The <u>general pattern</u> showed a range from impaired scores (1st %ile) on the RBANS total
    score and a coding test of mental speed to average scores on everyday abilities, phonemic
    fluency, memory of faces, problem solving tests, a test of divided and alternating mental
    set, and a test of auditory attention capacity. Mostly, the findings were in the low average
    to average range, with many findings in the borderline range.

2.  Overall <u>intellectual functioning</u> as represented by the Full Scale IQ score of 75 (5th %ile)
    was in the borderline to low average range (95% confidence interval: 71-80). (IQ table is
    appended for details.) The difference between his borderline Verbal IQ (77) and
    Performance IQ (76) scores was trivial. Moreover, the difference between his low average
    Verbal Comprehension Index score of 88 (21st %ile) and borderline to low average
    Perceptual Organization Index score of 80 (9th %ile) was also not significant, indicating
    that his verbal and nonverbal cognitive abilities were generally equivalent in the borderline
    to low average range overall. The overall Verbal, Performance, and Full Scale IQ scores
    are significantly below that predicted by the WTAR, but his verbal comprehension index
    and perceptual organization index scores are not significantly different from predictions.
    Thus, in general, his verbal and nonverbal cognitive abilities are consistent with
    predictions.

3.  The Repeatable Battery for the Assessment of Neuropsychological Status (RBANS)
    provides a total score that gives an accounting of <u>overall neuropsychological abilities</u>. His
    total score of 66 (1st %ile) indicated neuropsychological impairment overall. On this
    neuropsychological battery, he showed borderline to low average Immediate Memory (10th
    %ile), but impaired Delayed Memory (<1st %ile). He also showed borderline to low
    average Visuospatial Constructional index (10th %ile) and Language index (7th %ile) but a
    low borderline Attention index (3rd %ile). The latter was due to low mental speed on the
    Coding task. These findings are suggestive of neuropsychological problems, particularly
    in mental speed and memory after a delay.

4.  Tests of <u>everyday functioning</u> were also given. His ability to identify words was low
    average to average (30th %ile), which corresponded to an 8th grade level. His ability to
    comprehend short passages was similarly average (30th %ile), which corresponded to a
    high sixth grade level (GE: 6.7). His calculation abilities were also similar (29th %ile),
    which corresponded to a high sixth grade level as well. His mental arithmetic, however,
    was borderline (5th %ile), which likely reflected difficulties with mental control and focus.
    In general, however, his everyday abilities were commensurate with predictions.

5.  His <u>language abilities</u> were tested. During the mental status examination, he interpreted
    only 1/4 proverbs correctly. He did not know how to interpret two of the proverbs, and he
    missed an interpretation of another proverb. His visual confrontation naming abilities on
    the Woodcock-Johnson Picture Vocabulary Test were low average (11th %ile), which
    corresponded only to a 4th grade level. On the RBANS, his semantic fluency abilities were

impaired (2nd %ile), and similar to his semantic fluency on the COWA (4th %ile). Phonemic fluency on the COWA, however, was average (39th %ile). Word knowledge abilities were low average to average (25th %ile), and generally commensurate with predictions. Verbal abstraction abilities on the similarities test were also low average (16th %ile), and consistent with predictions. His language abilities are apparently limited by associational fluency problems, but are otherwise generally consistent with predictions.

6.      On tests of learning and memory, he showed a wide range of abilities. His auditory immediate memory index score of 71 ($3^{rd}.$%ile) on the Wechsler Memory Scale - III was in the impaired to borderline range. His Visual Immediate index score of 78 (7th %ile) was in the borderline range. His overall immediate memory index score of 69 (2nd %ile) was impaired. The auditory delayed index score of 64 (1st %ile) was impaired, but the visual delayed index score of 88 (21st %ile) was in the low average range. Thus, he has impaired auditory memory while his visual delayed memory is intact and commensurate with predictions. His general memory index score of 73 (4th %ile) was in the borderline range. It is noteworthy that both the immediate memory and general memory index scores were significantly below the WTAR predictions, with 6-9% of test takers obtaining a difference that large in that direction. He showed borderline immediate logical memory for paragraph length material (5th %ile), and impaired to borderline delayed memory for this material (2nd %ile). He showed 50% retention of this material, which is also borderline (5th %ile). His immediate verbal associate memory was borderline (5th %ile) while his delayed memory of this material was impaired to borderline (2nd %ile). His immediate face recognition, however, was average (37th %ile), while his delayed memory of these faces was solidly average (63rd %ile). His memory of family picture scenes was impaired to borderline (2nd %ile), while his delayed memory of these scenes was borderline (5th %ile). He did show 100% retention of this material, which was high average (75th %ile), but it is noted that his immediate memory of this material was low to begin with. On the RBANS, his immediate memory index (an auditory memory scale) was borderline to low average (10th %ile) and only somewhat higher than his auditory immediate memory on the Wechsler Memory Scale - III. His delayed memory on this test battery was impaired ($<1^{st}$ %ile), which was commensurate with his auditory delayed memory on the Wechsler Memory Scale. On the other hand, his figure recall was in the low average to average range (23rd %ile). Thus, it is apparent that his auditory memory is lacking compared to his visual memory abilities, which is consistent with psychotic disorders.

7.      Executive functioning involves initiation, planning, organization, problem solving, and concept formation based upon feedback from the environment. The ability of a person to exercise these functions usually depends upon the integrity of the frontal lobes. Mr. Sparks showed adequate planning and organization of the numerals around the clock face, except toward the end in which he had spacing problems. On the other hand, the hand placement was confused, which is consistent with left hemispheric dysfunction. He showed no perseverative tendencies in his copy of a simple alternating figure. His ability to inhibit a competing semantic process while color naming on the Stroop Task was borderline to low average (8th %ile). When his lower word reading and color naming

speeds were taken into account, he showed low average to average abilities (25th %ile), commensurate with expectations. On the Wisconsin Card Sorting Test - 64, which measures abilities for problem solving based upon feedback from the examiner, he obtained three categories, which is within normal limits. His overall error rate was in the average range (32nd %ile) and his perseverative error rate was low average to average (27th %ile), which is commensurate with the predictions. On the Woodcock-Johnson concept formation task, he scored in the low average range (18th %ile), but this corresponded only to the 3rd grade level. This indicated some struggle with concept formation. His ability to initiate designs on the Ruff Figural Fluency Tests was low average to average (19th %ile), and his ability to inhibit errors on this task was average (50th %ile). His design initiation was much higher than his word initiation on the semantic fluency task. His ability to divide and alternate mental set on the Trails B Task was average (55th %ile). His ability for planning and organization on the WAIS-III picture arrangement subtest was borderline to low average (9th %ile). Thus, he generally has variable but intact executive functioning with some difficulties with concept formation, visual planning and sequencing, and clock hand placement.

8.    The Working Memory Index on the Wechsler Memory Scale - III and the Wechsler Adult Intelligent Scale - III provide measures of overall <u>attention and concentration processes</u>. His WMS-III Working Memory Index score of 91 (27th %ile) was within the low average to average range. This score is divided between an average letter number sequencing score (37th %ile) and a low average to average spatial span score (25th %ile). On the WAIS-III, his working memory index score of 78 (7th %ile) was somewhat lower, but this is likely due to his inability to focus on mental calculation problems. His auditory attention capacity on the digit span test was borderline (5th %ile), but it is not clear why this should have been lower than the average letter number sequencing score, a harder attention capacity task. His mental control was impaired to borderline (2nd %ile), which also had to do with reduced mental speed.

9.    On tests of <u>mental speed</u>, he generally did poorly, with some exceptions. His speed of visual scanning and numerical sequencing on the Trails A task was low average (19th %ile) and commensurate with expectations. His visual matching speed on the Woodcock-Johnson Task was borderline to low average (9th %ile), which corresponded to a 4th grade level. His coding speed on the RBANS was impaired (1st %ile). His processing speed index on the WAIS-III was in the impaired to borderline range (3rd %ile) and significantly below his verbal comprehension index. His word reading speed on the Stroop test was impaired to borderline (3rd %ile), as was his color naming speed (3rd %ile).

10.   His <u>Perceptual Organization</u> index score on the WAIS - III was in the borderline to impaired range (9th %ile). His Visuospatial Construction index on the RBANS was similar (6th %ile). He showed reduced visual constructional on the Block Design task (9th %ile) and visual reasoning on the Matrix Reasoning task (9th %ile). On the Beery motor index he scored on the borderline range (6th %ile), and his visual perception was also borderline (3rd %ile). Thus, his visuospatial abilities are reduced relative to expectations.

11.   His ability to integrate three-step <u>motor movements</u> was intact with both hands. He showed good praxis for three-step commands with both hands. His dominant right hand fine motor speed was borderline to low average (10th %ile), and similar to his non-dominant hand fine motor speed (8th %ile). His figure copy on the RBANS, a measure of visually guided motor control, was in the borderline range (5th %ile). On the VMI his motor control score was grossly impaired (<1st %ile), but this score was reduced from an expected higher level due to his poor appreciation of many of the tasks.

**Social Emotional Functioning:**

Mr. Sparks came to this evaluation evincing paranoid persecutory delusions. In particular, he has felt and still feels he is the subject of being poisoned. He has also been depressed. On the Beck Depression Inventory - II, his total score of 46 indicated a very severe level of major depression. He identified with being so sad or unhappy that he cannot stand it, feeling his future is hopeless, feeling a total failure as a person, getting very little pleasure from the things he used to enjoy, and feeling guilty all of the time. He feels he is being punished and he dislikes himself. He is more critical of himself than he used to be. He would like to kill himself. He cries more than he used too. He is so restless or agitated that he has to keep moving or doing something and it is hard for him to get interested in anything. He has much greater difficulty in making decisions than he used too. He feels more worthless as compared to other people. He has less energy than he used to have and he sleeps a lot less than usual. He is much more irritable than usual, his appetite is less than before, and it is hard for him to keep his mind on anything for very long. He is too tired or fatigued to do a lot of the things he used to do and he is less interested in sex than he used to be.

On the MMPI-2, his scores produced a profile characterized by adequate response consistency and attention to item content (VRIN and TRIN), but generally high F family scores. This is indicative of over reporting of pathology, which will be further discussed below. His T scores are shown below.

| Scale | T | Scale | T | Scale | T |
|-------|-----|-------|-----|-------|-----|
| VRIN | 54 | ANX | 80 | RCd | 77 |
| TRIN | 57 (F) | FRS | 45 | RC1 | 61 |
| F | 120 | OBS | 65 | RC2 | 96 |
| FB | 120 | VEP | 92 | RC3 | 65 |
| Fp | 87 | HEA | 54 | RC4 | 85 |
| FBS | 17(Raw) | BIZ | 80 | RC6 | 94 |
| L | 52 | ANG | 79 | RC7 | 65 |
| K | 35 | CYN | 69 | RC8 | 63 |
| S | 38 | ASP | 85 | RC9 | 51 |
| Hs | 58 | TPA | 62 | | |
| D | 84 | LSE | 67 | | |
| Hy | 62 | SOD | 83 | | |
| Pd | 104 | FAM | 77 | | |

Sparks, R.                          9-25-08; 9-26-08                          p. 14

| Mf | 50 | WRK | 84 |
|----|----|-----|----|
| Pa | 93 | TRT | 95 |
| Pt | 81 |     |    |
| Sc | 94 |     |    |
| Ma | 73 |     |    |
| Si | 75 |     |    |

This is considered to be an invalid profile because F is equal to or >110T. Profile invalidity such as this can come from a number of factors that include excessive symptom checking, falsely claiming psychological problems, low reading level, a plea for help, or a confused state.

**Impressions:**
Psychotic disorders include the presence of delusions and hallucinations, along with other positive symptoms of schizophrenia (disorganized speech or behavior). According to the Diagnostic and Statistical Manual – IV (DSM-IV), schizophrenia typically includes a mixture of both positive and negative symptoms that have occurred for a long time (persisting for 6 months). Negative symptoms may include poverty of speech (laconic or empty replies) and emotional flattening in which the face may appear unresponsive even under conditions normally associated with emotions. Schizophrenia is often referred to as a "thought disorder," because the disordered thinking often comes out in terms of strange or bizarre beliefs (e.g., that a person is being followed, tormented, spied on, or poisoned) or language production that associates words by their sounds (e.g., clang associations). Disorganized behavior may appear as unpredictable agitation, or simply when the person dresses inappropriately for the current weather. Prodromal symptoms are those that occur prior to the active phase in which there may be attenuated forms of the active symptomology (e.g., hypervigilance preceding the actual delusion of being followed by the CIA). The gross disturbance in schizophrenia typically leads to dysfunction in major life areas such as work or school functioning, and in relationships. Schizophrenia may be of the Paranoid Type in which there are persecutory delusions, but other types include Disorganized and Catatonic in which other features are prominent. If there is a mood disturbance (e.g., depression) concurrent with active symptoms of schizophrenia, the diagnostic label will be Schizoaffective Disorder, which was Mr. Sparks's diagnosis in the Dallas County Jail records.

According to the DSM-IV, the diagnostic features of a Delusional Disorder include the presence of one or more non-bizarre delusions that persist for at least one month. Bizarre delusions are clearly implausible and not understandable, and they are not generally derived from usual life experiences. For example, a person who believes that an alien has removed her kidneys and put them up for auction on eBay and has done so telepathically has a bizarre delusion. By contrast, a non-bizarre delusion involves situations that occur in real life, such as being followed or poisoned or infected. A persecutory delusion occurs when the main theme of the delusion involves the belief that the person is being conspired against, poisoned, spied upon, etc. Small incidents become transferred into the delusional system. For example, a feeling of nausea or acid reflux following a meal might get transformed into the implication that the cook poisoned the person.

The simple act of another inmate or guard glancing into the jail cell can also get transformed into the idea of being spied upon, perhaps for the further reason of being poisoned, as if there was a conspiracy. Mr. Sparks apparently has these false beliefs wrapped up into a delusional system. The term that most people associate with delusional disorder is paranoia. Delusional disorder is often contrasted and must be differentiated from the condition known as paranoid schizophrenia. According to DSM-IV, schizophrenia occurs with a mixture of both positive and negative signs and symptoms that have been significant for a long period of time. The positive signs may include auditory or visual hallucinations (e.g., hearing voices that command the person to do certain things), but in delusional disorder these are not prominent if they are present at all. In paranoid schizophrenia, the paranoid delusions usually start earlier in life, and they are frequently associated with auditory hallucinations in which voices are part and parcel of the delusional system. In schizophrenia there may be disorganized speech. There are also typically negative symptoms such as emotional flattening, a prominent feature of Mr. Sparks's presentation. Other features of paranoid schizophrenia might include anxiety, anger, and being aloof and argumentative.

There is a strong genetic component to these disorders in which closer relatives of probands (the persons with the marker illness) have a much higher frequency of the same or similar disorder compared to more distant relatives. Recent studies have shown genetic associations between delusional disorder and paranoid schizophrenia. At least one study has revealed an important association between the genes for human leukocyte antigen (HLA) in paranoid disorders. It is thought that the neurotransmitter dopamine is involved in delusional disorder, and current molecular genetic evidence is suggestive that genotype frequencies of certain genes are significantly higher in patients with persecution-type delusional disorders compared to schizophrenic patients of other types or compared to controls. Thus, while it may be of some interest to classify Mr. Sparks as having a schizophrenic illness or a delusional disorder per se, it is most difficult to do so in this case as he has features of both. More important is that he has family members who have been diagnosed with schizophrenic illness, and his behavior must be taken into this context. The genetic research on persecutory disorders suggests that the diagnostic pie may require a different sort of cutting up, but that paranoid-type disorders are caused by a genetic malfunction.

For emphasis in the present case, the family background includes uncles and cousins with psychotic illnesses in which there are disordered belief systems that take over the person's life, causing major dysfunction. In families characterized by low functioning in general, these behaviors are often passed off as eccentric or as the result of some other issue. In Robert's case, his sister started believing that he needed some help, but his mother suggested that he just needed time to adapt from being imprisoned for so long. This prevented Robert from getting the psychiatric help that he needed in time. Moreover, because of the nature of paranoid-type illnesses, it is not clear that Robert would have agreed to obtain such help. Indeed, he has said that he believes his mother to be in on some conspiracy against him, and it is probable that he would have simply dismissed psychiatric help as part and parcel of a conspiracy. This problem is certainly suggested by the sister's thinking that he needed commitment, as opposed to simply suggesting that he get psychiatric help.

The high F family scores on the MMPI-2 require comment. These scales are often elevated when an individual is exaggerating or producing psychotic symptoms. Malingering involves the production of symptomatology for the purpose of secondary gain - either compensation or avoidance of punishment. In the case of someone charged with a capital crime in which he is facing a potential death sentence, it would be a surprise if certain symptoms were not exaggerated or produced out of whole cloth simply because death is on the line. And indeed, Mr. Sparks's assertion that the cord was moving when he was asked about visual or auditory hallucinations strains credibility; it is as if he was simply performing for the examiner when questioned about hallucinations. Nevertheless, every case requires close scrutiny, and in particular death cases must be examined very closely. Prisoners and individuals with genuine psychosis may produce high F scale scores on the MMPI-2, thus rendering them in the classification scheme as false positives, whereas the score on FP (Infrequency-Psychopathology) is less sensitive to the presence of severe psychopathology. This defendant's score on FP is not in the range ($\geq$100) that would invalidate the profile based upon a suspicion of malingering of psychotic symptomology. Also, his score on FBS is low, which does not provide evidence for other malingered symptomology (e.g., somatic and cognitive). Moreover, low functioning individuals often do not often understand the nature and consequences of a finding of malingering, even when they are warned. In these cases, examiners must take great care to sort out the responses and claims of the individual with respect to the history of the case.

In Mr. Sparks's case, the history hangs together well and is consistent in spite of the findings on the MMPI-2. The paranoia was apparently present long before the night in question and has continued with different targets since that time. The paranoia was noticed and discussed by family members prior to the night in question. Mr. Sparks continues to feel that he is the target of a conspiracy to poison him in the jail, which provides further evidence of the continuation of this disorder in spite of the original targets being eliminated. Other professionals have provided a schizophrenic diagnosis independent of this examination. There is no evidence of the sort of cognitive or memory claims that malingering defendants typically use, and the exaggerated components (e.g., cord moving on wall) have little to do with the core features of his disorder. His family history is also strongly suggestive of a genetic component to his paranoid disorder. These problems are consistent with poor functioning in daily life, including shallow relationships, and poor ability to work toward a set of goals.

These problems don't just suddenly appear in adulthood, but are often preceded by relatively poor organization during childhood, as was the case here. The evidence of poor functioning in school, poor relationships, poor problem solving during childhood, and disorganized responses to stressors is suggestive of poor development, possibly as a prodromal phase. In other terms, a genetic disorder that predisposes a brain to this sort of development is likely responsible for disorganization during childhood. Moreover, his life experiences never afforded him the training in problem solving or pursuit of life's goals that might have predisposed him to a simpler and less violent response to his delusional beliefs.

Mr. Sparks also fits criteria for recurrent depression at a level that is severe for Major Depression.

He has been suicidal and was placed on suicide watch. He also provided a history of panic disorder symptomology. It is likely that he was agoraphobic according to the history, but there is no good way to determine agoraphobia during his time in jail, although he has been socially withdrawn.

Neuropsychologically, he showed problems with concept formation, and disorganization of his clock drawing, along with mental speed and auditory memory problems that are suggestive of left hemispheric dysfunction. Dallas county jail records indicated that he suffered a significant closed head injury with loss of consciousness and was in the hospital for 2-3 weeks in 1991. These records are sparse, and it is not known by this examiner whether he was afforded cognitive rehabilitation for his injuries at the time. This is the sort of injury that with complications (e.g., bleeding in the left hemisphere) could result in clinically significant changes in mental speed and cognitive organization such as those seen here.

**Diagnostic Considerations:**

| | | |
|---|---|---|
| Axis I | **298.9** | Psychotic Disorder Not Otherwise Specified |
| | **296.33** | Depression, recurrent, severe |
| | **294.9** | Cognitive Disorder NOS |
| | **300.01** | Panic Disorder |
| | **305.20** | History of Cannabis Abuse/Dependence |
| Axis II | **301.7** | Antisocial Personality Disorder |
| Axis III | | History of motor vehicle accident with closed head injury |
| Axis IV | | Psychosocial stressors: incarceration; chronic mental illness |
| Axis V | | Current GAF = 46 Severe |

**Questions Answered:**

*1.    Does the defendant possess any neuropsychological deficits, and what is the nature and extent of any deficits? How would the deficits affect his daily functioning and life choices?*

As mentioned above, he has problems with auditory memory, concept formation, and disorganization of his clock drawing, along with mental speed problems that are suggestive of left hemispheric dysfunction. This examiner was unable to get records related to his motor vehicle accident and reported closed head injury (CHI). The reports

are suggestive of a "significant" injury, and if it is true that he woke up in the hospital (with the implication of loss of consciousness of longer than 30 minutes), then it is quite possible that the CHI was at the level of a moderate traumatic brain injury. It is not known whether there were complications (e.g., bleeding in the brain), but there is the distinct possibility of non-recovered damage, with mostly left hemispheric involvement. On the other hand, schizophrenic illness is associated with brain dysfunction that yields mental slowing and memory problems, along with frontal involvement that produces affective flattening. In daily life, these neuropsychological deficits would cause difficulty with work functioning by making it harder for him to learn from experience, and to remember instructions. The mental slowing would make it harder for him to think on his feet and provide responsive answers to challenges and questions. The rigidity and difficulty with problem solving would make it difficult for him to find creative solutions to problems, and to recognize legitimate alternatives. It is also important to note that psychotic syndromes occur more frequently in individuals who have suffered a traumatic brain injury.

2.   *Does the defendant have a genetic predisposition to a psychotic mental illness?*

Yes, he has an extensive family history of psychotic illness, with many close relatives having psychotic symptoms. The paranoid nature of his psychotic illness has a research base that shows a strong genetic linkage.

3.   *Does the defendant have a mental illness, psychotic or otherwise, and is this mental illness considered severe or serious?*

Yes, the defendant has a serious mental illness that is psychotic. He is prone to paranoid delusions that have continued in spite of treatment. He has poor emotional responses to stressors, and indeed one of his stressors involves the content of his delusions; in particular, he believes that people are trying to poison him. His history is suggestive of poor control, and he tends to respond to these beliefs with behavior that is oriented toward protecting himself from the idea that someone is trying to poison or otherwise kill him. For example, he believed that someone was in the attic in the house, so he nailed shut the attic door to try and trap this person who was persecuting him. This sort of action was taken in consequence to the content of the delusions. Others tend to regard this behavior as "crazy," and have difficulty interacting with a person who holds these beliefs. His sister, in fact, felt the need to have him committed, as opposed to merely getting him psychiatric help. This is suggestive that he would have regarded helpful suggestions within the delusional system as part of a conspiracy to do him in.

4.   *Could his symptoms significantly impact his emotional expression, cognition, functioning, and volitional control?*

As discussed above, his illness includes the emotional flattening in which his expressions lack the emotional responsiveness typically seen in response to emotional situations. He would have trouble expressing emotional sympathy with his loved ones with respect to

Sparks, R.                                        9-25-08; 9-26-08                                    p. 19

their troubles.  Also, from a neuropsychological perspective, psychotic illness is associated with mental slowing, and memory problems that have been discussed above and that contribute to his problems in life.  His difficulty inhibiting his responses, along with his poor problem solving, do not allow for flexibility in response to his beliefs that someone is trying to poison him.  In particular, at times when the feeling that he is the target of attack becomes severe, he may react by directly protecting himself, without being able to discuss or think of alternatives.  A major feature of psychotic illnesses is the inability of the person to get along in life: family relationships, work, friends, etc.  In this case, it is abundantly clear that his persecutory delusional system in which he believed people were trying to poison him directly participated in his estrangement from family, avoidance of friendships and associations, and inability to participate in meaningful goal directed work activity.

Thank you for involving me in the examination of this individual, if there are any questions or concerns about the findings or report, please feel free to contact me.

Michael D. Chafetz, Ph.D., ABPP
Licensed in Clinical Psychology and Neuropsychology
Board Certified in Clinical Neuropsychology

MDC/jmi

(This report is subject to transcription error.  The findings are based on the available evidence.  If new evidence comes to light, the examiner reserves the right to adjust his conclusions accordingly.)

Sparks, R.                          9-25-08; 9-26-08                          p. 20

# Findings From Wechsler Adult Intelligence Scale - III

| WAIS-III | IQ/Ix | %ile | Verbal Scale | ss | Performance Scale | ss |
|----------|-------|------|--------------|----|-------------------|----|
| VIQ | 77 | 6 | Vocabulary | 8 | Picture Completion | 8 |
| PIQ | 76 | 5 | Similarities | 7 | Coding | 5 |
| FSIQ | 75 | 5 | Arithmetic | 5 | Block Design | 6 |
| VC index | 88 | 21 | Digit Span | 5 | Matrix Reasoning | 6 |
| PO index | 80 | 9 | Information | 8 | Picture Arrangement | 6 |
| WM index | 78 | 7 | Comprehension | 4 | Symbol Search | 4 |
| PS index | 71 | 3 | LN Sequencing | 9 | | |

(100 is an average IQ/Index score at the 50th %ile; 10 is an average scale score at the 50th %ile)

# Appendix C - Relevant Pages from the DSM-5

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

# DSM-5™

## AMERICAN PSYCHIATRIC ASSOCIATION

ctans an opportunity to document factors that may have played a role in the etiology of the
disorder, as well as those that might affect the clinical course. Examples include genetic
disorders, such as fragile X syndrome, tuberous sclerosis, and Rett syndrome; medical con-
ditions such as epilepsy; and environmental factors, including very low birth weight and
fetal alcohol exposure (even in the absence of stigmata of fetal alcohol syndrome).

# Intellectual Disabilities

# Intellectual Disability (Intellectual Developmental Disorder)

## Diagnostic Criteria

Intellectual disability (intellectual developmental disorder) is a disorder with onset during
the developmental period that includes both intellectual and adaptive functioning deficits
in conceptual, social, and practical domains. The following three criteria must be met:

A. Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract
thinking, judgment, academic learning, and learning from experience, confirmed by
both clinical assessment and individualized, standardized intelligence testing.

B. Deficits in adaptive functioning that result in failure to meet developmental and socio-
cultural standards for personal independence and social responsibility. Without ongo-
ing support, the adaptive deficits limit functioning in one or more activities of daily life,
such as communication, social participation, and independent living, across multiple
environments, such as home, school, work, and community.

C. Onset of intellectual and adaptive deficits during the developmental period.

**Note:** The diagnostic term *intellectual disability* is the equivalent term for the ICD-11 diag-
nosis of *intellectual developmental disorders.* Although the term *intellectual disability* is
used throughout this manual, both terms are used in the title to clarify relationships with
other classification systems. Moreover, a federal statute in the United States (Public Law
111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability,* and
research journals use the term *intellectual disability.* Thus, *intellectual disability* is the
term in common use by medical, educational, and other professions and by the lay public
and advocacy groups.

Specify current severity (see Table 1):

317 (F70)  **Mild**
318.0 (F71)  **Moderate**
318.1 (F72)  **Severe**
318.2 (F73)  **Profound**

## Specifiers

The various levels of severity are defined on the basis of adaptive functioning, and not IQ
scores, because it is adaptive functioning that determines the level of supports required.
Moreover, IQ measures are less valid in the lower end of the IQ range.

## Diagnostic Features

The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairment in everyday adaptive functioning, in comparison to an individual's age-, gender-, and socioculturally matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65–75 (70 ± 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of

factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

Criterion B is met when at least one domain of adaptive functioning—conceptual, social, or practical—is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

## Associated Features Supporting Diagnosis

Intellectual disability is a heterogeneous condition with multiple causes. There may be associated difficulties with social judgment; assessment of risk; self-management of behavior, emotions, or interpersonal relationships; or motivation in school or work environments. Lack of communication skills may predispose to disruptive and aggressive behaviors. Gullibility is often a feature, involving naiveté in social situations and a tendency for being easily led by others. Gullibility and lack of awareness of risk may result in exploitation by others and possible victimization, fraud, unintentional criminal involvement, false confessions, and risk for physical and sexual abuse. These associated features can be important in criminal cases, including Atkins-type hearings involving the death penalty.

Individuals with a diagnosis of intellectual disability with co-occurring mental disorders are at risk for suicide. They think about suicide, make suicide attempts, and may die from them. Thus, screening for suicidal thoughts is essential in the assessment process. Because of a lack of awareness of risk and danger, accidental injury rates may be increased.

## Prevalence

Intellectual disability has an overall general population prevalence of approximately 1%, and prevalence rates vary by age. Prevalence for severe intellectual disability is approximately 6 per 1,000.

## Development and Course

Onset of intellectual disability is in the developmental period. The age and characteristic features at onset depend on the etiology and severity of brain dysfunction. Delayed motor, language, and social milestones may be identifiable within the first 2 years of life among those with more severe intellectual disability, while mild levels may not be identifiable until school age when difficulty with academic learning becomes apparent. All criteria (including Criterion C) must be fulfilled by history or current presentation. Some children under age 5 years whose presentation will eventually meet criteria for intellectual disability have deficits that meet criteria for global developmental delay.

When intellectual disability is associated with a genetic syndrome, there may be a characteristic physical appearance (as in, e.g., Down syndrome). Some syndromes have a *behavioral phenotype,* which refers to specific behaviors that are characteristic of particular genetic disorder (e.g., Lesch-Nyhan syndrome). In acquired forms, the onset may be abrupt following an illness such as meningitis or encephalitis or head trauma occurring during the developmental period. When intellectual disability results from a loss of previously acquired cognitive skills, as in severe traumatic brain injury, the diagnoses of intellectual disability and of a neurocognitive disorder may both be assigned.

Although intellectual disability is generally nonprogressive, in certain genetic disorders (e.g., Rett syndrome) there are periods of worsening, followed by stabilization, and in

30

ers (e.g., San Phillippo syndrome) progressive worsening of intellectual function. After early childhood, the disorder is generally lifelong, although severity levels may change over time. The course may be influenced by underlying medical or genetic conditions and co-occurring conditions (e.g., hearing or visual impairments, epilepsy). Early and ongoing interventions may improve adaptive functioning throughout childhood and adulthood. In some cases, these result in significant improvement of intellectual functioning, such that the diagnosis of intellectual disability is no longer appropriate. Thus, it is common practice when assessing infants and young children to delay diagnosis of intellectual disability until after an appropriate course of intervention is provided. For older children and adults, the extent of support provided may allow for full participation in all activities of daily living and improved adaptive function. Diagnostic assessments must determine whether improved adaptive skills are the result of a stable, generalized new skill acquisition (in which case the diagnosis of intellectual disability may no longer be appropriate) or whether the improvement is contingent on the presence of supports and ongoing interventions (in which case the diagnosis of intellectual disability may still be appropriate).

## Risk and Prognostic Factors

**Genetic and physiological.**   Prenatal etiologies include genetic syndromes (e.g., sequence variations or copy number variants involving one or more genes; chromosomal disorders), inborn errors of metabolism, brain malformations, maternal disease (including placental disease), and environmental influences (e.g., alcohol, other drugs, toxins, teratogens). Perinatal causes include a variety of labor and delivery-related events leading to neonatal encephalopathy. Postnatal causes include hypoxic ischemic injury, traumatic brain injury, infections, demyelinating disorders, seizure disorders (e.g., infantile spasms), severe and chronic social deprivation, and toxic metabolic syndromes and intoxications (e.g., lead, mercury).

## Culture-Related Diagnostic Issues

Intellectual disability occurs in all races and cultures. Cultural sensitivity and knowledge are needed during assessment, and the individual's ethnic, cultural, and linguistic background, available experiences, and adaptive functioning within his or her community and cultural setting must be taken into account.

## Gender-Related Diagnostic Issues

Overall, males are more likely than females to be diagnosed with both mild (average male:female ratio 1.6:1) and severe (average male:female ratio 1.2:1) forms of intellectual disability. However, gender ratios vary widely in reported studies. Sex-linked genetic factors and male vulnerability to brain insult may account for some of the gender differences.

## Diagnostic Markers

A comprehensive evaluation includes an assessment of intellectual capacity and adaptive functioning; identification of genetic and nongenetic etiologies; evaluation for associated medical conditions (e.g., cerebral palsy, seizure disorder); and evaluation for co-occurring mental, emotional, and behavioral disorders. Components of the evaluation may include basic pre- and perinatal medical history, three-generational family pedigree, physical examination, genetic evaluation (e.g., karyotype or chromosomal microarray analysis and testing for specific genetic syndromes), and metabolic screening and neuroimaging assessment.

## Differential Diagnosis

The diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met. A diagnosis of intellectual disability should not be assumed because of a particular

genetic or medical condition. A genetic syndrome linked to intellectual disability should be noted as a concurrent diagnosis with the intellectual disability.

**Major and mild neurocognitive disorders.**   Intellectual disability is categorized as a neurodevelopmental disorder and is distinct from the neurocognitive disorders, which are characterized by a loss of cognitive functioning. Major neurocognitive disorder may co-occur with intellectual disability (e.g., an individual with Down syndrome who develops Alzheimer's disease, or an individual with intellectual disability who loses further cognitive capacity following a head injury). In such cases, the diagnoses of intellectual disability and neurocognitive disorder may both be given.

**Communication disorders and specific learning disorder.**   These neurodevelopmental disorders are specific to the communication and learning domains and do not show deficits in intellectual and adaptive behavior. They may co-occur with intellectual disability. Both diagnoses are made if full criteria are met for intellectual disability and a communication disorder or specific learning disorder.

**Autism spectrum disorder.**   Intellectual disability is common among individuals with autism spectrum disorder. Assessment of intellectual ability may be complicated by social-communication and behavior deficits inherent to autism spectrum disorder, which may interfere with understanding and complying with test procedures. Appropriate assessment of intellectual functioning in autism spectrum disorder is essential, with reassessment across the developmental period, because IQ scores in autism spectrum disorder may be unstable, particularly in early childhood.

## Comorbidity

Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (e.g., mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population. The prognosis and outcome of co-occurring diagnoses may be influenced by the presence of intellectual disability. Assessment procedures may require modifications because of associated disorders, including communication disorders, autism spectrum disorder, and motor, sensory, or other disorders. Knowledgeable informants are essential for identifying symptoms such as irritability, mood dysregulation, aggression, eating problems, and sleep problems, and for assessing adaptive functioning in various community settings.

The most common co-occurring mental and neurodevelopmental disorders are attention-deficit/hyperactivity disorder; depressive and bipolar disorders; anxiety disorders; autism spectrum disorder; stereotypic movement disorder (with or without self-injurious behavior); impulse-control disorders; and major neurocognitive disorder. Major depressive disorder may occur throughout the range of severity of intellectual disability. Self-injurious behavior requires prompt diagnostic attention and may warrant a separate diagnosis of stereotypic movement disorder. Individuals with intellectual disability, particularly those with more severe intellectual disability, may also exhibit aggression and disruptive behaviors, including harm of others or property destruction.

## Relationship to Other Classifications

ICD-11 (in development at the time of this publication) uses the term *intellectual developmental disorders* to indicate that these are disorders that involve impaired brain functioning early in life. These disorders are described in ICD-11 as a metasyndrome occurring in the developmental period analogous to dementia or neurocognitive disorder in later life. There are four subtypes in ICD-11: mild, moderate, severe, and profound.

The American Association on Intellectual and Developmental Disabilities (AAIDD) also uses the term *intellectual disability* with a similar meaning to the term as used in this

manual. The AAIDD's classification is multidimensional rather than categorical and is based on the disability construct. Rather than listing specifiers as is done in DSM-5, the AAIDD emphasizes a profile of supports based on severity.

# Global Developmental Delay

## 315.8 (F88)

This diagnosis is reserved for individuals *under* the age of 5 years when the clinical severity level cannot be reliably assessed during early childhood. This category is diagnosed when an individual fails to meet expected developmental milestones in several areas of intellectual functioning, and applies to individuals who are unable to undergo systematic assessments of intellectual functioning, including children who are too young to participate in standardized testing. This category requires reassessment after a period of time.

# Unspecified Intellectual Disability (Intellectual Developmental Disorder)

## 319 (F79)

This category is reserved for individuals *over* the age of 5 years when assessment of the degree of intellectual disability (intellectual developmental disorder) by means of locally available procedures is rendered difficult or impossible because of associated sensory or physical impairments, as in blindness or prelingual deafness; locomotor disability; or presence of severe problem behaviors or co-occurring mental disorder. This category should only be used in exceptional circumstances and requires reassessment after a period of time.

# Communication Disorders

Disorders of communication include deficits in language, speech, and communication. *Speech* is the expressive production of sounds and includes an individual's articulation, fluency, voice, and resonance quality. *Language* includes the form, function, and use of a conventional system of symbols (i.e., spoken words, sign language, written words, pictures) in a rule-governed manner for communication. *Communication* includes any verbal or nonverbal behavior (whether intentional or unintentional) that influences the behavior, ideas, or attitudes of another individual. Assessments of speech, language and communication abilities must take into account the individual's cultural and language context, particularly for individuals growing up in bilingual environments. The standardized measures of language development and of nonverbal intellectual capacity must be relevant for the cultural and linguistic group (i.e., tests developed and standardized for one group may not provide appropriate norms for a different group). The diagnostic category of communication disorders includes the following: language disorder, speech sound disorder, childhood-onset fluency disorder (stuttering), social (pragmatic) communication disorder, and other specified and unspecified communication disorders.

# Appendix D - Sparks' School Records from Trial

WRKDOC4_1.iep

Dallas Independent School District
Transcript System

ID: 66034597   Loc: 997   Birthdate: 02/11/1974

SSN: 466599289   State ID:   ID: 66034597

Student: SPARKS, ROBERT B
Sex: m   Race: B   Grade: 09   Advisor:
Parent/Guard: PATRICIA CROCKETT
3510 CULVER ST
DALLAS, TX  75223

Transcript Loc: 022 WOODROW WILSON HIGH SCHOOL
Student Status: w  Effective: 03/11/1991
Average:  50.6100
Collegiate GPA:
Class Rank:  445 in class of  534; Quartile:  4
(last loaded on 02/22/1991)

Grad Plan: (0001) · HIGH SCHOOL PROGRAM
Yr-into-9th: 89/90 GTOption:   CATE Pathway:

College Bound:

SECTION 1: COURSE INFORMATION

WORKING DOCUMENT,  04/22/2008

Page     1
StuPg    1

| YR | Sem/ Mrkp | Loc | Crs/Sec | DISD title | Grd | AAR CODES CC.II.SS | GPA CAT | *****GRADES***** 1  2  3 | EX | SEM(type) | deny/ s(avg) | Cred (s/1) | GRD PMT | RNK PMT | Update/Message |
|----|-----------|-----|---------|------------|-----|---------------------|---------|--------------------------|-----|-----------|-------------|-------------|---------|---------|----------------|
| 87/88 | 1/3 | 048 | 4582/15 | PHY EDUC 7-8 | | 07 | Inst: | | 76 | | | 0.0 | | | |
| | | | 03823000 | PE           PE 7-8 | | | | | | | | | | |
| | | 048 | 9105/02 | BAS COMM SKLS S | | 07 | Inst: | | 75 | | | 0.0 | | | |
| | | | SE000100 | LA        COMM1 | | | | | | | | | | |
| | | 048 | 9106/02 | BAS SOC SKLS S | | 07 | Inst: | | 69 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9106/03 | BAS SOC SKLS S | | 07 | Inst: | | 73 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9107/02 | BAS MATH SKLS S | | 07 | Inst: | | 76 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9108/02 | BAS HLTH&GRM S | | 07 | Inst: | | 67 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9109/02 | BASIC WK SKL S | | 07 | Inst: | | 76 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| 87/88 | 2/6 | 048 | 4582/20 | PHY EDUC 7-8 | | 07 | Inst: | | 68 | | | 0.0 | | | |
| | | | 03823000 | PE           PE 7-8 | | | | | | | | | | |
| | | 048 | 9105/02 | BAS COMM SKLS S | | 07 | Inst: | | 74 | | | 0.0 | | | |
| | | | SE000100 | LA        COMM1 | | | | | | | | | | |
| | | 048 | 9106/02 | BAS SOC SKLS S | | 07 | Inst: | | 83 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9106/03 | BAS SOC SKLS S | | 07 | Inst: | | 81 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9107/02 | BAS MATH SKLS S | | 07 | Inst: | | 79 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9108/02 | BAS HLTH&GRM S | | 07 | Inst: | | 83 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| | | 048 | 9109/02 | BASIC WK SKL S | | 07 | Inst: | | 78 | | | 0.0(1) | | | |
| | | | SE000001 | LOCL  SPEC ED | | | | | | | | | | |
| 88/89 | 1/3 | 048 | 4582/09 | PHY EDUC 7-8 | | 08 | Inst: | | 70 | | | 0.0 | | | |
| | | | 03823000 | PE           PE 7-8 | | | | | | | | | | |

SPARKS, ROBERT B

ID: 66034597

35

STATE'S EXHIBIT

PENGAD 800-631-6989

WRKDOC4_1...<p
ID: 66034597    Loc: 997    Birthdate: 02/13/1974

Dallas Independent School District
Transcript System

SSN: 466599289    State ID:    ID: 66034597

Student: SPARKS, ROBERT B
Sex: m    Race: B    Grade: 09    Advisor:
Parent/Guard: PATRICIA CROCKETT
3530 CULVER ST
DALLAS, TX    75223

Transcript Loc: 022 WOODROW WILSON HIGH SCHOOL
Student Status: w    Effective: 03/11/1991
50.6100
Average:
Collegiate GPA.
Class Rank: 445 in class of 534; Quartile: 4
(last loaded on 02/22/1991)

Grad Plan: (0001) - HIGH SCHOOL PROGRAM
Yr-into-9th: 89/90 GROption:    CNTE Pathway:

College Bound:

SECTION 1: COURSE INFORMATION

WORKING DOCUMENT, 04/22/2008

Page
StuPg

| YR | Sem/ Mrkp | Loc | Crs/Sec DISD title | Grd | AAR CODES CC.II.SS | GPA CAT | GRADES 1 2 3 | EX SEM(type) | deny/ s(avg) | Cred (s/1) | GRD PNT | RNK PNT | Update/Message |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 88/89 1/3 | | 048 | 9125/02 BAS COMM SKL S 08 SE000112 LA BSCMSK-S | Inst: | | | | 74 | | 0.0 | | | |
| | | 048 | 9126/02 BAS SOC SKILL S 08 SE000113 EL BSSCSK-S | Inst: | | | | 80 | | 0.0 | | | |
| | | 048 | 9126/03 BAS SOC SKILL S 08 SE000113 EL BSSCSK-S | Inst: | | | | 85 | | 0.0 | | | |
| | | 048 | 9127/02 BAS MATH SKL S 08 SE000114 MA BSMTSK-S | Inst: | | | | 84 | | 0.0 | | | |
| | | 048 | 9128/02 BAS HLTH&GRM S 08 SE000115 HL BSHLTH-S | Inst: | | | | 81 | | 0.0 | | | |
| | | 048 | 9129/02 BAS WORK SKL S 08 SE000116 EL BSWKSK-S | Inst: | | | | 80 | | 0.0 | | | |
| 88/89 2/6 | | 048 | 4582/19 PHY EDUC 7-8 08 03823000 PE PE 7-8 | Inst: | | | | 71 | | 0.0 | | | |
| | | 048 | 9125/02 BAS COMM SKL S 08 SE000112 LA BSCMSK-S | Inst: | | | | 81 | | 0.0 | | | |
| | | 048 | 9126/02 BAS SOC SKILL S 08 SE000113 EL BSSCSK-S | Inst: | | | | 77 | | 0.0 | | | |
| | | 048 | 9126/03 BAS SOC SKILL S 08 SE000113 EL BSSCSK-S | Inst: | | | | 79 | | 0.0 | | | |
| | | 048 | 9127/02 BAS MATH SKL S 08 SE000114 MA BSMTSK-S | Inst: | | | | 79 | | 0.0 | | | |
| | | 048 | 9128/02 BAS HLTH&GRM S 08 SE000115 HL BSHLTH-S | Inst: | | | | 73 | | 0.0 | | | |
| | | 048 | 9129/02 BAS WORK SKL S 08 SE000116 EL BSWKSK-S | Inst: | | | | 72 | | 0.0 | | | |
| 89/90 1/3 | | 014 | 1200/72 ENGLISH I 09 03220100 LA ENG 1 | 0003 Inst: | | | | 49 | | 0.0 | | | |
| | | 014 | 1226/20 READING IMPRV I 09 03270100 LA READAPP | 0002 Inst: | | | | 50 | | 0.0 | 50.0 | 0 | |

SPARKS, ROBERT B

ID: 66034597

ID: 66034597

MRKDOC4_

ID: 66034597   Loc: 997   Birthdate: 02/13/1974

Dallas Independent School District
Transcript System

SSN: 466599289          State ID:          ID: 66034597

Student: SPARKS, ROBERT B
Sex: m   Race: B   Grade: 09   Advisor:
Parent/Guard: PATRICIA CROCKETT
3530 CULVER ST
DALLAS, TX   75223

Transcript Loc: 022 WOODROW WILSON HIGH SCHOOL
Student Status: w   Effective: 03/11/1991
Average GPA:          50.6100
Collegiate GPA:
Class Rank: 445 in class of 534; Quartile: 4
(last loaded on 02/22/1991)

Grad Plan: (0001) - HIGH SCHOOL PROGRAM
Yr-into-9th: 89/90 GROption:   CRTE Pathway:

College Bound:

SECTION 1: COURSE INFORMATION

WORKING DOCUMENT, 04/22/2008

Page
StuPg   3

| Sem/ YR | Mrkp | Loc | Crs/Sec | DISD title | Grd | CC.11.SS | AAR CODES | GPA CAT | 1 | 2 | 3 | EX | SEM(type) | deny/ a(avg) | Cred (s/1) | GRD PNT | RNK PNT | Update/Message |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 89/90 1/3 | 014 | | 2320/52 | U.S. HISTORY | 09 | 03340100 SS | US HIST | Inst: | 0003 | | | | 50 | | 0.0 | 50.0 | 0 | |
| | 014 | | 2615/64 | PRE-ALGEBRA | 09 | 03100300 MA | PRE-ALG | Inst: | 0003 | | | | 55 | | 0.0 | 55.0 | 0 | |
| | 014 | | 4610/30 | PHYS EDUCATION | 09 | 03820100 PE | PE 1 | Inst: | 0003 | | | | 57 | | 0.0 | 57.0 | 0 | |
| | 014 | | 5071/40 | HM EC (FNCHEM) | 09 | 11610120 CT | CHE | Inst: | 0003 | | | | 60 | | 0.0 | 60.0 | 0 | |
| | 014 | | 7816/10 | STUDY HALL | 09 | SR000003 EL | STUDYHAL | Inst: | 0000 | | | | 74 | | 0.0 | | | |
| 89/90 2/6 | 022 | | 1200/01 | ENGLISH I | 09 | 03220100 LA | ENG 1 | Inst: | 0003 | | | | 49 | | 0.0 | | | |
| | 022 | | 1226/15 | READING IMPRV I | 09 | 03270100 LA | READAPP | Inst: | 0002 | | | | 49 | | 0.0 | | | |
| | 022 | | 2320/08 | U.S. HISTORY | 09 | 03340100 SS | US HIST | Inst: | 0003 | | | | 49 | | 0.0 | | | |
| | 022 | | 2615/05 | PRE-ALGEBRA | 09 | 03100300 MA | PRE-ALG | Inst: | 0003 | | | | 49 | | 0.0 | | | |
| | 022 | | 3437/07 | HEALTH ED | 09 | 03810100 HL | HLTH ED | Inst: | 0003 | | | | 50 | | 0.0 | 50.0 | 0 | |
| | 022 | | 4610/07 | PHYS EDUCATION | 09 | 03820100 PE | PE 1 | Inst: | 0003 | | | | 49 | | 0.0 | | | |
| 90/91 1/3 | 022 | | 1201/01 | ENGLISH I | 09 | 03220100 LA | ENG 1 | Inst: | 0003 | | | | 49 | | 0.0 | | | |
| | 022 | | 1226/13 | READING IMPRV I | 09 | 03270100 LA | READAPP | Inst: | 0002 | | | | 49 | | 0.0 | | | |
| | 022 | | 2320/11 | U.S. HISTORY | 09 | 03340100 SS | US HIST | Inst: | 0003 | | | | 50 | | 0.0 | 50.0 | 0 | |
| | 022 | | 2615/01 | PRE-ALGEBRA | 09 | 03100300 MA | PRE-ALG | Inst: | 0003 | | | | 49 | | 0.0 | | | |

SPARKS, ROBERT B

WRKDOC_4

Dallas Independent School District
Transcript System

ID: 66034597   Loc: 997   Birthdate: 02/13/1974

SSN: 466599289   State ID:   ID: 66034597

Student: SPARKS, ROBERT B
Sex: m   Race: B   Grade: 09   Advisor:
Parent/Guard: PATRICIA CROCKETT
3530 CULVER ST
DALLAS, TX   75223

Transcript Loc: 022 WOODROW WILSON HIGH SCHOOL
Student Status: w   Effective: 03/11/1991
Average:           50.6100
Collegiate GPA:
Class Rank:  445 in class of  534;  Quartile:   4
(last loaded on 02/22/1991)

Grad Plan: (0001) - HIGH SCHOOL PROGRAM
Yr-Into-9th: 89/90 GROption:   CATE Pathway:

College Bound:

SECTION 1: COURSE INFORMATION

WORKING DOCUMENT, 04/22/2008

Page       4
StuPrg     4

| Sem/<br>YR Mrkp Loc Crs/Sec DISD title | AAR CODES<br>Grd CC.II.SS | GPA<br>CAT | ******GRADES*************** deny/ Cred<br>1   2   3   EX SEM(type) s(avg) (s/1) | GRD  RNK<br>PNT  PNT | Update/Message |
|---|---|---|---|---|---|
| 90/91 1/3 022 3110/11 PHYSICL SCIENCE 09 . | Inst: | 0003 | 49 | 0.0 | |
| 03060200 SC   PHYS SCI | | | | | |
| 022 4610/12 PHYS EDUCATION 09 . | Inst: | 0003 | 49 | 0.0 | |
| 03820100 PE   PE 1 | | | | | |

*y1/y2:           * = update in stugrcodes.dt; all others, update in transcript
deny/s(avg):      s(avg) = salvaged credit with full-year average
                  d = denied credit due to absences
Credis/(1):       (1) = local; blank = state
TEA group:        * = counts as a PE waiver
Please use the GPA Reports from menu for information about point totals.
Please use the SEP for analysis of courses by graduation plan requirements.

ID: 66034597

SPARKS, ROBERT B

ID: 66034597

|  | Transcript | Stugrades | Total |
|---|---|---|---|
| State Credits | 0.0 | 0.0 | 0.0 |
| Local Credits | 0.0 | 0.0 | 0.0 |
| Credits Denied | 0.0 | 0.0 | 0.0 |
| Incomplete Grades | 0 | 0 | 0.0 |

SECTION 2.  TEST SCORES AND COMMENTS

WORKING DOCUMENT, 04/22/2008

Page
StuPg

Student:  SPARKS, ROBERT B
ID: 66034597   Loc: 997   Birthdate: 02/13/1974

Transcript Loc: 022 WOODROW WILSON HIGH SCHOOL
SSN: 466599289   State ID:   ID: 66034597

Norm Referenced Tests
No Data on File

TAAS LVL  DATE    GRADE LANG  READ        MATH      WRITE    SCIENCE   SOC.STUD.
                  No Data On File

TAKS LVL  DATE    GRADE LANG  READ/ELA    MATH      WRITE    SCIENCE   SOC.STUD.  ELA WRIT COMP
                  No Data On File

TX SUCCESS INITIATIVE        math:      (    )   read:     (    )   writ:     (    )

TAAS:  1st Reading TLI -          1st Math TLI -           1st Writing SS -

END OF COURSE EXAMS          TYPE              DATE              RESULTS
                  No Data On File

College Entrance Exams
PSAT: DATE     LEV  VERB    VPCT  MATH  MPCT  WRITE  WPCT  SEL  SPCT
                  No Data On File
SAT:  DATE     LEV  CRIT READ  MATH  WRITING  TOTAL
                  No Data On File
ACT:  DATE     LEV  ENGL %  MATH %  READ %  SCI  %  COMP %
                  No Data On File
SAT-ACH:DATE   ACH1    ACH2    ACH3
                  No Data On File

End of Tests and Comments

SPARKS, ROBERT B

ID: 66034597

ID: 66034597

39

SECTION 3: MISCELLANEOUS

WORKING DOCUMENT, 04/22/2008

Page
StuPg

Student: SPARKS, ROBERT B
ID: 66034597   Loc: 997   Birthdate: 02/13/1974

Transcript Loc: 022 WOODROW WILSON HIGH SCHOOL
SSN: 466599289   State ID:   ID: 66034597

Bilingual Data

Immunization Records:

Academic History: (School awarding credit)

| SchYr | GRD | | | | |
|-------|-----|-----|-----|-----|-----|
| 87/88 | 07 | Semester 1: | 057-905-048 | DALLAS ISD | W H GASTON MIDDLE |
| 87/88 | 07 | Semester 2: | 057-905-048 | DALLAS ISD | W H GASTON MIDDLE |
| 88/89 | 08 | Semester 1: | 057-905-048 | DALLAS ISD | W H GASTON MIDDLE |
| 88/89 | 08 | Semester 2: | 057-905-048 | DALLAS ISD | W H GASTON MIDDLE |
| 89/90 | 09 | Semester 1: | 057-905-014 | DALLAS ISD | W W SAMUELL H S |
| 89/90 | 09 | Semester 2: | 057-905-022 | DALLAS ISD | WOODROW WILSON H S |
| 90/91 | 09 | Semester 1: | 057-905-022 | DALLAS ISD | WOODROW WILSON H S |

Transfer History Within DISD

SchYr GRD LOC                          Entry     Withdrawal   Reason
End of Miscellaneous

SPARKS, ROBERT B

ID: 66034597

ID: 66034597











# REQUEST FOR REVIEW OF STUDENT RECORD

To the Principal: _____ School.

I, _____ (Parent) (Guardian)

*(Name of Person Requesting Record)*

Address of Person Requesting Record

Signature of Principal        Telephone Number        Date

SPARKS
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 IN RN ALTWENC
(ENGLISH ONLY)

Name of Student _____ I.D.#

Student's Picture

## RECORD OF INSPECTION

Date Request Received

Signature of Principal        Signature of Person Requesting Record

Address of Person Requesting Record

Telephone Number        Date

Date Request Received

Signature of Principal        Signature of Person Requesting Record

Address of Person Requesting Record

Telephone Number        Date

Date Request Received

Signature of Principal        Signature of Person Requesting Record

Address of Person Requesting Record

Telephone Number        Date

# Appendix E - Additional School Records

## ACADEMIC ACHIEVEMENT RECORD

DATE PRINTED - 02/15/91

Full Legal Name: SPARKS, ROBERT B
Student ID Number: 6503049
Social Security Number: 460539392 Sex M
DOB: 02/13/74  Place of Birth: DALLAS, TX
Parents: PATRICIA CROCKETT
Current Address: 3530 CULVER ST DALLAS TEX 75223
Home Phone (214)381-7415

Name of High School: WOODROW WILSON HIGH SCHOOL  Proposed Date of Graduation: '73/01/94
Phone (214)841-5091
High School Address: 100 S GLASGOW DR
District Name: DALLAS INDEPENDENT SCHOOL DISTRICT
TEA County District County No. 057/EO5/022
Rank 446   Yr. in Class 556   Date of Rank: 02/14/91
Grade Point Average 50.81   Date Graduated
Last District High School Attended

College Board Content Code No. 441-035
☐ High School Program
☐ Advanced High School Program
☐ Advanced High School Honors Program
Date of Entry at 9th Grade: 09/08

TEAMS Mastery, Exit Level
Eng Language Arts      Mathematics

| | ABBREVIATED COURSE NAME | | | | | |
|---|---|---|---|---|---|---|
| | | | 0.0 | 88-89 | | |
| | | | 0.0 | 09/08 | | |
| | | | 0.0 | 09/08 | | |

Entry Date 09/06/88

**GRADE 09 1989-90**

| | ABBREVIATED COURSE NAME | Sem | | Credit Local |
|---|---|---|---|---|
| 01 | ENG 1 | 49 | 0.0 | 0.0 |
| 01 | ENG 1 | 49 | 0.0 | 0.0 |
| 02 | PRE-ALG | 55 | 0.0 | 0.0 |
| 02 | PRE-ALG | 49 | 0.0 | 0.0 |
| 04 | U S HIST | 50 | 0.0 | 0.0 |
| 04 | U S HIST | 49 | 0.0 | 0.0 |
| 06 | HLTH ED | 50 | 0.0 | 0.0 |
| 07 | PE 1 | 57 | 0.0 | 0.0 |
| 07 | PE 1 | 49 | 0.0 | 0.0 |
| 11 | CHE | 60 | 0.0 | 0.0 |
| 12 | STUDYHAL | 74 | 0.0 | 0.0 |
| 13 | READ IMP | 50 | 0.0 | 0.0 |
| 13 | READ IMP | 49 | 0.0 | 0.0 |

Sum 0.00

**GRADE 09 1990-91**

| | ABBREVIATED COURSE NAME | Sem | | Credit Local |
|---|---|---|---|---|
| 01 | ENG 1 | 49 | 0.0 | 0.0 |
| 03 | PRE-ALG | 49 | 0.0 | 0.0 |
| 03 | PHYS SCI | 49 | 0.0 | 0.0 |
| 04 | U S HIST | 50 | 0.0 | 0.0 |
| 07 | PE 1 | 49 | 0.0 | 0.0 |
| 13 | READ IMP | 49 | 0.0 | 0.0 |

Entry Date 08/01/87

Absence Year   87-88
Sem 1 Abs/Grade   07/07
Sem 2 Abs/Grade   10/07

Explanation of Grades/Credits
70-100 - Passing grade/credit
49 - Failing grade/No credit
W - PE waiver credit

PAGE 1 OF 1

Signature and Title of School Official
Accepted By:

DEFENDANT'S
EXHIBIT
19

48

## HEALTH STATUS

| | DATE | | DATE |
|---|---|---|---|
| RUBEOLA FV | DATE 09/75 | RUBELLA CV | DATE 09/75 |
| MUMPS CV | DATE 09/75 | POLIO BV | DATE 09/78 |
| D/T BV | DATE 10/88 | | |

## HONORS/ACTIVITIES

## SPECIAL COMMENTS

## ACADEMIC ACHIEVEMENT RECORD SENT

| Date Requested | Requesting Agency School or College | Date Sent |
|---|---|---|

## TRANSFER/WITHDRAWAL RECORD

| Sending | Receiving | Region |
|---|---|---|
| 08/27/90 WOODROW WILSON HI | w/b cody'sn WOODROW WILSON HI | '29 |
| 10/10/90 W/D - 997 | | |

### Summary of credits by Department

| | | | |
|---|---|---|---|
| Eng./Language Arts - | 0.0 | Other Language | 0.0 |
| Mathematics | 0.0 | Fine Arts | 0.0 |
| Science | 0.0 | Computer Science | 0.0 |
| Social Studies | 0.0 | Vocational Education | 0.0 |
| Economics/Free Ent. | 0.0 | Business Education | 0.0 |
| Health | 0.0 | Other Electives | 0.0 |
| Physical Education | 0.0 | Local Credit | 0.0 |
| TOTAL MID SCH CREDIT | 0.0 | TOTAL CREDITS | 0.0 |
| TOTAL LOCAL CREDITS | 0.0 | TOTAL P.E. WAIVER | 0.0 |

## STANDARDIZED TEST/TEAMS RESULTS

| TEAMS Mastery | Exit Level | T 0000000000 |
|---|---|---|

| | Scaled Score | Subject Mastery | Date |
|---|---|---|---|
| Eng. Language Arts | | | Date 04/89 |
| Mathematics | | | Lang. |
| Writing Sample | | | |

### Iowa Test of Basic Skills

| | VOC | Read | Lang. |
|---|---|---|---|
| Grade EQ | 08.9 | 05.4 | 04.8 |
| Nat.%ile | 09 | 06 | 03 |
| Loc.%ile | | | |

| | WRST | Math | Comp. |
|---|---|---|---|
| Grade EQ | 00.0 | 06.5 | 05.6 |
| Nat.%ile | 00 | 10 | 04 |
| Loc.%ile | | | |

### Tests of Achievement and Proficiency

| Grade | Form | Level | Date |
|---|---|---|---|
| | Read | Math | W.EXP | S.INF | S.S. | SCI | Comp. |
| Score | | | | | | | |
| Nat.%ile | | | | | | | |
| Loc.%ile | | | | | | | |

## COLLEGE ENTRANCE EXAMINATIONS RESULTS

| SAT | Date | Grade | Verb | Math | TSWE | Read | Voc |
|---|---|---|---|---|---|---|---|

| SAT ACH | Date | | ACH1 | ACH2 | ACH3 | | |
|---|---|---|---|---|---|---|---|

| ACT | Date | Grade | Eng | Math | Read | Sci R | COMP |
|---|---|---|---|---|---|---|---|
| SCORE | | | | | | | |
| SCORE | | | | | | | |

| PSAT | Date | Grade | Verb | Math | SEL | | |
|---|---|---|---|---|---|---|---|
| SCORE | | | | | | | |

49

# Appendix F: CV of Dr. Williams-Anderson

# Shawanda Williams-Anderson, Ph. D., HSPP
# (TX License #33380)

**13656 Breton Ridge Street, Suite F**
**Houston, TX  77070**
*Licensed Clinical Psychologist/ Neuropsychology Specialty*
(281)890-7776 voice      (713)459-6241 mobile      (281)890-7785 fax
shwi0899@yahoo.com

**EDUCATION**:

| Jackson State University | Northwestern State University | Dillard University |
|---|---|---|
| Jackson, MS  39217 | Natchitoches, LA  71497 | New Orleans, LA  70122 |
| Ph.D., Clinical Psychology | M.S., Clinical Psychology | B.A., Psychology (cum laude) |
| 08/97 – 05/04 | 08/94 – 08/97 | 08/89 – 05/93 |

**EMPLOYMENT/EXPERIENCE:**

*Neuropsychological Associates*, Houston, TX
Private Practice
12/08 – present
Private office setting composed of 2 psychologists, 2 Master's level clinicians, 1 doctoral practicum student, and 1 office assistant.  Services provided include neuropsychological evaluations, forensic evaluations, pre-surgical evaluations, school consultations, consultation and evaluation of severe and persistent mental illness with MHMRA/Neuropsychiatric Center (NPC) patients. Practitioners also provide individual psychotherapy with survivors of TBI, stroke, and other brain injuries, as well as general psychological issues. Group therapy for children and adults also offered with specialized topics varying as needs present.  Play therapy and developmental evaluations are offered for children ages 4-17. The licensed psychologists also perform Independent Medical Exams (IMEs) when the referral question is psychological in nature.   The office serves as a referral source for local neurologists, school psychologists, psychiatrists, inpatient facilities, and other paraprofessionals.  Contract work provided for TX Dept. of Assistive & Rehab. Services, Neuropsychiatric Center, Veterans Evaluation Services (VES), Child Protective Services, Athletes Without Limits, and a local professional sports team.
www.neuropsych-associates.com

*Walden University*, Minneapolis, MN
Core Full-time Faculty
04/2008 to 12/2011

Distance education lecture development and administration to graduate students pursuing doctoral degrees in Clinical Psychology.  Participation with school committees and task forces, recording and maintaining grade records, and virtual office hours were also included in job duties.  Quarterly travel for National Meetings and on-site clinical training was required.  Thesis and dissertation mentoring, editing, and chairperson duties for 15-18 students.  Coursework based on quarter sessions.

*Mental Health/Mental Retardation Authority of Harris County*, Houston, TX  77074
Clinical Psychologist VI-Specialized Therapies and Rehabilitative Services Clinic (S.T.A.R.S.)
06/07 – 04/09
Primary duties include providing outpatient clinical services to children, adolescents, and young adults with Axis II diagnoses. Other duties are monthly presentations to the psychological staff (MR division) on ethical concerns and issues, affiliation with local teaching institutions (adjunct-TX Southern Univ.), and demonstrated research through formal presentations and publications.  Behavioral support, treatment planning, family therapy, Adaptive Behavior Analysis (ABA), supplemental neuropsychological assessments, differential diagnosis, and psychological evaluations are also included in secondary duties. Appointment to the 4- digit Fetal Alcohol Spectrum Disorders Assessment Team.

*Adjunct Professor,* Houston, TX  77064
06/07 – present
Serving as adjunct professor for several universities within the metro-Houston area (Texas Southern University, Houston Baptist University, and Houston Community College). Adjunct duties include teaching various graduate and undergraduate courses within the discipline of Psychology.  Records maintenance and office hours held and coincide with number of courses taught.  Courses, to date, include Physiological Psychology, Statistics I, and General Psychology.

*Prairie View A & M University,* Prairie View, TX  77446
Assistant Professor/Training Director
Graduate Department of Psychology
08/04 – 06/07
Served as Director of Clinical Training of the doctoral program in Clinical Adolescent Psychology. Responsible for implementing, documenting, and supervising clinical training experiences for doctoral students in the Clinical Adolescent Psychology Program.  Additional duties include development of the program handbook, scheduling and coordination of oral and written comprehensive exams, liaison between program and CUDCP, lecture and instruction of undergraduate and graduate classes in specialties of Psychology. Developed on-line and web enhanced classes for undergraduate studies. Classes taught: [Undergraduate] General Psychology, Physiological Psychology, Clinical Psychology, Statistics I, Senior Thesis; [Graduate] Cognitive Psychology, Neuropsychology, Testing & Assessment, Personality, Psychopathology, Psychotherapy, Substance Abuse Counseling & Addictive Personalities, Psychopharmacology, Practicum and Field Placement.

*Methodist Rehabilitation Center,* Jackson, MS 39216
Post-doctoral Neuropsychology Training Fellowship
08/02 – 08/04
2-year, APPCN accredited, postdoctoral fellowship in Clinical Neuropsychology. First year inpatient rotation with primarily TBI and stroke survivors.  NIDRR funded National TBI Model Systems Grant data collection.  Neuropsychological evaluation of acute and post-rehabilitation patients. Second year entailed community reintegration of brain injury survivors, group therapy, individual outpatient therapy, and family conferences.

*Utah State Hospital,* Provo, UT  84601
Predoctoral Neuropsychology Internship
07/01 – 07/02
1-year, APA accredited, predoctoral internship in Developmental Neuropsychology. 6-month rotations on Youth & Children's Unit and Adult Unit.  Additional training in Forensics, neuropsychological assessment, and differential diagnosis.    Individual therapy, including cognitive remediation and music therapy.  Research projects on OCD, Landau-Kleffner Syndrome, severe and persistent mental illness, and test development of memory assessment.

*Methodist Rehabilitation Center,* Jackson, MS  39217
Practicum/Externship
12/99 – 12/00
Assisted, as a predoctoral student, with National TBI Model Systems data collection and coding, development of the MS Aphasia Screen Test, non-Model Systems data collections.  Neuropsychological evaluations and outpatient therapy with brain injury survivors.  Externship work required for fulfillment of doctoral degree coursework.

*Oakley Training School,* Raymond, MS  39154
Youth Services Counselor I
8/99 -- 5/00
Conducted group and individual therapeutic sessions with 25 juvenile offenders in a med./max. security unit. Administered personality, achievement, and intellectual assessments. Wrote and developed treatment plans, parole notifications and updates. Arranged transitional placement for released offenders.

52

Participated in the disciplinary committee. Maintained documentation and records and acted as a general advocate for the cadets.  1200 hours were towards Externship II.

*MS Baptist Medical Center,* Jackson, MS  39203
Practicum Student
05/98 – 08/99
Worked with Life Enrichment Services.  Major duties included intellectual, personality, and achievement assessment of dually-diagnosed adult and adolescent inpatient populations. Required for fulfillment of doctoral degree coursework.

*Hinds County Human Resource Agency,* Jackson, MS  39203
Co-Director
8/97 -- 8/99
Position funded by AmeriCorps/Corporation for National Service. Planned, coordinated, and scheduled after school activities for 29 "at-risk" youth. Devised monthly budgets, employee scheduling, volunteer recruitment, intellectual and achievement assessment, and supervised 2 other employees. Goals of the program were to improve academic performance of the youth, while building self-esteem and community awareness.

*Jackson State University,* Jackson, MS 39217
Teaching/Graduate Assistant
Department of Psychology
8/97 -- 12/00
Responsibilities included lecturing, constructing exams, keeping conference hours, reporting and recording grades for undergraduates enrolled in General Psychology.

*Housing Authority of the City of Shreveport,* Shreveport, LA 71101
Community Services Coordinator
3/97 -- 8/97
Duties included, writing and renewing federal grants to receive supplemental funding of coordinated educational, self-improvement programs/activities for public housing residents (i.e., GED programs, family self-sufficiency programs, self-esteem seminars, Welfare-to-Work training, etc.), and administration of surveys to assess needs and concerns of the residents.  Secured $1.8 million from Housing and Urban Development (HUD), in conjunction with The Salvation Army and other homeless shelters in the Metro area.

*Northwestern State University,* Natchitoches, LA 71497
Graduate Assistant
8/94 -- 5/96
Department of Psychology
Tutored and graded exams for undergraduate classes in statistics.  Lectured in General Psychology. Observed and graded clinical interviews of graduate students enrolled in the Master's program. Coordinated and taught Personality Assessment (PSY 576, MMPI-2 and projective techniques).

## FORENSIC/EXPERIENCE:

*State of Texas (Harris Co.) vs. M. Dickey (February, 2015);* CAUSE NO. 1392144
Murder charges
--Assessed defendant and served as expert witness for the defense during trial

*State of Texas (Harris Co.) vs. C. Dorsey (January, 2015);* CAUSE NO. 1367757
Capital Murder charges
--Served as neuropsychological evaluator for the defense

*State of Texas (Harris Co.) vs. T. Flack (November, 2014)*; CAUSE NO.

First degree murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Fort Bend Co.) vs. C. Harper*** *(February, 2014);* CAUSE NO. 11-DCR-056513
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. D. Sampson*** *(January, 2014);* CAUSE NO. 1358420
Aggravated Burglary with a deadly weapon
--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. B. Moore*** *(November, 2013);* CAUSE NO. 314483-A
Capital Murder charges
--Served as neuropsychological evaluator for the defense post-conviction, and provided
testimony at re-trial.

***State of Texas (Harris Co.) vs. W. Rivers*** *(November, 2013);* CAUSE NO. 475122
Capital Murder charges
--Served as neuropsychological evaluator for the defense post-conviction

***State of Texas (Harris Co.) vs. H. Lewis*** *(July, 2013);* CAUSE NO. 1428102
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Oklahoma (Okfuskee Co.) vs. Kevin Sweat*** *(June, 2013);* CASE NO. CF-2011-87
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Fort Bend Co.) vs. F. Marin*** *(May, 2013);* CAUSE NO. 11-DCR-056672A
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Fort Bend Co.) vs. R. Arteaga*** *(May, 2013)*; CAUSE NOs. 12-DCR-02002,
062023, 062024, and 062025
Inappropriate sexual contact with a minor
--Served as neuropsychological evaluator for the defense
--determination of competency to stand trial

***State of Texas (Fort Bend Co.) vs. J. Escobar*** *(March, 2013);* CAUSE NO. 12-DCR-061987
Aggravated assault with a deadly weapon, evading arrest, and criminal mischief
--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. R. Contreras*** *(February, 2013)*; CAUSE NO. 1328812
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. R. Masterson*** *(January, 2013);* CAUSE NO. H-09-2731
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Galveston Co.) vs. B. Cunningham*** *(August, 2012);* CAUSE NO.
Capital Murder charges

--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. K. Lim*** *(June, 2012);* CAUSE NO. 599621
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. C. Pearson*** *(March, 2012);* CAUSE NO. 1340290
Inappropriate sexual contact with a minor
--Conducted review of Child Protective Services (CPS) and rendered clinical opinion regarding mental status

***State of Texas (Dallas Division) vs. K. Sprouse*** *(March, 2012);* CIVIL ACTION NO. 3:10-CV-00317-P
Capital Murder charges
 --Served as neuropsychological evaluator for the defense post-conviction

***State of Texas vs. D. Miller*** *(December, 2011);* CAUSE NO. 241-1251-08
Capital Murder charges
--Served as neuropsychological evaluator for the defense post-conviction

***State of Texas (Fort Bend Co.) vs. R. Howe*** *(August, 2011); CAUSE NO. 53467*
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Harris Co.) vs. R. Fratta*** *(May, 2011)*
 Writ of Habeas Corpus following Capital Murder conviction
--Served as neuropsychological evaluator for defense post-conviction

***O. Hilliard vs. Tyson Foods*** *(March, 2011);* CIVIL ACTION NO. 4:10-CV-2338
--Served as neuropsychological evaluator for the plaintiff

***State of Texas (Harris Co.) vs. J. Green*** *(January, 2011):* CAUSE NO. 1170853
Capital Murder charges
--Served as neuropsychological evaluator for the defense

***State of Texas (Fort Bend Co.) vs. A. Turner*** *(August, 2010):* CAUSE NO. 54233
Capital Murder charges
--Served as neuropsychological evaluator for the defense.

***State of Texas (Harris Co.) vs. L. Lastrapes*** *(June, 2010):* CAUSE NO. 1235054
Capital Murder charges
--Served as neuropsychological evaluator for the defense.

***State of Texas (Harris Co.) vs. T. Owens*** *(April, 2010):* CAUSE NO. 1167769
Capital Murder charges
--Served as neuropsychological evaluator for the defense and provided testimony at August, 2011 trial.

***State of Texas (Burleson Co.) vs. M. Phillips*** *(February, 2010):* CAUSE NO. 13671
Capital Murder charges
--Served as neuropsychological evaluator for the defense.

**Competency Evaluator** for Harris County (Mental Health-Mental Retardation Authority)
Restore Program (HGAC) at Intracare Hospital, Houston, TX.
07/01/2010—012/31/2010

--provided post-competency hearing evaluations to determine if accused defendants were able to
be restored to competency. Defendants were transferred to Intracare Hospital from Harris County
Sheriff's Office to be housed until restored or other-wised sentenced. Evaluated the following
cases.

- CAUSE NO. 1259258
- CAUSE NO. 1668002
- CAUSE NO. 1692655
- CAUSE NO. 1669214
- CAUSE NO. 1249355

**Articles/Peer-Reviewed Manuscripts submitted for Publication:**

Anderson, S. W. & Jackson, C. R. (2009). Differential diagnoses and treatment of behavioral disturbances associated with Landau-Kleffner Syndrome: The case of T. R.  *Clinical Case Studies*, *8*(1), 14-24.

Anderson, S. W., Sutton, M. J., Brown, K. L., & Francis, N. (2009). Assessment of older driver abilities: The negative impact of anxiety on risk-taking behaviors. Manuscript submitted for publication in *The Journal of Psychology.*

Wilson, D. E., Foster, J. & Anderson, S. W. (2009). Racial socialization's moderating effect between poverty stress and psychological symptoms for African American youth. *Journal of Black Psychology, 35*, 102-124.

Anderson, S. W., & Moore, P. A. (2009). The impact of education and school-based counseling on children and adolescents' views of substance abuse. *Journal of Child and Adolescent Substance Abuse, 18*(1), 16-23. Research funded by Career Development Mini-grant provided by the Texas Juvenile Crime Prevention Center and the PVAMU College of Juvenile Justice & Psychology.

Anderson, S. W., Sly, K., Hart, K., & Alexander, K. (2006). Differentiating between chronic and nonchronic juvenile offenders using the MMPI-A. Manuscript submitted for publication in *Journal of Offender Rehabilitation (revisions pending).*

Anderson, S. & Booker, M. (2006). Cognitive Behavioral Therapy versus psychosurgery for a refractory case of Obsessive Compulsive Disorder. *Journal of Neuropsychiatry and Clinical Neurosciences, 18*(1), 129.

Anderson, S. W., Gontkovsky, S. G., Sherer, M., Nakase-Thompson, R., High, W., & Sander, A. (2004). The effects of intrastate location on treatment compliance for TBI survivors.  *Journal of Cognitive Remediation*, *22*(4), 6-10.

Anderson, S. W. (2004, November). Self-esteem and racial identity of African American students attending predominantly white versus historically black institutions: Implications for institutions. *Journal of African Studies*. University of Houston: Houston, TX.

Anderson, S. W. (2004). *Differentiating between chronic and nonchronic juvenile offenders using the MMPI-A*. Doctoral dissertation. ProQuest, Social Sciences, #3148763. ISBN: 0496081098

Anderson, S. W., Crist, A. J., & Payne, N. (2004). Predicting inpatient length of stay using the Brief Psychiatric Rating Scale-Expanded. *Psychiatric Services, 55*(1), 77-79.

**Presentations at  Scientific Meetings:**

Anderson, S. W. (2007, March). *The Impact of Education and School-Based Counseling on Children and Adolescents' Views of Substance Abuse.* Paper and poster presented at the 9th Annual Lonnie E. Mitchell National HBCU Substance Abuse and Mental Health Conference, Washington, DC.

Anderson, S. W. (2006, April). *A Glimpse into the Academic Achievement Testing of African American Children*. Paper presented at the 1st Biannual African American National Conference: The Black Scholar and the State of Black America, Michigan State University, East Lansing, MI.

Moore, P. A. & Anderson, S. W. (2005, August) *Posttraumatic Stress Disorder in Children: An examination of the treatment modalities and proposed African-centered treatment paradigms.* Paper presented at the 37th Annual International Convention of the Association of Black Psychologists, South Beach, FL.

Anderson, S. & Moore P. (2005, February). *Chronic juvenile offending and the MMPI-A*. Paper presented at the 32nd Annual Meeting of the Western Society of Criminology, Honolulu, HI.

Williams, S. & Crist, A. J. (2002, October). *Predicting inpatient length of stay using the Brief Psychiatric Rating Scale-Expanded.* Poster presented at the 110th Annual Meeting of the American Psychological Association, Chicago, Illinois.

Williams, S. (2001, September). *Treating Refractory Obsessive-Compulsive Disorder*. In-service staff training for Adult Services of the Utah State Hospital, Provo, Utah.

Williams, S. (1999, June). *Self-esteem and racial identity of African American students attending predominantly white versus historically black institutions: Implications for Institutions*. Poster presentation at the 12th Annual Meeting of the American Psychological Society, Denver, CO.

Williams, S. (1997, October). *Self-esteem and racial identity of African American students attending predominantly white versus historically black institutions*. Paper presented at the 49th Annual Meeting of the Louisiana Psychological Association, Baton Rouge, LA.

Williams, S. (1994, December). *What is known about Schizophreniform*. Paper presented at Northwestern State University, Fall 1994 Research Day.

Williams, S. (1993, October). *How much and when should a therapist disclose: A review of the literature*. Paper presented at the Dillard University Senior Seminar on Ethical Concerns.

Williams, S. (1993, April). *Children reared by single parents*. Paper presented at Dillard University, Spring 1993 Research Day.

Williams, S. (1992, May). *The influence of list length on the amount of recall* (Senior research project, independent study). Paper presented to the Dillard University School of Education.

Williams, S. (1992, May). *Determining point of subjective equality using the Muller-Lyer Illusion*. Paper presented at Dillard University, Spring 1992 Research Day.

Williams, S. & Frank, L. (1992, February). *Motivation, the organization of action: Obsessions and compulsions*. Paper presented at Dillard University, Spring 1992 Research Day.

Williams, S. (1991, September). *Factors that interfere with memory-why we forget*. Paper presented at Dillard University, Fall 1991 Research Day.

**Grants, Honors and Awards:**

♦ Credentialing Scholarship from the National Register of Health Service Providers in Psychology, 2008
♦ $1,000 mini-grant from Texas A & M University System/Disability Training Network; Spring, 2007
♦ $20,000 professional development grant from COJJP, PVAMU; Fall, 2004
♦ National Science Foundation/Association of Institutional Research Summer Fellowship; July, 1999
♦ American Psychological Society Travel Award; June, 1999
♦ $1.8 million housing grant from HUD c/o The City of Shreveport Housing Authority; 1997
♦ Jackson State University Graduate School Scholarship/Assistantship; August, 1997-2000
♦ National Service Corporation Educational Award/Scholarship; August, 1997-1998
♦ Northwestern State University Academic Scholarship/Assistantship; August, 1994-1996
♦ Psi Chi Honor Society; Fall, 1992
♦ Dillard University Biology Achievement Award; Spring, 1991
♦ Dillard University Mathematics Achievement Award; Spring 1990
♦ Dillard University Academic Scholarship; August, 1989-May, 1993

**Affiliations/Licenses:**

♦ Licensed Psychologist (TX License #33380), 2008
♦ National Academy of Neuropsychology, 2001
♦ Association of Black Psychologists, 2000
♦ Association for Institutional Research, 1999
♦ American Psychological Association, 1998
♦ American Psychological Society, 1998
♦ AmeriCorps National Service Volunteer, 1997
♦ Psi Chi Honor Society, 1992
♦ Licensed Psychometrist (MS #169236), 2000-2005

**Paid or Volunteer Experiences Related to Interest in Mental Health Research:**

♦ Current Treasurer for the Houston Association of Black Psychologists, 2011-2012
♦ Counselor for Katrina survivors, funded by Goodwill Industries and Bethel's Place, 2007
♦ Committee Member for the PVAMU Institutional Animal Care and Utilization Committee, 2006-2007
♦ Editorial Board/Reviewer for *Scientific Journals International*, 2006 to present
♦ PVAMU National Depression Screening Day Chairperson, October, 2005-2007.
♦ Faculty Fellow for University College, PVAMU, Spring 2005-2007
♦ Peer reviewer for *Knowledge and Best Practices in Criminal Justice & Psychology*, published by the PVAMU COJJP, 2005.
♦ Peer reviewer for *Psychiatric Services*, published by the American Psychiatric Association, 2003
♦ Data collection for Wechsler Intelligence Scale for Children- 4th edition (PI project); 2002
♦ Completed Red Cross Disaster Training for Mental Health Workers; worked 9 hours with 2002 Winter Olympics
♦ Volunteer Judge for the Mississippi Science and Engineering Fair; March, 1998
♦ Volunteer Program Director of the Mary C. Jones after-school mentor/tutoring program supported by Hinds County Human Resource Agency/Metro Jackson Service Coalition; August, 1998-2002
♦ Volunteer Test Administrator of the Iowa Test of Basic Skills (ITBS) for Operation Shoestring's Project Reading 'n' Ready (developed to improve academic achievement and self-esteem of impoverished children), Jackson, MS.  Supported, in part, by United Way; August, 1997-August, 1998
♦ Volunteer with the National Service Corporation, Washington, DC; August, 1997-2002
♦ Participated and represented Shreveport Housing Authority in a violence prevention campaign for juveniles at Bossier Parish Community College; July, 1997

♦   Participated in the Dillard University, McDonough 28 Middle School consortium.  Counseled "at-risk" youth enrolled at McDonough 28, conducted round-table forums, wrote and performed skits pertaining to problem-solving strategies; August, 1992-May, 1993

**Pertinent Continuing Education/Training:**

Contemporary Issues in Forensic Psychology (September 3-7, 2014)
Presented by the American Academy of Forensic Psychology
San Antonio, TX
35 hours

Trauma-focused Cognitive Behavioral Therapy (November 7-8, 2013)
Presented by Cenpatico and Depelchin Children's Center
Houston, TX
16 hours

Fundamentals of Forensic Assessment (July 13, 2012)
Presented by TZK Seminars (webinar)
Houston, TX
6 hours

Forensic Consultation in Neuropsychology (November 12, 2011)
Presented by The Houston Neuropsychological Society; presenter-Paul Kaufmann, J. D., Ph. D., ABPP
Houston, TX
4 hours

Effective Psychological Consultations for the Bariatric Surgery Client (July 12, 2011)
Presented by Cross Country Education (webinar)
Houston, TX
1 hour

An Ounce of Prevention: Mental Health Ethics and the Law (April 4, 2011)
Presented by Cross Country Education; presenter-Michael H. Flynn, J.D., Ph. D.
Houston, TX
6 hours

**References:**

Jeffrey Cassisi, Ph. D.
Professor & Chair
Department of Psychology
1200 Murchison Road
Fayetteville State University
Fayetteville, NC  28301
cassisi@att.net

Kaye Sly, Ph. D.
Advisor/Associate Professor
JSU Community Health Program
P. O. Box 17055
Jackson, MS 39217
(601)979-3693
kaye.f.sly@ccaix.jsums.edu

Mark Sherer, Ph. D., ABPP-Cn
Director, Research and Neuropsychology
Memorial Hermann/TIRR
1333 Moursund
Houston, TX  77030
(713)799-7007
mark.sherer@memorialhermann.org

Edward L. Manning, Ph. D.
Child Neuropsychologist
University of Mississippi Medical Center
Department of Neurology
Jackson, MS  39217
(601)984-5521
emanning@neurology.ums.med.edu

Alan J. Crist, Ph. D.
Director of Internship
Utah State Hospital
Department of Psychology
P. O. Box 270
Provo, UT  84603
(801)344-4366
acrist@utah.gov

Nancy Louise-Howes, Ph. D.
Utah State Hospital
Department of Psychology
P. O. Box 270
Provo, UT  84603
(801)344-4534
nhowes@utah.gov

Daniel Georges-Abeyie, Ph. D.
Department Chair, Public Affairs
Texas Southern University
3100 Cleburne
Houston, TX  77004
(713)313-7011
georgesabeyiede@tsu.edu

Keith Wismar, Ph. D.
Departmental Chairperson
Department of Psychology
Dillard University
2601 Gentilly Blvd.
New Orleans, LA 70122
(504)283-8822

Derek J. Wilson, Ph. D.
Prairie View A & M University
Undergraduate Coordinator
Mail Stop 2600, P. O. Box 519
Prairie View, TX  77446
(936)261-5223
dejwilson@pvamu.edu

Maria Quintero-Conk, Ph. D.
MHMRA-Deputy Director
MR Administration
7011 SW Freeway, 3rd floor
Houston, TX  77074
(713)970-7000
maria.quintero@mhmraharris.org

Frederick Rotgers, PsyD, ABPP
Walden University-Departmental Chair
732-762-6557
Past-President, Society of Addiction Psychology
(APA Division 50)
American Editor-in-Chief, *Addiction Research and Theory*

Fred_etoh@yahoo.com