IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ROBERT SPARKS,                         §
                                       §
            Petitioner,                §
                                       §
v.                                     §
                                       §     No. 3:12-CV-469-N
LORIE DAVIS,                           §
                                       §
            Respondent.                §

MEMORANDUM OPINION AND ORDER DENYING WITHOUT PREJUDICE MOTION
FOR FUNDING AND DENYING MOTION FOR STAY OF EXECUTION

On July 26, 2019 (doc. 68), Petitioner Robert Sparks filed a motion requesting that this court authorize his federal habeas corpus counsel to retain the services of an identified neuropsychologist to determine whether Sparks is intellectually disabled and, thereby, exempt from execution under the Supreme Court's holding in *Atkins v. Virginia*, 536 U.S. 304 (2002). On August 15, 2019 (doc. 68), Respondent filed a pleading opposing Sparks' request for funding attacking the validity of Sparks' *Atkins* claim.   On August 16, 2019 (doc. 69), Sparks filed a reply in which he erroneously asserted that the state trial courts lack the authority to appoint counsel or issue stays of execution in subsequent post-conviction applications.   On August 26, 2019 (doc. 70), less than a month before his scheduled September 25, 2019 execution, Sparks filed a motion for stay of execution.   In support of his request for funding and motion for stay, Sparks cites to not only the Supreme Court's holding in *Atkins* but also the Supreme Court's subsequent holdings in *Hall v. Florida*, 572 U.S. 701 (2014), and *Moore v. Texas*, 137 S. Ct. 1039 (2017), and the Fifth Circuit's opinion in *Cathey v. Davis*, 857 F.3d 221 (5th Cir. (5th Cir. 2017).

For several reasons, Sparks has failed to justify his eleventh-hour requests for investigative expenses and a stay of execution.

Motion for Expert Funding

First, the statutory standard for an indigent criminal defendant obtaining investigative,

expert, or other services is 18 U.S.C. § 3599(f)'s requirement that the services be "reasonably

necessary for the representation of the defendant."   The Supreme Court set forth the standard for

granting or denying a request for investigative funding, including expert services, in its recent

opinion in *Ayestes v. Davis*, 138 S. Ct. 1080 (2018).   The Supreme Court directed federal district

courts to consider (1) the potential merit of the claims the applicant wants to pursue, (2) the

likelihood the services will generate useful and admissible evidence, and (3) the prospect the

applicant will be able to clear any procedural hurdles standing in the way.   *Id.*, 138 S. Ct. at 1094.

Sparks was fully evaluated by a neuropsychologist in 2008 who did not conclude Sparks

was intellectually disabled.   Sparks speculates that because the report of the neuropsychologist

who evaluated Sparks in 2008 did not expressly mention either the statistical error of measurement

("SEM") applicable to standardized IQ test instruments[1] or the impact of the so-called Flynn

---

1 In *Hall v. Florida*, 572 U.S. 701 (2014), the Supreme Court explained in some detail the
nature of the imprecision inherent in IQ testing as follows:

> The professionals who design, administer, and interpret IQ tests have
> agreed, for years now, that IQ test scores should be read not as a single fixed number
> but as a range.   See D. Wechsler, The Measurement of Adult Intelligence 133 (3d
> ed. 1944) (reporting the range of error on an early IQ test).   Each IQ test has a
> "standard error of measurement," *ibid.*, often referred to by the abbreviation
> "SEM."   A test's SEM is a statistical fact, a reflection of the inherent imprecision
> of the test itself.   See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014)
> (identifying the SEM as "one of the most important concepts in measurement
> theory").   An individual's IQ test score on any given exam may fluctuate for a
> variety of reasons.   These include the test taker's health; practice from earlier tests;
> the environment or location of the test; the examiner's demeanor; the subjective
> judgment involved in scoring certain questions on the exam; and simple lucky
> guessing.   See American Association on Intellectual and Developmental
> Disabilities, R. Schalock et al., User's Guide to Accompany the 11th Edition of
> Intellectual Disability: Definition, Classification, and Systems of Supports 22
> (2012) (hereinafter AAIDD Manual), A. Kaufman, IQ testing 101, pp. 138-39
> (2009).

effect,[2] those factors may not have been considered in the ultimate conclusion that Sparks is not

intellectually disabled.    Sparks also argues that until adoption of the Diagnostic and Statistical

---

The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score.   For the purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score.   The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies.   See APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence that the measured score is within a broader range").   A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence.   See DSM-5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points) . . . .   This involves a score of 65-75 (70 +/- 5); APA Brief 23 ("For example, the average SEM for the WAIS-IV is 2.16 IQ test points and the average SEM for the Standford-Binet 5 is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error").   Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor.   See Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289-291, 318 (D. Sakolfske, C. Reynolds, V. Schwean, eds. 2013).   In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

*Hall v. Florida*, 572 U.S. at 712-13.

2 "The Flynn Effect, named after intelligence expert James Flynn, is a 'generally recognized phenomenon' in which the average IQ scores produced by any given IQ test tend to rise over time, often by approximately three points per ten years from the date the IQ test is initially standardized." *Black v. Carpenter*, 866 F.3d 734, 738 n.1 (6th Cir. 2017).   "The Flynn Effect 'is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population.   Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized.'" *In re Cathey*, 857 F.3d 221, 227 (5th Cir. 2017). "[P]roponents of the Flynn Effect argue IQ scores must be adjusted downward by 0.3 points for each year that has passed since the test was normed to arrive at a proper measure of the test taker's IQ." *Smith v. Duckworth*, 824 F.3d 1233, 1244 (10th Cir. 2016).   "When correcting for the Flynn Effect, 'the standard practice is to deduct 0.3 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test.'"

say

Manual Fifth Edition ("DSM-5") in 2013, there was inadequate consideration of both the SEM and Flynn effect.

Sparks' contention that the mental health expert who evaluated him in 2008 was either unaware of, or failed to consider, both factors is entirely speculative, if not refuted by his 2008 expert's report.   Nothing in his 2008 expert's report, which accompanied Sparks' motion for funding of a new neuropsychological evaluation, suggests Sparks' 2008 evaluator was unaware of the SEM for IQ tests.   On the contrary, on page 10, the 2008 report states the 95% confidence level for a range of 71-80 for Sparks' full-scale IQ.   Thus, Sparks' 2008 evaluator was well aware of the SEM (plus or minus five points) for Sparks' full-scale score of 75 on the Wechsler Adult Intelligence Scale - III.   Moreover, in Texas, while the Flynn effect may be considered for purposes of evaluating a defendant's immunity from execution, individual IQ scores may not be changed.   *Griffin v. State*, 491 S.W.3d 771, 790 n.16 (Tex. Crim. App. 2016); *Ex parte Cathey*, 451 S.W.3d 1, 18 (Tex. Crim. App. 2014).   Given the amount of detail included in the report on Sparks' 2008 evaluation, particularly the focus on the consistency in Sparks' "borderline to low average" test performances across a wide range of standardized test instruments, there is little probability that a new round of neuropsychological evaluation would produce a different outcome from the 2008 report with regard to the evaluation of Sparks' intellectual functioning.

Second, unlike the petitioner in *Cathey*, Sparks has never previously litigated the issue of whether he is intellectually disabled – in either state or federal court.   There has never been any erroneous state or federal court determination in Sparks' case relying upon the *Briseno* factors abrogated by the Supreme more than two years in *Moore v.* Texas.   Likewise, there has never

---

*Smith v. Ryan*, 813 F.3d 1175, 1185 (9th Cir. 2016).

been any judicial decision in Sparks' case erroneously failing to apply either (1) the plus or minus five-point SEM applicable to standardized IQ tests mandated by the Supreme Court five years ago in *Hall v. Florida* or (2) the so-called Flynn effect which the Fifth Circuit discussed and recognized as efficacious more than two years ago in *Cathey v. Davis.* Thus, none of the legal errors present in either *Moore, Hall, or Cathey* have taken place in any prior adjudication of Sparks' federal constitutional rights.

In 2008, Sparks was evaluated by a neuropsychologist who concluded Sparks displayed Antisocial Personality Disorder, displayed a variety of other mental problems, but was not intellectually disabled. Sparks' federal habeas counsel now argue that a qualified neuropsychological evaluation conducted today under the guidance of the holdings in *Moore, Hall,* and *Cathey*, might reach a different conclusion regarding whether Sparks is intellectually disabled. Sparks offers this court no specific facts showing why this is so or any rational explanation for his failure to either investigate this new claim prior to the eve of his scheduled execution.

Sparks' conviction became final on April 25, 2011, when the United States Supreme Court denied his petition for writ of certiorari. *Sparks v. Texas*, 563 U.S. 962 (2011). Sparks filed his first state habeas corpus application and initial federal habeas corpus petition long after the Supreme Court issued its opinion in *Atkins*. He now seeks federal funding for expert assistance to investigate an unexhausted *Atkins* claim, a claim which will necessarily be asserted for the first time more than twenty-eight months after the Supreme Court handed down the decision in *Moore v. Texas* on which Sparks relies for his contention that he is intellectually disabled. Absolutely nothing prevented Sparks from investigating his claim of intellectual disability within one year from the date of the Supreme Court's decision in *Moore*. Sparks did not request a stay of his federal habeas corpus proceeding in this court for the purpose of investigating an *Atkins* claim.

Nor did Sparks ever seek to amend his federal habeas corpus pleadings in this court to include an

*Atkins* claim premised upon the decision in *Moore*.

This court handed down its ruling denying Sparks federal habeas corpus relief on March

27, 2018, more than nine months after the Fifth Circuit decided *Cathey*, almost exactly one year

after the date the Supreme Court decided *Moore*, more than three years after the Supreme Court

decided *Hall*, more than nine years after Sparks scored a 75 on a standardized intelligence test

instrument, and more than seventeen years after the Supreme Court decided *Atkins*.    Sparks cites

no evidence unavailable at the time this court ruled on the merits of his first federal habeas corpus

petition (and no new evidence reasonably likely to be produced by a new neuro-psychological

evaluation) showing Sparks is, in fact, intellectually disabled within the meaning of the DSM-5.

Under such circumstances, Sparks' delay in seeking federal funding for expert services for the

purpose of evaluating whether Sparks qualifies as intellectually disabled under *Atkins* and *Moore*

is not merely inexplicable; it is inexcusable.    Sparks' current counsel deliberately waited until the

eve of Sparks' execution to request funding for an investigation into an *Atkins* claim that was fully

available to Sparks more than two years ago.    In so doing, Sparks' current counsel have engaged

in a high stakes game of chicken with their client's life on the line.    The Court will not encourage

such gamesmanship.

Third, it is far from clear whether federal funding is available to support a request for

investigative expenses in connection with an unexhausted claim for state habeas corpus relief that

may well be time-barred under both state and federal legal principles.    The Supreme Court has

concluded that 18 U.S.C. § 3599 authorizes appointments of counsel made in connection with

representations in state clemency proceedings.    *See Harbison v. Bell*, 556 U.S. 180, 184-94

(2009) (holding Section 3599 authorizes appointment by federal courts of counsel to represent

state prisoners challenging their death sentences in state clemency proceedings). In *Harbison*, the Supreme Court carefully drew a distinction, however, between state clemency proceedings and successive state habeas corpus proceedings and explained that not all state habeas corpus proceedings filed after a federal habeas corpus action will qualify for funding under the statute:

> Pursuant to § 3599(e)'s provision that counsel may represent her client in "other appropriate motions and procedures," a district court may determine on a case-by-case basis that is appropriate for federal counsel to exhaust a claim in the course of her federal habeas representation. This is not the same as classifying state habeas proceedings as "available post-conviction process" within the meaning of the statute.

*Harbison*, 556 U.S. at 190 n.7. The appropriateness of using the federal CJA appropriation to fund federal habeas counsel's work in state court depends, in part, on whether applicable state law provides for counsel and whether state-court work reflects the ordinary, sequential course of proceedings envisioned by § 3599. *Id.* at 189-90.

Principles of comity and federalism require that, if state funding is available for legal representation in the state court in a subsequent state habeas proceeding, federal habeas counsel is obligated to seek state funding for legal services rendered in state court before turning to federal tax payers. The State of Texas charged Petitioner with capital murder. The State of Texas tried and convicted Petitioner for that offense. The State of Texas is now seeking to execute Petitioner. Under such circumstances, it is only reasonable to expect the State of Texas to bear the burden of underwriting Petitioner's legal representation in a State court proceeding.

More importantly, this court and all other federal courts are statutorily prohibited from granting Sparks relief in a federal habeas corpus proceeding on his currently unexhausted *Atkins* claim. 28 U.S.C. § 2254(b)(1). Sparks has alleged no facts showing there is an absence of available State corrective process or circumstances exist that render such State corrective process ineffective to protect his constitutional rights recognized in *Atkins*. In fact, Sparks alleges no

facts showing that he has ever attempted to present an *Atkins* claim to any state court or that he has ever attempted to obtain authorization from a state court for investigation into, or the filing of, an *Atkins* claim.

Fourth, contrary to Sparks' arguments in his reply brief, Section 5 of Article 11.071 of the Texas Code of Criminal Procedure provides a procedure under which an applicant for state habeas corpus relief may obtain permission for the filing of a subsequent state habeas corpus application. *See Ex parte Gallo*, 448 S.W.3d 1, 3 (Tex. Crim. App. 2014) (a Texas trial court receiving notice that the Texas Court of Criminal Appeals has authorized the filing of a subsequent state habeas corpus application under Section 5 is required to appoint and compensate counsel for an indigent death-row inmate). Sections 6(b-1) and (b-2) of Article 11.071 authorize compensation for counsel appointed to represent an applicant in a subsequent state habeas corpus proceeding. Sparks alleges no facts showing that he has ever sought authorization from the Texas Court of Criminal Appeals for the filing of an *Atkins* claim in a subsequent state habeas corpus application. Logic dictates that, before seeking federal funding as "reasonably necessary" for attorney fees or investigative expenses under § 3599, a federal habeas petitioner's counsel who wishes to file a subsequent state habeas corpus application must first seek permission to file the subsequent state habeas corpus application under Section 5 and request appointment and funding under Sections 6(b-1) and 6(b-2).

Federal funding under § 3599 is available for attorney fees and investigative expenses "reasonably necessary" for adequate representation of the defendant. This inquiry necessarily requires a good faith effort by counsel to obtain state funding for legal representation and investigative expenses undertaken in state court. The reasonable necessity of federal funding for a subsequent state habeas corpus proceeding will, therefore, turn upon the reasonableness of the

actions undertaken by counsel within the context of the entire case, including the availability of state funding sources.   The determination of the reasonableness of a request for attorney fees under § 3599 is typically made after the submission of a detailed voucher by responsible counsel after performance of the legal services for which compensation is sought.   Nothing in § 3599 requires a federal district court to authorize attorney fees or investigative expenses in advance of the provision of professional legal services or expert services in state court, especially when there is no allegation the federal habeas petitioner has sought state funding for legal representation and investigative services in state court.   Because Sparks has failed to allege any facts showing that he has attempted to secure state funding for investigation of his new *Atkins* claim from the state courts, his request for federal funding for the same purpose is premature.

Insofar as Respondent attacks the legal basis for Petitioner's Sparks' unexhausted *Atkins* claim, those arguments are more appropriately addressed to the Fifth Circuit in a proceeding filed under 28 U.S.C. § 2244(b)(3) seeking permission for the filing of a successive federal habeas corpus petition.   Absent a ruling from the Fifth Circuit authorizing the filing of a successive federal habeas corpus petition or a remand order, this court is not the proper forum for consideration of whether Sparks' unexhausted *Atkins* claim satisfies the requirements of § 2244(b).

Sparks currently faces an execution date of September 25, 2019.   Sparks makes no allegation that he has made any effort to seek state court permission or state funding for the investigation or filing of a subsequent state habeas corpus application asserting an *Atkins* claim. Moreover, Sparks does not request adoption by this court of a budget in connection with his proposed new *Atkins* claim or the filing of a state habeas corpus proceeding that will be a necessary predicate to the granting of federal habeas corpus relief premised upon an *Atkins* claim.   Sparks' learned counsel should be well aware of the proper procedure for filing a request for budget

authorization.    For the reasons discussed above, absent a showing that Sparks has made a good faith effort to obtain appointment of counsel and state court funding for his investigation into his alleged intellectual disability, Sparks' request for federal funding for expert services in connection with his proposed new *Atkins* claim is not "reasonably necessary." Therefore, the Court denies Sparks' request for federal funding without prejudice at this time.

Motion for Stay

A stay of execution is an equitable remedy and is not available as a matter of right.   *Hill v. McDonough*, 547 U.S. 573, 584 (2006).   Equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts.   *Id.*   In determining whether to grant a stay of execution, the Supreme Court has directed federal courts to consider the following factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.   *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).   A court considering a stay must apply a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.   *Hill v. McDonough*, 547 U.S. at 584.

For the reasons discussed above, Sparks has failed to establish he is reasonably likely to succeed on the merits of his proposed new *Atkins* claim.   *See Nken v. Holder*, 556 U.S. at 434 ("It is not enough that the chance of success on the merits be better than negligible.").   Sparks will clearly be irreparably injured absent a stay.   Given the fact Sparks waited more than two years after the Supreme Court's decision in *Moore* to seek federal funding to begin an investigation into

10

an *Atkins* claim that was readily available not later than March 28, 2017, the State's considerable interest in protecting against abusive delay in carrying out a valid criminal sentence imposed for a crime committed more than a decade ago will be substantially injured by granting a stay in this cause.   In fact, granting an eleventh hour stay in this cause would likely promote further gamesmanship in this and other federal habeas corpus proceedings by encouraging federal habeas corpus petitioners to engage in piecemeal litigation, deliberately withhold available potential claims, and wait until the eve of execution before requesting investigative funding for claims that were readily available at the time a prior federal habeas corpus proceeding was pending.

Accordingly, the Court denies Sparks' motion seeking funding for expert services in connection with a proposed *Atkins* claim without prejudice and denies Sparks' motion for stay of execution.

SIGNED August 27, 2019.

DAVID C. GODBEY
UNITED STATES DISTRICT JUDGE